#113235

CLERK US DISTRICT COURT
NORTHERN DIST. OF TX
FILED

2019 JAN -8 PM 2:58

DEPUTY CLERK

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**

Case No. _____

# 3-19CV-056-B

STEVEN B. AUBREY, and
BRIAN E. VODICKA,

    *Plaintiffs,*

v.

D MAGAZINE PARTNERS, L.P.;
ALLISON MEDIA, INC.;
JAMIE L. THOMPSON;
ROBERT L. ERMATINGER, JR.;
SCOTT ROBERT SAYERS;
ERIC VAUGHN MOYE;
CITY OF DALLAS;
DALLAS COUNTY, TEXAS; and
DOES 1-20, all whose true names
are unknown,

    *Defendants.*

_____/

## COMPLAINT

Plaintiffs Steven B. Aubrey and Brian E. Vodicka file this Complaint against Defendants

D Magazine Partners, L.P., Allison Media, Inc., Jamie L. Thompson, Robert L. Ermatinger, Jr.,

Scott Robert Sayers, Eric Vaughn Moye, City of Dallas, Dallas County, Texas, and Does 1-10,

all whose true names are unknown, alleging as follows:

**OVERVIEW**

1.    This case arises out of judge's conspiracy to save his job by manipulating law enforcement, the plaintiffs and the media to cover-up his aggravated assault, witnessed by the public and committed on the same morning his friend died in a fire.   The judge quickly reached an agreement with law enforcement to ignore his assault victim's plea for help and spent the following six (6) days strategically releasing statements to the media, designed to make him appear as the victim, set the plaintiffs up to take the fall for his friend's murder (before determination of cause of death) and he publically asked law enforcement for extra security, to demonstrate that he feared for his safety.

2.    After assisting the judge with his cover-up, certain defendants acted in their capacities as police officers and county law enforcement officers and began a campaign to deprive the plaintiffs of their liberties without due process of law.   They executed unreasonable searches and seizures on the plaintiffs and their properties, used excessive force and aggravated assault to falsely arrest the plaintiffs, and deprived the plaintiffs of their property without due process of law, violating the plaintiffs' rights, privileges and immunities guaranteed under the Fourth, Fifth and Fourteenth Amendments to the U.S. Constitution.   The end did not justify the means because no evidence was found even after all of the unlawful maneuvering.   The plaintiffs, who had absolutely no motive for the crime, were never convicted, indicted, charged or named as suspects for the murder of the judge's friend.   The judge saved his job.

3.    The Dallas City Council is the final policymaker for Defendant City of Dallas. The City of Dallas is a home-rule municipality.   Texas law grants the City the authority to organize and operate a police force.   Any member of the Dallas Police Department is a City of Dallas employee.   Chief of Police David Brown ("Chief Brown") was the final policymaker for

the Dallas Police Department, with the authority for setting policies, including training of the Dallas Police Officers. The Dallas City Council and Chief Brown, vested with all powers of the City and the determination of all matters of policy, had a duty, but failed to implement and enforce such policies, practices and procedures in the DPD thereby causing the violations of the plaintiffs' constitutional rights.

4.     Chief Brown and the Dallas City Council's failure to implement and enforce the necessary policies resulted in the implementation of unconstitutional patterns and practices, causing injuries to the plaintiffs. For these civil rights violations and other causes of action discussed herein, the plaintiffs seek answers and compensation for their respective damages.

5.     The Dallas County Commissioners Court is the final policymaker for Defendant Dallas County, Texas.   Any member of the Dallas County Sheriff's Department is an employee of Dallas County, Texas.  Dallas County Sheriff Lupe Valdez ("Sheriff Valdez") was the final policymaker for the Dallas County Sheriff's Department, with the authority for setting policies, including training of the Dallas County law enforcement officers.  Sheriff Valdez was the final policymaker for running and administering the jail in Dallas County. The Dallas County Commissioners Court and Sheriff Valdez, vested with all powers of Dallas County and the determination of all matters of policy, had a duty to implement lawful policies, practices and procedures for the Sheriff's Department.  Instead county officials, employees and agents adopted widespread customs and practices that violated the plaintiffs' constitutional rights.

6.     While the judge's "official" murder accusation was the main course for the ever-hungry media, DPD kept them fed with a steady leak of information about the capital murder investigation.   The plaintiffs were forced into a trial by media, which forever damaged their

reputations. Certain defendants defamed plaintiffs with statements and publications that are actionable *per se*.

## PARTIES

7.      Plaintiff Steven B. Aubrey ("Aubrey") is a resident of Broward County, Florida and is before this Court for all purposes.

8.      Plaintiff Brian E. Vodicka ("Vodicka") is a resident of Broward County, Florida and is before this Court for all purposes.

9.      Defendant D Magazine Partners, L.P. is a Texas limited partnership whose principal place of business is 750 North Saint Paul Street-Suite 2100, Dallas, Texas 75201 and may be served through its Registered Agent, Allison Media, Inc., 750 North Saint Paul Street-Suite 2100, Dallas, Texas 75201.

10.     Defendant Allison Media, Inc. is a Texas corporation whose principal place of business is 750 North Saint Paul Street-Suite 2100, Dallas, Texas 75201 and may be served through its Registered Agent, Wick Allison, 750 North Saint Paul Street-Suite 2100, Dallas, Texas 75201.

11.     Defendant Jamie L. Thompson ("Thompson") is a resident of Montgomery County, Maryland and can be served wherever she may be found.

12.     Defendant Robert L. Ermatinger, Jr. ("Ermatinger") is a resident of Ellis County, Texas and may be served with process at his residence, 5010 Monroe Court, Midlothian, Texas 76065, or wherever he may be found.

13.     Defendant Scott Robert Sayers ("Sayers") is a resident of Collin County, Texas and may be served with process at his office, Jack Evans Police Headquarters, 1400 S. Lamar Street, Dallas, Texas 75215, or wherever he may be found.

14.     Defendant Eric Vaughn Moye ("Moye") is a resident of Dallas County, Texas and may be served with process at his office, George L. Allen, Sr. Courts Building - 600 Commerce Street, 5th Floor New Tower, Dallas, TX 75202, or wherever he may be found.

15.     Defendant Dallas County, Texas ("County Defendants") is a covered governmental entity of the United States within the definition of 42 U.S.C. § 12101 *et seq.* and may be served with process through Clay Jenkins at 411 Elm St, Suite 200, Dallas, Texas 75202.

16.     Defendant City of Dallas is a covered governmental agency of the State of Texas within the definition of 42 U.S.C. § 12101 *et seq.* and may be served with process through Mayor Mike Rawlings at Dallas City Hall, 1500 Marilla Street, Suite 5EN, Dallas, Texas 75201.

17.     Upon information and belief, Does 1-20 ("Doe Defendants"), are individuals whose names and addresses of residences are unknown. They include Dallas police officers and/or employees, Dallas County law enforcement officers and/or employees and Dallas County District Attorneys and/or employees.

18.     Aubrey and Vodicka are referred to collectively as "Plaintiffs."

19.     Magazine Partners, L.P., Allison Media, Inc. and Thompson are referred to collectively as "D Magazine."

20.     Ermatinger, Sayers and The City are referred to collectively as "City Defendants."

21.     Moye, D Magazine, City Defendants, County Defendants and Doe Defendants are referred to collectively as "Defendants."

## JURISDICTION AND VENUE

22.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1334 as this action is brought under the Fourth Amendment to the United States Constitution and 42 U.S.C. § 1983, to redress the deprivation of rights, privileges and immunities.

23.     This Court has diversity jurisdiction pursuant to 28 U.S.C. §1332 because the matter in controversy exceeds the sum or value of $75,000, the plaintiffs are citizens of the state of Florida and the defendants are citizens of the states of Texas and Maryland.

24.     Venue is proper in this Court because a substantial part of the events giving rise to the claim occurred within the Northern District of Texas, Dallas Division.

## AGENCY/RESPONDEAT SUPERIOR

25.     As used herein, whenever it is alleged in this Original Complaint that Ermatinger performed an act or made a statement prior to December 1, 2016, a date which approximates Ermatinger's retirement/termination from the Dallas Police Department ("DPD"), Plaintiffs intend that said act or statement was done or made together with, and/or on behalf of The City, or as an authorized agent of The City, or that Ermatinger did the act or made the statement under the authority of The City via express, implied, apparent and/or some other authority, pursuant to *Respondeat Superior.*

26.     Upon information and belief, at all times relevant herein, Ermatinger and The City acted jointly with regard to the actions asserted. Ermatinger retired from the DPD in November 2016, and continued to leak governmental classified information that was part of a homicide investigation, violating Sections 323.04 and 323.05 of the Dallas Police Department General Order.

27.     As used herein, whenever it is alleged in this Original Complaint that Sayers performed an act or made a statement, Plaintiffs intend that said act or statement was done or made together with, and/or on behalf of The City, or as an authorized agent of The City, or that Sayers did the act or made the statement under the authority of The City via express, implied, apparent and/or some other authority, pursuant to *Respondeat Superior.*

28.     Upon information and belief, at all times relevant herein, Sayers and The City acted jointly with regard to the actions asserted.

29.     As used herein, whenever it is alleged in this Original Complaint that Urbina performed an act or made a statement, Plaintiffs intend that said act or statement was done or made together with, and/or on behalf of Dallas County, or as an authorized agent of Dallas County, or that Urbina did the act or made the statement under the authority of Dallas County via express, implied, apparent and/or some other authority, pursuant to *Respondeat Superior.*

30.     Upon information and belief, at all times relevant herein, Urbina and Dallas County acted jointly with regard to the actions asserted.

## FACTS

31.     Plaintiffs Steven Aubrey and Brian Vodicka were partners for nearly two (2) decades before they married in 2014.   After Vodicka graduated in the top of his class at University of Texas at Austin, he became a CPA and worked as an auditor for Arthur Anderson. Vodicka returned to school and graduated with a Doctor of Jurisprudence degree from the School of Law at University of Texas-Austin.   In the early 1990s, Vodicka was a nationally recognized teacher at the University of Texas at Austin McCombs School of Business.   Vodicka volunteered for the Texas Advocacy Project; has been very active in with his church; and in 2018, he participated in a church-sponsored mission trip to Guyana.   Due to health limitations, Vodicka has been unable to work a full-time job and he currently works part-time as a reading tutor for minority foster children.

32.     Aubrey graduated from Texas A&M University with a bachelor's degree in finance.   While attending the university, Aubrey raised and trained quarter horses, entering competitions and ultimately was awarded a prestigious Reserve World Championship.   In the

early 1990s, Aubrey was a medical device salesman. He then started his own successful company, designing and installing outdoor lighting systems. Photos or Aubrey's projects appear in lighting manufacturer brochures and websites. As a self-employed contractor, Aubrey's ability to support his family has been significantly diminished because of injuries caused by the defendants.

## A. Fire and Death

33.    On May 13, 2016, early in the morning, Ira Tobolowsky died in a suspicious fire at his home. DPD treated the death as a potential murder and have investigated it as such for nearly three (3) years.

34.    Ira Toblowsky's business partner, Stephen Schoettmer, told the detectives he believed Plaintiffs were responsible and that Mr. Tobolowsky had recently received a death threat email that stated: "I am going to kill you." It was quickly verified that no such email existed.

35.    The investigation has been unsuccessful thus far and authorities have never been able to name a suspect or discover evidence that would lead them to one. D Magazine reported the Tobolowsky's displeasure with the lack of progress in its May 2017 magazine issue, stating: "The family came to believe that investigators had bungled the case." Plaintiffs could not agree more. D Magazine is the only party to this case who has reaped benefit from the unsolved crime.

## B. Aggravated Assault and Facebook

36.    On the same morning as the Tobolowsky fire/death, Moye was driving on the North Dallas Tollway when he pointed his loaded firearm at a woman driver next to him, an

aggravated assault offense. The judge played his "get of jail free" card and quickly reached an agreement with law enforcement to ignore his assault.[1]

37.     Moye's victim, a woman scared for her life, took a picture of Moye in his Mercedes and posted it on Facebook asking for the public to help identify the gunman because DPD would not do anything. Moye's problem was suddenly very public and this happened in the middle of Moye's re election campaign.

38.     In full damage control mode, Moye devised a scheme to excuse his little indiscretion using law enforcement, the media and Plaintiffs. Moye began strategically releasing statements to the media, designed to make himself the victim, instead of the perpetrator. He told the media he feared for his life because he thought the opposing party in Ira Tobolowsky's lawsuit, killed him, which indicates the murderer must be a serial killer and the judge is always next. On May 15, 2016, The Dallas Morning News featured the article: *Dallas judge given extra security after attorney's death in suspicious fire.*

39.     Moye publically asked law enforcement for extra security to demonstrate that he feared for his safety. On May 19, 2016, CBS reported: "Civil District Judge Eric Moye said in a statement that law enforcement told him to arm himself before traveling anywhere."[2] Stated another way, Moye had been given permission to commit his aggravated assault. The judge denied all of the media's requests for interviews to avoid the unwanted questions about his assault.

---

[1]  Moye, who lives in South Dallas and works in Downtown Dallas, was driving on the "North" Dallas Tollway, in North Dallas, the same part of Dallas where Ira Tobolowsky lived and was murdered, on the same morning of the murder, when he became agitated enough to point his loaded gun at a woman driving next to him.

[2]  Plaintiffs don't believe for a second that law enforcement told Moye to carry a weapon. Ironically, it was Moye's victim that needed the extra security to be protected from Moye.

## C. **Extrajudicial Murder Accusation**

40.    Moye successfully convinced the public he was scared that someone related to one of his cases was going to murder him, that he needed special and extra security (in the secure courthouse as well) and that law enforcement told him the carry a weapon.

41.    The judge's week of pageantry culminated with an invitation to all media to join him in his courtroom. After Moye entered the courtroom and commenced a hearing, in front of all the media, he publically implicated Aubrey in the death of Ira Tobolowsky. Stated another way, Moye said the Aubrey murdered Ira Tobolowsky.[3] The judge packaged the murder accusation as a reason for his voluntary recusal from the case, sticking with the fear factor theme.[4]

42.    Moye packaged his baseless and extremely damaging accusation as a reason for his voluntary recusal from the case, again emphasizing his fear factor.

43.    The staged fear for his life satisfied the public, and the media, as an excuse for Moye's felony offense. Moye had given the media the gift of a much bigger story about Aubrey

---

[3] Nobody, including Moye, has ever alleged a motive to support the extraordinary allegation that Plaintiffs had something to do with the murder of Ira Tobolowsky. Plaintiffs had recently been involved in multiple lawsuits and were unable to recover their lifelong savings, lost in an investment scheme. Plaintiffs never considered killing any of those opposing parties. Ira Tobolowsky was never an important figure in Plaintiffs' lives. Without motive and without evidence everyone relied on Moye's self-serving released statements. Plaintiffs are unaware of a crime pattern theory or any precedent that would indicate a judge should fear for his life when a party to a case in his court is murdered.

[4] Plaintiffs believe that it is an extraordinary practice for a judge to invite the media into his court to make an announcement. Of course this was a controlled setting where again, Moye would not be questioned. Plaintiffs are unaware of the reason or neccesity to have the media present when a judge recuses himself.

committing murder, which served as the media's green light to begin aggressively defaming Plaintiffs. [5]

44.     Moye never released another statement to the media about his safety, Aubrey or why he recused himself. His "fear" of Aubrey seemed to immediately evaporate and he did save his job.

45.     Moye subjected Plaintiffs to public ridicule and hatred and unfairly influenced potential jurors and judges, evidenced by the Texas Supreme Court assigning a judge outside of the Dallas area to preside over the case he recused himself from. Moye's actions deprived Plaintiffs due process of law, deprived them of equal protection and violated Plaintiffs' rights to an impartial jury.

**D.    Aggravated Perjury**

46.     At Moye's direction, law enforcement wanted to speak with Plaintiffs. Aubrey had known many years to be wary of investigator interviews. Plaintiffs were torn between wanting to clear their names and whether or not they should help. After some quick research online, the overwhelming majority of advice was absolutely never speak with law enforcement without an attorney. So they did not.

47.     Plaintiffs plan to not speak with authorities created two problems for the City Defendants who had a murder to solve. When the authorities realized Plaintiffs did not want to participate in interviews, City Defendants concocted a scheme to fabricate probable cause so that they could search Plaintiffs, their apartments and all of their belongings, confiscate their computers, phones and impound their cars.

---

[5] Judges cannot make murder accusations in civil or criminal courts because anything that might impede a jury's ability to remain impartial or prevent it from reaching a unanimous decision is grounds for a mistrial. Moye's malicious comment was published by dozens of media outlets and read by millions of people.

48.     Ermatinger and Sayers drafted fraudulent Affidavits for Search Warrants that included misleading innuendo and outright lies. Ermatinger signed the first three (3) fraudulent affidavits for search warrants, which basically misrepresented that Plaintiffs were in hiding and could not be found.

49.     After Ermatinger's first two (2) warrant affidavits, he decided to jazz it up a bit with something sure to raise a judge's eyebrow. Ermatinger made it more compelling by strategically adding the words "and against his life" to completely change the odd statement into a very alarming one. *See* Affidavit attached as **Exhibit A**, stated:

50.     The added words made the statement blatantly false but it increased the probable cause value dramatically. The statement now read:

**"It was alleged in the lawsuit that Steven Aubrey threatened "Jihad" the same words used to describe the wars brought by terrorists, <u>and against his life</u> which was filed in court docket number 15-08135…"** (emphasis added)

It worked and Ermatinger got the search warrants he requested.

51.     Days later, Sayers wanted two (2) more search warrants on Plaintiffs so he adopted the same language used by Ermatinger, signed the affidavits under oath and then perjured himself when he presented to fictitious warrant affidavits to a judge. The system was working fine for everybody except Plaintiffs. *See* Affidavits attached as **Exhibits B & C.**

52.     Ermatinger acted under color of law when he unlawfully searched Plaintiffs and their residence and unlawfully seized their personal property including clothes, electronics, phones, computers and automobiles.

53.     Sayers acted under the color of law when he unlawfully searched Plaintiffs' residences and unlawfully seized their personal property.

54.     On October 24, 2016, Aubrey filed a detailed complaint with the Public Integrity Unit whose mission "is to investigate and prosecute those who have misused the trust placed in them by State licensing boards. Independence and Transparency are paramount to a process that is fair to both law enforcement and the citizens of this County."

55.     Sgt. Dotson, a "Public Integrity Unit" lawyer, called Aubrey and said that he had a meeting with the perpetrator, DPD, and together they determined DPD had done nothing wrong.

### E.  **"Shock and Awe" Excessive Force**

56.     Ermatinger used two (2) more fraudulent affidavits to request searches and seizures of Aubrey and Vodicka personally.  He got the search warrants, which stated, in part:

"...examine, photograph and fingerprint said Steven Aubrey within accepted practices."

"...examine, photograph and fingerprint said Brian Vodicka within accepted practices."

57.     Rather than respect legal boundaries and Plaintiffs' rights as citizens, Ermatinger and Sayers decided it might be fun to risk Plaintiffs' lives for no reason.

58.     Knock-and-announce requires City Defendants to announce their presence and provide residents with an opportunity to open the door prior to a search.

59.     The only exceptions to the knock-and-announce if doing so could endanger officers, permit escape, or cause the destruction of evidence, otherwise, the procedure is constitutionally required.

60.     On May 19, 2016, there was no basis for the officers to believe knocking on Plaintiff's door could cause them danger.  Plaintiffs were in their mid-50's and both had clean records with no arrests or charges for any type of violence. As well, City Defendants could not claim that knocking would risk destruction of evidence, as Plaintiffs were the evidence.

61.     The alternative of choice was for City Defendants to conspire with County Defendants and enlist the assistance of the Tactical Division for a Stake-Out and High-Risk Apprehension of Suspects.  The Dallas Police Department General Order Section 313.07A.1. defines the operation as follows:

- Stake-out: an operation in which officers assume concealed or covert positions in anticipation of a criminal act for the purpose of apprehending the persons involved.

- Surveillance: the continuous observation of persons, places and things for the purpose of gathering information.

- High Risk Apprehension: any planned arrest in which there is good reason to believe that the person to be arrested may be armed and intent upon resistance.

62.     City Defendants maliciously included false facts in its affidavits for search warrants to intentionally deprive Plaintiffs of their rights.  By means of wholly unfounded search warrants, City Defendants, County Defendants and Doe Defendants used excessive force against Plaintiffs, falsely arrested them, deprived them from their personal property, including automobiles, deprived them of their liberty without due process of law, invaded their privacy and defamed them.

63.     On May 19, 2016, DPD utilized the Tactical Division for a Stake-Out and High-Risk Apprehension of Plaintiffs to execute unlawful search warrants to obtain fingerprints and photographs of Plaintiffs.  Applicable Defendants waited, in hiding, for Plaintiffs to exit their residence.  Following the exit from their residence, Plaintiffs entered into their parked vehicle and began to back out of the driveway.  Using tactics and resources reserved for the likes of a Pablo Escobar, Applicable Defendants ambushed Plaintiffs.  Unmarked cars traveling at very

high speeds blocked Plaintiffs' vehicle from every angle.   What appeared to be an attack by lawless maniacs, Applicable Defendants slammed their brakes, jumped out of their vehicles wearing unidentifiable plain clothes with firearms drawn and pointed at Plaintiffs as they descended upon Plaintiffs' vehicle.  The crazed and threatening men screamed at Plaintiffs to get out of the car and then forced them to the concrete with loaded guns at the temples of their heads. One of the gunmen, who had Vodicka pinned to the ground, said in a low voice, "You know what you did, faggot."

64.     General Order 906.02(E), "Drawing or Displaying Firearms," requires that a threat or reasonable belief that there is a threat to life or they have reasonable fear for their own safety and/or the safety of others, exist in order to authorize an officer to draw or display her/his firearm.  Plaintiffs were not a threat to anyone.

65.     It is reasonable to assume that City and County Defendants' use of an undercover tactical division to apprehend Plaintiffs to get their fingerprints was for reasons other than getting their fingerprints.  It is reasonable to assume that City and County Defendants orchestrated the ambush without identifying themselves, hoping for the possibility that Plaintiffs might resist arrest and try to defend themselves or even try to break free from the attack. giving    It is reasonable to assume that had Plaintiffs resisted in any way, John Does 1-10 may have determined there was cause to use Plaintiffs for target practice.

66.     Plaintiffs, lucky to be alive, were arrested, handcuffed and hauled off to police headquarters, against their will.

67.     The unlawful search warrants very simply commanded Ermatinger to examine, photograph and fingerprint Plaintiffs within "accepted practices."  The search warrants *were not* arrest warrants. Ermatinger did not trick the judge into issuing arrest warrants.

68.     The apartment property managers and Plaintiffs' neighbors watched the incident in horror.  The following day an eviction notice was on Plaintiffs' front door for the following violation of their Lease Agreement; "Arrested on Property."

**F.  Prostitution in Big D**

69.     On October 20, 2016, under color and pretense of law, DPD unsuccessfully attempted to entrap Aubrey for prostitution.  Nevertheless, DPD proceeded with a false arrest and false imprisonment as part of its campaign to maliciously prosecute Aubrey.  To deceive the public, DPD fabricated a story about an undercover prostitution investigation of a website where Aubrey advertised his massage services.  In truth, there was no investigation and Aubrey was DPD's chosen target.

70.     Because Aubrey is not a prostitute, he would not agree to meet the undercover officer for a cocktail in the bar and there was never any communication about "masturbation and sexual intercourse," which some of the media gladly published.[6]  Additionally, Aubrey refused to accept money upfront, before services were rendered. Because Aubrey is not a prostitute, the district attorney never prosecuted the case.

71.     On October 19, 2018, the statute of limitations expired, which terminated the proceedings in favor of Aubrey. Because Aubrey is not a prostitute, his arrest for prostitution was a false arrest.

72.     Aubrey's arrest was unauthorized, unlawful, against his will and the restraint was unreasonable under the circumstances.

---

[6] DPD leaked false information to the media, attempting to justify the false arrest, false imprisonment and charge for prostitution. Though sex was never a topic of discussion between Aubrey and decoy officer, D Magazine's April 26, 2017 article, *A Place Where Something Evil Happened*, falsely stated: "Aubrey agreed to masturbation and sexual intercourse for $300." This is a blatantly false statement.

73.      Plaintiffs could not take the abuse Dallas was serving them. Soon after the bogus arrest and entrapment for prostitution, Plaintiffs moved to South Florida.

## G.   D Magazine Defames

74.      It is unclear if Plaintiffs' move to Florida gave D Magazine a shot of courage but D Magazine took the gloves of and went all the way in to defame Plaintiffs.  It used three (3) promotional publications to make its readers thirsty for the monthly magazine issue that had the answers.  The 3 promotional teasers had some very provocative titles, as follows:

- *Sneak Peek: D Magazine's May Issue, Which Explores Who Killed Ira Tobolowsky,* April 26, 2017,  ("Promo-1")  *See* **Exhibit D.**

- *Who Murdered Ira Tobolowsky?* May 3, 2017,  ("Promo-2")  YouTube Video. *See* **Exhibit E.**

- *The Unsolved Murder of Ira Tobolowsky, The prominent lawyer was burned alive in his North Dallas garage. The family thinks they know who did it.*  May 8, 2017, ("Promo-3")  *See* **Exhibit F.**

75.      ANSWER: Finally the promotional publication cliffhangers were answered with D Magazine's May 2017 issue.  The magazine's feature story was about Aubrey.

- *A Place Where Something Evil Happened,* by Jamie Thompson ("Article") *See* **Exhibit G.**

76.      The Article was not about Ira Tobolowsky or attempts to figure out who murdered him.  D Magazine had predetermined it was Aubrey, with some assistance from Vodicka, and the

only left to do was pin Aubrey up on the cross.  This was a story about Aubrey.  His name appears 96 times in the Article, more than the name of anybody else.

77.    D Magazine defamed Plaintiffs coming and going.  The Article is loaded with straight up defamation and defamation by implication.  D Magazine went so far as to include some defamation per se.  The false per se statement does not appear to leave much wiggle room. It states:

**"Aubrey agreed to masturbation and sexual intercourse for $300."**

78.    D Magazine was pretty brutal.  A very bold and very false statement indeed.

## CAUSES OF ACTION

79.    All conditions precedent to Plaintiffs' recovery have occurred or have been waived, excused, or otherwise satisfied.  All notices required have been provided or were waived, excused, or otherwise satisfied.

### COUNT I
### Constitutional Law - Unreasonable Searches and Seizures
### (Against City Defendants, County Defendants and Doe Defendants)

80.    Plaintiffs repeat and incorporate by reference paragraphs 1 through 80 above as though fully set forth herein.

81.    The Fourth and Fifth Amendments to the U.S. Constitution and 42 U.S.C. §1983 protect American citizens from interference with an individual's possessory property rights or liberty by the government.

82.    Plaintiffs were deprived of their liberty in violation of their rights under the Fourth and Fifth Amendment and 42 U.S.C. § 1983 when Applicable Defendants unlawfully searched Plaintiffs' residences and seized their property and unlawfully searched and seized Plaintiffs personally.

83.     While police officers generally have broad powers to carry out their duties, the Constitution and other laws place limits on how far police can go in trying to enforce the law. A primary purpose of the nation's civil rights laws is to protect citizens from abuses by government, including police misconduct.

84.     Police officers are immune from lawsuits for the performance of their jobs unless willful, unreasonable conduct is demonstrated, as in this case. Here, City Defendants conspired together and with others to cause unlawful search warrants to be executed on Plaintiffs.

85.     On May 18, 2016, under color and pretense of law, Ermatinger presented a falsified warrant affidavit to Judge Jeanine Howard, causing her to issue unlawful search warrants. Ermatinger included a false fact stating the following:

> "It was aledged [sic] in the lawsuit that Steven Aubrey threatened "Jihad" the same words used to describe the wars brought by terrorists, and against his life which was filed in court document number 15-08135 in the 14 Judicial district court judge Eric Moye presiding."

Not only did Aubrey not threaten Ira Tobolowsky's life, Ira Tobolowsky never "alleged" that Aubrey threatened his life. There is no filing in Case No. 15-08135 to validate Ermatinger's false and defamatory claim.

86.     On May 25, 2016, under color and pretense of law, Sayers used the identical false fact used by Ermatinger and presented two (2) fictitious warrant affidavits to Judge Jennifer Bennett, causing her to issue unlawful search warrants.

87.     The fact that Ermatinger and Sayers found it necessary to lie in the warrant affidavits is proof that at a minimum, they believed the affidavits lacked probable cause without adding the lie.

88.     Ermatinger and Sayers' fraudulent representation that court filings contained allegations that Aubrey threatened Tobolowsky life was a material fact that caused the unlawful search warrants to be issued and executed.

89.     Not so easily proven false, Ermatinger and Sayers lied in their affidavits when they alleged Plaintiffs were trying to hide.  Plaintiffs did not try very hard as DPD set up its "shock and awe" ambush at Plaintiffs' apartment, where they always could be found. Plaintiffs allege the detectives possibly stopped by their apartment one time.  When they determined Plaintiffs were not returning Ermatinger's phone calls they began fabricating probable cause, acting as though Plaintiffs were "on the run" by passing out Aubrey's photo at the courthouse and telling personnel to be on the lookout.  Plaintiffs had no reason to run, which is why they were at home.  As proof the detectives knew exactly where to find Plaintiffs, when the unlawful warrants gave them permission to invade and intrude on Plaintiffs' lives and property, the rogue detectives orchestrated the unlawful tactical division "shock and awe" takedown of Plaintiffs at their apartment where they had been all along.

90.     A jury will find that no reasonable officer could have believed that the affidavit was lawful, in light of clearly established law and the information Ermatinger possessed, or could have easily possessed, when he submitted the affidavit to a judge at her home late at night instead of requesting the warrants from the magistrate on duty.

91.     Two of the search warrants commanded City Defendants to "examine, photograph and fingerprint" the plaintiffs "within accepted practices."

92.     City Defendants maliciously included false facts in its affidavits for search warrants to intentionally deprive Plaintiffs of their rights. By means of wholly unfounded search warrants, City Defendants, County Defendants and Doe Defendants used excessive force against

22

Plaintiffs, falsely arrested them, deprived them from their personal property, including automobiles, deprived them of their liberty without due process of law, invaded their privacy and defamed them.

93.     On October 20, 2016, under color and pretense of law, DPD unsuccessfully attempted to entrap Aubrey for prostitution.  Nevertheless, DPD proceeded with a false arrest and false imprisonment as part of its campaign to maliciously prosecute Aubrey.  To deceive the public, DPD fabricated a story about an undercover prostitution investigation of a website where Aubrey advertised his massage services.  In truth, there was no investigation and Aubrey was DPD's chosen target.

94.     Because Aubrey is not a prostitute, he would not agree to meet the undercover officer for a cocktail in the bar and there was never any communication about "masturbation and sexual intercourse" which some of the media gladly published.  Additionally, Aubrey refused to accept money upfront, before services were rendered. Because Aubrey is not a prostitute, the district attorney never prosecuted the case.

95.     On October 19, 2018, the statute of limitations expired, which terminated the proceedings in favor of Aubrey.  Because Aubrey is not a prostitute, DPD's search and seizure was unlawful.

96.     While Aubrey was unlawfully held in custody, Ermatinger and Sayers illegally trespassed into Plaintiffs' residence, without a search warrant, committing another unlawful search and seizure.

97.     The direct and proximate result of Applicable Defendants' malicious acts is that Plaintiffs suffered severe injury including, but not limited to, personal humiliation, emotional

distress, impairment of reputations, medical expense, legal expense, loss of employment, lost earnings capacity, and damage to character.

98.     Applicable Defendants committed one or more willful violations of Plaintiffs' rights under the Fourth and Fifth Amendments to the U.S. Constitution and 42 U.S.C. 1983.

## COUNT II
### Constitutional Law - Excessive Force
### (Against City Defendants, County Defendants and Doe Defendants)

99.     Plaintiffs repeat and incorporate by reference paragraphs 1 through 98 above as though fully set forth herein.

100.    The search and seizure requirement under the Fourth Amendment to the U.S. Constitution and 42 U.S.C. 1983, protect American citizens rights to be free from excessive force. "Cruel and unusual punishments" by the state (police) are prohibited by the Eighth Amendment to the U. S. Constitution.  There are very few situations in which a violent takedown should be utilized, and it is generally in cases where a person is resisting an arrest with great force.

101.    When executing the warrants that permitted DPD to fingerprint and photograph Plaintiffs, DPD ignored its duty to announce their presence and authority "knock and announce" prior to entering Plaintiffs' residence (or vehicle).   Instead, DPD used excessive force, a violation of Plaintiffs' Fourth Amendment right to be secure against unreasonable searches.

102.    On May 19, 2016, DPD utilized the Tactical Division for a Stake-Out and High-Risk Apprehension of Plaintiffs to execute unlawful search warrants to obtain fingerprints and photographs of Plaintiffs.  Applicable Defendants waited, in hiding, for Plaintiffs to exit their residence.  Following the exit from their residence, Plaintiffs entered into their parked vehicle and began to back out of the driveway.  Using tactics and resources reserved for the likes of a

Pablo Escobar, Applicable Defendants ambushed Plaintiffs. Unmarked cars traveling at very high speeds blocked Plaintiffs' vehicle from every angle. What appeared to be an attack by lawless maniacs, Applicable Defendants slammed their brakes, jumped out of their vehicles wearing unidentifiable plain clothes with firearms drawn and pointed at Plaintiffs as they descended upon Plaintiffs' vehicle. The crazed and threatening men screamed at Plaintiffs to get out of the car and then forced them to the concrete with loaded guns at the temples of their heads. One of the gunmen, who had Vodicka pinned to the ground, said in a low voice, "You know what you did, faggot."

103.   General Order 906.02(E), "Drawing or Displaying Firearms," requires that a threat or reasonable belief that there is a threat to life or they have reasonable fear for their own safety and/or the safety of others, exist in order to authorize an officer to draw or display her/his firearm. Plaintiffs were not a threat to anyone.

104.   Applicable Defendants had a duty to knock on Plaintiffs' door and announce and identify themselves. In *Wilson v. Arkansas*, 514 U.S. 927 (1995), is a United States Supreme Court decision in which the Court held that police officers must "knock and announce" before entering a house to serve a warrant.

105.   In a unanimous (9–0) decision, the Supreme Court reversed the decision of the Arkansas Supreme Court. Clarence Thomas authored the majority opinion, arguing that the "knock-and-announce" rule is a part of the reasonableness standard applied while conducting a search, according to the rules of common law":

The Fourth Amendment to the Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." In evaluating the scope of this right, we have looked to the traditional protections against unreasonable searches and seizures afforded by the common law at the time of the framing. See *California v. Hodari D.*, 499 U.S. 621, 624 (1991); *United States v. Watson*, 423 U.S. 411, 418-420 (1976); *Carroll v. United States*, 267 U.S. 132, 149 (1925). "Although the underlying

command of the Fourth Amendment is always that searches and seizures be reasonable," *New Jersey v. T. L. O.*, 469 U.S. 325, 337 (1985), our effort to give content to this term may be guided by the meaning ascribed to it by the Framers of the Amendment. <u>An examination of the common law of search and seizure leaves no doubt that the reasonableness of a search of a dwelling may depend in part on whether law enforcement officers announced their presence and authority prior to entering.</u>"

The court later said that although unexcused knock-notice remains a requirement of constitutional reasonableness, non-compliance does not trigger the exclusionary rule. *(Hudson v. Michigan)* Nevertheless, officers sworn to abide by the law (and wishing to avoid civil liability) should still comply with knock-notice, unless one of the identified risks makes unannounced entry permissible.

106.    Instead of complying with the "knock-and-announce" rule, Applicable Defendants used force that was unreasonable and violent.  It was not necessary to ambush Plaintiffs and force them to the ground with loaded firearms pointed at their heads. Plaintiffs were no armed, did not pose a threat, they did not resist arrest, and the warrant did not authorize their arrests. The search warrants commanded City Defendants to "examine, photograph and fingerprint" Plaintiffs "within accepted practices."

107.    The City of Dallas and Chief Brown failed to adequately supervise and/or discipline its employees and if they consider their actions to be "within accepted practices" then their practices are unconstitutional and they should be liable for their damage.

108.    Chief Brown, the final policymaker for the DPD, the Dallas City Council and The City did not provide adequate training to its employees as it relates to the use of deadly force and the use of non-deadly force, proper arrest and confrontation techniques.  Chief Brown, the Dallas City Council and The City knew or should have known that the training provided to its employees was inadequate or nonexistent and they did not adequately supervise its employees if the employees believe their actions on May 19, 2016, are "within accepted practices."

109.   Applicable Defendants were in plain clothes, drove unmarked cars, screamed while pointing loaded firearms and forced Plaintiffs to the ground intending to terrify Plaintiffs. It was unreasonable to terrify Plaintiffs to retrieve their fingerprints and photograph them. If Plaintiffs had made the slightest wrong move or resisted the apprehension by the unidentified gunmen, they would likely have been shot and killed because the of City Defendants unlawful training.

110.   Plaintiffs are members of a minority group because of their sexual orientation and DPD is well known for abusing and even killing minorities. Doe Defendant referred to Vodicka as a "faggot" during the ambush, indicating that Plaintiffs' sexual minority was a component of the excessive force used against them.

111.   DPD's severe lack of training and its official custom and policies have resulted in many deadly police shootings of unarmed minorities, to wit:

- On or about July 24, 2012, unarmed James Harper ("Harper") was fatally shot by DPD officer Brian Rowden ("Rowden"). Rowden pursued Harper on foot and fired a shot at Harper as he ran away. Rowden was not disciplined for the unlawful killing of Harper.

- On or about March 10, 2013, unarmed Clinton Allen ("Allen") was fatally shot 7 times by DPD officer Clark Staller. Allen was wrongfully gunned down although he held both hands up. Clark Staller, despite previously falsifying a police report prior to the shooting death of Allen, was allowed to remain on as an officer and was not disciplined for the death of Allen. Clark Staller was allowed to prepare his statement of the incident with the assistance of his attorney and was not asked any questions to determine the veracity of his statements.

- On or about October 14, 2013, a DPD officer shot Bobby Bennett ("Bennett"), an unarmed individual, and attempted to falsify a police report and cover-up the murder saying that Bennet lunged at him with a raised knife. But a video revealed that Bennett complied with the officer's order to freeze and was standing still for several seconds when the officer opened fire and killed him.

- On October 2, 2013, David Blair, an unarmed individual was standing outside of his east Oak Cliff apartment when a pair of Dallas Police Officers harassed him for no lawful reason. The officers approached him, followed him to his apartment and shot at him 14 times as he stepped out of his apartment for no lawful reason. Blair's story surfaced just a week after a video circulated of a Dallas police officer shooting Bennett, a man with mental challenges, after he stood up from a chair he set in the middle of a cul-de-sac. Police initially claimed the man lunged at them, but the video showed otherwise. An aggravated assault charge against the wounded man has since been dropped.

- On December 10, 2013, 19-year-old Kelvion Walker was still in the vehicle with his hands up when a Dallas police officer shot him. On August 27, 2015, an unarmed Bertrand Syjuan Davis was fatally shot by Officer Matthew Terry. According to multiple witness accounts, immediately upon arriving at the scene, Officer Terry failed to conduct an objectively-reasonable assessment of the facts, drew his gun and shot Bert several times including once in the back, without any verbal warning. Per witnesses, Officer Terry was not facing or reacting to an imminent threat of death or serious bodily injury to him or any other person at the

time he fired multiple shots that struck Bert, including one to the back. Officer
Terry was not disciplined by the DPD for his wrongful conduct.

- On January 18, 2017, Officers Christopher Hess and Jason Kimpel used excessive
  and deadly force resulting in the death of 21-year-old Genevive Dawes and the
  injuries to Virgilio Rosales. As Dawes drove in her vehicle in reverse at a very
  slow rate of speed, Hess and Kimpel fired at least 13 shots through the passenger
  side window where Rosales was seated, striking Dawes five times in the neck,
  her right tricep, left arm, upper left chest and right forearm. Dawes's right earlobe
  was also partially amputated. Dawes was transported to Baylor Hospital where
  she later died as a result of her injuries. Hess's defense for firing at the moving
  vehicle was not supported by body cam evidence. Despite body cam footage that
  shows Dawes was not trying to injure anyone as she reversed her vehicle, Hess
  and Kimpel were not terminated for their violation of DPD policy. In fact, the
  released to the Dallas District Attorney's office almost six months later. Hess was

- On September 6, 2018, Officer Amber Guyger used excessive and deadly force
  resulting in the death of Botham Jean ("Jean") who was lawfully in his apartment,
  unarmed and not attempting to harm her or any other person. Officer Guyger was
  not placed under arrest and was allowed to continue roaming about the crime
  scene. The DPD investigation was designed to cover-up the misconduct of
  Officer Guyger. Detectives sought warrants for Jean's home with the specific
  intent of discovering evidence of illegality. Detectives did not initially seek
  warrants for the apartment or vehicle of Officer Guyger. DPD began providing
  local media with information to cast Officer Guyger in the best light saying the

29

physical evidence at the crime scene substantiated the officer's version of events. The media published the warrant affidavit that indicated drugs and drug paraphernalia were recovered from Jean's home, designed to protect Officer Guyger.

112.    Like the DPD victims detailed in the previous paragraph above, Plaintiffs were unarmed minorities, were not resisting arrest and they did not pose an imminent threat of death or serious bodily injury to the gunmen who ambushed them or to any other person. DPD maliciously acted out a scheme to intentionally put Plaintiffs in the same position as their other victims, on the wrong side of loaded firearms, one squeeze of a trigger finger away from death. While DPD likely trains its officers to act as though they are licensed to kill minorities, brutalizing and killing minorities remains unlawful and unconstitutional.

113.    Interestingly, while nearly all incidents of excessive force attributed to DPD is force used in a spontaneous situation, the excessive force used on Plaintiffs was premeditated and had literally been organized and planned in advance, indicating approval from commanding officers.

114.    DPD and Applicable Defendants intentionally put Plaintiffs in a life or death situation that could easily have ended with another headline in which a police shooting resulted in death. The bloodthirsty DPD has a documented history that proves its standard protocol is when guns are drawn on Dallas minorities and officers decide to murder them, the entire department will stand behind the officer and do whatever is possible to cover-up the malfeasance. The problem is systemic and starts at the top with Dallas Police Chief David Brown, who led the department during the time of the May 19, 2016 incident against Plaintiffs.

115.    DPD has a pattern, practice, history, and custom of using excessive force against minorities, including approaching them with guns drawn, when there is no imminent threat of bodily harm or other justifiable reason to do so. The DPD trains its officers to use deadly force even when there exists no immediate threat to themselves or others.

116.    Whether force is reasonably necessary or excessive is measured by the force a reasonable and prudent law enforcement officer would use under the circumstances.

117.    All use of force lawsuits are measured by standards established by the Supreme Court in *Graham v. Connor*, 490 U.S. 386 (1989). In the *Graham* case, the Court instructed lower courts to always ask three questions to measure the lawfulness of a particular use of force: (1) the severity of the offense suspect; (2) whether the suspect posed an immediate threat to the officer or others; and (3) whether the suspect was actively resisting or attempting to evade arrest by flight. Here, there was no offense. Plaintiffs were "arrested" so that City Defendants could be "examine, photograph and fingerprint" them. Plaintiffs did not pose a threat to the officers and they did not resist the arrest.

118.    A police officer may use only that force that is both *reasonable* and *necessary* to effect an arrest or detention. Anything more is *excessive force* (*Payne v. Pauley*, 337 F.3d 767, 7th Cir. 2003).

119.    Applicable Defendants violated 18 U.S.C. § 242 through the willful and deliberate application of excessive force under the color of law. This violation deprived Plaintiffs of their most basic human and civil rights. DPD has a history of using illegal and excessive force against minorities, falsifying reports and/or fabricating evidence to elude criminal prosecution for its actions. The history of violence against minorities combined with their knowledge that Plaintiffs

31

had absolutely no history of violence, confirms that Applicable Defendants actions were motivated by Plaintiffs' sexual orientation, in violation of 18 U.S.C. § 249.

120.    *The Matthew Shepard and James Byrd, Jr.. Hate Crimes Prevention Act of 2009,* creates a new federal criminal law which criminalizes willfully causing bodily injury (or attempting to do so with fire, firearm, or other dangerous weapon) when the crime was committed because of the actual or perceived race, color, religion, national origin of any person. Subsection (a)(2) of § 249 protects a wider class of victims. Subsection (a)(2) criminalizes acts of violence (and attempts to commit violent acts undertaken with a dangerous weapon) when motivated by the actual or perceived gender, disability, sexual orientation, or gender identity of any person.

121.    Ermatinger and Sayers' falsified affidavits for search warrants were fabrications of fake probable cause and they presented the fictitious sworn document to various judges. Aubrey submitted a complaint to the Internal Affairs Division of the Dallas Police Department. It was ignored. Aubrey submitted a complaint to the Public Integrity Unit - Dallas County District Attorney.  In response to the complaint, Sgt. Dotson with the Public Integrity Unit called Aubrey and said he had spoken with the perpetrator, DPD, about the complaint and determined that the lies in the affidavits, the excessive force, the false arrest and false imprisonment did not constitute police misconduct.

122.    Further investigation into the Internal Affairs Division of the Dallas Police Department may reveal an agency wide culture of corruption and ongoing illegal activity as it relates to investigating its own officers for alleged misconduct. The egregious acts used against Plaintiffs are not merely issues of excessive force or police misconduct, they represent only a

part of a long history of unlawful behavior, systemic human rights failures and civil rights violations perpetrated by DPD.

123.   A jury will find that no reasonable officer could have believed that the preconceived force used was lawful, in light of clearly established law and the information Applicable Defendants possessed.

124.   The direct and proximate result of Applicable Defendants' malicious acts is that Plaintiffs suffered severe injury including, but not limited to, personal humiliation, emotional distress, impairment of reputations, medical expense, legal expense, loss of employment, lost earnings capacity, and damage to character.

125.   Applicable Defendants committed one or more willful violations of Plaintiffs' rights under the Fourth and Eighth Amendments to the U.S. Constitution and 42 U.S.C. 1983 depriving their freedoms from the use of excessive and unreasonable force and deprivation of liberty without due process of law.

## COUNT III
### Intentional Tort - Aggravated Assault
### (Against City Defendants, County Defendants and Doe Defendants)

126.   Plaintiffs repeat and incorporate by reference paragraphs 1 through 125 above as though fully set forth herein.

127.   A cause of action for assault occurs when one intentionally or knowingly threatens another with imminent bodily injury and uses or exhibits a deadly weapon during the commission of the assault as defined by Texas Penal Code §§ 22.01 and 22.02.  When there is not probable cause and law enforcement threatens another with imminent bodily injury, it commits an aggravated assault offense, violating a citizen's rights under the Fourth and Eighth Amendments to the U.S. Constitution and 42 U.S.C. 1983.

128.    On May 19, 2016, Applicable Defendants several men in unmarked cars and plain clothes ambushed Plaintiffs with firearms drawn and pointed at their heads.    Applicable Defendants intended to create a state of fear or danger in Plaintiffs.    Plaintiff believed Applicable Defendants would harm them and fire bullets into their heads.

129.    Applicable Defendants intentional lack of visual or audible identification is proof of their objective to create fear in Plaintiffs.

130.    A jury will find that no reasonable officer could have believed that the preconceived aggravated assault was lawful, in light of clearly established law and the information Applicable Defendants possessed.

131.    The direct and proximate result of Applicable Defendants' malicious acts is that Plaintiffs suffered severe injury including, but not limited to, personal humiliation, emotional distress, impairment of reputations, medical expense, legal expense, loss of employment, lost earnings capacity, and damage to character.

132.    Applicable Defendants' aggravated assault represents one or more willful violations of Plaintiffs' rights under the Fourth and Eighth Amendments to the U.S. Constitution and 42 U.S.C. 1983, depriving their freedoms from the use of excessive and unreasonable force and deprivation of liberty without due process of law.

### COUNT IV
### Intentional Tort - False Arrest
### (Against City Defendants, County Defendants and Doe Defendants)

133.    Plaintiffs repeat and incorporate by reference paragraphs 1 through 132 above as though fully set forth herein.

134.    This cause of action is a tort arising from a party claiming to have authority to make the arrest when, in fact, they did not.    A false arrest violates a citizen's rights to be free of

unreasonable searches and seizures under the Fourth Amendment to the U.S. Constitution and 42 U.S.C. 1983.

135.    On May 18, 2016, under color and pretense of law, Ermatinger presented falsified affidavits for search warrants to Judge Jeanine Howard, causing her to issue unlawful search warrants on Plaintiffs, personally.    The search warrants commanded DPD to "examine, photograph and fingerprint" Plaintiffs "within accepted practices."    Instead, Applicable Defendants used excessive force and aggravated assault to ambush Plaintiffs, then handcuffed them against their will and took them to police headquarters against their will.

136.    Plaintiffs' arrests were unauthorized, unlawful, against their will and the restraint was unreasonable under the circumstances.

137.    Following the May 2016 false arrest, Aubrey arrived at his residence to find an eviction notice attached to his front door.    The reason cited on the notice of eviction was a violation of the lease agreement: "Arrested on Property."

138.    Applicable Defendants are not immune for their actions because they violated a clearly established Constitutional Right or law that a reasonable person would have known about. A great deal depends on what the officers knew at the time of arrest and what was happening at the time of arrest.

139.    Courts have consistently held that handcuffing is a use of force and as such must meet the reasonableness requirements of *Graham v. Connor*, 490 U.S. 386 (1989).    In the *Graham* case, the Court instructed lower courts to always ask three questions to measure the lawfulness of a particular use of force: (1) the severity of the offense suspect; (2) whether the suspect posed an immediate threat to the officer or others; and (3) whether the suspect was actively resisting or attempting to evade arrest by flight. Here, there was no offense.    Plaintiffs

were "arrested" so that DPD could be "examine, photograph and fingerprint" them.  Plaintiffs did not pose a threat to the officers and they did not resist the arrest.

140.    Moreover, Plaintiffs were victims of police brutality.  Police brutality is defined as any act of unmerited excessive and aggressive physical, mental, and/or emotional abuse, above and beyond the law, enacted upon by an individual or groups of individuals in law enforcement. Police brutality results in potentially severe mental and physical injury.

141.    Black's Law Dictionary: "Police brutality is the use of excessive and/or unnecessary force by police when dealing with civilians."  "The most obvious form of police brutality is a physical form."  "Police brutality can also take the form of false arrests, verbal abuse, psychological intimidation, sexual abuse, police corruption, racial profiling, political repression, and the improper use of tasers.

142.    Plaintiffs were deprived of their liberty without cause, arrested and taken to Dallas Police Department Headquarters, without giving consent.

143.    On October 20, 2016, under color and pretense of law, DPD unsuccessfully attempted to entrap Aubrey for prostitution.  Nevertheless, DPD proceeded with a false arrest and false imprisonment as part of its campaign to maliciously prosecute Aubrey.  To deceive the public, DPD fabricated a story about an undercover prostitution investigation of a website where Aubrey advertised his massage services.  In truth, there was no investigation and Aubrey was DPD's chosen target.

144.    Because Aubrey is not a prostitute, he would not agree to meet the undercover officer for a cocktail in the bar and there was never any communication about "masturbation and sexual intercourse," which some of the media gladly published.[7]  Additionally, Aubrey refused to

---

[7] DPD leaked false information to the media, attempting to justify the false arrest, false imprisonment and charge for prostitution. Though sex was never a topic of discussion between Aubrey and decoy officer,

accept money upfront, before services were rendered. Because Aubrey is not a prostitute, the district attorney never prosecuted the case.

145.    On October 19, 2018, the statute of limitations expired, which terminated the proceedings in favor of Aubrey. Because Aubrey is not a prostitute, his arrest for prostitution was a false arrest.

146.    Aubrey's arrest was unauthorized, unlawful, against his will and the restraint was unreasonable under the circumstances.

147.    Aubrey was deprived of his liberty without cause, and taken to Lew Sterrett Justice Center, without giving consent. Aubrey's arrest was unauthorized, unlawful, against his will and without consent.

148.    A jury will find that no reasonable officer could have believed the May 2016 and October 2016 arrests were lawful, in light of clearly established law and the information Applicable Defendants possessed.

149.    The direct and proximate result of the May 2016 and October 2016 malicious arrests is that Plaintiffs suffered severe injury including, but not limited to, personal humiliation, emotional distress, impairment of reputations, medical expense, legal expense, loss of employment, lost earnings capacity, and damage to character.

150.    Without authority stipulated in the search warrants and without Plaintiffs' consent, Applicable Defendants arrested Plaintiffs under false pretenses and violated their rights to be free of unreasonable searches and seizures under the Fourth Amendment to the U.S. Constitution and 42 U.S.C. 1983.

---

D Magazine's April 26, 2017 article, *A Place Where Something Evil Happened*, falsely stated: "Aubrey agreed to masturbation and sexual intercourse for $300." This is a blatantly false statement.

## COUNT V
### Intentional Tort - False imprisonment
### (Against City Defendants, County Defendants and Doe Defendants)

151.    Plaintiffs repeat and incorporate by reference paragraphs 1 through 150 above as though fully set forth herein.

152.    This cause of action is a tort arising from a party claiming to have authority, wrongfully holds a citizen against his/her will or takes a citizen into their custody against his/her will when, in fact, the party did not have authority.  False imprisonment violates a citizen's rights to be free of unreasonable searches and seizures under the Fourth Amendment to the U.S. Constitution and 42 U.S.C. §§ 1981(c) and 1983.

153.    On May 19, 2016, under color and pretense of law, Applicable Defendants used excessive force and aggravated assault to ambush Plaintiffs, handcuff them against their will and take them to police headquarters against their will.  The detention of Plaintiffs was intentional, was performed without consent and without authority of law.

154.    The May 18, 2016 search warrants commanded DPD to "examine, photograph and fingerprint" Plaintiffs.   The search warrants did not command DPD to hold Plaintiffs in custody against their will for approximately ten (10) hours and repeatedly attempt to interrogate them.

155.    On October 20, 2016, under color and pretense of law, DPD unsuccessfully attempted to entrap Aubrey for prostitution.  Nevertheless, DPD proceeded with a false arrest and false imprisonment as part of its campaign to maliciously prosecute Aubrey.  To deceive the public, DPD fabricated a story about an undercover prostitution investigation of a website where Aubrey advertised his massage services.  In truth, there was no investigation and Aubrey was DPD's chosen target.

156.    Because Aubrey is not a prostitute, he would not agree to meet the undercover officer for a cocktail in the bar and there was never any communication about "masturbation and sexual intercourse" which some of the media gladly published. Additionally, Aubrey refused to accept money upfront, before services were rendered. Because Aubrey is not a prostitute, the district attorney never prosecuted the case.

157.    On October 19, 2018, the statute of limitations expired, which terminated the proceedings in favor of Aubrey. Because Aubrey is not a prostitute, his imprisonment for prostitution was a false imprisonment.

158.    Aubrey's imprisonment was unauthorized, unlawful, against his will and the restraint was unreasonable under the circumstances.

159.    Aubrey was deprived of his liberty without cause, and taken to Lew Sterrett Justice Center, without giving consent. Aubrey's arrest was unauthorized, unlawful, against his will and without consent.

160.    Under color and pretense of law and without cause, Aubrey was deprived of his liberty without cause for approximately ten (10) hours while being held in jail. Aubrey was imprisoned against his will until the following day when he was finally arraigned, longer than any other intake prisoner on that day.

161.    While Aubrey was unlawfully held in custody, Defendants Ermatinger and Sayers illegally trespassed into Plaintiffs' residence, without a search warrant.

162.    Aubrey's false imprisonment would have continued had a $500 bond not been posted.

163. A jury will find that no reasonable officer could have believed the May 2016 and October 2016 imprisonments were lawful, in light of clearly established law and the information Applicable Defendants possessed.

164. The direct and proximate result of the May 2016 and October 2016 malicious imprisonments is that Plaintiffs suffered severe injury including, but not limited to, personal humiliation, emotional distress, impairment of reputations, medical expense, legal expense, loss of employment, lost earnings capacity, and damage to character.

165. Without authority, without probable cause and without Plaintiffs' consent, Applicable Defendants imprisoned Plaintiffs under false pretenses and violated their rights to be free of unreasonable searches and seizures under the Fourth Amendment to the U.S. Constitution and 42 U.S.C. §§ 1981(c) and 1983.

## COUNT VI
### Constitutional Law - Deprived of Liberty without Due Process of Law
### (Against Defendants)

166. Plaintiffs repeat and incorporate by reference paragraphs 1 through 165 above as though fully set forth herein.

167. No person, including Plaintiffs, shall be deprived of life, liberty, or property, without due process of law and without just compensation under the Fifth and Fourteenth Amendments to the U.S. Constitution and 42 U.S.C. §1983.

168. Due process rules are meant to protect persons not from the deprivation, but from the mistaken or unjustified deprivation of life, liberty, or property." Thus, the required elements of due process are those that "minimize substantively unfair or mistaken deprivations" by enabling persons to contest the basis upon which a state proposes to deprive them of protected interests. The core of these requirements is notice and a hearing before an impartial tribunal.

169.     On May 18, 2016, Moye gathered all available media in his courtroom and acted under color of law when he alleged that Aubrey was implicated in the murder of Ira Tobolowsky, before medical examiners had even determined the cause of death.     Moye had a pecuniary interest when he made the public accusation, launching a trial by media that would forever deprive Plaintiffs a fair and impartial tribunal in the Dallas-Fort Worth area. The Supreme Court of Texas was forced to assign the underlying case to a judge outside of Dallas County after three (3) Dallas County judges recused themselves from presiding over the case due to Moye's reckless and self-serving statement.

170.     Moye, a civil judge, blindsided Aubrey with his criminal accusation for murder. An elementary and fundamental requirement of due process in any proceeding, which is to be accorded finality, is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections. Notice must be sufficient to enable the recipient to determine what is being proposed and what he must do to prevent the deprivation of his interest.  Moye did not notice Aubrey about his planned public murder accusation.

171.     Moye violated Texas Code of Judicial Conduct Canon 3B(10), which states in part: A judge shall abstain from public comment about a pending or impending proceeding which may come before the judge's court in a manner which suggests to a reasonable person the judge's probable decision on any particular case. After Moye accused Aubrey for the murder, a reasonable person would believe that Moye would decide against Plaintiffs in the underlying defamation case.

172.    A jury will find that no reasonable judge could believe that any judge acted within their capacity when during an official court proceeding, accuses a party of murder, in light of clearly established law.

173.    Some form of hearing is required before an individual is finally deprived of a property or liberty interest. This right is a basic aspect of the duty of government to follow a fair process of decision making when it acts to deprive a person of his possessions. The purpose of this requirement is not only to ensure abstract fair play to the individual. Its purpose, more particularly, is to protect his use and possession of property from arbitrary encroachment.

174.    As in criminal and quasi-criminal cases, an impartial decision maker is an essential right in civil proceedings as well. The neutrality requirement helps to guarantee that life, liberty, or property will not be taken on the basis of an erroneous or distorted conception of the facts or the law.

175.    On May 18 and 25, 2016, Applicable Defendants caused unreasonable searches and seizures, depriving Plaintiffs of their cars, computers, cell phones and other personal property. DPD acquired Plaintiffs' personal information through their unlawful searches and have continued to harass Plaintiffs with the information.

176.    On October 20, 2016, under color and pretense of law, DPD unsuccessfully attempted to entrap Aubrey for prostitution. Applicable Defendants caused unreasonable searches and seizures, depriving Aubrey of his cars, cell phone and other personal property.

177.    On April 26, 2017, D Magazine published *A Place Where Something Evil Happened,* by Jamie Thompson. The article defames Plaintiffs accusing them for a capital murder. The article states that Aubrey agreed to act as a prostitute. The false accusations have

severely impacted Plaintiffs' right to due process and caused unjust discrimination depriving them of life, liberty, or property.

178.    Applicable Defendants circumvented due process of law thereby depriving Plaintiffs of possession of property.

179.    Applicable Defendants conspired together and with others to commit aggravated assaults, false arrest, and false imprisonment on Plaintiffs, without due process of law.

180.    By reason of the above, the Applicable Defendants acted with malice or with reckless disregard for Plaintiffs' rights and the proximate result is that Plaintiffs suffered severe injury including, but not limited to, personal humiliation, emotional distress, impairment of reputations, medical expense, legal expense, loss of employment, lost earnings capacity, and damage to character.

181.    By reason of the above, Applicable Defendants have eliminated Plaintiffs' chances for a fair and impartial tribunal in the Dallas-Fort Worth area, the only place that has jurisdiction over these claims.  Plaintiffs' reputations have been greatly injured and have been brought into public scandal, disrepute, and disgrace.

182.    Applicable Defendants violated Plaintiffs' rights to due process under the Fifth and Fourteenth Amendments to the U.S. Constitution.

## COUNT VII
### Intentional Tort - Conversion
### (Against City Defendants and Doe Defendants)

183.    Plaintiffs repeat and incorporate by reference paragraphs 1 through 182 above as though fully set forth herein.

184.   No person, including Plaintiffs, shall be deprived of life, liberty, or property, without due process of law and without just compensation under the Fifth and Fourteenth Amendments to the U.S. Constitution and 42 U.S.C. §1983.

185.   The Texas Theft Liability Act creates civil liability for theft. Under the TTLA, "theft" means unlawfully appropriating property or unlawfully obtaining services as described by Section 31.03, 31.04, 31.06, 31.07, 31.11, 31.12, 31.13, or 31.14 of the Texas Penal Code. Tex. Civ. Prac. & Rem. Code § 134.002(2). Under section 31.03 of the Texas Penal Code, a person commits an offense if he unlawfully appropriates property with intent to deprive the owner of property. Tex. Pen. Code § 31.03(a). Deprive means to withhold property from the owner permanently or for so extended a period of time that a major portion of the value or enjoyment of the property is lost to the owner. Tex. Pen. Code § 31.01(2)(A).

186.   Conversion is an offense against the possession of property. *Stats v. Miller*, 240 S.W.2d 342, 345 (Civ. App.-Amarillo 1951), *rev'd on other grounds*, 150 Tex. 581, 243 S.W.2d 686 (1951). It is the unauthorized and wrongful assumption and exercise of dominion and control over the personal property of another, to the exclusion of, or inconsistent with, the other person's rights. *Waisath v. Lack's Stores, Inc.*, 474 S.W.2d 444, 446 (Tex. 1971)].

187.   DPD hatched a plan to use fraudulent affidavits for search warrants, which would result in unlawful search warrants. In fact, as a result of Ermatinger and Sayers' aggravated perjury, unlawful search warrants were issued, and Applicable Defendants unlawfully took possession of personal property belonging to Plaintiffs.

188.   Plaintiffs owned and had the right to possess the personal property in question at the time of the interference. Applicable Defendants intentionally interfered with Plaintiffs' personal property (sometimes also described as exercising "dominion and control" over it). The

44

interference deprived Plaintiffs of possession or use of the personal property in question and the interference caused damages to Plaintiffs.

189.    Applicable Defendants took possession of Plaintiffs' cars, computers, cell phones, clothing, parts of Aubrey's car, tools and other personal property, depriving Plaintiffs possession and use of the personal property causing damage to Plaintiffs.  Most of the unlawfully seized property has never been returned.

190.    Demonstrating malice, Applicable Defendants tendered copies of their fraudulent affidavits for search warrants and copies of Plaintiffs' personal property unlawfully taken from them to media sources so that the information would be published for public consumption.

191.    The direct and proximate result of Applicable Defendants' malicious acts is that Plaintiffs suffered severe injury including, but not limited to, personal humiliation, emotional distress, impairment of reputations, medical expense, legal expense, loss of employment, lost earnings capacity, and damage to character.

192.    Applicable Defendants deprived Plaintiffs their of life, liberty, or property, without due process of law and without just compensation under the Fifth and Fourteenth Amendments to the U.S. Constitution and are liable for damages inflicted on Plaintiffs under the Texas Theft Liability Act.

### COUNT VIII
### Intentional Tort - Malicious Prosecution
### (Against City Defendants and Doe Defendants)

193.    Plaintiffs repeat and incorporate by reference paragraphs 1 through 192 above as though fully set forth herein.

194.    Malicious Prosecution is the intentional tort of initiating a criminal prosecution against a party with malice and without probable cause.  Malicious Prosecution violates a

citizen's rights to be free of unreasonable searched and seizures under the Fourth Amendment to the U.S. Constitution and 42 U.S.C. 1983. An action for damages based on this tort is brought after termination of the proceedings in favor of the party seeking damages.

195.    On October 20, 2016, under color and pretense of law, DPD initiated a criminal prosecution against Aubrey. Though they failed to entrap Aubrey for prostitution, they proceeded with their campaign to maliciously prosecute him, beginning with a false arrest. To deceive the public, DPD fabricated a story about an undercover prostitution investigation of a website where Aubrey advertised his massage services. In truth, there was no investigation and instead they had a target, Aubrey.

196.    Because Aubrey is not a prostitute, he would not agree to meet the undercover officer for a cocktail in the bar and there was never any communication about "masturbation and sexual intercourse," which some of the media published to defame Plaintiffs. Additionally, Aubrey refused to accept money upfront, before services were rendered. Because Aubrey is not a prostitute, the district attorney never prosecuted the case.

197.    DPD wrongly deprived the Aubrey of his Fourteenth Amendment right to liberty and commenced a criminal proceeding. On October 19, 2018, the statute of limitations expired, which terminated the proceedings in favor of Aubrey, thereby establishing there was no probable cause. Attempting to disguise their malicious intent and deceive the public, DPD fabricated a story about an undercover prostitution investigation of a website. Plaintiffs were targets for harassment and abuse. Several minutes after DPD falsely arrested Aubrey for prostitution, Ermatinger and Sayers took advantage of Aubrey's false imprisonment and they illegally trespassed into Plaintiffs' residence, this time without a warrant.

198.    On May 18, 2016, Ermatinger maliciously fabricated and included false facts in his sworn affidavits for search warrants, which caused the issuance of three (3) unlawful search warrants and injured Plaintiffs.   The unlawful search warrants trigger claims for malicious prosecution because Ermatinger intentionally instituted and pursued a legal action that was brought without probable cause and the search warrants were unsuccessful.

199.    On May 25, 2016, Sayers maliciously fabricated and included false facts in his sworn affidavits for search warrants, which caused the issuance of two (2) unlawful search warrants and injured Plaintiffs.   The unlawful search warrants trigger claims for malicious prosecution because Sayers intentionally instituted and pursued a legal action that was brought without probable cause and the search warrants were unsuccessful.

200.    In *Harris et al v. Rivera et al*, No. 3:2011cv03013 - (N.D. Tex. 2013) the Court found that a cause of action for malicious prosecution does not accrue until the criminal proceeding has terminated in the plaintiff's favor. In *Rivera*:  Because this suit was filed fewer than two years after the underlying criminal proceeding terminated in Capt. Harris' favor, Count Two is timely. *See Heck v. Humphrey*, 512 U.S. 477, 489-90 (1994) ("Just as a cause of action for malicious prosecution does not accrue until the criminal proceedings have terminated in the plaintiff's favor, so also a § 1983 cause of action for damages attributable to an unconstitutional conviction or sentence does not accrue until the conviction or sentence has been invalidated." (citations omitted)). The court therefore declines to grant judgment on the pleadings dismissing Count Two as time-barred.

201.    Being the subject of a malicious prosecution can cause a wide range of injuries, whether it's from unsubstantiated criminal charges or a bogus civil claim. In either case, the plaintiff may claim compensatory and sometimes punitive damages. Compensatory damages

consist of both the actual damages that were a direct result of the malicious prosecution (which may include pain and suffering and other non-monetary injuries), and special damages that identify quantifiable monetary losses - such as lost earnings, additional domestic costs such as childcare, etc.).

202.    Actual damages for a malicious prosecution claim will hinge on the emotional impact of the act, such as the confusion, bewilderment, and isolation typically experienced by the wrongfully accused. The emotional pain usually is more pronounced if the claim is in response to malicious criminal charges, since the plaintiff may have spent time in jail or otherwise detained or treated as a criminal. In addition, just the uncertainty and fear of entering a criminal trial is often enough to convince a jury that the malicious act caused severe emotional distress.

203.    Plaintiffs also may claim a damaged reputation, loss of future earning potential, attorney fees, and court fees.

204.    In *Heck v. Humphrey*, 512 U.S. 477, 489-90 (1994) But a successful malicious prosecution plaintiff may recover, in addition to general damages, "compensation for any arrest or imprisonment, including damages for discomfort or injury to his health, or loss of time and deprivation of the society." *Id.*, at 887-888 (footnotes omitted). See also *Roberts* v. *Thomas*, 135 Ky. 63, 121 S. W. 961 (1909).

205.    Criminal prosecuting attorneys and judges are protected from tort liability for malicious prosecution by doctrines of prosecutorial immunity and judicial immunity, rendering the City Defendants the only participants of the prosecution with liability.

206.    The direct and proximate result of Applicable Defendants' malicious acts is that Plaintiffs suffered severe injury including, but not limited to, personal humiliation, emotional

distress, impairment of reputations, medical expense, legal expense, loss of employment, lost earnings capacity, and damage to character.

207.    DPD's May 18, 2016, May 25, 2016 and October 20, 2016 malicious prosecutions violate Plaintiffs' rights to be free of unreasonable searches and seizures under the Fourth Amendment to the U.S. Constitution and 42 U.S.C. 1983.

## COUNT IX
### Constitutional Law - Deprivation of Rights Under Color of Law
### (Moye, City Defendants, County Defendants and Doe Defendants)

208.    Plaintiffs repeat and incorporate by reference paragraphs 1 through 207 above as though fully set forth herein.

209.    Under the Fourth Amendment to the U.S. Constitution and 42 U.S.C. 1983, protects American citizens from deprivation of rights.  Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any person in any State, Territory, Commonwealth, Possession, or District to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States.  Title 18 U.S.C. § 242 makes it a crime for a person acting under color of any law to willfully deprive a person of a right or privilege protected by the Constitution or laws of the United States.

210.    Color of law is the appearance of an act being performed based upon legal right or enforcement of statute, when in reality no such right exists. An outstanding example is found in the civil rights acts, which penalize law enforcement officers for violating civil rights by making false arrests under color of law. Color of law includes acts done beyond the bounds of that official's lawful authority, if the acts are done while the official is purporting to or pretending to act in the performance of his/her official duties.

49

211.    Under the color of law, law enforcement agents are allowed to stop suspects and search with probable cause, but they cannot stop suspects, search or seize the property under false pretenses.

212.    Applicable Defendants acted under color of law and undertook a course of conduct that deprived Plaintiffs of their civil rights to wit:

a. Moye, City Defendants and County Defendants made factually inaccurate comments to the media framing Plaintiffs for murder and depriving them of their rights to a fair tribunal;

b. Ermatinger and Sayers fabricated falsified affidavits and submitted them as testimony to support unlawful search warrants depriving Plaintiffs their rights to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures;

c. City Defendants and County Defendants deprived Plaintiffs their rights to have warrants served legally with "knock and announce" rather than subject Plaintiffs to injury from excessive force designed to intimidate, threaten and terrorize Plaintiffs;

d. City Defendants and County Defendants deprived Plaintiffs their rights to be protected by the law when they committed aggravated assaults on Plaintiffs;

e. City Defendants and County Defendants deprived Plaintiffs their rights to be protected by the law when they falsely arrested and imprisoned Plaintiffs;

f. City Defendants deprived Aubrey his rights to be secure in his person and against unreasonable searches and seizures and Aubrey's right to due process when they falsely arrested, falsely imprisoned and maliciously prosecuted Aubrey for a bogus prostitution charge; and

g. City Defendants leaked factually inaccurate information to the media about the bogus prostitution charge, defaming Aubrey and depriving him his right to a fair tribunal.

213.    Applicable Defendants acted, together and with others, with malice or with reckless disregard for Plaintiffs' rights, proximately causing Plaintiffs to continue to suffer from psychological harm, mental distress, humiliation, embarrassment, fear, and defamation of their

characters and reputations, were prevented from attending to their usual duties and underwent psychological treatment, entitling Plaintiffs to damages that exceed the jurisdiction of this Court.

214.   The direct and proximate result of Applicable Defendants' malicious acts is that Plaintiffs suffered severe injury including, but not limited to, personal humiliation, emotional distress, impairment of reputations, medical expense, legal expense, loss of employment, lost earnings capacity, and damage to character.

215.   Applicable Defendants committed crimes against Plaintiffs when they deprived them their rights, privileges, or immunities secured or protected under the Fourth Amendment to the U.S. Constitution, 42 U.S.C. 1983 and 18 U.S.C. § 242.

## COUNT X
### Constitutional Law - Pattern and Practice
### (City Defendants and County Defendants)

216.   Plaintiffs repeat and incorporate by reference paragraphs 1 through 215 above as though fully set forth herein.

217.   Title 42, U.S.C., Section 14141: makes it unlawful for state or local law enforcement agencies to allow officers to engage in a pattern and practice of conduct that deprives persons of rights protected by the Constitution or laws of the United States. This law is commonly referred to as the Police Misconduct Statute. This law gives DOJ the authority to seek civil remedies in cases where it is determined that law enforcement agencies have policies or practices that foster a pattern of misconduct by employees.

218.   City Defendants and County Defendants violated Plaintiffs' rights to be protected from unlawful search, seizures and excessive force under the Fourth Amendment to the U. S. Constitution and violated their rights to be protected from cruel and unusual punishments under the Eighth Amendment to the U. S. Constitution and 42 U.S.C. §1983.

219.    42  U.S.C.  §  14141  addresses  misconduct  including  excessive  force, discriminatory harassment, false arrest and unlawful stops and searches in this action directed against an agency, not against individual officers.

220.    The conduct that deprived Plaintiffs of their rights protected by the Constitution or laws of the United States was/is a persistent and widespread practice of city and county officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy." *Bennett v. City of Slidell*, 735 F.2d 861, 862 (5th Cir.1984).

221.    Issues that form the basis of this Pattern and Practice claim against City Defendants and County Defendants include:

- Lack of supervision/monitoring of officers' actions.

- Officers not providing justification or reporting incidents involving the use of force.

- Lack of, or improper training of officers.

- A department having a citizen complaint process, which treats complainants as adversaries.

222.    Chief Brown and Sheriff Valdez had a golden opportunity to supervise and monitor law enforcements May 19, 2016 savage ambush and takedown of Plaintiffs because the excessive force used was premeditated and preplanned.  Because the unlawful assault was planned, supervisors knew or should have known the warrants used for the basis of the false arrest were for photographs and fingerprints, they were not arrest warrants. City Defendants and County Defendants enlisted the assistance of the Tactical Division for a Stake-Out and High-Risk Apprehension of Plaintiffs. The officers performed a stakeout of Plaintiffs' residence, waited for Plaintiffs to get into their vehicle, assaulted them with weapons, arrested and

imprisoned them as part of their pattern, practice, history, and custom to retrieve fingerprints and photographs, violating Plaintiffs' constitutional rights.

223.   The preplanned attack on Plaintiffs is proof that "knock-and-announce," which is required by law, was intentionally excluded from excessive force conspiracy.   The Supreme Court's Clarence Thomas authored the majority opinion, arguing that the "knock-and-announce" rule is a part of the reasonableness standard applied while conducting a search, according to the rules of common law"

224.   The officers could not provide the supervisors justification for the assault, brutal takedown, arrest and imprisonment as the warrants only permitted retrieval of Plaintiffs' fingerprints and photographs.   Neither of the plaintiffs had a history of violence nor had they ever been known to carry a weapon.

225.   The General Order stipulates conditions permitting an officer to draw or display firearms.   General Order 906.02(E), "Drawing or Displaying Firearms," requires that a threat or reasonable belief that there is a threat to life or they have reasonable fear for their own safety and/or the safety of others, exist in order to authorize an officer to draw or display her/his firearm.   City Defendants failed to train officers to follow the guidelines established in the General Order.

226.   City Defendants have established a pattern, practice, history, and custom of using excessive force against minorities, including approaching them with guns drawn, when there is no imminent threat of bodily harm or other justifiable reason.   *Id.* Count II - Excessive Force ¶ 111.

227.   City Defendants and County Defendants trained its officers to use excessive or deadly force even when there exists no immediate threat to themselves or others.

228.    City Defendants did not provide adequate training to Ermatinger or Sayers as it relates to perjury and unlawful searches and seizures.

229.    City Defendants did not provide adequate training to Ermatinger or Sayers as it relates to the use of deadly force and the use of non-deadly force.

230.    City Defendants and County Defendants did not provide adequate training to its officers on proper arrest and confrontation techniques.

231.    Plaintiffs directed complaints regarding Ermatinger and Sayers perjury, misuse of force, false arrest and false imprisonment to Chief Brown, Lt. Chuck Young, DPD Internal Affairs Division and the Public Integrity Unit. All were ignored.

232.    City Defendants failed to adequately discipline Ermatinger, Sayers and others for their perjury, misuse of force, false arrest and false imprisonment.

233.    City Defendants and County Defendants' unlawful and unwarranted acts, lack of training and the official customs or policies of the DPD caused injury to Plaintiffs.

234.    The actions of the unidentified officers who participated in the Tactical Division Stake-Out and High-Risk Apprehension of Plaintiffs, Ermatinger and Sayers were the result of, or within the scope of, wrongful and reckless customs, policies, practices and/or procedures of the DPD, in regard to the use of excessive force for which City Defendants and Chief Brown knew or should have known, but never provided the requisite and proper training.

235.    City Defendants and County Defendants failed to properly train, supervise and discipline its officers, the proximate cause of the violation of Plaintiffs' constitutional rights.

236.    The direct and proximate result of Applicable Defendants' malicious acts is that Plaintiffs suffered severe injury including, but not limited to, personal humiliation, emotional

distress, impairment of reputations, medical expense, legal expense, loss of employment, lost earnings capacity, and damage to character.

237.  City Defendants and County Defendants committed one or more willful violations of Plaintiffs' rights under the Fourth and Eighth Amendments to the U.S. Constitution and 42 U.S.C. 1983. City Defendants and County Defendants violated 42 U.S.C. § 14141 when they allowed officers to engage in a pattern or practice of conduct that deprived Plaintiffs of rights protected by the Constitution or laws of the United States.

## COUNT XI
### Intentional Tort - Civil Conspiracy
### (Against All Defendants)

238.  Plaintiffs repeat and incorporate by reference paragraphs 1 through 237 above as though fully set forth herein.

239.  Conspiracy is an agreement between two or more natural persons to break the law at some time in the future or to achieve a lawful aim by unlawful means.

240.  Applicable Defendants conspired to deprive Plaintiffs life, liberty, or property, without due process of law and without just compensation under the Fifth and Fourteenth Amendments to the U.S. Constitution and 42 U.S.C. 1983, deprive Plaintiffs their rights to be free of unreasonable searches and seizures under the Fourth Amendment to the U.S. Constitution and 42 U.S.C. 1983, and deprive Plaintiffs their rights to be free from excessive force under the Fourth Amendment and free from cruel and unusual punishments by the state (police) under the Eighth Amendment to the U. S. Constitution and 42 U.S.C. 1983.

241.  On May 16, 2016, Moye committed aggravated assault on the Dallas North Tollway when he threatened a woman driver next to him with a loaded firearm. Looking for something to excuse his felony offense, Moye and County Defendants reached an understanding

to frame Plaintiffs for the murder of Ira Tobolowsky and deprive them their rights to due process of law.   Moye and County Defendants released a series of defamatory statements designed to ruin Plaintiffs' reputations and subject them to public hatred and ridicule.   Moye and County Defendants' actions proximately caused Plaintiffs to suffer severe injuries including financial loss, medical and legal expenses, deprivation of their physical liberty and great pain and mental suffering.

242.   On May 18, 2016, Ermatinger fabricated a material false fact for his warrant affidavit and signed the document under oath and penalty of perjury.   Sayers reached an understanding with Ermatinger to use the exact same false fact for his May 25, 2016 warrant affidavits and signed the documents under oath and penalty of perjury.   The two DPD officers wanted to search Plaintiffs and all of their property but they did not have probable cause to get the warrants they needed. Ermatinger and Sayers committed aggravated perjury on multiple occasions to get the unlawful search warrants they executed on Plaintiffs.   Their actions proximately caused Plaintiffs to suffer severe injuries including financial loss, medical and legal expenses, deprivation of their physical liberty and great pain and mental suffering.

243.   On or before May 19, 2016, City Defendants and County Defendants reached an understanding to terrorize Plaintiffs and cause them harm.   City Defendants and County Defendants preplanned the use of excessive force and aggravated assault to falsely arrest and falsely imprison Plaintiffs.   Their actions proximately caused Plaintiffs to suffer severe injuries including financial loss, medical and legal expenses, deprivation of their physical liberty and great pain and mental suffering.

244.   On October 19, 2016, Ermatinger, Sayers, DPD and the Sheriff's Department reached an understanding try to entrap Aubrey for prostitution.   Though the entrapment for

prostitution failed, they went forward to falsely arrest, falsely imprison and maliciously prosecute Aubrey. Ermatinger and Sayers were waiting for a message from their coconspirators on the other side of town to signal that Aubrey had been arrested so they could illegally trespass into Plaintiffs' residence, without a warrant. Their actions proximately caused Plaintiffs to suffer severe injuries including financial loss, medical and legal expenses, deprivation of their physical liberty and great pain and mental suffering.

245.    On or before April 26, 2017, D Magazine reached an understanding with Ermatinger and Moye to create trial publicity and public hatred by releasing an article that defamed Plaintiffs a few days before a trial would be held, making it impossible for Plaintiffs to get a fair trial. Ermatinger, Moye and D Magazine manufactured false facts for D Magazine's, *A Place Where Something Evil Happened.* Ermatinger manufactured the following: Phone records, detectives told the Tobolowsky family, showed no activity on the men's cellphones from about 9 pm the night before the fire until the next afternoon, meaning their phones were not pinging towers and may have been turned off. The records did show cell activity before and after that time period. Moye manufactured the following: I think at this point," he said, "with the allegations which have been made related to Mr. Aubrey and his implication in the death of Mr. Tobolowsky and related issues, I don't think that it is unreasonable for a judge other than myself to hear this case." D Magazine published unauthorized photos of Plaintiffs and modified one photo to further demonize Plaintiffs.

246.    Their actions proximately caused Plaintiffs to suffer severe injuries including financial loss, medical and legal expenses, deprivation of their physical liberty and great pain and mental suffering.

247.    Applicable Defendants conspired to violate Plaintiffs' rights by causing materially falsified search warrant affidavits; unlawful search warrants procured by fraudulent means, including perjury by public officials; unlawful execution of governmental searches; unlawful governmental seizures; assault and battery by governmental officials; false arrests; false imprisonment; and published articles that were defamation per se.

248.    The direct and proximate result of Applicable Defendants' malicious acts is that Plaintiffs suffered severe injury including, but not limited to, personal humiliation, emotional distress, impairment of reputations, medical expense, legal expense, loss of employment, lost earnings capacity, and damage to character.

## COUNT XII
### Intentional Tort - Defamation Per Se
### (Against D Magazine)

249.    Plaintiffs repeat and incorporate by reference paragraphs 1 through 248 above as though fully set forth herein.

250.    Plaintiffs incorporate by reference all statements made in Exhibits x, x, and C, inclusive, as if fully stated herein.

251.    A free press is essential to a healthy democracy. Through conscientious and diligent reporting, the press holds public officials accountable and helps citizens stay informed on matters of public concern. Accordingly, both the U.S. Constitution and the Florida Constitution robustly protect freedom of speech. But, these safeguards are not unlimited and do not categorically deprive individuals of legal recourse when they are injured by false and defamatory speech.

252.    A cause of action for defamation per se under Florida law accrued in Florida because Plaintiffs are residence in Florida and were injured in Florida.  Defamation is a tort

provided by Florida Statute Chapter 770.  Texas law, Texas statute of limitations and Texas

sovereign immunity under the Texas Tort Claim Act do not apply to this claim.

253.    Defamation is any action alleging that forms of speech are false, have caused

damage to reputation or emotional distress, have presented any person in a false light, or have

resulted in criticism, dishonor, or condemnation of any person and are not protected under

Constitutional Free Speech provisions of the First Amendment and 42 U.S.C. §1983.

254.    Damages in a defamation per se case are simply assumed to exist and the court

will not require any evidence to be provided before a money award can be given in certain,

specific situations (meaning, the plaintiff does not have to prove special damages in order to be

compensated – Special damages usually contemplate the loss to something that has economic

value).

255.    To find defamation *per se* a court must first determine whether the statement is

capable of a defamatory meaning. *See Ragano v. Time, Inc.*, 302 F. Supp. 1005, 1010 (M.D. Fla.

1969). In *Ragano*, the district court explained that on a motion for summary judgment it is only

necessary for the court to "determine whether or not the [statement's] characterization is

reasonably capable of a defamatory meaning[,]" and if so, then the jury should determine

whether the statement is actually defamatory. *Id.* (citing *Belli v. Orlando Daily Newspapers, Inc.*,

389 F.2d 579, 583 (5th Cir. 1967)) (alterations added; footnote call number omitted) (requiring

the court to determine in a libel action if the statement at issue is reasonably capable of a

defamatory interpretation before the jury may decide whether the statement was in fact

understood as defamatory).

256.    According to the United States District Court, Southern District of Florida, a

written publication rises to defamation or libel *per se* "if, when considered alone and without

innuendo, it (1) charges that a person has committed an infamous crime; (2) tends to subject one to hatred, distrust, ridicule, contempt, or disgrace; or (3) tends to injure one in his trade or profession." Paulson v. Cosmetic Dermatology, Inc., Case No. 17-20094-CIV-Scola, 2017 U.S. Dist. LEXIS 88031 (S.D. Fla. June 8, 2017).

257.    On April 28, 2016, Jamie Thompson's, *A Place Where Something Evil Happened,* was published as the cover story for D Magazine's May 2017 issue. The publishers has two versions of the same story, one for the print magazine ("Article Magazine") and one for online access ("Article") (*Id.* Exhibit G)

258.    The Article's purpose is to bring profits to the publisher by framing Plaintiffs for the murder of Ira Tobolowsky.  The focus and subject of the Article is Plaintiffs and how they are deplorable and reprehensible persons, the type that would commit murder.

**Libel Per Se Statement No. 1**

259.    While the lengthy Article is loaded with statements that contribute to the defamation and defamation by implication causes of action, it also has two (2) statements that reach the level of per se.  Intending to defame Aubrey, the Article states as fact that he agreed to an act that constitutes the criminal act of prostitution, as follows:

**"Aubrey agreed to masturbation and sexual intercourse for $300."**

This is a false and defamatory per se statement.  Aubrey never agreed to anything as stated in the egregious statement.  Thompson's defamatory per se statement was fabricated to brand Aubrey as a criminal and including the fictitious statement insinuates that because Aubrey was definitely a criminal, he is also responsible for the murder.

260.    D Magazine's statement of fact charges that Aubrey committed an infamous crime.  Crimes characterized as having an infamous nature are "murder, perjury, piracy, forgery, larceny, robbery, arson, sodomy or buggery." *King v. State*, 17 Fla. 183, 186 (Fla. 1879)

261.    D Magazine published the fabricated statement that accuses sodomy to subject Aubrey to distrust, ridicule, contempt, or disgrace.

262.    D Magazine's implies that because Aubrey is a prostitute, he is a murderer as well. With over 500,000 readers of D Magazine's print magazine and over 1.2 million online followers, Thompson's fictitious accusation did exactly as it was intended, selling copies and humiliating Plaintiffs.

263.    Because the Article represents a classic trial by media instead of a trial with evidence and cross examination, D Magazine used everything it  could imagine, including the kitchen sink, to convince its readers that Aubrey and/or Plaintiffs were guilty of the murder, whether or not it was relevant and whether or not it was truthful, to portray Plaintiffs in the most negative and false light possible.  D Magazine's statement that accuses Aubrey of committing an infamous crime has severely impacted Aubrey's legitimate massage business.

**Libel Per Se Statement No. 2**

264.    Under republication liability, D Magazine is treated as a publisher when repeating a defamatory falsehood and can be held liable to the same extent as the original speaker. On April 26, 2017, D Magazine republished Moye's extrajudicial defamatory per se statement, as follows:

> **"...with the allegations which have been made related to Mr. Aubrey and his implication in the death of Mr. Tobolowsky and related issues, I don't think that it is unreasonable for a judge other than myself to hear this case."**

265.   When Moye made the statement, the cause of death had not been determined and for many weeks authorities would go no further than to say the death was suspicious.  For over two (2) years following the death of Ira Tobolowsky, not one shred of evidence has ever been found connecting Aubrey to what ultimately was determined to be murder.   When Moye stated that Aubrey was implicated, involved in, connected to or associated with the death, that was his clever and indirect way of saying Aubrey murdered the man. There is no other interpretation.

266.   No authority has ever alleged that Aubrey was implicated in the death of Ira Tobolowsky, but D Magazine chose to republish the per se statement that caused Plaintiffs irreparable injuries.  D Magazine had the luxury of hindsight recognize the falsity of Moye's statement but the statement fit the magazine's narrative perfectly, so they used it.

267.   D Magazine was more interested in publishing a scandalous article calculated to increase sales of the magazine than it was in reporting the truth.  D Magazine had the opportunity to consider and check the information Aubrey forwarded to Thompson that dispels so much of what was written.  D Magazine purposefully avoided the truth.  Minimal due diligence would have likely left this story on the cutting room floor.

268.   D Magazine made the defamatory statements against Plaintiffs without regard to the truthfulness of those statements. A reasonable reader of the promotional publications and the Article would reach the conclusion that Plaintiffs were engaged in criminal behavior and had committed multiple criminal acts including prostitution, none of which is true. Those defamatory or libelous statements constitute libel *per se*. Further, in addition to the statements contained in the Article, the Article as a whole, when read by a reasonable reader, would result in the reader concluding that Plaintiffs were guilty of murder.

269.    The defamatory and libelous statements constitute libel *per se*.  D Magazine has

engaged in a pattern of conduct, resulting in publication of defamatory and libelous statements

against Plaintiffs and is liable to Plaintiffs for damages caused by their conduct. In particular, D

Magazine, as set forth, engaged in the following conduct as described above:

1.    D Magazine published statements which it alleged were factual;

2.    The statements referred to Aubrey;

3.    The statements were defamatory;

4.    The statements were false;

5.    D Magazine was acting with actual malice or, in the alternative, was
negligent in publishing the statements contained in the Article.

270.    The direct and proximate result of D Magazine's malicious per se acts is that

Plaintiffs suffered severe injury including, but not limited to, personal humiliation, emotional

distress, impairment of reputations, medical expense, legal expense, loss of employment, lost

earnings capacity, damage to character, criticism, dishonor, and condemnation.

### COUNT XIII
### Intentional Tort - Defamation
### (Against D Magazine, Ermatinger and Sayers)

271.    Plaintiffs repeat and incorporate by reference paragraphs 1 through 270 above as

though fully set forth herein.

272.    Defamation is any action alleging that forms of speech are false, have caused

damage to reputation or emotional distress, have presented any person in a false light, or have

resulted in criticism, dishonor, or condemnation of any person and are not protected under

Constitutional Free Speech provisions of the First Amendment and 42 U.S.C. §1983.

273.    A cause of action for defamation under Florida law accrued in Florida because

Plaintiffs reside in Florida and were injured in Florida.  Defamation is a tort provided by Florida

Statute Chapter 770.  Texas law, Texas statute of limitations and Texas sovereign immunity under the Texas Tort Claim Act do not apply to this claim.

274.    Republication liability is established when one who repeats a defamatory falsehood is treated as the publisher of that falsehood and can be held liable to the same extent as the original speaker.  Republication liability subjects newspapers, magazines, and broadcast news stations to liability when they publish defamatory letters to the editor and advertisements. Republication liability also makes it possible for a journalist to be sued for libel over a defamatory quote he includes in a story, even if the quote is accurate and attributed to a source.

275.    However, republication liability, works differently on the Internet. In 1996, Congress passed Section 230 of the Communications Decency Act, a law that limits the extent to which Internet service providers and websites can be held liable for republishing content created by third parties.

276.    If a reporter for a news site writes a defamatory sentence in an article, the news site will be treated as the "information content provider" of the defamatory sentence and be unable to invoke Section 230's protections.

277.    Under republication liability, D Magazine is treated as the publisher and would be liable to the same extent as the original speaker for repeating a defamatory falsehood in its May 2017 article, *A Place Where Something Evil Happened,* by Jamie Thompson.

278.    Because Thompson's same story appeared online; D Magazine is treated as an information content provider and is unable to invoke Section 230 protections.

279.    One who republishes a defamatory statement is himself liable for the defamation, even if he attributes the information to the original publisher. *Times Pub. Co. v. Carlisle,* 94 F.

762 (8th Cir. 1899). This is true whether the publication is libel (printed) or slander (spoken). *Wheeler v. Shields,* 3 Ill. (2 scam.) 348 (1840).

280.    D Magazine perpetrated a fraud upon the public.    D Magazine asserts that its April 26, 2017 story is based on the investigation of who killed Ira Tobolowsky, however, D Magazine published a fictional crime story based primarily on opinions of the family and false facts of investigators and designed to conclude the Plaintiffs are bad people who are guilty of murder.

## D MAGAZINE LIABILITY

281.    D Magazine published the following false and/or defamatory statements which are attributable to D Magazine as the information content provider and Thompson as the author:

282.    The underlying theme of the Article is that Plaintiffs are bad people, especially Aubrey; therefore, they committed the murder of Ira Tobolowsky ("Tobolowsky").

## Libel Statement No. 1

283.    Intending to defame Aubrey, one paragraph in the Article incorrectly details a situation in which Tobolowsky is having issues with his fax machine and blames it on Aubrey. The Article implies that Aubrey lied about filing a restraining order with the court and that Aubrey was faxing worthless papers to Tobolowsky to harass him. The Article states:

**Ira searched online for the suit, but it was never officially filed.**

This is a false and defamatory statement.  The restraining order was filed, officially, at a cost to Aubrey of $285.01.  *See* the efile.txcourts.gov Envelope Details, attached as **Exhibit D**.

## Libel Statement No. 2

284.    Intending to defame Plaintiffs, one paragraph in the Article implies that Plaintiffs were down on their luck and had become desperate.  The insinuation is they were desperate

enough to kill.  It states that Plaintiffs had lost hundreds of thousands of dollars in a Ponzi scheme, were forced to sell their home and Tobolowsky really backed them into a corner. The Article states:

> **They'd spent nearly $2.3 million fighting the case and still owed about $400,000 in legal fees.**

This is a false and defamatory statement.  Plaintiffs did not spend half of that amount.  Thompson's defamatory statement was fabricated to amplify her portrayal of a desperate situation.

## Libel Statement No. 3

285.   Intending to defame Aubrey, the Article implies that Aubrey was down on his luck and had become desperate.  The insinuation is he was desperate enough to kill.  The Article states:

> **Ira had defeated Aubrey at every turn, stripped him of his ability to file lawsuits, and now was coming after him for defamation.**

This is a false and defamatory statement.  Tobolowsky did not defeat Aubrey at every turn.  Tobolowsky asked the court to hold Plaintiffs in contempt of court and punish them with putting them in jail for 29 days and grant a judgment against Plaintiffs for over $1 million. Tobolowsky's motion was unsuccessful.  Aubrey was not stripped of his ability to file lawsuits. Tobolowsky was able to get Moye to agree to sign an ex parte order that stipulated Aubrey could no longer file lawsuits against five (5) specific persons or their entities. Thompson's defamatory statement was fabricated to amplify her portrayal of a desperate situation.

## Libel Statement No. 4

286.   Intending to defame Plaintiffs, the Article implies that Plaintiffs were beating up on Aubrey's mother, Betsy.    It insinuates that Aubrey's mother, a sweet little old lady is

Aubrey's victim who needed help so she stumbled up a quant little neighborhood law office run by a sweet little old man.   The Article states:

> **Betsy sought help at a small law office on Lovers Lane run**
> **by Ira Tobolowsky.**

287.    This is a false and defamatory statement.  Aubrey's issue has always been with Aubrey's brother, who stole their father's entire estate, exceeding $5 million. of family trust properties out of the trust and into his personal LLC.  The only relief Aubrey sought was to transfer the properties back into the trust, which would benefit Aubrey's mother the most.  At all times Aubrey's brother was Tobolowsky's client.  Aubrey's brother retained Tobolowsky and paid all of his legal fees and Tobolowsky was a legal force to contend with.  Thompson's defamatory statement was fabricated suggest Aubrey was mean and nasty to his mother who was forced to find help.

## Libel Statement No. 5

288.    Intending to defame Aubrey, the Article implies that karma caught up with Aubrey when he was arrested for prostitution as part of DPD's usual diligent investigation into websites that massage therapists use to advertise their businesses.  In other words, Aubrey got what he deserved.  The Article states:

> **Dallas police were running an undercover investigation into the**
> **website masseurfinder.com.**

This is a false and defamatory statement.  Aubrey is the only one DPD's undercover officers contacted to try and entrap.  Thompson's defamatory statement was fabricated to make DPD's malicious prosecution appear indiscriminate instead of targeted.

**Libel Statement No. 6**

289.    Intending to defame Aubrey, the Article states as fact that he agreed to an act that constitutes prostitution, as follows:

**Aubrey agreed to masturbation and sexual intercourse for $300.**

290.    This is a false and defamatory statement.    Aubrey never agreed to anything as stated in the egregious statement.    Thompson's defamatory statement was fabricated to brand Aubrey as a criminal and including the fictitious statement insinuates that because Aubrey was definitely a criminal, he is also responsible for the murder.

**Libel Statement No. 7**

291.    Intending to defame Plaintiffs, the Article implies that Plaintiffs murdered Tobolowsky, moved to Margaritaville and are sipping on piña coladas.   The Article insinuates Plaintiffs are living without a conscious, like they never murdered anybody.   The Article states:

**The men live in a bungalow surrounded by palm trees.**

This is a false and defamatory statement.   Plaintiffs no character box house resembles anything but a bungalow.   Nearly all definitions of bungalow list characteristics that include large front porches or verandas covered by an overhanging roof that is supported by substantial columns. Plaintiffs house has no front porch at all, no overhanging roof and absolutely no columns. Bungalow cannot be easily proven but the palm trees can.   There are no palm trees on the property.   Thompson's defamatory statement was fabricated to make the magazine readers angry because Plaintiffs did not pay the price for the murder and should be behind bars.

292.    Thompson interviewed Tobolowsky's widow and included her admission that the Tobolowsky sons threatened to murder Plaintiffs.   Thompson followed with the comment that Aubrey "was still free."

It had occurred to family members to take matters into their own hands. Debbie worried about keeping her boys leashed. "I don't know how serious they were, but I thought they could have very easily gone and done something stupid," she says. "I told them, 'Do you think your father would want you in jail for the rest of your life?' "

Most of the family thought Aubrey had killed Ira. But he was still free, living not far away in North Dallas.

Thompson's comment reinforces her fabricated statement about the palm trees and a bungalow, insinuating Plaintiffs should be in prison.

**Libel Image No. 8**

293.    D Magazine published one picture in the Online Article that implied fact or truth but the photo was modified to further scandalize Plaintiffs.

294.    D Magazine altered a photograph with the following description: "Michael Tobolowsky lays out all the homemade evidence in his Lovers Lane law office as he attempts to solve the mystery of who killed his father." However, D Magazine's readers cannot see all of the homemade evidence because D Magazine blurred out all of the names on the board listed as suspects, except for Plaintiffs' names.

295.    One of the dry-erase whiteboards had two columns titled Motive and Opportunity. Under "Motive" was the statement that read: *Being sued for defamation.*[8] Under "Opportunity" was *7777 Glen America Dr*, Plaintiffs' former Dallas address. However, Plaintiffs were not the only ones sued by Tobolowsky for defamation and others had lawsuits against Tobolowsky where he was the defendant. All of the parties suing or being sued by Tobolowsky lived in

---

[8] To allege the defamation lawsuit was motive for murder is ludicrous. Plaintiffs considered the case frivolous and a neusance. But, because Plaintiffs were judgment proof, they were not very engaged with the case and would appear for roughly one half of the hearings. While judgment proof is generally not a good position to be in, as defendants in a lawsuit, it is not the worst because there is absolutely nothing to lose. Tobolowsky's timing for this defamation claim was poor. Plaintiffs have never considered killing an opposing party in a lawsuit and this one certainly did not change that.

Dallas.  But none of those people made it to the whiteboards, or if they did, D Magazine

protected their identity by modifying the photo.

296.    The staged photograph indicates that Plaintiffs used two propane tanks to light the

fire that killed Tobolowsky.  Plaintiffs will forever be confused about the implied significance of

the tanks as this makes less sense than the motive and opportunity.  Propane tanks are heavy,

bulky, are not self-lighting and persons walking around with them would certainly attract

attention.   It is clear, the staged photo included the propane tanks to further crucify Plaintiffs,

but that would suggest that Plaintiffs could not figure out an easier way to light a fire.  It suggests

that Plaintiffs hauled propane tanks to the crime scene and brought Bic lighters to light the tanks,

to then light the fire, when the Bic lighter is capable of lighting a fire on its own.

297.    The modified photo was false and defamatory as it was and D Magazine made the

it even more scandalous and damaging by altering it to represent, as did the Article, that only

Plaintiffs could have murdered Ira Tobolowsky.   That was ludicrous

### D MAGAZINE, SAYERS & ERMATINGER LIABILITY

#### Libel Statement No. 9

298.    Ermatinger and Sayers both committed aggravate perjury when they presented

their sworn fraudulent affidavits for search warrants to judges who relied on the affidavits when

they issued search warrants.  The affidavits included the same material false fact, stating:

> **"It was aledged [sic] in the lawsuit that Steven Aubrey threatened**
> **'Jihad' the same words used to describe the wars brought by**
> **terrorists, and against his life which was filed in court document..."**

This is a false and defamatory statement.  No such allegation exists in the lawsuit or any filed

court document.   Aubrey has never threatened anybody's life and knows of nobody who would

allege that he has.  Ermatinger and Sayers fabricated the statement because there was nothing

that connected Plaintiffs to the murder and the only way to get the search warrants, they were so certain would solve the crime, was to fabricate probable cause and lie to the judge.

299.    The detectives' unlawful acts are a direct result Chief Brown and the Dallas City Council's failure to implement and enforce the necessary policies, which caused the implementation of unconstitutional patterns and practices.

300.    D Magazine had a responsibility to refrain from publishing a third party's defamatory statements.

301.    The person who knowingly publishes a defamatory statement is liable to the person who has been defamed. Negligence or intent to publish will be considered relative to liability, however.

302.    D Magazine exhibited laser intent and determination when it republished false and/or defamatory statements previously made by Sayers.

303.    While Thompson was investigating this story, Aubrey informed her about the falsity in the affidavits that caused a very damaging chain reaction.

304.    All of Tobolowsky's allegations are easily found in his accessible Petition, First Amended Petition and Second Amended Petition.  Altogether, the three (3) petitions total only thirty (30) pages in length.

305.    While it is likely Thompson read the 30 pages to verify what Aubrey told her, any information that worked against condemning Plaintiffs was information D Magazine ignored.  If Thompson had found that Tobolowsky alleged in his lawsuit that Aubrey had threatened his life with Jihad, D Magazine would have eagerly published that document as it did the fraudulent warrant affidavits, unlawful search warrants and irrelevant Aubrey family email.

306.    Thompson knew or should have known that Sayers' affidavits for search warrants defamed Aubrey but D Magazine published them regardless, embedding them in the Online Article to ensure Aubrey would suffer injury from the statements again.

**Libel Statement No. 10**

307.    Thompson interviewed the Tobolowsky family and published defamatory information that the Tobolowsky's attributed to Ermatinger and Sayers.  Though Thompson also interviewed Ermatinger, she did not bother to verify the information that allegedly originated from him, or maybe she did but the Tobolowsky version was better.  Nonetheless, D Magazine published the information about Plaintiffs' cell phone activity as it was translated through the Tobolowsky family.

308.    Intending to defame Plaintiffs, the Article states that Plaintiffs' phones were turned off or not being used for the entire morning on the day Tobolowsky was murdered.  The possible insinuation is that because Plaintiffs committed the murder, they were scared to use their phones.  Or possibly it suggests a change in behavior because of a traumatic event.  The Article states:

> **Phone records, detectives told the Tobolowsky family, showed no activity on the men's cellphones from about 9 pm the night before the fire until the next afternoon, meaning their phones were not pinging towers and may have been turned off. The records did show cell activity before and after that time period.**

309.    This is a false and defamatory statement.  Plaintiffs' phone records indicate that on the morning of May 13, 2016, Vodicka placed five (5) calls beginning at 9:17am and Aubrey placed two calls beginning at 10:51am.  Thompson was continually sending email to Aubrey asking for verification or details.  She did not inquire about the phone records, which Aubrey

could have clarified for her.   Instead, Thompson wrote the Article and published false information that injured Plaintiffs.

## D MAGAZINE & ERMATINGER, Individually  LIABILITY

### Libel Statement No. 11

310.   D Magazine is the first publication to ever refer to Plaintiffs as suspects.  All other media specifically stated Plaintiffs were not suspects.  The Dallas Morning News reported multiple times that DPD had not named any suspects in the Tobolowsky case.

311.   Thompson interviewed Ermatinger for the Article after he had retired from DPD. While lack of training is ultimately responsible for Ermatinger's poor performance with DPD and for the perjury he committed while acting in his official capacity, under color of law, it would be difficult to believe his habitual lack of regard for the truth, Texas Government Code and Texas Penal Code, changed in the couple of months since his retirement.

312.   During his interview, Ermatinger relied on his former training and he began fabricating facts that defame Plaintiffs.  Not only did he say Plaintiffs were suspects, Ermatinger said they were primary suspects.

313.   Because Thompson liked the way Ermatinger's new facts played into her narrative, she did not bother to verify Ermatinger's revelation.  Instead, she decided to be a leader, taking D Magazine to the cutting edge and pushing it to be the first media to stare liability in the face and brand Plaintiffs as suspects.  The Article stated:

> **Detective Ermatinger, now retired, says the men remain primary suspects; no one else on their list came close.**
>
> **"They are suspects, and they are strong ones," Ermatinger says. "But I had no evidence to arrest them.**

These are false and defamatory statements.  DPD, Ermatinger's former employer, does not agree with him.  Thompson reduced herself to rely on the words of a retired cop about an ongoing

73

investigation. Ermatinger's claims are worthless. Thompson's practice of interviewing people who have no knowledge destroys the integrity of her stories. Using whatever sounds the best and raises the most eyebrows denigrates her work and the work of D Magazine. Thompson owes the D Magazine subscribers some minimal standard of due diligence and fact checking instead of taking everyone's word for it because it adds to the sizzle of the story.

314. Ermatinger was a retired cop with the same authority as any other retiree, who came across a reporter who was interested in what he had to say. There was a time when Ermatinger had been the lead investigator on the Tobolowsky case and his fraudulent affidavits caused roughly 18 search warrants to be executed, more than any other case he worked on. In the end, Ermatinger turned up absolutely no evidence, he suggested that a lawsuit could stand as a motive, he deduced that someone from Dallas had a better opportunity to commit the murder than someone from Plano or Oak Cliff and he seized two propane tanks from Aubrey's giant plastic tub of plumbing supplies.

315. "The family came to believe that investigators had bungled the case" and Plaintiffs agree.

316. The nature of the false statements is such that malice and actual damage are presumed.

317. D Magazine, Ermatinger and Sayers have engaged in a pattern of conduct, resulting in publication of defamatory and libelous statements against Plaintiffs and is liable to Plaintiffs for damages caused by their conduct. In particular, Applicable Defendants, as set forth, engaged in the following conduct as described above:

- Applicable Defendants published statements which they alleged were factual;
- The statements referred to Plaintiffs;

74

- The statements were defamatory;
- The statements were false;
- Applicable Defendants were acting with actual malice or, in the alternative, were negligent in publishing the statements contained in the Article.

318.   The direct and proximate result of D Magazine, Ermatinger and Sayers' malicious acts is that Plaintiffs suffered severe injury including, but not limited to, personal humiliation, emotional distress, impairment of reputations, medical expense, legal expense, loss of employment, lost earnings capacity, damage to character, criticism, dishonor, and condemnation.

**COUNT XIV**
**Intentional Tort - Defamation By Implication**
**(Against D Magazine and City Defendants)**

319.   Plaintiffs repeat and incorporate by reference paragraphs 1 through 318 above as though fully set forth herein.

320.   Defamation is any action alleging that forms of speech are false, have caused damage to reputation or emotional distress, have presented any person in a false light, or have resulted in criticism, dishonor, or condemnation of any person and are not protected under Constitutional Free Speech provisions of the First Amendment and 42 U.S.C. §1983.

321.   A cause of action for defamation by implication under Florida law accrued in Florida because Plaintiffs are residence in Florida and were injured in Florida.  Defamation is a tort provided by Florida Statute Chapter 770.  Texas law, Texas statute of limitations and Texas sovereign immunity under the Texas Tort Claim Act do not apply to this claim.

322.   "Defamation by implication arises, not from what is stated, but from what is implied when a defendant (1) juxtaposes a series of facts so as to imply a defamatory connection between them, or (2) creates a defamatory implication by omitting facts . . . ." *Jews For Jesus, Inc.*, 997 So. 2d at 1106 (internal quotation marks and citations omitted). "All of the protections

75

of defamation law that are afforded to the media and private defendants are [] extended to the tort of defamation by implication." *Id.* at 1108 (alteration added; citation and footnote call number omitted). *See Jews For Jesus, Inc.*, 997 So. 2d at 1107 ("Defamation by implication is premised not on direct statements but on false suggestions, impressions and implications arising from otherwise truthful statements." (citation and internal quotation marks omitted)).

323.    D Magazine made Plaintiffs the subjects of its publications for the May 2017 issue. Plaintiffs' names were printed and reprinted 140 times in the Article. Ira Tobolowsky's name appeared 92 times. Published in D Magazine's "CRIME" section, the Article implies Plaintiffs are reprehensible degenerates therefore, Plaintiffs committed the murder. The Article even included a picture of Plaintiffs, marked as suspects, with a caption underneath that describes the photo as "all the evidence... to solve the mystery of who killed his father [Ira Tobolowsky]." D Magazine basically connected the dots for the readers. The only suspects listed and pictured are Plaintiff and that is all the evidence he has to figure out who killed Tobolowsky.

324.    D Magazine tantalized its readers, making them thirsty for the magazine's next issue. It published short promotions that used the Socratic method of teaching in which its various publications would ask and answer questions to stimulate its readers.    The other thing D Magazine used for its promotions was Plaintiffs.

*325.*    On April 26, 2017, ***Sneak Peek: D Magazine's May Issue, Which Explores Who Killed Ira Tobolowsky.*** ("Promo-1") (*Id.* Exhibit D)

326.    On May 3, 2017, ***Who Murdered Ira Tobolowsky?*** ("Promo-2")  D Magazine YouTube Video.  (*Id.* Exhibit E)

327. On May 8, 2017, ***The Unsolved Murder of Ira Tobolowsky***, *The prominent lawyer was burned alive in his North Dallas garage.* ***The family thinks they know who did it.*** ("Promo-3")   (*Id.* Exhibit F)

328. ANSWER: Finally the promotional publication cliffhangers were answered when D Magazine released the May 2017 issue. The magazine's feature story was about Aubrey. D Magazine May 2017, *A Place Where Something Evil Happened,* by Jamie Thompson ("Article") (*Id.* Exhibit G)

329. The Article was not about Ira Tobolowsky or attempts to figure out who murdered him. D Magazine had predetermined it was Aubrey, with some assistance from Vodicka, and the only left to do was pin Aubrey up on the cross. This was a story about Aubrey. His name appears 96 times in the Article, more than the name of anybody else.

330. Applicable Defendants conspired with one another for several months in preparation so that D Magazine could publish its May 2017 defamatory story about Plaintiffs. The multi-purpose story was designed to be pretrial publicity for the defamation case brought against Plaintiffs in Moye's court. D Magazine's May 2017 article was published and the trial was conducted on the one-year anniversary of Ira Tobolowsky's murder.[9] The conspirators worked together to publish D Magazine's Article that caused Plaintiffs injury Florida, as Florida

---

[9] The trial was conducted without producing a single document responsive to discovery requests, without identification of a single defamatory statement and without a witness (he was deceased) to testify about injury. At trial, the court found, "plaintiff has proven their case of defamation per se" without identifying or alleging a single statement, throughout the entirety of the trial. Mr. Tobolowsky's sons only testified about how much they hated Plaintiffs, Aubrey was a prostitute, etc.; never about how Mr. Tobolowsky was damaged from defamation. The court awarded $500,000 for mental anguish and damage to reputation though the one of the son's testified his father's business was so good that he was turning away business and D Magazine had interviewed Mr. Tobolowsky's legal assistant and stated in the article: "Ira wondered aloud whether Aubrey was violent. But mostly he laughed about the case, Allen says." Additionally, without any proof of actual damages, without evidence to support exemplary damages and with a statutory limitation of $750,000 for noneconomic damages, Moye's court awarded $5 million in exemplary damages.

is one of their target markets and the Article was accessed and read in Florida, where Plaintiffs reside.

331.     D Magazine seized this opportunity at the trail to write one final nasty online article to further defame Plaintiffs.

332.     On May 9, 2017, the online article, *Judge Awards Huge $5.5 Million Verdict in Ira Tobolowsky Defamation Suit* ("Article-2"), stated:  (*Id.* Exhibit H)

- "The sons had continued to pursue the case after their father's death. And they all believe that Aubrey killed Ira."

- Two judges had voluntarily recused themselves from the case after Ira's death…"

- "A key reason the family and police suspect Aubrey in the murder is the personal animosity he showed against Tobolowsky…"

- "'I wish the defendants were here,' Schoettmer said. 'What these two defendants do ... is that they sue people in order to destroy their lives.'" [10]

333.     One of the Article-2 readers, "ecstatist," shared his/her observations at the end of the online story in the comments section.  Ecstatist believed D Magazine's reporting was not balanced and that most Texas judges could not be impartial in dealing with the case.  Ecstatist stated:

- "There was too much innuendo to call the reporting balanced."

- "I fail to see how most Texas judges could be impartial dealing with the defamation of a fellow (dead) lawyer in the same generation as so many judges. Lawyers seldom criticize lawyers unless there is some money in it"

- "The suspects certainly don't seem to be nice people but assume for a moment that they are actually innocent. And consider what their situation would be now if they were African- Americans!" (*Id.* Ex. G)

---

[10] Stephen Schoettmer flipped the script on this one because Schoettmer represented the Tobolowskys when he filed the defamation lawsuit against Plaintiffs to destroy their lives.  The only problem was that he was a little late, Plaintiffs' savings had already been stolen.

334.   D Magazine boasts its hard copy publication readership is 551,535, its "D Magazine social channels" have 1,298,565 followers and it has average digital monthly page views of 4,000,000+.

335.   Through implication, it cannot be denied that D Magazine's Promo-1, Promo-2, Promo-3, Article, Article Magazine, and Article-2 (collectively "The Publications") make every inference imaginable to hang Plaintiffs for the murder of Ira Tobolowsky.

336.   D Magazine chose profits over truth thereby exposing Plaintiffs to public hatred, contempt, and ridicule, and caused them financial injury, and impeaching Plaintiffs' honesty, integrity, virtue and reputations.

337.   D Magazine and the other defendants conspired with one another to make Plaintiffs suffer through their trial by media, convincing the court of public opinion that Plaintiffs had committed capital murder.

338.   The Publications were a combination of blatant false statements mixed with other statements, in such a way to suggest that Plaintiffs were deserving of public hatred and that they committed capital murder.

339.   D Magazine's Publications about Plaintiffs have been read by millions of people, subjecting Plaintiffs to ridicule and hatred. Aubrey's name appeared ninety-three (93) times and Vodicka's name twenty-seven (27) times, each time a reference to something loathsome and deplorable. Of the millions of readers, some were in Florida, where Plaintiffs reside.[11]

340.   D Magazine and the other Defendants were reckless with regard for the truth. They maliciously published, or caused to be published, statements that defamed Plaintiffs

---

[11] Vodicka personally witnessed Florida residents access and read D Magazine's Article, *A Place Where Something Evil Happened.*

together and individually, or caused to be published combinations of statements that together implied a defamatory meaning regarding Plaintiffs together and individually and with intent, ignored the truth or the results from their own investigations and instead published, or caused to be published, salacious, defamatory and/or false facts or conveyed false meaning or implication in the Article. D Magazine's false suggestions, impressions and implications arising from otherwise truthful statements, include, but are not limited to, the following:

a.  "Steven Aubrey, middle son of a Dallas orthodontist who died in 2004, was fighting an inheritance battle with his mother, who believed he'd come unhinged. He stood well over 6 feet tall and carried 220 pounds packed with muscle, which he flaunted in online ads for his services as a masseur."

b.  "Betsy came to fear her son. "He has absolutely gone crazy and is on a rampage like no other," she wrote to a relative."

c.  "Betsy and Buck told the court that they thought Aubrey might hurt them, and a judge issued peace bonds forbidding Aubrey from contacting them for one year."

d.  "Over the years, the feud grew more heated, and Betsy came to fear her son."

e.  "Eventually, Betsy sought help at a small law office on Lovers Lane run by Ira Tobolowsky."

f.  "Ira had defeated Aubrey at every turn,"

g.  "The next week, Aubrey tried to set a deposition for September 26, during Rosh Hashana. Ira thought Aubrey did it just to irritate him and asked for a date change."

h.  "Ira showed Aubrey's pattern: he'd file a lawsuit and clog the court with motions. If rulings didn't go his way, he'd sue the judge and demand recusal. If that didn't work, he'd nonsuit and file in a different court."

i.  "Steve Schoettmer...who worked at Thompson & Knight, to file a defamation suit against Aubrey in the summer of 2015."

j.  "In February 2016, Judge Eric Moyé declared Aubrey a vexatious litigant and ordered him to pay his mother $250,000."

k.  "It had been a bruising couple of years for the couple. They had been involved in another contentious lawsuit in Austin, after they'd invested hundreds of thousands

of dollars in a real estate deal that turned out to be a Ponzi scheme. They had to sell their $1 million house, and they moved to an apartment in Dallas. They'd spent nearly $2.3 million fighting the case and still owed about $400,000 in legal fees. Aubrey had become estranged from his family. Ira had defeated Aubrey at every turn..."

l.  "'And it's over with, and I'm asking everybody to please leave,' Ira said. The men lingered, and Ira grew more stern. 'Steven and Brian, will you please vacate my office now. These are my offices, this is my property, and I'm asking you all to leave. ... I'll be forced to have you escorted out of here.'"

m.  "Sheriff's deputies had been patrolling Moyé's home that weekend and had instructed   him to carry a gun, fearing that he, too, might be in danger."

n.  "Sheriff's deputies had been patrolling Moyé's home that weekend and had instructed him to carry a gun, fearing that he, too, might be in danger." It is not the policy of law enforcement to "instruct" citizens to carry a gun, especially one known to instigate physical assault on a fellow judge."

o.  "But after talking to Ira's relatives and colleagues, detectives turned their focus to Aubrey and Vodicka. The level of hostility the men had displayed toward Ira— and the fact that he'd recently defeated them in court—pushed the men to the top of their list."

p.  "Police officers eyed the crowd packed with judges and attorneys."

q.  "One of the suspects Dallas police detectives investigated following Ira Tobolowsky's murder" (caption underneath a photo of Aubrey)

r.  "The level of hostility the men had displayed toward Ira—and the fact that he'd recently defeated them in court—pushed the men to the top of their list."

s.  "On May 17, the Tuesday after the fire, detectives went to Aubrey and Vodicka's Dallas apartment. They planned to take the men in for interviews, according to search warrants. But no one answered the door. Two detectives noticed the blinds on a window were open and angled upward. When they returned later, the blinds were closed. Both men's cars were in the parking lot."

t.  Article -Imbedded images of the fraudulent affidavits for search warrants.

u.  "The next day, Aubrey and Vodicka were scheduled to appear at a hearing in Ira's defamation case. Security was tight in the courtroom, as extra sheriff's deputies stood guard, but the men didn't show."

v.  "From the bench, Judge Moyé announced his recusal. 'I think at this point,' he said, 'with the allegations which have been made related to Mr. Aubrey and his

implication in the death of Mr. Tobolowsky and related issues, I don't think that it is unreasonable for a judge other than myself to hear this case.'"

w.    "Vodicka had reactivated his law license and could file the lawsuits on his partner's behalf, sidestepping the need to get approval. Michael wanted to get Vodicka disbarred, to shut them down for good."

x.    "Later that day, detectives returned to the men's apartment. No answer. Aubrey's car was gone. Ermatinger called their phones and left messages and also sent them texts. No response."

y.    "Detectives began monitoring the men's credit card transactions and discovered that Aubrey's card had been used that day to book a room at the Crowne Plaza hotel in Dallas under the name Alexandra Krot."

z.    "Phone records, detectives told the Tobolowsky family, showed no activity on the men's cell phones from about 9 pm the night before the fire until the next afternoon, meaning their phones were not pinging towers and may have been turned off. To the contrary, however, Plaintiffs' phone records did show cell activity before and after that time period."

aa.   "Aubrey declined an interview for this story but did respond to questions over email. "Ermatinger is a lying sack of shit," he wrote."

bb.   That night, at 9:30, Ermatinger got a judge to sign search warrants to examine Aubrey and Vodicka for burns and search their apartment. He was looking for combustible liquids, empty containers, medical supplies to treat burns, and gas receipts, according to the warrants. No one was at the apartment when police arrived, but detectives seized an Apple desktop computer and paperwork for burner phones.

cc.   "They needed to find the killer before any injuries had time to heal."

dd.   "Plainclothes detectives watched and waited until about 3:30 pm, when they saw Aubrey and Vodicka get into their car, heading out for a late lunch. Police cars surrounded the men. Detectives jumped out with guns drawn and screamed, 'Get down on the ground!',.,"

ee.   "For the next nine hours, Aubrey was kept in an interrogation room…"

ff.   "Aubrey refused to talk without a lawyer and said he couldn't afford one. Detective Ermatinger called Assistant District Attorney Gary McDonald, who helped find a public defender and also subpoenaed Aubrey to testify before a grand jury, a tactic prosecutors sometimes use when dealing with uncooperative witnesses. A few days later, the prosecutor questioned Aubrey before jurors. It

would be a violation of law for anyone to reveal what exactly was said that day, but the proceedings didn't produce an indictment.

gg.    "Ermatinger says Aubrey had red marks on both arms."

hh.    "'The doctor explained to us that it could be from the flash of a fire, it could be burns, or it could just be a sunburn,' Ermatinger says. He says too much time had passed."

ii.    "They did not have good alibis, telling detectives that at the time of the fire, they were at their apartment."

jj.    "Michael saw a hole surrounded by what looked like black paint. It appeared to have been made recently. For someone of his height—the 6 feet and 4 inches that helped get him onto the team at Trinity—it provided a clear view to the garage where his father had died."

kk.    "Detectives remembered seeing a drill at Aubrey and Vodicka's apartment and obtained warrants for another search. When they searched it the following week, they found an Apple MacBook in the process of having its hard drive wiped clean, according to a later search warrant. They seized it for testing. From the two apartments, they also collected a cordless drill and bits, two red gasoline containers, a yellow propylene tank with a torch attachment, a blue propane torch, two cans of paint, and a couple of pairs of shorts and pants."

ll.    "Ermatinger would have to wait for crime scene technicians to search the men's computers and process the juice bottle found in the garage for fingerprints."

mm.    "Detective Ermatinger, now retired, says the men remain primary suspects; no one else on their list came close. He says detectives executed more search warrants on the Tobolowsky case—roughly 18—than on any other case he'd worked. Most of those dealt with Aubrey and Vodicka; others were for cell tower dumps. "They are suspects, and they are strong ones," Ermatinger says. "But I had no evidence to arrest them.""

nn.    "Aubrey agreed to masturbation and sexual intercourse for $300."

oo.    "It had occurred to family members to take matters into their own hands. Debbie worried about keeping her boys leashed. "I don't know how serious they were, but I thought they could have very easily gone and done something stupid," she says. "I told them, 'Do you think your father would want you in jail for the rest of your life?'""

pp.    "Michael filled a whiteboard with evidence and photos of Aubrey and Vodicka. He still researched other suspects, but the more he learned about the two men, the

more he believed they were responsible. Michael decided to keep representing Aubrey's mother and to move forward with his dad's defamation case."

qq.   "Most of the family thought Aubrey had killed Ira. But he was still free, living not far away in North Dallas."

rr.   "One afternoon Ira's sister saw Aubrey in Bed Bath & Beyond, and her knees buckled."

ss.   "In early October, Michael got an email from a pair of private investigators. "We are private investigators who simply have a low tolerance for scumbaggery and this case really bothers us," they wrote."

tt.   "One whiteboard lists 10 suspects in his dad's death. He has crossed off only two, his mother and neighbors. Like his mother, he fears police may not have done enough work to rule out any of the rest."

uu.   "Debbie had never been sued before, and she was frightened. Someone sent a blank piece of paper to her house, in an envelope with Aubrey's return address on it. To her, it seemed to be saying: I know where you live."

vv.   "While believing the men killed her husband, Debbie sometimes wonders whether police have adequately ruled out the other suspects."

ww.   "Family members also worry about the lack of physical evidence. While believing the men killed her husband, Debbie sometimes wonders whether police have adequately ruled out the other suspects."

xx.   "Late last year, they learned Aubrey and Vodicka had moved to Florida. The men live in a bungalow surrounded by palm trees."

yy.   Debbie cried for two days. Michael worries about her. She has been living elsewhere, paralyzed about what to do next.

zz.   With an arrest, with justice and closure, maybe Michael could move on. But not now. Because he can also hear his father saying, Get the bastard.

341.   If a statement implies the existence of undisclosed defamatory facts, then it's illegal defamation.

342.   The Article was an accumulation of every negative connotation and inference that the D Magazines could dig up and piece together, taking facts out of context and using them to

defame Plaintiffs per se. Though detectives admit they do not have even the smallest bit of evidence, D Magazine boldly alleges it solved the crime, and Plaintiffs are the criminals.

343. To further demonize Aubrey, Thompson only includes a nasty excerpt from Aubrey's response email to Michael Tobolowsky. She did not fairly include the completely vile content in Michael Tobolowsky's email that caused Aubrey to respond as he did.

344. D Magazine does not clearly indicate in the Article if it accuses that Vodicka is an accomplice or an accessory to the crime/murder. Either way, D Magazine has publically branded Vodicka as a criminal as well.

345. The Article disclosed gross amounts of Plaintiffs' personal information, however, nothing about the other persons of interest was disclosed, proof the Article is discriminatory, malicious, unbalanced, unfair and defamatory. D Magazine grossly discriminated against Plaintiffs and did not balance the story with any information about the others, not their names and certainly not their pictures, unlike Plaintiffs.

346. D Magazine eagerly published the fraudulent affidavits and search warrants used against Plaintiffs but failed to include those executed on other persons of interest. D Magazine never wavered from its absolute discrimination used against Plaintiffs.

347. The Publications were not fair or balanced. D Magazine only includes nasty and hateful comments from a retired detective, the Tobolowsky family and the author, Thompson, who had the audacity to summarize the Tobolowsky family's thoughts, including:

> "While believing the men killed her husband, Debbie sometimes wonders
> whether police have adequately ruled out the other suspects," and "Most
> of the family thought Aubrey had killed Ira."

348. Aubrey tendered information to Thompson that reasonably explained the truth of some matters. Though Thompson had the truth at her fingertips, she intentionally published false

facts to defame Plaintiffs, or she was recklessly indifferent to the truth so that intent may be presumed.

349.    D Magazine, Ermatinger and Sayers have engaged in a pattern of conduct, resulting in publication of defamatory and libelous statements against Plaintiffs and is liable to Plaintiffs for damages caused by their conduct.

350.    D Magazine published Promo-1, Promo-2 and Promo-3 to bait its reader's with the unanswered questions: *Who Killed Ira Tobolowsky, Who Murdered Ira Tobolowsky, and The family thinks they know who did it.* It would prove far too cruel for D Magazine to not have the answer and it turned out they did have the answer; Aubrey.

351.    The Article is not clear if D Magazine considers Vodicka to be an accomplice or an accessory to the crime/murder.

352.    The Article as a whole creates a false and defamatory impression in several respects.  Defamation by implication occurs when true statements are stated in a way that implies a defamatory connection – or the omission of certain facts – as to create a defamatory implication. Jews for Jesus, Inc. v. Rapp, 997 So. 2d 1098, 1108 (Fla. 2008).

353.    The direct and proximate result of D Magazine, Ermatinger and Sayers' malicious acts is that Plaintiffs suffered severe injury including, but not limited to, personal humiliation, emotional distress, impairment of reputations, medical expense, legal expense, loss of employment, lost earnings capacity, damage to character, criticism, dishonor, and condemnation.

354.    Plaintiffs repeat and incorporate by reference paragraphs 1 through 349 above as though fully set forth herein.

355.    This claim arises from the appropriation of Plaintiffs identities and/or names in publications for benefit of others.

356.    The Fourth and Fifth Amendments to the U.S. Constitution and 42 U.S.C. §1983 protect American citizens from interference with an individual's possessory property rights or liberty by the government and protect against self-incrimination, which in turn protects the privacy of personal information.

357.    D Magazine violated Aubrey's right to privacy when it appropriated Aubrey's private image in its May 2017 article, *A Place Where Something Evil Happened,* by Jamie Thompson, for commercial purposes and without Aubrey's consent. The unlawfully used image appears in the print version of the article and in the online version. (*See* **Exhibit G.**)

358.    D Magazine used Aubrey's photo for profit in the sale of its magazine. The purpose of D Magazine's Article is to defame Aubrey and paint him as a criminal and the photo is another tool used to injure Aubrey.  The nature of the Article and nonconsensual use of Aubrey image has subjected Aubrey to criticism, dishonor, and condemnation.

359.    The description underneath the photo further subjects Aubrey to public ridicule, stating:

> "Steven Aubrey—one of the suspects Dallas police detectives investigated following Ira Tobolowsky's murder—during a taped deposition."

360.    D Magazine admits that the source of Aubrey's photo was a deposition and that deposition is not a public record. The deposition was not a public record because it had not been filed with the court.

361.    Courts have held that litigants have no First Amendment right to publish deposition testimony that is not filed in court, and most depositions — especially videotapes of depositions — are not filed in court. This means, however, that once the videotaped deposition

testimony is filed in court without a protective order, it will become a public record, available to the public at large.

362.     D Magazine violated Vodicka's right to privacy when it appropriated his private image in its May 2017 article, *A Place Where Something Evil Happened,* by Jamie Thompson, for commercial purposes, without Vodicka's consent.  The unlawfully used image appears in the the in the online version of the story. (*See* **Exhibit G.**)

363.     Like Aubrey's photo, D Magazine acquired Vodicka's image from a private deposition, without first getting consent.   Vodicka's deposition has not been filed in court and is not a public record.

364.     D Magazine placed Vodicka's photo and a different photo of Aubrey, this time public, at the top of a crime board, both positioned at the top of the board as "suspects" for the murder of Ira Tobolowsky.  The staged photo defames Plaintiffs, holds them out to be guilty of capital murder.   While the Article and the picture caused serious injury to Plaintiffs, D Magazine realized commercial profits from the pictures and the injury unleashed on Plaintiffs.

365.     On may 18, 2016, Moye appropriated Aubrey's name, announcing to the media invited into his courtroom, that Aubrey was implicated in the death of Ira Tobolowsky.  Moye was outside his capacity and acting under color of law when he accused Aubrey of murder, in front of the whole world.

366.     Moye had a pecuniary interest in accusing Aubrey of criminality because it would serve as an excuse for his own.   On May 13, 2016, Moye committed aggravated assault on the Dallas North Tollway, which put his job at risk.   Moye was in the middle of a re election campaign when he pointed his loaded firearm and a woman driving next to him.  The woman

took a picture of Moye in his Mercedes and posted it on Facebook asking for help to identify the gunman.

367.    It is likely extremely uncommon for a judge to invite the media to court to witness a voluntary recusal but that is what Moye did and his very damaging murder accusation diverted the media and the publics attention away from his felony offense as he planned.

368.    D Magazine realized financial profits from their May 2017 defamatory cover story that destroyed Plaintiffs' reputation and caused public hatred and ridicule.

369.    Plaintiffs, being Citizens of the United States, were subjected to deprivations of their rights, privileges, and immunities secured by the states, sustained deprivations of their personal liberties, invasions of their privacy, and violations of their civil rights, have suffered and will continue to suffer from psychological harm, mental distress, humiliation, embarrassment, fear, and defamation of their characters and reputations, were prevented from attending to their usual duties and underwent psychological treatment, all to their damages that exceed the jurisdiction of this Court.

370.    On or before May 18, 2016, DPD appropriated a photo of Aubrey and passed it out in the courthouse acting as though Aubrey was not simply at home in his apartment. City Defendants were putting on a show to create probable cause so they could get search warrants to snoop around and invade Aubrey's privacy in yet another way.

371.    Plaintiff had no interest in speaking with the detectives and because Plaintiffs do not know anything about the murder of Ira Tobolowsky, there was nothing that could serve as probable cause for the detectives to get warrants a legally intrude on Plaintiffs.

372.    While Plaintiffs were as home, DPD were in the downtown courthouse putting on a show for the pubic, passing out photos of Aubrey and telling court personnel to be on the

lookout, as though Aubrey was on the run.  Plaintiffs do not understand why someone on the run would run to the courthouse but that is where they stage show was focused.

373.    DPD has an interest in defaming Aubrey so they could try to establish probable cause.  In the end they felt their exercise of pretend hide-and-seek was not enough so they went ahead and lied on their affidavits, stating that Tobolowsky had alleged that Aubrey threatened his life with Jihad, whatever that entails.

374.    As stated above, Applicable Defendants gained some benefit from the appropriation of Plaintiffs' pictures and names.  Plaintiffs were injured each time the appropriation occurred.

375.    The direct and proximate result of the acts described above, Applicable Defendants' malicious behavior caused Plaintiffs to suffer severe injury including, but not limited to, personal humiliation, emotional distress, impairment of reputations, medical expense, legal expense, loss of employment, lost earnings capacity, and damage to character.

**COUNT XV**
**Intentional Tort - Invasion of Privacy, Appropriation**
**(Against Moye, D Magazine and City Defendants)**

376.    Plaintiffs repeat and incorporate by reference paragraphs 1 through 375 above as though fully set forth herein.

377.    This claim arises from the appropriation of Plaintiffs identities and/or names in publications for benefit of others.

378.    The Fourth and Fifth Amendments to the U.S. Constitution and 42 U.S.C. §1983 protect American citizens from interference with an individual's possessory property rights or liberty by the government and protect against self-incrimination, which in turn protects the privacy of personal information.

379.   D Magazine violated Aubrey's right to privacy when it appropriated Aubrey's private image in its May 2017 article, *A Place Where Something Evil Happened,* by Jamie Thompson, for commercial purposes and without Aubrey's consent. The unlawfully used image appears in the print version of the article and in the online version. (*See* **Exhibit G**.)

380.   D Magazine used Aubrey's photo for profit in the sale of its magazine. The purpose of D Magazine's Article is to defame Aubrey and paint him as a criminal and the photo is another tool used to injure Aubrey. The nature of the Article and nonconsensual use of Aubrey image has subjected Aubrey to criticism, dishonor, and condemnation.

381.   The description underneath the photo further subjects Aubrey to public ridicule, stating:

> "Steven Aubrey—one of the suspects Dallas police detectives investigated following Ira Tobolowsky's murder—during a taped deposition."

382.   D Magazine admits that the source of Aubrey's photo was a deposition and that deposition is not a public record. The deposition was not a public record because it had not been filed with the court.

383.   Courts have held that litigants have no First Amendment right to publish deposition testimony that is not filed in court, and most depositions — especially videotapes of depositions — are not filed in court. This means, however, that once the videotaped deposition testimony is filed in court without a protective order, it will become a public record, available to the public at large.

384.   D Magazine violated Vodicka's right to privacy when it appropriated his private image in its May 2017 article, *A Place Where Something Evil Happened,* by Jamie Thompson,

for commercial purposes, without Vodicka's consent. The unlawfully used image appears in the online version of the story. (*See* **Exhibit G**.)

385.    Like Aubrey's photo, D Magazine acquired Vodicka's image from a private deposition, without first getting consent. Vodicka's deposition has not been filed in court and is not a public record.

386.    D Magazine placed Vodicka's photo and a different photo of Aubrey, this time public, at the top of a crime board, both positioned at the top of the board as "suspects" for the murder of Ira Tobolowsky. The staged photo defames Plaintiffs, holds them out to be guilty of capital murder. While the Article and the picture caused serious injury to Plaintiffs, D Magazine realized commercial profits from the pictures and the injury unleashed on Plaintiffs.

387.    On may 18, 2016, Moye appropriated Aubrey's name, announcing to the media invited into his courtroom, that Aubrey was implicated in the death of Ira Tobolowsky. Moye was outside his capacity and acting under color of law when he accused Aubrey of murder, in front of the whole world.

388.    Moye had a pecuniary interest in accusing Aubrey of criminality because it would serve as an excuse for his own. On May 13, 2016, Moye committed aggravated assault on the Dallas North Tollway, which put his job at risk. Moye was in the middle of a re election campaign when he pointed his loaded firearm and a woman driving next to him. The woman took a picture of Moye in his Mercedes and posted it on Facebook asking for help to identify the gunman.

389.    It is likely extremely uncommon for a judge to invite the media to court to witness a voluntary recusal but that is what Moye did and his very damaging murder accusation diverted the media and the publics attention away from his felony offense as he planned.

390.    D Magazine realized financial profits from their May 2017 defamatory cover story that destroyed Plaintiffs' reputation and caused public hatred and ridicule.

391.    Plaintiffs, being Citizens of the United States, were subjected to deprivations of their rights, privileges, and immunities secured by the states, sustained deprivations of their personal liberties, invasions of their privacy, and violations of their civil rights, have suffered and will continue to suffer from psychological harm, mental distress, humiliation, embarrassment, fear, and defamation of their characters and reputations, were prevented from attending to their usual duties and underwent psychological treatment, all to their damages that exceed the jurisdiction of this Court.

392.    On or before May 18, 2016, DPD appropriated a photo of Aubrey and passed it out in the courthouse acting as though Aubrey was not simply at home in his apartment. City Defendants were putting on a show to create probable cause so they could get search warrants to snoop around and invade Aubrey's privacy in yet another way.

393.    Plaintiff had no interest in speaking with the detectives and because Plaintiffs do not know anything about the murder of Ira Tobolowsky, there was nothing that could serve as probable cause for the detectives to get warrants a legally intrude on Plaintiffs.

394.    While Plaintiffs were as home, DPD were in the downtown courthouse putting on a show for the pubic, passing out photos of Aubrey and telling court personnel to be on the lookout, as though Aubrey was on the run.  Plaintiffs do not understand why someone on the run would run to the courthouse but that is where they stage show was focused.

395.    DPD has an interest in defaming Aubrey so they could try to establish probable cause.  In the end they felt their exercise of pretend hide-and-seek was not enough so they went

ahead and lied on their affidavits, stating that Tobolowsky had alleged that Aubrey threatened his life with Jihad, whatever that entails.

396. As stated above, Applicable Defendants gained some benefit from the appropriation of Plaintiffs' pictures and names. Plaintiffs were injured each time the appropriation occurred.

397. The direct and proximate result of the acts described above, Applicable Defendants' malicious behavior caused Plaintiffs to suffer severe injury including, but not limited to, personal humiliation, emotional distress, impairment of reputations, medical expense, legal expense, loss of employment, lost earnings capacity, and damage to character.

## COUNT XVI
### Intentional Tort - Emotional Distress, Intentional Infliction
### (Against All Defendants)

398. Plaintiffs repeat and incorporate by reference paragraphs 1 through 397 above as though fully set forth herein.

399. Intentional infliction of emotional distress is a common law tort that allows individuals to recover for severe emotional distress caused by another individual who intentionally or recklessly inflicted emotional distress by behaving in an "extreme and outrageous" way.

400. This cause of action arises from emotional shock suffered by Plaintiffs resulting from the impact of Applicable Defendants' extreme and intentional aggravated assault on May 19, 2016, conduct that would be described as outrageous, causing Plaintiffs severe and ongoing emotional distress, conduct considered shocking or scandalous by an average member of the

community and the claim is also a violation under the Sixth Amendment to the U.S. Constitution and 42 U.S.C. 1983.

401.    On May 18, 2016, Moye gathered all available media in his courtroom and acted under color of law when he alleged that Aubrey was implicated in the murder of Ira Tobolowsky, before medical examiners had even determined the cause of death.    Moye had a pecuniary interest when he made the public accusation, launching a trial by media that would forever deprive Plaintiffs a fair and impartial tribunal in the Dallas-Fort Worth area.  The Supreme Court of Texas was forced to assign the underlying case to a judge outside of Dallas County after three (3) Dallas County judges recused themselves from presiding over the case due to Moye's reckless and self-serving statement.

402.    Moye, a civil judge, blindsided Aubrey with his criminal accusation of murder. An elementary and fundamental requirement of due process in any proceeding, which is to be accorded finality, is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.  Notice must be sufficient to enable the recipient to determine what is being proposed and what he must do to prevent the deprivation of his interest.  Moye did not notice Aubrey about his planned public murder accusation.

403.    Moye's egregious and self-serving murder accusation had forever impacted Plaintiffs' lives.  The moment Moye accused Aubrey for the murder of Tobolowsky, the media saw that as a green light to decimated Plaintiffs and their reputations.  Prior to the accusation, fear of liability kept the media in check, but after Moye, an "official" spoke Plaintiffs' names, it was all over.    Moye's conduct was so evil, malicious and premeditated.  He has no regard for other humans, which is why he ratings are consistently to lowest of all Dallas County judges.  He

has two publically witnessed assaults and who knows how many that the public has not seen. Plaintiffs have forever lost their faith in judges and the expectation for them to simply be fair is long gone. Plaintiffs filed complaints with State Commission on Judicial Conduct who have disciplined Dallas judges for far less. Somehow he is connected and untouchable. Moye answers to nobody and was given a free pass for his felony offense. Moye's conduct was intentional because it was planned in advance.

404. On May 19, 2016, DPD utilized the Tactical Division for a Stake-Out and High-Risk Apprehension of Plaintiffs to execute unlawful search warrants to obtain fingerprints and photographs of Plaintiffs. Applicable Defendants waited, in hiding, for Plaintiffs to exit their residence. Following the exit from their residence, Plaintiffs entered into their parked vehicle and began to back out of the driveway. Using tactics and resources reserved for the likes of a Pablo Escobar, Applicable Defendants ambushed Plaintiffs. Unmarked cars traveling at very high speeds blocked Plaintiffs' vehicle from every angle. What appeared to be an attack by lawless maniacs, Applicable Defendants slammed their brakes, jumped out of their vehicles wearing unidentifiable plain clothes with firearms drawn and pointed at Plaintiffs as they descended upon Plaintiffs' vehicle. The crazed and threatening men screamed at Plaintiffs to get out of the car and then forced them to the concrete with loaded guns at the temples of their heads. One of the gunmen, who had Vodicka pinned to the ground, said in a low voice, "You know what you did, faggot."

405. Instead of complying with the "knock-and-announce" rule, Applicable Defendants used force that was unreasonable and violent. It was not necessary to ambush Plaintiffs and force them to the ground with loaded firearms pointed at their heads. Plaintiffs were no armed, did not pose a threat, they did not resist arrest, and the warrant did not authorize their arrests.

The search warrants commanded City Defendants to "examine, photograph and fingerprint" Plaintiffs "within accepted practices."

406.    The City of Dallas and Chief Brown failed to adequately supervise and/or discipline its employees and if they consider their actions to be "within accepted practices" then their practices are unconstitutional and they should be liable for their damage.  The excessive force was intentional conduct because it was planned in advance.

407.    Plaintiff will never ever trust law enforcement again.  Plaintiffs had never had loaded guns pointed at their heads.  Plaintiffs thought they were going to die, the reaction Applicable Defendants expected.  Plaintiffs were humiliated in front of all of their neighbors who gazed at the spectacle that one would assume would be saved for taking down a drug lord. The apartment complex evicted Plaintiffs for "arrest on property."  DPD got as many search warrants as they requested.  Plaintiffs will never feel secure in their homes again, something they had grown to believe was a constitutional right.

408.    Plaintiffs continue to suffer emotional shock, resulting from the impact of Applicable Defendants' aggravated assault.

409.    Plaintiffs were forced to witness the assaults on each other as they occurred simultaneously.

410.    Plaintiffs were deprived of their liberty without cause, and taken to Dallas Police Department Headquarters, without giving consent.

411.    Because of Applicable Defendants' malicious actions, both Plaintiffs were held in interrogation rooms deprived of their liberty without cause for a period of approximately nine (9) hours,

412.    On May 19, 2016, Applicable Defendants in unmarked cars and plain clothes ambushed Plaintiffs with firearms drawn and pointed at their heads. Applicable Defendants intended to create a state of fear or danger in Plaintiffs. Plaintiff believed Applicable Defendants would harm them and fire bullets into their heads, making this an aggravated assault.

413.    Applicable Defendants intentional lack of visual or audible identification is proof of their objective to create fear in Plaintiffs.

414.    In 2016, Aubrey was falsely imprisoned twice and Vodicka once. Because Plaintiffs do not frequent prisons or jails, losing control over ever single aspect of your life for the time in jail and extremely demoralizing and humiliating. DPD is a sick culture of many officers that think they can do whatever they like and enjoy having control over others. It is a mental illness that spreads like a cancer. Plaintiffs felt the need to move to another state to be free of the oppressive culture of the DPD.

415.    On October 20, 2016, under color and pretense of law, DPD initiated a criminal prosecution against Aubrey. Though they failed to entrap Aubrey for prostitution, they proceeded with their campaign to maliciously prosecute him, beginning with a false arrest. To deceive the public, DPD fabricated a story about an undercover prostitution investigation of a website where Aubrey advertised his massage services. In truth, there was no investigation and instead they had a target, Aubrey.

416.    Because Aubrey is not a prostitute, he would not agree to meet the undercover officer for a cocktail in the bar and there was never any communication about "masturbation and sexual intercourse," which some of the media published to defame Plaintiffs. Additionally, Aubrey refused to accept money upfront, before services were rendered. Because Aubrey is not a prostitute, the district attorney never prosecuted the case.

417.    Attempting to disguise their malicious intent and deceive the public, DPD fabricated a story about an undercover prostitution investigation of a website.  Plaintiffs were targets for harassment and abuse.   Several minutes after DPD falsely arrested Aubrey for prostitution, Ermatinger and Sayers took advantage of Aubrey's false imprisonment and they illegally trespassed into Plaintiffs' residence, this time without a warrant.

418.    Plaintiffs never could feel comfortable or peaceful in their home after DPD had been there twice and Ermatinger and Sayers trespassed without a warrant.  They made sure to spin their stories for the media and tried to legitimize Aubrey's prostitution arrest.  Of course they maliciously prosecuted the case and left it on the books for two years until the statute of limitations ran out, all the while, Aubrey was forced to pay an attorney to show up at court every two months for the case to again be passed to the next date.  It was a way for DPD to have their grimy hooks in Aubrey, purely for harassment value.  DPD's conduct was intentional because the entrapment was planned in advance.  As well, they knew they could never prosecute the bogus case but instead of dropping the charges, they let it charge stay on the books for 2 years out of spite.

419.    Moye and law enforcement all acted under color of law.  The people you think are there to protect you are really out to take from you.

420.    D Magazines defamation of Plaintiffs is unmatched.  The magazine's work is disgusting and filthy.  Plaintiffs believe that D Magazine guessed Plaintiffs would be easy targets because they moved far away.   For a publisher to convince millions of readers that Plaintiffs are murders is tough to fathom.  Putting in print, completely fabricated lies because profits over truth is the company motto.  The damage D Magazine has caused is beyond anything Plaintiff could have imagined and its disgusting Article is always waiting online to stare back and horrify

anybody who happens to search Plaintiffs' names.   As long as they leave the grotesque defamatory article up, Plaintiffs live in fear of which relationship will be the next to vanish overnight.

421.   As a result of the defamation, perjured affidavits for search warrants, unlawful searches and seizures, trespass, aggravated assault, excessive force, multiple false arrests, multiple false imprisonments, and multiple malicious prosecutions, Plaintiffs, being Citizens of the United States, were subjected to deprivations of their rights, privileges, and immunities secured by the Constitution of the United States, sustained deprivations of their personal liberties, invasions of their privacy, and violations of their civil rights, have suffered and will continue to suffer from psychological harm, mental distress, humiliation, embarrassment, fear, extreme shock and nervousness and defamation of their characters and reputations, were prevented from attending to their usual duties and underwent psychological treatment, all to their damages that exceed the jurisdiction of this Court.

422.   By reason of the above, Plaintiffs' reputations have been greatly injured and have been brought into public scandal, disrepute, and disgrace, and have suffered great emotional trauma and harm.

423.   Applicable Defendants actions have proximately resulted in material damages to Plaintiffs.

424.   Plaintiffs are entitled to recover compensatory damages, special damages and punitive damages.

## DAMAGES

425.   As a direct and proximate cause of Defendants' acts, Plaintiffs suffered injury and damages including, but not limited to, the following:

## PRAYER

WHEREFORE, Plaintiffs Steven B. Aubrey and Brian E. Vodicka request that Defendants be served with service of process and that after a trial on the merits, Plaintiffs be awarded compensatory damages against Defendants, jointly and severally, in an amount not less than $40 Million ($40,000,000.00) and exemplary damages, to punish and deter Defendants, jointly and severally, in an amount not less than $80 Million ($80,000,000.00) and to all other further relief to which Plaintiffs may be entitled in equity and in law and Grant the following relief:

a.    For an immediate, preliminary injunction and permanent injunction enjoining All Defendants from hosting, posting, or in any manner publishing or disseminating, whether under its legal identity or under any aliases, whether now created or created in the future, any defamatory or injurious information regarding Plaintiffs; and

b.    For an Order compelling Defendant D Magazine to immediately remove from its websites: dmagazine.com, prestonhollowpeople.com and parkcitiespeople.com, as well as any and all other media and communication conduits, any and all postings of articles that mention Plaintiffs by name and/or can be attributed to or regarding either Plaintiff by reasonable logical deductive means.

## JURY DEMAND

Plaintiffs request trial by jury in this above-styled action.

Respectfully submitted,

By: _____

Steve Aubrey, Pro Se
2601 NW 3rd Ave
Wilton Manors, FL 33311
Telephone: (512) 666-8004
defamationperse@gmail.com

By: _____
 Brian  Vodicka
2601 NW 3rd Ave
Wilton Manors, FL 33311
Telephone: (954) 716-9375
defamationperse@gmail.com

# EXHIBIT  A

## to

## Plaintiffs' Original Complaint

## AFFIDAVIT FOR SEARCH WARRANT

STATE OF TEXAS      §      Residence located at
                    §      7777 Glen America #223
COUNTY OF DALLAS    §      Dallas, Dallas County, Texas

1. There is in Dallas County, Texas, a suspected place and premises described and located as follows: A private residence located at 7777 Glen America #223 Dallas, Dallas County, Texas. The residence is an apartment complex called Tonti Lakeside Apartments. The Apartment in question is located on the second floor and is a red brick structure the number 223 is located on the top center of the door.

2. There is at said suspected place and premises the following item(s) constituting evidence of a criminal offense or constituting evidence tending to show that a particular person committed a criminal offense: Any combustable liquids or empty containers that are similar to the items found at the crime scene. Any medical treatment for burn injuries, medical items that could be used to treat injuries as well as burns. Any receipts that would show any purchases that would be consistent with the evidence found at the scene like gasoline purchases. Any computers or electronic devises that can store data or files that might be evidence in this case regarding threats or research done that is similar to what happened at the crime scene. Cell phones, clothing, blood,shoes,weapons of any kind. Any egnitable liquids or evidence of any egnitable liquids that could have been spilled on the floor that can be sent to a laboratory and compared to evidence found at the scene.

3. Said suspected place and premises are in charge of and controlled by each of the following persons: StevenBenton Aubrey W/M 10/11/60 and Brian Edward Vodicka W/M 08/09/59 who are on the lease argeemnent for the address listed in this warrant. The lease agreement was dated on 2/07/16.

4. It is the belief of Affiant, and he hereby charges and accuses that: the above described residence contains evidence, Any combustable liquids or empty containers that are similar to the items found at the crime scene. Any medical treatment for burn injuries, medical items that could be used to treat injuries as well as burns. Any receipts that would show any purchases that would be consistent with the evidence found at the scene like gasoline purchases. Any computers or electronic devises that can store data or files that might be evidence in this case regarding threats or research done that is similar to what happened at the crime scene. Cell phones, clothing, blood,shoes,weapons of any kind. Any egnitable liquids or evidence of any egnitable liquids that could have been spilled on the floor that can be sent to a laboratory and compared to evidence found at the scene. 7777 Glen America #223 Dallas, Dallas County, Texas.

Affiant has probable cause for said belief by reason of the following facts:  On May 13, 2016 at approximately 7:52 am Dallas Fire Rescue, and Dallas Police were called to a residential structure fire located at 7435 Kenshire Ln, Dallas, Dallas County, Texas.  Fire Rescue discovers the burned body of Ira Tobolowsky in the garage next to his motor vehicle.  He was pronounced dead at the scene.  Arson investigators along with Homicide Detective Sayers #7157 responded to the location and determined that the victim was burned by criminal means and are investigating this as a Murder.  During the investigation Detectives discovered that the victim Ira Tobolowky was involved in a civil defamation lawsuit with Steven Aubrey and his partner Brian Vodicka who was representing him.  Family members advised detectives that complainant Tobolowsky felt threatened by Steve Aubrey because of a law suit that complainant Tobolowsky won when he represented the mother of Steven Aubry, Betsy Aubrey.  It was aledged in the lawsuit that Steven Aubrey threatened "Jihad" the same words used to describe the wars brought by terrorists, and against his life which was filed in court document number 15-08135 in the 14 Judicial district court judge Eric Moye presiding.  Ira Tobolowsky is of Jewish descend and felt Jihad was an anti-semitic statement. It is the belief of Detectives in this case as well as Arson investigators that the person who set fire to complainant Tobolowsky could have been burned themselves as the area of the burning was inside the garage in a small confined space that would not allow for very much movement.  It is believed that who ever set the complainant on fire may have suffered serious burns and is hiding from public site as to prevent their injuries from being seen by the public as well as detectives.  Detectives went to the location of 7777 Glen America and knocked on the door of #223 to confront Steven Aubrey and Brian Vodicka and ask them to come to police headquarters and be interviewed as well as allow detectives to view any injuries that might have been sustained.  No one answered the door and neighbors stated that they have not seen either Steven Aubrey or Brian Vodicka since Saturday the 14th of May 2016 and they have not heard any occupants walking around inside.

Wherefore, Affiant asks for issuance of a warrant that will authorize the search of said suspected place and premises and above described individual(s) for said personal property and seize the same and to arrest each said described and accused person who is in violation of the laws of the State of Texas.

_D 2 Ernett    505/_
AFFIANT

Subscribed and sworn to before me by the said affiant on this _18th_ day of _May_, 20_16_.

_Jeanine Newcord_
DISTRICT JUDGE, DALLAS COUNTY, TEXAS

# EXHIBIT  B

## to

## Plaintiffs' Original Complaint

## AFFIDAVIT FOR SEARCH WARRANT

| | | |
|---|---|---|
| STATE OF TEXAS | § | Residence located at |
| | § | 8617 Souhwestern Blvd #911 |
| COUNTY OF DALLAS | § | Dallas, Dallas County, Texas |

1. There is in Dallas County, Texas, a suspected place and premises described and located as follows: A private residence located at 8617 Southwestern Blvd #911 Dallas, Dallas County, Texas. The residence is an apartment complex called The North Bridge Apartments located in the Village apartment comunity. The Apartment in question is located on the first floor and is a red brick structure with the top floors being gray wood. The number 911 is to the right of the door.

2. There is at said suspected place and premises the following item(s) constituting evidence of a criminal offense or constituting evidence tending to show that a particular person committed a criminal offense: Any combustable liquids or empty containers that are similar to the items found at the crime scene. Any medical treatment for burn injuries, medical items that could be used to treat injuries as well as burns. Any receipts that would show any purchases that would be consistent with the evidence found at the scene like gasoline purchases. Any computers or electronic devises that can store data or files that might be evidence in this case regarding threats or research done that is similar to what happened at the crime scene. Cell phones, clothing, blood,shoes,weapons of any kind. Tools or drills and drill bits that could be used to drill a hole in a wood fence. Any ignitable liquids or evidence of any ignitable liquids that could have been spilled on the floor  that can be sent to a laboratory and compared to evidence found at the scene.

3. Said suspected place and premises are in charge of and controlled by each of the following persons: StevenBenton Aubrey W/M 10/11/60 who uses this location for business purposes to meet clients and give massage therapy. Brian Vodicka who is steve Aubreys boyfriend stated in an interview that the apartment is used for this purpose.

4. It is the belief of Affiant, Detective Scott Sayers #7157 who is employed by the Dallas Police Department for 21 years and who has been assigned to the Homicide unit does hereby charges and accuses that:  the above described residence contains evidence, Any combustable liquids or empty containers that are similar to the items found at the crime scene.  Any medical treatment for burn injuries, medical items that could be used to treat injuries as well as burns. Any receipts that would show any purchases that would be consistent with the evidence found at the scene like gasoline purchases. Any computers or electronic devises that can store data or files that might be evidence in this case regarding threats or research done that is similar to what happened at the crime scene.  Cell phones, clothing,

blood,shoes,weapons of any kind. Tools or drills and drill bits that could be used to drill a hole in a wood fence.  Any ignitable liquids or evidence of any ignitable liquids that could have been spilled on the floor  that can be sent to a laboratory and compared to evidence found at the scene.  8617 Southwestern Blvd #911 Dallas, Dallas County, Texas.

Affiant has probable cause for said belief by reason of the following facts:  On May 13, 2016 at approximately 7:52 am Dallas Fire Rescue, and Dallas Police were called to a residential structure fire located at 7435 Kenshire Ln, Dallas, Dallas County, Texas.  Fire Rescue discovers the burned body of Ira Tobolowsky in the garage next to his motor vehicle.  He was pronounced dead at the scene.  Arson investigators along with Homicide Detective Sayers #7157 responded to the location and determined that the victim was burned by criminal means and are investigating this as a Murder.   During the investigation Detectives discovered that the victim Ira Tobolowky was involved in a civil defamation lawsuit with Steven Aubrey and his partner Brian Vodicka who was representing him.   Family members advised detectives that complainant Tobolowsky felt threatened by Steve Aubrey because of a law suit that complainant Tobolowsky won when he represented the mother of Steven Aubry, Betsy Aubrey.  It was aledged in the lawsuit that Steven Aubrey threatened "Jihad" the same words used to describe the wars brought by terrorists, and against his life which was filed in court document number 15-08135 in the 14 Judicial district court judge Eric Moye presiding.  Ira Tobolowsky is of Jewish descend and felt Jihad was an anti-semitic statement. It is the belief of Detectives in this case as well as Arson investigators that the person who set fire to complainant Tobolowsky could have been burned themselves as the area of the burning was inside the garage in a small confined space that would not allow for very much movement.  It is believed that who ever set the complainant on fire may have suffered serious burns and is hiding from public site as to prevent their injuries from being seen by the public as well as detectives.  Detectives went to the location of 7777 Glen America and knocked on the door of #223 to confront Steven Aubrey and Brian Vodicka and ask them to come to police headquarters and be interviewed as well as allow detectives to view any injuries that might have been sustained.  No one answered the door and neighbors stated that they have not seen either Steven Aubrey or Brian Vodicka since Saturday the 14th of May 2016 and they have not heard any occupants walking around inside.

Detectives executed a search warrant on Steven Aubrey and Brian Vodicka's Apartment located at 7777 Glen America #223 on May 19th 2016.  After searching the apartment detectives received information from the complainants family about some holes that were drilling in the complianants fence so that someone could observe the complainant coming and going from his residence without being seen.  The holes were located on the far southeastern part of the fence and gave a clear hidden view from the Alley of the complainants garage.  Detective Richardson remembers seeing a dril and dril bits inside the apartment at the time of the execution of the warrant but

detectives had not received the information about the suspicious holes till after the warrant was executed.  It is believed that the drill and drill bits need to taken for examination purposes  to determine if in fact it was used to drill the suspicious holes in the complainants fence.  Steven Aubrey was finally located coming out of 8617 Southwestern Blvd #911 and was taken to Dallas Headquarters to be photographed and interviewed.  The apartment that he came out of was never searched for the above listed items.

Wherefore, Affiant asks for issuance of a warrant that will authorize the search of said suspected place and premises and above described individual(s) for said personal property and seize the same and to arrest each said described and accused person who is in violation of the laws of the State of Texas.

_____
AFFIANT

Subscribed and sworn to before me by the said affiant on this _25th_ day of ___May___, 201_6_.

_____
DISTRICT JUDGE/DALLAS COUNTY, TEXAS

# EXHIBIT  C

## to

## Plaintiffs' Original Complaint

## AFFIDAVIT FOR SEARCH WARRANT

STATE OF TEXAS   §    Residence located at
                 §    7777 Glen America #223
COUNTY OF DALLAS  §    Dallas, Dallas County, Texas

1. There is in Dallas County, Texas, a suspected place and premises described and located as follows: A private residence located at 7777 Glen America #223 Dallas, Dallas County, Texas.  The residence is an apartment complex called Tonti Lakeside Apartments.  The Apartment in question is located on the second floor and is a red brick structure the number 223 is located on the top center of the door.

2. There is at said suspected place and premises the following item(s) constituting evidence of a criminal offense or constituting evidence tending to show that a particular person committed a criminal offense:  Any combustable liquids or empty containers that are similar to the items found at the crime scene.  Any medical treatment for burn injuries, medical items that could be used to treat injuries as well as burns.  Any receipts that would show any purchases that would be consistent with the evidence found at the scene like gasoline purchases.  Any computers or electronic devises that can store data or files that might be evidence in this case regarding threats or research done that is similar to what happened at the crime scene.  Cell phones, clothing, blood,shoes,weapons of any kind.  Tools or drills and drill bits that could be used to drill a hole in a wood fence.  Any egnitable liquids or evidence of any egnitable liquids that could have been spilled on the floor  that can be sent to a laboratory and compared to evidence found at the scene.

3. Said suspected place and premises are in charge of and controlled by each of the following persons:  StevenBenton Aubrey W/M 10/11/60 and Brian Edward Vodicka W/M 08/09/59 who are on the lease argeemnent for the address listed in this warrant.  The lease agreement was dated on 2/07/16.

4. It is the belief of Affiant, Detective Scott Sayers #7157 who is employed by the Dallas Police Department for 21 years and who has been assigned to the Homicide unit does and he hereby charges and accuses that: the above described residence contains evidence, Any combustable liquids or empty containers that are similar to the items found at the crime scene.  Any medical treatment for burn injuries, medical items that could be used to treat injuries as well as burns.  Any receipts that would show any purchases that would be consistent with the evidence found at the scene like gasoline purchases.  Any computers or electronic devises that can store data or files that might be evidence in this case regarding threats or research done that is similar to what happened at the crime scene.  Cell phones, clothing, blood,shoes,weapons of any kind.  Tools or drills and drill bits that could be used to drill a hole in a wood fence. Any ignitable liquids or evidence of any ignitable liquids

that could have been spilled on the floor  that can be sent to a laboratory and compared to evidence found at the scene.  7777 Glen America #223 Dallas, Dallas County, Texas.

Affiant has probable cause for said belief by reason of the following facts:  On May 13, 2016 at approximately 7:52 am Dallas Fire Rescue, and Dallas Police were called to a residential structure fire located at 7435 Kenshire Ln, Dallas, Dallas County, Texas.  Fire Rescue discovers the burned body of Ira Tobolowsky in the garage next to his motor vehicle.  He was pronounced dead at the scene.  Arson investigators along with Homicide Detective Sayers #7157 responded to the location and determined that the victim was burned by criminal means and are investigating this as a Murder.  During the investigation Detectives discovered that the victim Ira Tobolowky was involved in a civil defamation lawsuit with Steven Aubrey and his partner Brian Vodicka who was representing him.   Family members advised detectives that complainant Tobolowsky felt threatened by Steve Aubrey because of a law suit that complainant Tobolowsky won when he represented the mother of Steven Aubry, Betsy Aubrey.   It was aledged in the lawsuit that Steven Aubrey threatened "Jihad" the same words used to describe the wars brought by terrorists, and against his life which was filed in court document number 15-08135 in the 14 Judicial district court judge Eric Moye presiding.  Ira Tobolowsky is of Jewish descend and felt Jihad was an anti-semitic statement. It is the belief of Detectives in this case as well as Arson investigators that the person who set fire to complainant Tobolowsky could have been burned themselves as the area of the burning was inside the garage in a small confined space that would not allow for very much movement.  It is believed that who ever set the complainant on fire may have suffered serious burns and is hiding from public site as to prevent their injuries from being seen by the public as well as detectives.   Detectives went to the location of 7777 Glen America and knocked on the door of #223 to confront Steven Aubrey and Brian Vodicka and ask them to come to police headquarters and be interviewed as well as allow detectives to view any injuries that might have been sustained.  No one answered the door and neighbors stated that they have not seen either Steven Aubrey or Brian Vodicka since Saturday the 14th of May 2016 and they have not heard any occupants walking around inside.

Detectives executed a search warrant on Steven Aubrey and Brian Vodicka's Apartment located at 7777 Glen America #223 on May 19th 2016.  After searching the apartment detectives received information from the complainants family about some holes that were drilling in the complianants fence so that someone could observe the complainant coming and going from his residence without being seen.  The holes were located on the far southeastern part of the fence and gave a clear hidden view from the Alley of the complainants garage.  Detective Richardson remembers seeing a drill and drill bits inside the apartment at the time of the execution of the warrant but detectives had not received the information about the suspicious holes till after the warrant was executed.  It is believed that the drill and drill bits need to taken for

examination purposes to determine if in fact it was used to drill the suspicious holes in the complainants fence.

Wherefore, Affiant asks for issuance of a warrant that will authorize the search of said suspected place and premises and above described individual(s) for said personal property and seize the same and to arrest each said described and accused person who is in violation of the laws of the State of Texas.

_____
AFFIANT

Subscribed and sworn to before me by the said affiant on this ___20th___ day of ___May___ , 20_16_.

_____
DISTRICT JUDGE, DALLAS COUNTY, TEXAS

265TH   Bennett

# EXHIBIT  D

## to

## Plaintiffs' Original Complaint



MEDIA

# Sneak Peek: *D Magazine*'s May Issue, Which Explores Who Killed Ira Tobolowsky

**We're giving you a look inside the pages of our May issue weeks before the stories are published online.**

BY MATT GOODMAN · PUBLISHED IN FRONTBURNER · APRIL 26, 2017 · 3:22 PM



On newsstands now!

Beginning today, you'll see the May issue of *D Magazine* rolling out on newsstands. That's it on the left. The name Ira Tobolowsky figures prominently on the cover. I'm willing to bet many of you remember that name. For one, Tobolowsky was a highly regarded attorney who operated for decades out of a small office on Lovers Lane, west of the Tollway. And two, he was burned to death in his North Dallas home just under a year ago, and police have still yet to charge anyone with the crime.

But the family believes they are close: "We are a little bit of evidence short of getting this case taken to a grand jury, getting an indictment, and moving forward with a capital murder trial," says Ira's 28-year-old son, Michael, who now runs his father's practice. "We've been here a couple months or so. The type of information we're looking for we believe someone has out there. We're just trying to reach out and connect with that person."

Michael, along with his siblings and his mother, spent hours with *D Magazine* writer Jamie Thompson for her cover story, "A Place Where Something Evil Happened." What emerges is a picture of a family driven to get justice, another family torn apart by greed and anger, and an overtaxed police department trying hard to solve a bizarre and unthinkable tragedy but coming up just short. Head to newsstands to read it now. (It'll go online in a few weeks.) But first, I wanted to leave you with how Michael described his father:

> "Ira was definitely the type of person who had more personality than you could imagine. He was hands down the smartest person in the room, no matter what room he was in. He was caring, he was affectionate, he was a loving guy. He really was a perfect combination of all the good attributes you would want in a husband, father, friend, everything. He was amazing.

> "Dad was actually what I would call an old school lawyer. He was a true councilor, someone who would help you on your

business transactions, he'd help you in court, he would help you if you had just a little dispute where you needed some advice. No matter what it was, he was there. After all this happened, I started talking with a bunch of different lawyers. Dad did both transactional and litigation, and I found the transactional attorneys telling me, you know, 'Your dad is a very good transactional attorney, but what he's best at is litigation.' I had the litigators telling me, 'Your dad is really good at litigation but what he was best at was transactional work.' That really made me smile, because it proved he was one of the best at each and every aspect of law that he practiced."

After you pick up the May issue and read Jamie's story, flip one page to learn about the next Floyd Mayweather (minus the ever-mounting legal problems, we pray) under our noses. We'll find out on May 27, when DeSoto native Errol Spence Jr. flies to London to battle International Boxing Federation welterweight champion Kell Brook, who's 36-1. Spence is 21-0, with 18 knockouts, and he's got the eye of people like Mayweather, who had this to say: "The guy that I think that's gonna really make the most noise in boxing is Errol Spence."

Our dining critic, Eve Hill-Agnus, has a pair of important pieces—a review of famed restaurateur Nick Badovinus' opulent temple to beef, Town Hearth; and a guide to the finest regional Indian food in Dallas-Fort Worth, a trip that will take you well beyond biryani and butter chicken. Meanwhile,

Michael J. Mooney returns to the pages of *D* by asking
attorneys to explore their most memorable divorce
cases. He gets dirt on murder-for-hires, pastor-
punchers, stalkers, and more.

In the front of the book, Peter Simek chronicles the
troubles of the Fort Worth Opera, and city columnist
Eric Celeste has an exclusive profile of the Democrat
policy wonk who is convinced that he can knock Pete
Sessions from his longstanding congressional seat in
District 32.

There's something for everyone. Get to your favorite
local newsstand now.

**LOCAL NEWS    MEDIA**

**et a weekly recap in your inbox every Sunday of our best stories from th
week plus a primer for the days ahead.**

ail

- Receive D Brief

# RELATED CONTENT

# EXHIBIT  E

## to

## Plaintiffs' Original Complaint

D Magazine. (2017, May 3) Who Murdered Ira Tobolowsky? YouTube

Retrieved from https://www.youtube.com/watch?v=Sp6LCb5kweo

(video posted thereon)



**Prominent Dallas attorney**

**IRA TOBOLOWSKY**

**was found in the garage of his North Dallas home.**

# BURNED *to* DEATH

# IRA HAD BEEN MURDERED.

**A strong suspect quickly emerged.**

# Who wanted Ira Tobolowsky dead?



**Read the story in
*D Magazine*'s May issue.**

**ON NEWSSTANDS NOW**

# EXHIBIT  F

## to

## Plaintiffs' Original Complaint





CRIME

# The Unsolved Murder of Ira Tobolowsky

**The prominent lawyer was burned alive in his North Dallas garage. The family thinks they know who did it.**

BY TIM ROGERS | PUBLISHED IN FRONTBURNER | MAY 8, 2017 | 10:00 AM

The May issue of *D Magazine* features a story by Jamie
Thompson about the murder of Ira Tobolowsky. A
year ago, the prominent lawyer was burned alive on a

Friday morning in his North Dallas garage. Police still don't know who did it. But the Tobolowsky family thinks they know who the killer is. The story is now online.

I asked Jamie about her reporting process and what she had to leave out of the story that she wished we'd had the space to include.

> I followed the news about Ira's death when it happened. I live about 10 minutes from his house, and it is rare for someone to be murdered in this part of North Dallas. Rarer still that it would be a respected attorney, killed in such a violent way, as he's about to climb into his Lexus and head to his law office. I thought I might want to write something about it. After about six months—when no one had been charged with the murder—I decided to look into the case.

> I reached out to Jonathan Tobolowsky, the eldest brother, toward the end of last year, told him I'd like to meet with him and his two brothers. They weren't sure they wanted to do a story, but agreed to get together and talk about it. We met for lunch at Mi Cocina in West Village. I didn't take any notes or record. We just chatted and got to know each other. Jonathan seemed the most hesitant. He had to get up and leave the table at one point, because talking about his dad's death upset him so much. He looked me in the eye at one point and said something like: We don't want to be a crazy story. If we do this,

you will write this story, then move on. We will still be here, without our dad. This isn't just a story to us. Someone stole our father from us. We want that person to be caught and to pay for what they've done.

I started out thinking the story would be part biography and part murder investigation. I interviewed several dozen people about Ira—the man, the father, the friend, the lawyer—and have several hundred pages of notes of interesting stories and interviews about him, and zero of that made it into the story. Of all the people I've written about over the years, it's rare that I encounter a person who was as beloved as Ira. People often talk about lost loved ones in adoring terms, but this man was LOVED. Nearly everyone I spoke to said the same things: Ira dropped everything and focused on whoever was in front of him in the moment. Ira was a loyal, faithful friend. I laughed my ass off and cried more than a few times, hearing Ira's relatives and friends talk about their times with him. He loved the law, loved his family and friends, loved living. Although he was often in excruciating pain due to his spine deformity, whenever anyone asked how he was doing, he'd say, "I'm terrific." It is my one regret that more of Ira didn't make it into the story.

But as the reporting unfolded, I began spending more and more time with Michael, Jonathan's brother, keeping up with the investigation. The story began to turn in that

direction. In March, I talked to Michael at least once a day—sometimes multiple times a day—as I followed along. I was at his office at least once a week, sitting across from him as he sat in his father's chair, at his father's desk, trying to find justice for his dad.

Ira's death shook—probably forever—how his family and friends and acquaintances feel about their own safety. Michael sleeps with a gun in his nightstand. After learning so much about Ira's death, I, too, got a little paranoid, making sure my keys were in my hand when I walked out of my house into the garage toward my car, making sure no one was out there. That's part of what's so unsettling about this crime. If a lawyer like Ira could get murdered in daylight in a safe neighborhood, it starts to strip away everyone else's feelings of safety.

I have no doubt that this family will not rest until they discover, for certain, who killed Ira. They believe that if the tables had been turned, and one of them had been murdered, Ira would have done the same, probably to an even greater extent than what they are doing.

**CRIME**

# EXHIBIT  G

## to

## Plaintiffs' Original Complaint





CRIME

# 'A Place Where Something Evil Happened'

**Ira Tobolowsky, a prominent lawyer, was burned alive in his North Dallas garage. A strong suspect quickly emerged. So why can't the cops solve the case?**

BY JAMIE THOMPSON   PUBLISHED IN D MAGAZINE MAY 2017   PHOTOGRAPH BY STEVEN VISNEAU

The gentle beeping of her home security system roused Debbie Tobolowsky from bed. It was about 7:15 on a Friday morning, and her husband, Ira, had just opened the back door leading to the garage, headed off to work. Debbie had stayed up late the night before, working on details for their eldest son's wedding rehearsal dinner, checking on the white daisy arrangements, perfecting the seating chart. The event would be a production. Theirs was a large, prominent Jewish family with more than a dozen lawyers in it, including State District Judge Emily Tobolowsky. George Tobolowsky, the noted Dallas sculptor, was Ira's brother. One of his cousins was actor Stephen Tobolowsky, who played Ned Ryerson, the insurance salesman in *Groundhog Day.*

Debbie knew that Ira was trying to leave the house without waking her. Her 68-year-old husband had a debilitating spine condition that turned his back into a portrait of pain. His shoulders were hunched, and he struggled to raise his arms above his chest or turn his neck, but he had learned to lift himself quietly from bed without disturbing his wife of 39 years.

About 30 minutes later, as she was getting ready in the bathroom, a blaring alarm startled her. She ran to the security system control panel in the bedroom, saw it said "Fire," and headed to the living room. From the back windows, she saw smoke drifting across the swimming pool. She opened the door to the garage, and hot, black smoke hit her face. The alarm company called, and Debbie told them to send help.

Debbie grabbed her purse and wedding ring, and leashed Oliver, their Cavalier King Charles spaniel. Within minutes, firefighters arrived and asked how to get into the garage. Debbie gave them a remote.



A Real Mensch: Ira with Oliver, the family's Cavalier King Charles spaniel. "If there was a time to lose Ira, it was not now," said Rabbi Adam Roffman at his funeral.

As soon as she stepped outside, she called Ira. Her call went straight to voicemail. She dialed his cell again and again. No answer. Firetrucks crowded their cul-de-sac as neighbors gathered on their lawns. Smoke billowed from the eaves of their sprawling brick ranch in North Dallas. Debbie thought, *Why isn't he answering?* Then it hit her. She ran to a

firefighter who was looking through the garage windows.

"How many cars are in there?" she asked.

"Two," the firefighter said. "Why?"

Debbie screamed, "He's in there! My husband is in there! Get him out!"

The remote wouldn't work, so firefighters smashed through the garage door. As smoke blackened the sky, they sprayed water into the garage, then searched for Ira. Paramedics raced up the driveway with a gurney. After a couple of minutes, they bowed their heads and pushed the empty gurney away. Debbie fell to her knees.

---

A homicide detective named Scott Sayers arrived at the house wearing a button down and tie. Detectives routinely respond to house fires involving deaths, but Dallas' 34 member homicide unit was stretched thin in May of last year; they'd already caught 10 murders in the past week. The detective asked Debbie: "Do you think this was an accident, or could someone have done this?"

"What do you mean?" she asked. She couldn't think of anyone who wanted to hurt her husband.

Sayers poked around, then told the family that Dallas Fire Rescue would lead the investigation. Investigators combed through the wrecked garage, trampled by firefighters wielding axes and high pressure hoses. They had broken through walls and tossed the family's belongings from a second story media room into the swimming pool. While firefighters were trained to use the least destructive measures to help preserve evidence that took a back seat to putting down flames.

It appeared that Ira had made it down the steps into the garage, walked past his wife's car, and approached the driver's side of his Lexus. They found his burned body there, lying in a small space between the closed driver's side door and a wall lined with mops and brooms. He still had his wallet and phone. Had Ira's car caught fire? His phone? Investigators searched for flammable liquids, examining shelves packed with Clorox wipes, Windex, and paper towels. Gasoline fumes hung in the air.

Then they found their first big clue. In the back of the garage, lying beside

Case 3:19-cv-00056-B   Document 3   Filed 01/08/19   Page 130 of 162   PageID 134

cardboard boxes, they found a large plastic juice bottle with no label. It held a few ounces of what appeared to be gasoline. Investigators asked Debbie if she or Ira drank juice. Was there any reason for that plastic bottle to be in the garage? No, she replied. They asked if the couple kept gas in containers. No, she said. Her husband couldn't operate a lawn mower. They kept no fuel or gas powered equipment.

Investigators took photographs of the bottle and placed it in an evidence can for testing. Was it possible, they wondered, that someone had snuck up on Ira in daylight, in one of the city's safest neighborhoods, doused him with fuel, and set him on fire?

The fire department was skilled at uncovering the cause of fires. Murder investigations were another matter. But now it appeared they were on the hunt for a killer.

---

Michael Tobolowsky woke in a haze to the sound of his older brother, Jonathan, screaming. A half hour after their father had been found dead, Jonathan had gotten a call from his fiancée. Ira's three sons were at a beach in Destin, Florida, for Jonathan's bachelor party. The sons quickly booked return flights to Texas.

At a window seat, watching the landscape drift by below, Michael struggled to process the idea that his father was gone. The 28 year old had decided to become a lawyer after spending summers in his dad's office, learning how to write motions and briefs, following his dad around the courthouse. At 6 foot 4, Michael had attended Trinity University on a partial basketball scholarship, gone to law school in San Diego, and was in his third year with a civil firm in Dallas. He spoke to his father every day, always ending with, "All right, good shit. Talk to you later, Pops."



I Debbie with their three sons, (from left) Zach, Michael, and Jonathan, at a wedding in 2015.

Before the flight, Michael had learned the fire might have been set intentionally. The thought infused his grief with rage. Cramped in his window seat, Michael felt his hands aching and realized both fists were clenched. All he could think about was *Who?*

Back in Dallas, by midmorning, fire investigators still hadn't roped off the house with police tape. Relatives and friends walked all over the yard. TV reporters broadcast live from the cul-de-sac. The investigators kept asking whether Ira had enemies. Sure, family members said, nearly every lawyer makes enemies. Ira had practiced law for more than 45 years. They could run through a list of people Ira had defeated or angered at one time or another. But among them, one stood out.

---

Steven Aubrey, middle son of a Dallas orthodontist who died in 2004, was fighting an inheritance battle with his mother, who believed he'd come unhinged. He stood well over 6 feet tall and carried 220 pounds packed with muscle, which he flaunted in online ads for his services as a masseur. He promised strong hands, professionalism, and discretion. Aubrey had graduated from W.T. White High in Dallas and majored in finance at Texas A&M. He lived in a $1 million house in Austin with his longtime partner,

Brian Vodicka, who had attended law school but was on disability for
medical conditions.

After the death of his father, Aubrey had grown unhappy with how his 79-
year-old mother, Betsy, and oldest brother, Buck, had handled the estate.
Aubrey accused Buck in court filings of taking advantage of their mom and
funneling family assets into his own name. Over the years, the feud grew
more heated, and Betsy came to fear her son. "He has absolutely gone crazy
and is on a rampage like no other," she wrote to a relative. By the end of
2012, she'd had enough and sent Aubrey an email saying she had cut him out
of her will.



Aubrey responded a few hours later: "You have 3 days to change your mind
and apologize to me or else. Or else I will make it my mission to make the
rest of your life miserable, as you deserve. EVERYONE you have ever known
will know what has happened and the poor choices you have made. It is
sickening to watch you make threats with the money that dad made while
you played bridge. I guess I am lucky that what I got from you is thin good
looks but poor Buck got the 'lazy never had a job' part of you. ... I don't know
a single mother who would do what you have done. You should never have
had children."

But Betsy refused to change her will or apologize to her son. About two
weeks later, she called police to report a break-in at her home. A few pieces
of art with sentimental value had been stolen. But she also discovered that
someone had let loose in her house four pet-store rats. Everyone in her

Case 3:19-cv-00056-B    Document 3    Filed 01/08/19    Page 133 of 162    PageID 137

family knew she was terrified of rats. She suspected her middle son, though Aubrey said in an email to her that he had nothing to do with the rats. Betsy and Buck told the court that they thought Aubrey might hurt them, and a judge issued peace bonds forbidding Aubrey from contacting them for one year.

Aubrey responded by calling the judge a lesbian and continuing to file lawsuits against his mother. Eventually, Betsy sought help at a small law office on Lovers Lane run by Ira Tobolowsky.



Who Was Ira Tobolowsky?

Ira first met Aubrey in August 2014. They sat across a table from each other at a deposition in downtown Dallas. Aubrey, 53, working without a lawyer, was there to question his mother. Some lawyers take passive roles in depositions, objecting to questions for the record but then letting their clients answer them. Not Ira. After Aubrey asked his first question   for his mother to state her name   Ira objected. For the first hour, the mother barely talked, as her lawyer sparred with her son. Over the four and a half hour deposition, Ira objected more than 200 times. From the transcript, it's clear the interruptions frustrated Aubrey.

Aubrey: "Can you just be quiet?"

Ira: "You're wasting my time."

Aubrey: "I don't care about your time."

Two weeks after the deposition, a fax machine in Ira's office churned out a

118-page lawsuit in which Aubrey petitioned the court for a temporary restraining order against Ira. After the machine finished printing, Aubrey faxed the lawsuit five more times. Ira fumed as the machine spat out hundreds of pages, until his paralegal finally unplugged it. Ira searched online for the suit, but it was never officially filed.

The next week, Aubrey tried to set a deposition for September 26, during Rosh Hashana. Ira thought Aubrey did it just to irritate him and asked for a date change.



d with the lack of results in the investigation into Ira's murder, the family bought a billboard ad on Central Expressway.

Aubrey faxed his response: "Jews spend these days working to amend their behavior and seeking forgiveness for wrongs done during the past year. My suggestion: you attend the scheduled deposition and amend your behavior while there. Perhaps God will forgive you for your many wrongs during the past year and previous depositions." He included a list of Jewish holidays, asking if Ira planned to take off work for all of them.

Ira filed a motion for contempt. "ANTI-SEMITISM SHOULD NOT BE TOLERATED BY THIS COURT. PLAINTIFF'S RESPONSE IS FRAUGHT WITH INNUENDO AND OUTRIGHT ANTI-JEWISH REMARKS THAT ARE INSULTING, CRUEL, AND EVIL."

Aubrey's response: "TOBOLOWSKY'S PATTERN IN ALL OF HIS FILINGS
IS TO RANT AND RAVE IN BOLD UPPERCASE LETTERING WHEN HE
WANTS TO COERCE THE COURT TO BELIEVE SOMETHING THAT IS
NOT TRUE."

The legal battle dragged on as Aubrey filed lengthy motions against his
mother. Responding to them began to consume Ira's law practice. But
nearly every time the men appeared before a judge, Ira won. Given the
venom of Aubrey's filings, Ira and his paralegal, Leigh Allen, joked about
locking the front door, and they did for a time. Ira wondered aloud whether
Aubrey was violent. But mostly he laughed about the case, Allen says. "We
felt like we were fighting the good fight," she says, "defending a mother
against her hateful son."

Three days before Ira was set to question Aubrey under oath in a deposition,
Aubrey nonsuited the case. It was the legal equivalent of: never mind. Ira
had won, but by that point, Aubrey had accused him of bribery, witness
tampering, and a host of other crimes. In one filing, he compared Ira to an
"ISIS butcher." After all that, Ira was not ready to walk away. And, in any
case, he figured Aubrey wasn't finished with his harassment.

---

Ira enlisted a longtime colleague, Steve Schoettmer, a former linebacker for
Duke University who worked at Thompson & Knight, to file a defamation
suit against Aubrey in the summer of 2015. "He just desperately wanted
them to stop," Schoettmer says. "And he'd become resigned that the only
way they would stop was if a court ordered them to." "They" were Aubrey
and his domestic partner, Brian Vodicka, whom Ira made a co
defendant in the defamation suit.

But Ira also wanted to end Aubrey's ability to sue his mother by having him
declared a vexatious litigant, a rare designation that, if granted, would
require Aubrey to get approval from a judge to file further motions or
lawsuits. Ira and his paralegal prepared a 367 page document detailing
Aubrey's history. In two years, he had filed seven lawsuits against his
mother in different courts. He had also sued her lawyers, her accountant,
and three judges. Ira showed Aubrey's pattern: he'd file a lawsuit and clog
the court with motions. If rulings didn't go his way, he'd sue the judge and
demand recusal. If that didn't work, he'd nonsuit and file in a different
court.

In February 2016, Judge Eric Moyé declared Aubrey a vexatious litigant and
ordered him to pay his mother $250,000. He could no longer sue his mother,
his brother, or Ira without permission.

But Ira continued with the defamation suit. In April 2016, five weeks before

Case 3:19-cv-00056-B   Document 3   Filed 01/08/19   Page 136 of 162   PageID 140

the fire, Aubrey and Vodicka came to Ira's office for a deposition. It had been a bruising couple of years for the couple. They had been involved in another contentious lawsuit in Austin, after they'd invested hundreds of thousands of dollars in a real estate deal that turned out to be a Ponzi scheme. They had to sell their $1 million house, and they moved to an apartment in Dallas. They'd spent nearly $2.3 million fighting the case and still owed about $400,000 in legal fees. Aubrey had become estranged from his family. Ira had defeated Aubrey at every turn, stripped him of his ability to file lawsuits, and now was coming after him for defamation.

During the deposition, Ira and his attorney, Schoettmer, thought the 56 year old Vodicka was impaired. He kept closing his eyes, mumbling about being in the bathtub that morning. Schoettmer asked if he was on medication.

"Yes, sir," Vodicka said.

"Tell me what the medication is for?" Schoettmer asked.

"It's anti Ira medication," he said.

After about 30 minutes, Ira stopped the deposition and asked the men to leave. Aubrey and Vodicka refused.

"You invited us to be here. We're here," Aubrey said.

"And it's over with, and I'm asking everybody to please leave," Ira said. The men lingered, and Ira grew more stern. "Steven and Brian, will you please vacate my office now. These are my offices, this is my property, and I'm asking you all to leave. … I'll be forced to have you escorted out of here."

The men left.

---

Two days after the fire, more than 1,200 people packed Congregation Shearith Israel for Ira's funeral. The police department assigned extra officers to patrol. Rabbi Adam Roffman acknowledged the anger felt by many over Ira's death. The familiar words of Ecclesiastes to everything there is a season would provide no comfort on that day, the rabbi said. "If there was a time for Ira to die, surely that day was not Friday," he said. "If there was a time to lose Ira, it was not now."

Police officers eyed the crowd packed with judges and attorneys. Ira's cousin Emily, the state district judge, was there, as was Judge Moyé, who had been presiding over the defamation case. Sheriff's deputies had been patrolling Moyé's home that weekend and had instructed him to carry a gun, fearing that he, too, might be in danger.

The day after the funeral, on Monday, fire investigators asked Dallas police homicide detectives for help. Detective Bob Ermatinger got the case. He had worked at the Dallas Police Department for three decades and was one of the detectives who had appeared on the A&E series *The First 48*, the title a reference to the premise that if cops didn't solve a case in the first two days, their odds of doing so decreased by half. Ermatinger came across as folksy on the show, tearing up with victims but coming down hard on suspects.



e of the suspects Dallas police detectives investigated following Ira Tobolowsky's murder—during a taped deposition.

By the time Ermatinger got the Tobolowsky case, 72 hours already had passed. Investigators believed the perpetrator might have been burned,

because Ira had been doused in a confined area of the garage. They needed
to find the killer before any injuries had time to heal. Investigators had
about half a dozen suspects on their list. That included: Debbie, neighbors, a
lawyer Ira was trying to get disbarred, a patient of a plastic surgeon that Ira
had defended, a lawn worker's son who had asked the family for money, and
a potential client who had called Ira at all hours and left bizarre phone
messages. Some of the suspects cooperated and provided alibis; others were
looked at only on paper.

But after talking to Ira's relatives and colleagues, detectives turned their
focus to Aubrey and Vodicka. The level of hostility the men had displayed
toward Ira—and the fact that he'd recently defeated them in court—pushed
the men to the top of their list.

On May 17, the Tuesday after the fire, detectives went to Aubrey and
Vodicka's Dallas apartment. They planned to take the men in for interviews,
according to search warrants. But no one answered the door. Two detectives
noticed the blinds on a window were open and angled upward. When they
returned later, the blinds were closed. Both men's cars were in the parking
lot.



The next day, Aubrey and Vodicka were scheduled to appear at a hearing in
Ira's defamation case. Security was tight in the courtroom, as extra sheriff's
deputies stood guard, but the men didn't show. From the bench, Judge
Moyé announced his recusal. "I think at this point," he said, "with the
allegations which have been made related to Mr. Aubrey and his implication

in the death of Mr. Tobolowsky and related issues, I don't think that it is unreasonable for a judge other than myself to hear this case."

Later that day, detectives returned to the men's apartment. No answer. Aubrey's car was gone. Ermatinger called their phones and left messages and also sent them texts. No response.

Detectives began monitoring the men's credit card transactions and discovered that Aubrey's card had been used that day to book a room at the Crowne Plaza hotel in Dallas under the name Alexandra Krot (a friend who did spend the night at the hotel, police later learned). That night, at 9:30, Ermatinger got a judge to sign search warrants to examine Aubrey and Vodicka for burns and search their apartment. He was looking for combustible liquids, empty containers, medical supplies to treat burns, and gas receipts, according to the warrants. No one was at the apartment when police arrived, but detectives seized an Apple desktop computer and paperwork for burner phones.

By the next day, Thursday, detectives had learned that the men shared a second apartment, on Southwestern Boulevard. Plainclothes detectives watched and waited until about 3:30 pm, when they saw Aubrey and Vodicka get into their car, heading out for a late lunch. Police cars surrounded the men. Detectives jumped out with guns drawn and screamed, "Get down on the ground!" according to a complaint Aubrey would later file with DPD.

October 26, 2016                    *Via Certified Mail - 7016 1370 0002 1359 8038*

Dallas Police Department
Internal Affairs Division
1400 S. Lamar Street
Dallas Texas 75215

        RE: Official Corruption: Fraudulent Affidavits

Dear Internal Affairs Division:

My name is Steve Aubrey and my partner's name is Brian Vodicka. On May 18, 19 and
25, 2016, Dallas Police Department Special Investigations Det. Robert Ermatinger and
Det. Scott Sayers committed Aggravated Perjury, pursuant to Penal Code Sec. 37.03,
grossly violating our rights under the Fourth Amendment of the U.S. Constitution. Two
False Report complaints, Incident #187988-2016, was improperly and egregiously
assigned to Det. Ermatinger for investigation. The False Reports prove the falsity of his
own fraudulent affidavits; therefore, he ultimately would be investigating himself.
Obviously, this violates simple police procedure.

                    **Det. Robert Ermatinger**

On May 13, 2016, Ira Tobolowsky died in a home fire that appeared to be a
murder/arson case. Stephen Schoettmer, a lawyer who had/has personal issues with
me, told Special Investigations Unit Det. Robert Ermatinger that he felt I was responsible

For the next nine hours, Aubrey was kept in an interrogation room,
according to his complaint, which he provided to *D Magazine*. Detectives
came by every so often and told him they were looking for a doctor to
examine his skin for burns, according to a written statement from Aubrey's
lawyer, Phillip Hayes. When a doctor finally arrived, he asked Aubrey to
strip so he could examine him.

Ermatinger says Aubrey had red marks on both arms. But a SWAT doctor
couldn't definitively say what the marks were from. "The doctor explained
to us that it could be from the flash of a fire, it could be burns, or it could
just be a sunburn," Ermatinger says. He says too much time had passed.

Ermatinger didn't have any physical evidence linking them to the crime
scene. But the men remained strong suspects. They did not have good alibis,
telling detectives that at the time of the fire, they were at their apartment.
Phone records, detectives told the Tobolowsky family, showed no activity on
the men's cellphones from about 9 pm the night before the fire until the
next afternoon, meaning their phones were not pinging towers and may
have been turned off. The records did show cell activity before and after
that time period.

Ermatinger would have to wait for crime scene technicians to search the
men's computers and process the juice bottle found in the garage for
fingerprints.

---

Michael Tobolowsky, the middle of Ira's three sons, stepped in to help with

his father's law practice. At the time of Ira's death, his firm had never been
busier. He had cases pending, clients waiting, deadlines looming. Michael
needed to file extensions and reassure clients that they hadn't been
forgotten. But as he read through his dad's email, one case drew his
attention: Aubrey's.

The Thursday after Ira was killed   the day police detained Aubrey and
Vodicka   more than a dozen Tobolowsky family members gathered at Ira's
sister's house, around the block from the scene of the fire. Not knowing that
police were interrogating suspects, the family set up headquarters, working
on laptops at the kitchen table. At about 7 pm, Michael and his girlfriend
stepped outside to get some air. They crossed the street and walked into the
alley that runs behind Ira and Debbie's house.

Michael felt that he'd lost not just his dad in the fire, but the backdrop of his
favorite memories. It had been a noisy, lively home, where the three
Tobolowsky boys kicked soccer balls down the halls, shot carrots from
slingshots, and slid little brother Zach down the stairs in a cardboard box.
As Michael and his girlfriend walked down the alley that night, the air still
smelled of smoke. Michael didn't think he'd ever be able to smell a campfire
again without feeling ill.

He stopped to talk with a neighbor, then heard his girlfriend shout,
"Michael!" She was staring at the wooden fence behind his parents' home.
Michael saw a hole surrounded by what looked like black paint. It appeared
to have been made recently. For someone of his height   the 6 feet and 4
inches that helped get him onto the team at Trinity   it provided a clear view
to the garage where his father had died.

"Holy shit," he said.

The next morning, Detective Ermatinger had a look at the fence. He, too,
thought it looked as if someone had drilled the hole. Crime scene
technicians took the board for processing.

Detectives remembered seeing a drill at Aubrey and Vodicka's apartment
and obtained warrants for another search. When they searched it the
following week, they found an Apple MacBook in the process of having its
hard drive wiped clean, according to a later search warrant. They seized it
for testing. From the two apartments, they also collected a cordless drill and
bits, two red gasoline containers, a yellow propylene tank with a torch



spicious hole had been drilled in his
ence.

attachment, a blue propane torch, two cans of paint, and a couple of pairs of shorts and pants.

Aubrey refused to talk without a lawyer and said he couldn't afford one. Detective Ermatinger called Assistant District Attorney Gary McDonald, who helped find a public defender and also subpoenaed Aubrey to testify before a grand jury, a tactic prosecutors sometimes use when dealing with uncooperative witnesses. A few days later, the prosecutor questioned Aubrey before jurors. It would be a violation of law for anyone to reveal what exactly was said that day, but the proceedings didn't produce an indictment.

---

Last September, Michael left his law firm and took over his dad's practice full time. He had spent months debating the decision. He had his dream job, working in a civil firm on big contingency cases. He worried that his father's small practice might feel lonely, but he couldn't stand the thought of shutting it down. Now he spent every day behind his father's old mahogany desk. There were things about the office Michael wanted to change: the old wallpaper, the red and pink bathroom tiles. But he couldn't bring himself to touch anything that had been his dad's.

He focused on keeping his father's clients happy, but the murder investigation was a constant concern. The medical examiner had released preliminary findings. His father had died of burns, smoke inhalation, and blunt force injuries. The family desperately hoped that Ira had been knocked unconscious before the fire had been set.

Michael filled a whiteboard with evidence and photos of Aubrey and Vodicka. He still researched other suspects, but the more he learned about the two men, the more he believed they were responsible. Michael decided to keep representing Aubrey's mother and to move forward with his dad's defamation case.

His mother was furious. "How dare you do this to our family?" she said. "We

have lost too much. What if I lose you, too?"

It didn't take Aubrey and Vodicka long to resume their legal filings, trying to undo Ira's work. Aubrey once again tried to get his mother removed from the family trust. Michael alerted the courts to Aubrey's designation as a vexatious litigant, but that designation only applied to Aubrey as a *pro se* litigant. Vodicka had reactivated his law license and could file the lawsuits on his partner's behalf, sidestepping the need to get approval. Michael wanted to get Vodicka disbarred, to shut them down for good.

On September 12, Michael went to the courthouse for a hearing in the defamation suit. It was his first chance to see Aubrey and Vodicka since his dad's death, four months earlier. When Michael walked into the courtroom, his heart raced and his hands clenched into fists. He made a point to look both men in the eye. He wanted to see if he could tell whether they had murdered his dad. As the hearing went on, Schoettmer and Aubrey sparred, trading insults. It grew so tense that the judge ordered the parties to leave the court separately.

Michael and Aubrey emailed about the cases, and their discourse quickly turned contentious. "As luck (or bad luck) would have it, you were born into a filthy and dirty family," Aubrey wrote. Aubrey filed another lawsuit, this time accusing the *Dallas Morning News* of defamation for its coverage of the case. He was also suing Judge Moyé, Schoettmer, and Debbie.

Debbie had never been sued before, and she was frightened. Someone sent a blank piece of paper to her house, in an envelope with Aubrey's return address on it. To her, it seemed to be saying: *I know where you live.*

---

Last fall, after work, Michael stayed up late in his East Dallas town home watching true crime shows: *I (Almost) Got Away With It* and *Real Detective*. They made him feel normal again, somehow. He got to repeatedly experience that climactic moment when the cops finally caught the bad guy, the satisfying ending that his family longed for.

In the shows, murders were solved by single minded detectives who were obsessed with their cases. In real life, the Dallas detectives were distracted and overworked, running from one murder to the next. 2016 was a tough year for the Dallas Police Department. A gunman ambushed officers downtown in July, killing five. The Tobolowsky family mourned the tragedy, but they knew it meant their case would take longer to solve. And then came the fiasco with the Police and Fire Pension System, which, teetering toward insolvency, drove scores of older, experienced cops to retire before they'd planned to in an effort to preserve their pensions.

As the months passed, the family began to lose hope that the police could solve Ira's murder. In 2016, there were 171 murder cases in Dallas, and police solved just half of them, falling below the national average of about 60 percent.

It had occurred to family members to take matters into their own hands. Debbie worried about keeping her boys leashed. "I don't know how serious they were, but I thought they could have very easily gone and done something stupid," she says. "I told them, 'Do you think your father would want you in jail for the rest of your life?'"

Most of the family thought Aubrey had killed Ira. But he was still free, living not far away in North Dallas. One afternoon Ira's sister saw Aubrey in Bed Bath & Beyond, and her knees buckled.

The family came to believe that investigators had bungled the case. Why had they waited six days before picking up Aubrey and Vodicka? If the men had burns, they'd had time to heal. Michael learned that the fence board with the hole had not been sent for testing to determine whether the black substance on it matched the cans of paint found in the men's apartments. He didn't believe police had collected all the available video footage. The family began filing their own public records requests to obtain footage from DART buses, but most agencies deleted video after 30 days. The family had tried to stay out of the detectives' way; now they regretted it.

They'd call detectives and get no response. Michael called one detective every single day for a week. Nothing. If a prominent North Dallas family couldn't get police to respond   one that had so many lawyers and a state and federal judge among its relatives   what must it be like for others with less means and access?

Michael contacted the investigator who had been hired by his parents' insurance company to examine the fire scene. A 29 year arson investigator, he told Michael that several days after the fire he had bagged a dozen pieces of evidence that he was surprised authorities had left behind. He had carefully archived the items to preserve chain of custody. He told Michael that he'd ruled out all other causes   faulty wiring, car fire   and was convinced someone had poured an ignitable liquid on his father and set him on fire. He found nothing in the garage that matched the fuel source. It had been brought into the garage that morning by the killer, he said. Also, he

told Michael that there was a 50 50 chance the suspect had suffered burns. If so, it might look like a sunburn, he said.

The family had debated hiring a private investigator and finally decided to call around. They talked to a retired FBI agent who charged a $25,000 retainer. They talked to another guy who told them, "I'm gonna do some stuff, but I can't tell you because most of it's illegal." A third told them, "If you want to solve the case, you're going to have to do it yourselves."

In early October, Michael got an email from a pair of private investigators. "We are private investigators who simply have a low tolerance for scumbaggery and this case really bothers us," they wrote. Michael liked the email and agreed to a meeting. The pair offered to start pro bono, see what they could find, and Michael agreed. The family had put up a billboard on Central Expressway offering a $25,000 reward. If the investigators could solve the case, the money was theirs.



As the family was taking an active role in searching for Ira's killer, Dallas police were running an undercover investigation into the website masseurfinder.com. Aubrey regularly posted ads there, showing a picture of himself shirtless.

His ads read: "My goal is to offer male massage at its very best for ALL men of any curiosity, any size or any age. Professionalism and discretion are assured. I am a muscular 6'5", 220 lb fit and masculine masseur smooth, friendly, easy going, intuitive, skilled and GIANT STRONG hands."

A police officer sent a text message to "Massage Bi Steve" in response to the ad and set up an appointment at the Hilton Anatole on Stemmons Freeway. Aubrey knocked on the door and walked in carrying a massage table, according to court records. They "started a casual conversation that turned into a sexual conversation," the officer wrote. Aubrey agreed to masturbation and sexual intercourse for $300. Officers booked Aubrey into jail on a prostitution charge.

That night, the Tobolowskys' private investigators got word of the arrest and went looking for Vodicka. In Aubrey's absence, they hoped he might talk. One of the PIs spotted him pulling into his apartment complex, carrying takeout. The PI identified herself as merely "an investigator" and offered to put him up in a hotel in case the media got word of Aubrey's arrest and swarmed. Vodicka agreed.

While in the parking lot, Vodicka asked, "Do you know Debbie Tobolowsky?" The PI answered yes, and Vodicka said, "Will you please tell her that I'm sorry, and I never meant for any of this to happen?"

The second PI soon joined them, and the three went to a hotel room. One of the PIs had a video recorder, disguised as a pen, in his pocket. As they chatted, watching the Chicago Bears play the Green Bay Packers, one PI raised the subject of Ira's murder.

"I mean, do you think he's capable of doing something like that?" There was a long pause. "Well, I guess everybody's capable, to some degree, but," the investigator said.

"I don't know," Vodicka said. "I'd say, if there were anybody that he would bust out of the gate, you know, cross a line, it'd be his brother. And he hasn't done anything, you know, like that on his brother."

During the hourlong exchange, Vodicka said nothing definitive about Ira's murder.

---



y lays out all the homemade evidence in his Lovers Lane law office as he attempts to solve the mystery of who killed his father.

In mid-November, Detective Ermatinger went to Michael's law office to let him know where the case stood. He brought another detective, Dale Richardson. After the men took seats in Michael's office, Ermatinger said that he was retiring. Though he didn't share this with Michael, his decision to retire was based in part on the shaky state of the pension. He wanted to preserve as much of his retirement savings as possible. He said that he hated to leave Ira's case unsolved, but fresh eyes might do it some good. Richardson would take over.

Michael had a question. If they found no more evidence, did prosecutors have enough to file a case? No, the detectives answered. They had good circumstantial evidence against Aubrey, but nothing that placed him at the house on May 13.

As Michael walked them out, he told Richardson he'd leave him alone for the next two weeks as he got up to speed on the case. Richardson said he

would appreciate that. He told Michael about a mom who had been calling him every week since her son's murder three years ago. Michael wondered whether he would wind up like that mom, calling detectives every week forever?

Detective Ermatinger, now retired, says the men remain primary suspects; no one else on their list came close. He says detectives executed more search warrants on the Tobolowsky case   roughly 18   than on any other case he'd worked. Most of those dealt with Aubrey and Vodicka; others were for cell tower dumps.

"They are suspects, and they are strong ones," Ermatinger says. "But I had no evidence to arrest them. We like to have a fingerprint at the scene or catch them on a video or, of course, DNA is even better than a fingerprint. They provided all those samples, but we can't match anything at this time."

Family members also worry about the lack of physical evidence. While believing the men killed her husband, Debbie sometimes wonders whether police have adequately ruled out the other suspects. "I'm deathly afraid we've spent all our time focused on them, and someone else is out there laughing, thinking they got away with it," she says.

Aubrey declined an interview for this story but did respond to questions over email. "Ermatinger is a lying sack of shit," he wrote. Aubrey says his arms were not red when detectives picked him up. He offered a list of Ira's adversaries, asking why those people were never pursued by police. His only connection to Ira, Aubrey says, was a string of lawsuits   just words, no threats. As for the emails to his mother, he says he only threatened to expose her behavior. "I did not say I would physically harm her or anybody," Aubrey wrote. Aubrey says he was not hiding from police after the fire, that he was at the second apartment, and he says the equipment that police found   the drill, plumbing supplies, gas containers   was left over from when he did maintenance on his house in Austin.

"I did not kill Ira, nor do I know who did," Aubrey wrote.



Debbie Tobolowsky won't return to the house she shared with her husband, Ira, even after it has been repaired. "Because he was murdered
l."

One afternoon in January, Ira's eldest son, Jonathan, and one of the family's
private investigators went to see Aubrey's younger brother, Tom. Tom had
been the one member of the family who had taken Aubrey's side during the
inheritance battle. The police hadn't interviewed Tom, and the Tobolowskys
wondered if he was still in touch with Aubrey. Jonathan knocked on the
door of his Dallas home and introduced himself and the investigator, calling
her "his friend Rachel." Tom invited the pair inside. Jonathan had the pen
video camera clipped to his shirt between two buttons.

"Thank you for letting us in," Jonathan said, as they settled in chairs in the
living room.

"No problem," Tom said.

Jonathan got to the point: "Do you think he did it?"

Case 3:19-cv-00056-B    Document 3    Filed 01/08/19    Page 150 of 162    PageID 154

"That was my first instinct, yeah," Tom said.

"I mean, you know him. He's your brother," Jonathan said. "Is he capable of something like this?"

"Well, it's hard to imagine, but obviously somebody did it," Tom said. "Like I said, that was my first instinct, but it's very difficult to imagine somebody that you grew up with killing somebody."

Jonathan asked if Tom would be willing to help the family by calling Aubrey.

"I don't know that he'd be stupid enough to tell me something," Tom said. He hadn't spoken to his brother since before the fire. Tom continued: "He had the perfect upbringing, but then he's had a really shitty last eight or nine years. ... Several years ago, if he had killed Buck, I wouldn't have been surprised."

"Really? I didn't know it was that bad," Jonathan said.

"It was that bad," Tom said.

Tom said he had seen his brother and Ira face off in court, and it had always seemed professional, not particularly contentious. "I think he had a bit of a love hate relationship with your dad. ... I think he enjoyed the sparring, the battle," Tom said.

"I mean, that's a very hard thing to hear, to be honest with you," Jonathan said.

After a half hour, the men exchanged phone numbers. Tom said he was sorry for all the Tobolowsky family had been through and told Jonathan to call anytime.

---

These days, Michael arrives at the office around 6 am. He likes to get his legal work done early, so he can spend the rest of the day trying to push his father's murder investigation forward. His office is filled with whiteboards, columns detailing lists of motive and opportunity and evidence. One whiteboard lists 10 suspects in his dad's death. He has crossed off only two, his mother and neighbors. Like his mother, he fears police may not have done enough work to rule out any of the rest.

He's still awaiting results from police on key evidence. Detectives sent the juice bottle to Quantico for analysis; forensic experts are trying to extract data from the wiped computer.

The Tobolowsky family worries whether the Dallas police have the resources to find Ira's killer. They've pinned their hopes on private

investigators. Late last year, they learned Aubrey and Vodicka had moved to Florida. The men live in a bungalow surrounded by palm trees.

Aubrey continues filing motions in Dallas courts. He has taken aim at Michael. After hearing about one particularly hostile filing against her son, Debbie cried for two days. Michael worries about her. She has been living elsewhere, paralyzed about what to do next. She wanted to move back into the house after it was repaired, hoping to feel her husband's presence. But over time, she realized she couldn't go back.

"If he had died a natural death, it would have been different," she says. "But because he was murdered there, I felt violated. It became a place where something evil happened."

One afternoon recently, Ira's longtime paralegal, Leigh Allen, walked into Michael's office as he and his older brother, Jonathan, discussed the case.

"Are you ever going to stop investigating?" Allen asked.

Jonathan looked at her. He said, "Don't you know him better than that by now?"

Michael vows he will never stop. He knows his father trusted the justice system, believed that everyone was innocent until proven guilty, and that the system generally works. He can hear his father telling him, *Life isn't fair. I'm not coming back either way. I don't want you sitting here, mourning me forever.*

With an arrest, with justice and closure, maybe Michael could move on. But not now. Because he can also hear his father saying, *Get the bastard.*

# EXHIBIT  H

## to

## Plaintiffs' Original Complaint

Case 3:19-cv-00056-B   Document 3   Filed 01/08/19   Page 153 of 162   PageID 157





Family Man: Ira and Debbie with their three sons, (from left) Zach, Michael, and Jonathan, at a wedding in 2015.

LAW

# Judge Awards Huge $5.5 Million Verdict in Ira Tobolowsky Defamation Suit

**Neither Steve Aubrey nor Brian Vodicka, the defendants, appeared in court.**

BY JAMIE THOMPSON | PUBLISHED IN FRONTBURNER | MAY 9, 2017 | 10:01 AM

On Monday morning, when visiting Judge Don Cosby called to order his courtroom in downtown Dallas, he quickly noted the absence of the co-defendants in the case he was about to hear. Steve Aubrey and and his partner Brian Vodicka had moved to Florida. The original plaintiff in the case, Ira Tobolowsky, wasn't there either. He'd been



This defamation suit was anything but usual. Ira's widow, Debbie, and their three sons were all in the courtroom. The sons had continued to pursue the case after their father's death. And they all believe that Aubrey killed Ira. Aubrey's unorthodox defense in the defamation case — some done *pro se*, some done by Vodicka, a lawyer — had consisted of numerous lengthy and venomous motions. But after the couple's move to Florida, they quit showing up at hearings. Two judges had voluntarily recused themselves from the case after Ira's death, and the Supreme Court of Texas had to appoint Cosby, a Fort Worth judge, to hear the case.

A key reason the family and police suspect Aubrey in the murder is the personal animosity he showed against Tobolowsky, who had represented Aubrey's estranged mother in a contested estate case. Aubrey strongly denies that he had anything to do with Ira's death. Aubrey and Vodicka have said in court filings that they are indigent and could not afford to travel to Texas for the trial. They asked Judge Cosby if the court would pay for travel and lodging. They also asked to appear by telephone. Cosby denied that request.

The bailiff yesterday called out into an empty court corridor: "Mr. Aubrey? Mr. Vodicka?" He walked back into the courtroom and shook his head. The judge nodded. Time to begin.

Tobolowsky's attorney, Steve Schoettmer, rose and motioned to the empty defense table. "I wish the defendants were here," Schoettmer said. "What these two defendants do ... is that they sue people in order to destroy their lives."

Schoettmer called his first witness, Ira Tobolowsky's youngest son, Zach, who described seeing a blog post Aubrey had written about his father, calling him a mortgage fraudster, jail bars superimposed over his picture. Zach called Ira to tell him about the post.

"He was taken aback, to say the least," Zach testified. "He was very caught off guard." What most upset Ira about the post was that it listed some corporations he had formed for his clients. To take aim at him was one thing, but maligning his clients was another, Zach said. Ira suspected Aubrey was responsible. (Aubrey had first denied, but later admitted he had written the post about Ira.)

Ira typically would downplay and laugh at anything that happened to him, Zach said. "But this was different to me. I could tell that this



is their reputation. That's all a lawyer has.

Schoettmer put a picture of the post on an overhead projector in the courtroom, showing it had been viewed more than 800 times. How many times had that post been seen by potential clients thinking of hiring Ira? It was likely that at least a handful of people had viewed the post and decided against hiring him, his family said.

Schoettmer called his second witness, Ira Tobolowsky's middle son, Michael. Michael took the judge through his father's work in defending Aubrey's mother, showing how contentious the litigation had become. Schoettmer put on the screen an affidavit Ira had written before his death, detailing the things Aubrey had said about him. That he was a crooked lawyer, a fraudulent businessman. That he was part of a team of attorneys who represented pedophiles. That he'd had a sexual relationship with the CEO of the *Dallas Morning News*. Judge Crosby listened from the bench, raising his eyebrows, shaking his head.

After every filing, Michael said, his father had called him. "It was very clear Dad was stressed," Michael said. "I know he had a lot of emotion surface every single time they accused him of something like this. Dad had dealt with crazy individuals in the past. He had dealt with evil individuals." But this was different, he testified. "He'd spent so long and so much effort building and creating a name for himself for being ethical, being honest, being trustworthy." No one had ever attacked him like this before, with such blatant lies, Michael said.

He told the judge that his father had a medical condition that had caused his spine to fuse and caused symptoms similar to arthritis. It was exacerbated by stress. His dad didn't like people to know this, but during times of stress, Ira needed more help doing basic tasks, like putting on his socks. He began asking his wife to put on his socks during the litigation with Aubrey, became more stooped and began looking tired.

After testifying for about an hour, Michael stepped off the witness stand. Schoettmer made his closing statement. He asked the judge to rule against the defendants and order them to pay $500,000 for mental anguish and damage to Ira's reputation. "It probably should be more," Schoettmer said. "But this has never truly been about going to judgment for damages. This was about trying to absolutely stop the conduct that is so atrocious."

Case 3:19-cv-00056-B    Document 3    Filed 01/08/19    Page 156 of 162    PageID 160



and spoke. "I think the fear that this family, the Tobolowsky family, has endured over these past many months ... the court recognizes what has been happening," Cosby said. The plaintiff proved his case, Cosby said. He awarded the Tobolowskys $500,000. And then he went further.

In addition to the half a million the family had asked for, the court would grant them an additional $5 million. Hearing the number, Tobolowsky's eldest, Jonathan, sharply inhaled. He looked at his brothers. Their eyes filled with tears.

The judge looked at Tobolowsky's widow, Debbie, in the front row. "I'm sorry it's come this far."

Debbie Tobolowsky started to weep, as did the other family members in the courtroom. They rose and hugged. As they walked out into the hallway, Debbie looked at her sons. "I wish your father had been here to see this," she said. "He would be proud." She turned toward her dead husband's friend and attorney, Schoettmer, a former linebacker who also was in tears. "Steve, you did an amazing job," she said. He nodded quietly.

In the year since Ira's death, the family has had little relief. For that one brief moment on Monday, the legal system that Ira had loved seemed to stand behind him.

"The judge seemed to be sending a message," Debbie said. "He seemed to be saying that he believed those guys were lying. That he respected Ira. That Ira didn't deserve this. It felt like the judge was saying, 'I'm with you. I feel your family's pain.'"

For the youngest of Ira's sons, Zach, the verdict felt as if one small painful chapter had come to a close. "For us, this was about finishing a fight for our father," he said.

"I genuinely lost my breath," Jonathan said of the verdict. "For the first time since my father's death, I felt completely happy for a moment."

The middle son, Michael, who has taken over his father's law practice, also felt relieved. But he and the rest of the family know their fight is not over. The verdict will be appealed. More motions will be filed. Aubrey and Vodicka claim to be indigent, so there seems little



Michael walked out of the courthouse into the sunlight, relishing the verdict, but planning to soon return to his father's law office. There he would take his seat behind his father's desk and continue working to solve his murder.

When asked for comment over email, Aubrey wrote: "I hope this trial gives the Tobolowsky family the closure they have been so desperate to find."

LAW

 

## Newsletter

Get a weekly recap in your inbox every Sunday of our best stories from the week plus a primer for the days ahead.

| Email | |

Browse all newsletters here.

f  🐦  📷

## Find It

SEARCH OUR DIRECTORIES FOR...

    

Dining      Bars      Events      Attractions      View All





**CRIME**
**'A Place Where
Something Evil
Happened'**
JAMIE THOMPSON





**MEDIA**
**Sneak Peek: _D
Magazine_'s May Issue,
Which Explores Who
Killed Ira Tobolowsky**
MATT GOODMAN

**CRIME**
**The Unsolved Murder of
Ira Tobolowsky**
TIM ROGERS

COMMENTS

Case 3:19-cv-00056-B    Document 3    Filed 01/08/19    Page 159 of 162    PageID 163



♡ Recommend  4          🐦 Tweet          f Share                                    Sort by Oldest ▾

          Join the discussion…

**LOG IN WITH**          **OR SIGN UP WITH DISQUS** ⑦

          Name

          **Kathy Wise** Mod · 2 years ago
What an epilogue.
1 ∧ ⋮ ∨ · Reply · Share ›

          **Mavdog** · 2 years ago
olav ha-shalom
∧ ⋮ ∨ · Reply · Share ›

          **ecstatist** · a year ago
I wonder what skeletal problems Ira suffered from. The journalist I think should have mentioned it to make the reporting comprehensive, no shame in disease. It could be relevant as far as his death may have been suicide which he may have tried to disguise to protect his post mortem reputation. Many people including older generation Jews dogmatically consider suicide to be cowardly and shameful and he was known to be a tenacious fighter.
I take a guess at (progressive) ankalosing spondylitis. He exhibits the bending back that causes one's breathing volume to decrease and some times losing throat control to the point that it similar to waterboarding and can be the ultimate cause of a horrifying death. He may have wanted to protect his family from witnessing this kind of ending. Some of the drugs used to extend life are also used in cancer treatment with varying side effects.
I wonder what Ira's feelings were about homosexuals. Nevertheless I have great pity and sympathy for the man There was too much innuendo to call the reporting balanced.
I fail to see how most Texas judges could be impartial dealing with the defamation of a fellow (dead) lawyer in the same generation as so many judges. Lawyers seldom criticize lawyers unless there is some money in it Consider their prejudices exhibited in patent cases so flagrant that patent cases are now disallowed in that part of Texas. Also their crazy responses to the Waco "motorbike gang" / "police gang" debacle.
The suspects certainly don't seem to be nice people but assume for a moment that they are actually innocent. And consider what their situation would be now if they were African- Americans!

The police pension or non pension should be an interesting story. Note how so many police are scrabbling to get "their fair share" probably leaving their brothers with an unfair share. I wouldn't like to be on the Titanic with them. Bet they would still vote for the same type of politicians that caused this problem or was some of this caused by police departments and cities being sued for their police misbehavior. Greed is good? Texas certainly doesn't need fiction writers.
∧ ⋮ ∨ · Reply · Share ›

          **Sandy** · 10 months ago
dd
∧ ⋮ ∨ · Reply · Share ›

          **Sandy** · 10 months ago
I would have to agree with "ecstatist." The reporting was not balanced. While the story mentions many potential suspects, it hides the identity of all except two. There does not seem to be anything factual connecting the two to the crime. It appears that because the reporter had no facts to give foundation to her story, she resorted to barrage of innuendo.

It is absolutely horrific what happened to this family. But I really hope the reporter does a more thorough reporting

# EXHIBIT I

## to

## Plaintiffs' Original Complaint

Print this page

# Envelope 2336763

**Case Information**

| | |
|---|---|
| Location | Dallas County - District Clerk - Civil |
| Date Filed | 08/29/2014 04:53:43 PM |
| Case Number | |
| Case Description | |
| Assigned to Judge | |
| Attorney | |
| Firm Name | Individual |
| Filed By | Steven Aubrey |
| Filer Type | Not Applicable |

**Fees**

| | |
|---|---|
| Convenience Fee | $8.01 |
| Total Court Case Fees | $277.00 |
| Total Court Filing Fees | $0.00 |
| Total Court Service Fees | $0.00 |
| Total Filing & Service Fees | $0.00 |
| Total Service Tax Fees | $0.00 |
| Total Provider Service Fees | $0.00 |
| Total Provider Tax Fees | $0.00 |
| Grand Total | $285.01 |

**Payment**

| | |
|---|---|
| Account Name | Steve Aubrey (MC 4562) |
| Transaction Amount | $285.01 |
| Transaction Response | |
| Transaction ID | 3865419 |
| Order # | 002336763-0 |

**Application**

| | |
|---|---|
| Filing Type | EFile |
| Filing Code | Application |
| Filing Description | Application For Temporary Restraining Order and Temporary Injunction |
| Reference Number | |
| Comments | |
| Status | Cancelled |

**Fees**

| | |
|---|---|
| Court Fee | $0.00 |
| Service Fee | $0.00 |

**Documents**

| | | |
|---|---|---|
| *Lead Document* | TRO-final.pdf | [Original] |



