aggravated assault offense.  The judge played his "get of jail free" card and quickly reached an agreement with law enforcement to ignore his assault.[1]

37.     Moye's victim, a woman scared for her life, took a picture of Moye in his Mercedes and posted it on Facebook asking for the public to help identify the gunman because DPD would not do anything.  Moye's problem was suddenly very public and this happened in the middle of Moye's re election campaign.

38.     In full damage control mode, Moye devised a scheme to excuse his little indiscretion using law enforcement, the media and Plaintiffs.  Moye began strategically releasing statements to the media, designed to make himself the victim, instead of the perpetrator.   He told the media he feared for his life because he thought the opposing party in Ira Tobolowsky's lawsuit, killed him, which indicates the murderer must be a serial killer and the judge is always next.  On May 15, 2016, The Dallas Morning News featured the article: *Dallas judge given extra security after attorney's death in suspicious fire.*

39.     Moye publically asked law enforcement for extra security to demonstrate that he feared for his safety. On May 19, 2016, CBS reported: "Civil District Judge Eric Moye said in a statement that law enforcement told him to arm himself before traveling anywhere."[2]  Stated another way, Moye had been given permission to commit his aggravated assault. The judge denied all of the media's requests for interviews to avoid the unwanted questions about his assault.

---

[1]  Moye, who lives in South Dallas and works in Downtown Dallas, was driving on the "North" Dallas Tollway, in North Dallas, the same part of Dallas where Ira Tobolowsky lived and was murdered, on the same morning of the murder, when he became agitated enough to point his loaded gun at a woman driving next to him.

[2]  Plaintiffs don't believe for a second that law enforcement told Moye to carry a weapon. Ironically, it was Moye's victim that needed the extra security to be protected from Moye.

## C.  **Extrajudicial Murder Accusation**

40.      Moye successfully convinced the public he was scared that someone related to one of his cases was going to murder him, that he needed special and extra security (in the secure courthouse as well) and that law enforcement told him the carry a weapon.

41.      The judge's week of pageantry culminated with an invitation to all media to join him in his courtroom.  After Moye entered the courtroom and commenced a hearing, in front of all the media, he publically implicated Aubrey in the death of Ira Tobolowsky.  Stated another way, Moye said the Aubrey murdered Ira Tobolowsky.[3]  The judge packaged the murder accusation as a reason for his voluntary recusal from the case, sticking with the fear factor theme.[4]

42.      Moye packaged his baseless and extremely damaging accusation as a reason for his voluntary recusal from the case, again emphasizing his fear factor.

43.      The staged fear for his life satisfied the public, and the media, as an excuse for Moye's felony offense.  Moye had given the media the gift of a much bigger story about Aubrey committing murder, which served as the media's green light to begin aggressively defaming Plaintiffs. [5]

---

[3] Nobody, including Moye, has ever alleged a motive to support the extraordinary allegation that Plaintiffs had something to do with the murder of Ira Tobolowsky.  Plaintiffs had recently been involved in multiple lawsuits and were unable to recover their lifelong savings, lost in an investment scheme. Plaintiffs never considered killing any of those opposing parties. Ira Tobolowsky was never an important figure in Plaintiffs' lives. Without motive and without evidence everyone relied on Moye's self-serving released statements.  Plaintiffs are unaware of a crime pattern theory or any precedent that would indicate a judge should fear for his life when a party to a case in his court is murdered.

[4] Plaintiffs believe that it is an extraordinary practice for a judge to invite the media into his court to make an announcement.  Of course this was a controlled setting where again, Moye would not be questioned.  Plaintiffs are unaware of the reason or neccesity to have the media present when a judge recuses himself.

[5] Judges cannot make murder accusations in civil or criminal courts because anything that might impede a jury's ability to remain impartial or prevent it from reaching a unanimous decision is grounds for a

12

44.     Moye never released another statement to the media about his safety, Aubrey or why he recused himself.  His "fear" of Aubrey seemed to immediately evaporate and he did save his job.

45.     Moye subjected Plaintiffs to public ridicule and hatred and unfairly influenced potential jurors and judges, evidenced by the Texas Supreme Court assigning a judge outside of the Dallas area to preside over the case he recused himself from. Moye's actions deprived Plaintiffs due process of law, deprived them of equal protection and violated Plaintiffs' rights to an impartial jury.

### D.     Aggravated Perjury

46.     At Moye's direction, law enforcement wanted to speak with Plaintiffs.  Aubrey had known many years to be wary of investigator interviews.  Plaintiffs were torn between wanting to clear their names and whether or not they should help.   After some quick research online, the overwhelming majority of advice was absolutely never speak with law enforcement without an attorney.  So they did not.

47.     Plaintiffs plan to not speak with authorities created two problems for the City Defendants who had a murder to solve.  When the authorities realized Plaintiffs did not want to participate in interviews, City Defendants concocted a scheme to fabricate probable cause so that they could search Plaintiffs, their apartments and all of their belongings, confiscate their computers, phones and impound their cars.

48.     Ermatinger and Sayers drafted fraudulent Affidavits for Search Warrants that included misleading innuendo and outright lies.  Ermatinger signed the first three (3) fraudulent

---

mistrial.   Moye's malicious comment was published by dozens of media outlets and read by millions of people.

affidavits for search warrants, which basically misrepresented that Plaintiffs were in hiding and could not be found.

49.     After Ermatinger's first two (2) warrant affidavits, he decided to jazz it up a bit with something sure to raise a judge's eyebrow. Ermatinger made it more compelling by strategically adding the words "and against his life" to completely change the odd statement into a very alarming one.  *See* Affidavit attached as **Exhibit A**, stated:

50.     The added words made the statement blatantly false but it increased the probable cause value dramatically.  The statement now read:

> **"It was alleged in the lawsuit that Steven Aubrey threatened "Jihad" the same words used to describe the wars brought by terrorists, <u>and against his life</u> which was filed in court docket number 15-08135…"**  (emphasis added)

It worked and Ermatinger got the search warrants he requested.

51.      Days later, Sayers wanted two (2) more search warrants on Plaintiffs so he adopted the same language used by Ermatinger, signed the affidavits under oath and then perjured himself when he presented to fictitious warrant affidavits to a judge.  The system was working fine for everybody except Plaintiffs.  *See* Affidavits attached as **Exhibits B & C.**

52.     Ermatinger acted under color of law when he unlawfully searched Plaintiffs and their residence and unlawfully seized their personal property including clothes, electronics, phones, computers and automobiles.

53.     Sayers acted under the color of law when he unlawfully searched Plaintiffs' residences and unlawfully seized their personal property.

54.     On October 24, 2016, Aubrey filed a detailed complaint with the Public Integrity Unit whose mission "is to investigate and prosecute those who have misused the trust placed in

them by State licensing boards. Independence and Transparency are paramount to a process that is fair to both law enforcement and the citizens of this County."

55.     Sgt. Dotson, a "Public Integrity Unit" lawyer, called Aubrey and said that he had a meeting with the perpetrator, DPD, and together they determined DPD had done nothing wrong.

### E.   "Shock and Awe" Excessive Force

56.     Ermatinger used two (2) more fraudulent affidavits to request searches and seizures of Aubrey and Vodicka personally.  He got the search warrants, which stated, in part:

"...examine, photograph and fingerprint said Steven Aubrey within accepted practices."

"...examine, photograph and fingerprint said Brian Vodicka within accepted practices."

57.     Rather than respect legal boundaries and Plaintiffs' rights as citizens, Ermatinger and Sayers decided it might be fun to risk Plaintiffs' lives for no reason.

58.     Knock-and-announce requires City Defendants to announce their presence and provide residents with an opportunity to open the door prior to a search.

59.     The only exceptions to the knock-and-announce if doing so could endanger officers, permit escape, or cause the destruction of evidence, otherwise, the procedure is constitutionally required.

60.     On May 19, 2016, there was no basis for the officers to believe knocking on Plaintiff's door could cause them danger.  Plaintiffs were in their mid-50's and both had clean records with no arrests or charges for any type of violence. As well, City Defendants could not claim that knocking would risk destruction of evidence, as Plaintiffs were the evidence.

61.     The alternative of choice was for City Defendants to conspire with County Defendants and enlist the assistance of the Tactical Division for a Stake-Out and High-Risk

Apprehension of Suspects.   The Dallas Police Department General Order Section 313.07A.1. defines the operation as follows:

- Stake-out: an operation in which officers assume concealed or covert positions in anticipation of a criminal act for the purpose of apprehending the persons involved.

- Surveillance: the continuous observation of persons, places and things for the purpose of gathering information.

- High Risk Apprehension: any planned arrest in which there is good reason to believe that the person to be arrested may be armed and intent upon resistance.

62.   City Defendants maliciously included false facts in its affidavits for search warrants to intentionally deprive Plaintiffs of their rights.  By means of wholly unfounded search warrants, City Defendants, County Defendants and Doe Defendants used excessive force against Plaintiffs, falsely arrested them, deprived them from their personal property, including automobiles, deprived them of their liberty without due process of law, invaded their privacy and defamed them.

63.   On May 19, 2016, DPD utilized the Tactical Division for a Stake-Out and High-Risk Apprehension of Plaintiffs to execute unlawful search warrants to obtain fingerprints and photographs of Plaintiffs.  Applicable Defendants waited, in hiding, for Plaintiffs to exit their residence.  Following the exit from their residence, Plaintiffs entered into their parked vehicle and began to back out of the driveway.  Using tactics and resources reserved for the likes of a Pablo Escobar, Applicable Defendants ambushed Plaintiffs.  Unmarked cars traveling at very high speeds blocked Plaintiffs' vehicle from every angle.   What appeared to be an attack by lawless maniacs, Applicable Defendants slammed their brakes, jumped out of their vehicles

16

wearing unidentifiable plain clothes with firearms drawn and pointed at Plaintiffs as they descended upon Plaintiffs' vehicle.  The crazed and threatening men screamed at Plaintiffs to get out of the car and then forced them to the concrete with loaded guns at the temples of their heads. One of the gunmen, who had Vodicka pinned to the ground, said in a low voice, "You know what you did, faggot."

64.    General Order 906.02(E), "Drawing or Displaying Firearms," requires that a threat or reasonable belief that there is a threat to life or they have reasonable fear for their own safety and/or the safety of others, exist in order to authorize an officer to draw or display her/his firearm.   Plaintiffs were not a threat to anyone.

65.    It is reasonable to assume that City and County Defendants' use of an undercover tactical division to apprehend Plaintiffs to get their fingerprints was for reasons other than getting their fingerprints.  It is reasonable to assume that City and County Defendants orchestrated the ambush without identifying themselves, hoping for the possibility that Plaintiffs might resist arrest and try to defend themselves or even try to break free from the attack. giving   It is reasonable to assume that had Plaintiffs resisted in any way, John Does 1-10 may have determined there was cause to use Plaintiffs for target practice.

66.    Plaintiffs, lucky to be alive, were arrested, handcuffed and hauled off to police headquarters, against their will.

67.    The unlawful search warrants very simply commanded Ermatinger to examine, photograph and fingerprint Plaintiffs within "accepted practices."  The search warrants *were not* arrest warrants. Ermatinger did not trick the judge into issuing arrest warrants.

68.     The apartment property managers and Plaintiffs' neighbors watched the incident in horror.  The following day an eviction notice was on Plaintiffs' front door for the following violation of their Lease Agreement; "Arrested on Property."

## F.  Prostitution in Big D

69.     On October 20, 2016, under color and pretense of law, DPD unsuccessfully attempted to entrap Aubrey for prostitution.  Nevertheless, DPD proceeded with a false arrest and false imprisonment as part of its campaign to maliciously prosecute Aubrey.  To deceive the public, DPD fabricated a story about an undercover prostitution investigation of a website where Aubrey advertised his massage services.  In truth, there was no investigation and Aubrey was DPD's chosen target.

70.     Because Aubrey is not a prostitute, he would not agree to meet the undercover officer for a cocktail in the bar and there was never any communication about "masturbation and sexual intercourse," which some of the media gladly published.[6]  Additionally, Aubrey refused to accept money upfront, before services were rendered. Because Aubrey is not a prostitute, the district attorney never prosecuted the case.

71.     On October 19, 2018, the statute of limitations expired, which terminated the proceedings in favor of Aubrey. Because Aubrey is not a prostitute, his arrest for prostitution was a false arrest.

72.     Aubrey's arrest was unauthorized, unlawful, against his will and the restraint was unreasonable under the circumstances.

---

[6] DPD leaked false information to the media, attempting to justify the false arrest, false imprisonment and charge for prostitution. Though sex was never a topic of discussion between Aubrey and decoy officer, D Magazine's April 26, 2017 article, *A Place Where Something Evil Happened*, falsely stated: "Aubrey agreed to masturbation and sexual intercourse for $300."  This is a blatantly false statement.

73.     Plaintiffs could not take the abuse Dallas was serving them. Soon after the bogus arrest and entrapment for prostitution, Plaintiffs moved to South Florida.

## G.  D Magazine Defames

74.     It is unclear if Plaintiffs' move to Florida gave D Magazine a shot of courage but D Magazine took the gloves of and went all the way in to defame Plaintiffs.  It used three (3) promotional publications to make its readers thirsty for the monthly magazine issue that had the answers.  The 3 promotional teasers had provocative titles, including:

- *Sneak Peek: D Magazine's May Issue, Which Explores Who Killed Ira Tobolowsky,*  April 26, 2017,  ("Promo-1")  *See* **Exhibit D.**

- *Who Murdered Ira Tobolowsky?* May 3, 2017,  ("Promo-2")  YouTube Video. *See* **Exhibit E.**

- *The Unsolved Murder of Ira Tobolowsky, The prominent lawyer was burned alive in his North Dallas garage. The family thinks they know who did it.*  May 8, 2017, ("Promo-3")  *See* **Exhibit F.**

75.     ANSWER: Finally, the promotional publication cliffhangers were answered with D Magazine's May 2017 issue feature story; the story about Aubrey in:

- *A Place Where Something Evil Happened,* by Jamie Thompson ("Article") *See* **Exhibit G.**

76.     The Article was not about Ira Tobolowsky or attempts to figure out who murdered him.  D Magazine had predetermined it was Aubrey, with some assistance from Vodicka, and the

only left to do was pin Aubrey up on the cross.   This was a story about Aubrey.   His name appears 96 times in the Article, more than the name of anybody else.

77.      D Magazine's Article defamed Plaintiffs from beginning to end with many provably false statements and dozens of statements that defamed by implication.   The publisher's intentions were so extreme that the Article included libel statements that were per se.   One false statement that fits squarely within the definition of libel per se, stated:

> Aubrey agreed to masturbation and sexual intercourse for $300.

78.      D Magazine went for the jugular and put all their cards on the table, fabricating a bold and nasty per se statement that caused Aubrey and Vodicka damages, which are presumed.

### CAUSES OF ACTION

79.      All conditions precedent to Plaintiffs' recovery have occurred or have been waived, excused, or otherwise satisfied.   All notices required have been provided or were waived, excused, or otherwise satisfied.

### COUNT I
### Constitutional Law - Unreasonable Searches and Seizures
### (Against City Defendants, County Defendants and Doe Defendants)

80.      Plaintiffs repeat and incorporate by reference paragraphs 1 through 79 above as though fully set forth herein.

81.      The Fourth and Fifth Amendments to the U.S. Constitution and 42 U.S.C. §1983 protect American citizens from interference with an individual's possessory property rights or liberty by the government.

82.     Plaintiffs were deprived of their liberty in violation of their rights under the Fourth and Fifth Amendment and 42 U.S.C. § 1983 when Applicable Defendants unlawfully searched Plaintiffs' residences and seized their property and unlawfully searched and seized Plaintiffs personally.

83.     While police officers generally have broad powers to carry out their duties, the Constitution and other laws place limits on how far police can go in trying to enforce the law.  A primary purpose of the nation's civil rights laws is to protect citizens from abuses by government, including police misconduct.

84.     Police officers are immune from lawsuits for the performance of their jobs unless willful, unreasonable conduct is demonstrated, as in this case.  Here, City Defendants conspired together and with others to cause unlawful search warrants to be executed on Plaintiffs.

85.     On May 18, 2016, under color and pretense of law, Ermatinger presented a falsified warrant affidavit to Judge Jeanine Howard, causing her to issue unlawful search warrants.  Ermatinger included a false fact stating the following:

> "It was aledged [sic] in the lawsuit that Steven Aubrey threatened "Jihad" the same words used to describe the wars brought by terrorists, and against his life which was filed in court document number 15-08135 in the 14 Judicial district court judge Eric Moye presiding."

 Not only did Aubrey not threaten Ira Tobolowsky's life, Ira Tobolowsky never "alleged" that Aubrey threatened his life.  There is no filing in Case No. 15-08135 to validate Ermatinger's false and defamatory claim.

86.     On May 25, 2016, under color and pretense of law, Sayers used the identical false fact used by Ermatinger and presented two (2) fictitious warrant affidavits to Judge Jennifer Bennett, causing her to issue unlawful search warrants.

87.    The fact that Ermatinger and Sayers found it necessary to lie in the warrant affidavits is proof that at a minimum, they believed the affidavits lacked probable cause without adding the lie.

88.    Ermatinger and Sayers' fraudulent representation that court filings contained allegations that Aubrey threatened Tobolowsky life was a material fact that caused the unlawful search warrants to be issued and executed.

89.    Not so easily proven false, Ermatinger and Sayers lied in their affidavits when they alleged Plaintiffs were trying to hide.   Plaintiffs did not try very hard and DPD's premeditated "shock and awe" ambush proved that.

90.    Plaintiffs allege the detectives probably never stopped by their apartment previous to their attack.  When DPD determined Plaintiffs were not willing to return Ermatinger's phone calls they began fabricating probable cause, acting as though Plaintiffs were "on the run" by passing out Aubrey's photo at the courthouse and telling personnel to be on the lookout.

91.     Plaintiffs had no reason to run, which is why they were at home.  As proof, the detectives knew exactly where to find Plaintiffs when the unlawful warrants gave them permission to invade and intrude on Plaintiffs' lives and property. The rogue detectives orchestrated the unlawful tactical division "shock and awe" takedown of Plaintiffs at their apartment where they had been all along.

92.    A jury will find that no reasonable officer could have believed that the affidavit was lawful, in light of clearly established law and the information Ermatinger possessed, or could have easily possessed, when he submitted the affidavit to a judge at her home late at night instead of requesting the warrants from the magistrate on duty.

93.     Two of the search warrants commanded City Defendants to "examine, photograph and fingerprint" the plaintiffs "within accepted practices."

94.     City Defendants maliciously included false facts in its affidavits for search warrants to intentionally deprive Plaintiffs of their rights.  By means of wholly unfounded search warrants, City Defendants, County Defendants and Doe Defendants used excessive force against Plaintiffs, falsely arrested them, deprived them from their personal property, including automobiles, deprived them of their liberty without due process of law, invaded their privacy and defamed them.

95.     On October 20, 2016, under color and pretense of law, DPD unsuccessfully attempted to entrap Aubrey for prostitution.  Nevertheless, DPD proceeded with a false arrest and false imprisonment as part of its campaign to maliciously prosecute Aubrey.  To deceive the public, DPD fabricated a story about an undercover prostitution investigation of a website where Aubrey advertised his massage services.  In truth, there was no investigation and Aubrey was DPD's chosen target.

96.     Because Aubrey is not a prostitute, he would not agree to meet the undercover officer for a cocktail in the bar and there was never any communication about "masturbation and sexual intercourse" which some of the media gladly published.  Additionally, Aubrey refused to accept money upfront, before services were rendered. Because Aubrey is not a prostitute, the district attorney never prosecuted the case.

97.     On October 19, 2018, the statute of limitations expired, which terminated the proceedings in favor of Aubrey.  Because Aubrey is not a prostitute, DPD's search and seizure was unlawful.

98.     While Aubrey was unlawfully held in custody, Ermatinger and Sayers illegally trespassed into Plaintiffs' residence, without a search warrant, committing another unlawful search and seizure.

99.     The direct and proximate result of Applicable Defendants' malicious acts is that Plaintiffs suffered severe injury including, but not limited to, personal humiliation, emotional distress, impairment of reputations, medical expense, legal expense, loss of employment, lost earnings capacity, and damage to character.

100.    Applicable Defendants committed one or more willful violations of Plaintiffs' rights under the Fourth and Fifth Amendments to the U.S. Constitution and 42 U.S.C. 1983.

### COUNT II
### Constitutional Law - Excessive Force
### (Against City Defendants, County Defendants and Doe Defendants)

101.    Plaintiffs repeat and incorporate by reference paragraphs 1 through 100 above as though fully set forth herein.

102.    The search and seizure requirement under the Fourth Amendment to the U.S. Constitution and 42 U.S.C. 1983, protect American citizens rights to be free from excessive force.  "Cruel and unusual punishments" by the state (police) are prohibited by the Eighth Amendment to the U. S. Constitution.  There are very few situations in which a violent takedown should be utilized, and it is generally in cases where a person is resisting an arrest with great force.

103.    When executing the warrants that permitted DPD to fingerprint and photograph Plaintiffs, DPD ignored its duty to announce their presence and authority "knock and announce" prior to entering Plaintiffs' residence (or vehicle).  Instead, DPD used excessive force, a violation of Plaintiffs' Fourth Amendment right to be secure against unreasonable searches.

104.    On May 19, 2016, DPD utilized the Tactical Division for a Stake-Out and High-Risk Apprehension of Plaintiffs to execute unlawful search warrants to obtain fingerprints and photographs of Plaintiffs.   Applicable Defendants waited, in hiding, for Plaintiffs to exit their residence.   Following the exit from their residence, Plaintiffs entered into their parked vehicle and began to back out of the driveway.   Using tactics and resources reserved for the likes of a Pablo Escobar, Applicable Defendants ambushed Plaintiffs.   Unmarked cars traveling at very high speeds blocked Plaintiffs' vehicle from every angle.    What appeared to be an attack by lawless maniacs, Applicable Defendants slammed their brakes, jumped out of their vehicles wearing unidentifiable plain clothes with firearms drawn and pointed at Plaintiffs as they descended upon Plaintiffs' vehicle.   The crazed and threatening men screamed at Plaintiffs to get out of the car and then forced them to the concrete with loaded guns at the temples of their heads. One of the gunmen, who had Vodicka pinned to the ground, said in a low voice, "You know what you did, faggot."

105.    General Order 906.02(E), "Drawing or Displaying Firearms," requires that a threat or reasonable belief that there is a threat to life or they have reasonable fear for their own safety and/or the safety of others, exist in order to authorize an officer to draw or display her/his firearm.   Plaintiffs were not a threat to anyone.

106.    Applicable Defendants had a duty to knock on Plaintiffs' door and announce and identify themselves.   In *Wilson v. Arkansas*, 514 U.S. 927 (1995), is a United States Supreme Court decision in which the Court held that police officers must "knock and announce" before entering a house to serve a warrant.

107.    In a unanimous (9–0) decision, the Supreme Court reversed the decision of the Arkansas Supreme Court.   Clarence Thomas authored the majority opinion, arguing that the

"knock-and-announce" rule is a part of the reasonableness standard applied while conducting a search, according to the rules of common law":

> The Fourth Amendment to the Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." In evaluating the scope of this right, we have looked to the traditional protections against unreasonable searches and seizures afforded by the common law at the time of the framing. See *California v. Hodari D.*, 499 U.S. 621, 624 (1991); *United States v. Watson*, 423 U.S. 411, 418-420 (1976); *Carroll v. United States*, 267 U.S. 132, 149 (1925). "Although the underlying command of the Fourth Amendment is always that searches and seizures be reasonable," *New Jersey v. T. L. O.*, 469 U.S. 325, 337 (1985), our effort to give content to this term may be guided by the meaning ascribed to it by the Framers of the Amendment. <u>An examination of the common law of search and seizure leaves no doubt that the reasonableness of a search of a dwelling may depend in part on whether law enforcement officers announced their presence and authority prior to entering</u>."

The court later said that although unexcused knock-notice remains a requirement of constitutional reasonableness, non-compliance does not trigger the exclusionary rule. *(Hudson v. Michigan)* Nevertheless, officers sworn to abide by the law (and wishing to avoid civil liability) should still comply with knock-notice, unless one of the identified risks makes unannounced entry permissible.

108.    Instead of complying with the "knock-and-announce" rule, Applicable Defendants used force that was unreasonable and violent.  It was not necessary to ambush Plaintiffs and force them to the ground with loaded firearms pointed at their heads. Plaintiffs were no armed, did not pose a threat, they did not resist arrest, and the warrant did not authorize their arrests. The search warrants commanded City Defendants to "examine, photograph and fingerprint" Plaintiffs "within accepted practices."

109.    The City of Dallas and Chief Brown failed to adequately supervise and/or discipline its employees and if they consider their actions to be "within accepted practices" then their practices are unconstitutional and they should be liable for their damage.

110.    Chief Brown, the final policymaker for the DPD, the Dallas City Council and The City did not provide adequate training to its employees as it relates to the use of deadly force and the use of non-deadly force, proper arrest and confrontation techniques.  Chief Brown, the Dallas City Council and The City knew or should have known that the training provided to its employees was inadequate or nonexistent and they did not adequately supervise its employees if the employees believe their actions on May 19, 2016, are "within accepted practices."

111.    Applicable Defendants were in plain clothes, drove unmarked cars, screamed while pointing loaded firearms and forced Plaintiffs to the ground intending to terrify Plaintiffs. It was unreasonable to terrify Plaintiffs to retrieve their fingerprints and photograph them.   If Plaintiffs had made the slightest wrong move or resisted the apprehension by the unidentified gunmen, they would likely have been shot and killed because the of City Defendants unlawful training.

112.    Plaintiffs are members of a minority group because of their sexual orientation and DPD is well known for abusing and even killing minorities.  Doe Defendant referred to Vodicka as a "faggot" during the ambush, indicating that Plaintiffs' sexual minority was a component of the excessive force used against them.

113.    DPD's severe lack of training and its official custom and policies have resulted in many deadly police shootings of unarmed minorities, to wit:

- On or about July 24, 2012, unarmed James Harper ("Harper") was fatally shot by DPD officer Brian Rowden ("Rowden"). Rowden pursued Harper on foot and fired a shot at Harper as he ran away. Rowden was not disciplined for the unlawful killing of Harper.

- On or about March 10, 2013, unarmed Clinton Allen ("Allen") was fatally shot 7 times by DPD officer Clark Staller. Allen was wrongfully gunned down although he held both hands up. Clark Staller, despite previously falsifying a police report prior to the shooting death of Allen, was allowed to remain on as an officer and was not disciplined for the death of Allen. Clark Staller was allowed to prepare his statement of the incident with the assistance of his attorney and was not asked any questions to determine the veracity of his statements.

- On or about October 14, 2013, a DPD officer shot Bobby Bennett ("Bennett"), an unarmed individual, and attempted to falsify a police report and cover-up the murder saying that Bennet lunged at him with a raised knife. But a video revealed that Bennett complied with the officer's order to freeze and was standing still for several seconds when the officer opened fire and killed him.

- On October 2, 2013, David Blair, an unarmed individual was standing outside of his east Oak Cliff apartment when a pair of Dallas Police Officers harassed him for no lawful reason. The officers approached him, followed him to his apartment and shot at him 14 times as he stepped out of his apartment for no lawful reason. Blair's story surfaced just a week after a video circulated of a Dallas police officer shooting Bennett, a man with mental challenges, after he stood up from a chair he set in the middle of a cul-de-sac. Police initially claimed the man lunged at them, but the video showed otherwise. An aggravated assault charge against the wounded man has since been dropped.

- On December 10, 2013, 19-year-old Kelvion Walker was still in the vehicle with his hands up when a Dallas police officer shot him. On August 27, 2015, an

unarmed Bertrand Syjuan Davis was fatally shot by Officer Matthew Terry. According to multiple witness accounts, immediately upon arriving at the scene, Officer Terry failed to conduct an objectively-reasonable assessment of the facts, drew his gun and shot Bert several times including once in the back, without any verbal warning. Per witnesses, Officer Terry was not facing or reacting to an imminent threat of death or serious bodily injury to him or any other person at the time he fired multiple shots that struck Bert, including one to the back. Officer Terry was not disciplined by the DPD for his wrongful conduct.

- On January 18, 2017, Officers Christopher Hess and Jason Kimpel used excessive and deadly force resulting in the death of 21-year-old Genevive Dawes and the injuries to Virgilio Rosales. As Dawes drove in her vehicle in reverse at a very slow rate of speed, Hess and Kimpel fired at least 13 shots through the passenger side window where Rosales was seated, striking Dawes five times in the neck, her right tricep, left arm, upper left chest and right forearm. Dawes's right earlobe was also partially amputated. Dawes was transported to Baylor Hospital where she later died as a result of her injuries. Hess's defense for firing at the moving vehicle was not supported by body cam evidence. Despite body cam footage that shows Dawes was not trying to injure anyone as she reversed her vehicle, Hess and Kimpel were not terminated for their violation of DPD policy. In fact, the DPD and the city of Dallas attempted to cover-up this shooting until the body cam footage was released to the Dallas District Attorney's office almost six months later. Hess was indicted for the death of Dawes.

- On September 6, 2018, Officer Amber Guyger used excessive and deadly force resulting in the death of Botham Jean ("Jean") who was lawfully in his apartment, unarmed and not attempting to harm her or any other person.  Officer Guyger was not placed under arrest and was allowed to continue roaming about the crime scene.   The DPD investigation was designed to cover-up the misconduct of Officer Guyger.   Detectives sought warrants for Jean's home with the specific intent of discovering evidence of illegality.   Detectives did not initially seek warrants for the apartment or vehicle of Officer Guyger.  DPD began providing local media with information to cast Officer Guyger in the best light saying the physical evidence at the crime scene substantiated the officer's version of events.  The media published the warrant affidavit that indicated drugs and drug paraphernalia were recovered from Jean's home, designed to protect Officer Guyger.

114.    Like the DPD victims detailed in the previous paragraph above, Plaintiffs were unarmed minorities, were not resisting arrest and they did not pose an imminent threat of death or serious bodily injury to the gunmen who ambushed them or to any other person.   DPD maliciously acted out a scheme to intentionally put Plaintiffs in the same position as their other victims, on the wrong side of loaded firearms, one squeeze of a trigger finger away from death. While DPD likely trains its officers to act as though they are licensed to kill minorities, brutalizing and killing minorities remains unlawful and unconstitutional.

115.    Interestingly, while nearly all incidents of excessive force attributed to DPD is force used in a spontaneous situation, the excessive force used on Plaintiffs was premeditated

and had literally been organized and planned in advance, indicating approval from commanding officers.

116.    DPD and Applicable Defendants intentionally put Plaintiffs in a life or death situation that could easily have ended with another headline in which a police shooting resulted in death.  The bloodthirsty DPD has a documented history that proves its standard protocol is when guns are drawn on Dallas minorities and officers decide to murder them, the entire department will stand behind the officer and do whatever is possible to cover-up the malfeasance.    The problem is systemic and starts at the top with Dallas Police Chief David Brown, who led the department during the time of the May 19, 2016 incident against Plaintiffs.

117.    DPD has a pattern, practice, history, and custom of using excessive force against minorities, including approaching them with guns drawn, when there is no imminent threat of bodily harm or other justifiable reason to do so. The DPD trains its officers to use deadly force even when there exists no immediate threat to themselves or others.

118.    Whether force is reasonably necessary or excessive is measured by the force a reasonable and prudent law enforcement officer would use under the circumstances.

119.    All use of force lawsuits are measured by standards established by the Supreme Court in *Graham v. Connor*, 490 U.S. 386 (1989).  In the *Graham* case, the Court instructed lower courts to always ask three questions to measure the lawfulness of a particular use of force: (1) the severity of the offense suspect; (2) whether the suspect posed an immediate threat to the officer or others; and (3) whether the suspect was actively resisting or attempting to evade arrest by flight.  Here, there was no offense.  Plaintiffs were "arrested" so that City Defendants could be "examine, photograph and fingerprint" them.  Plaintiffs did not pose a threat to the officers and they did not resist the arrest.

120.    A police officer may use only that force that is both *reasonable* and *necessary* to effect an arrest or detention. Anything more is *excessive force* (*Payne v. Pauley*, 337 F.3d 767, 7th Cir. 2003).

121.    Applicable Defendants violated 18 U.S.C. § 242 through the willful and deliberate application of excessive force under the color of law. This violation deprived Plaintiffs of their most basic human and civil rights.  DPD has a history of using illegal and excessive force against minorities, falsifying reports and/or fabricating evidence to elude criminal prosecution for its actions.  The history of violence against minorities combined with their knowledge that Plaintiffs had absolutely no history of violence, confirms that Applicable Defendants actions were motivated by Plaintiffs' sexual orientation, in violation of 18 U.S.C. § 249.

122.    *The Matthew Shepard and James Byrd, Jr.. Hate Crimes Prevention Act of 2009*, creates a new federal criminal law which criminalizes willfully causing bodily injury (or attempting to do so with fire, firearm, or other dangerous weapon) when the crime was committed because of the actual or perceived race, color, religion, national origin of any person. Subsection (a)(2) of § 249 protects a wider class of victims. Subsection (a)(2) criminalizes acts of violence (and attempts to commit violent acts undertaken with a dangerous weapon) when motivated by the actual or perceived gender, disability, sexual orientation, or gender identity of any person.

123.    Ermatinger and Sayers' falsified affidavits for search warrants were fabrications of fake probable cause and they presented the fictitious sworn document to various judges. Aubrey submitted a complaint to the Internal Affairs Division of the Dallas Police Department. It was ignored.  Aubrey submitted a complaint to the Public Integrity Unit - Dallas County District Attorney.  In response to the complaint, Sgt. Dotson with the Public Integrity Unit called Aubrey

and said he had spoken with the perpetrator, DPD, about the complaint and determined that the lies in the affidavits, the excessive force, the false arrest and false imprisonment did not constitute police misconduct.

124.    Further investigation into the Internal Affairs Division of the Dallas Police Department may reveal an agency wide culture of corruption and ongoing illegal activity as it relates to investigating its own officers for alleged misconduct. The egregious acts used against Plaintiffs are not merely issues of excessive force or police misconduct, they represent only a part of a long history of unlawful behavior, systemic human rights failures and civil rights violations perpetrated by DPD.

125.    A jury will find that no reasonable officer could have believed that the preconceived force used was lawful, in light of clearly established law and the information Applicable Defendants possessed.

126.    The direct and proximate result of Applicable Defendants' malicious acts is that Plaintiffs suffered severe injury including, but not limited to, personal humiliation, emotional distress, impairment of reputations, medical expense, legal expense, loss of employment, lost earnings capacity, and damage to character.

127.    Applicable Defendants committed one or more willful violations of Plaintiffs' rights under the Fourth and Eighth Amendments to the U.S. Constitution and 42 U.S.C. 1983 depriving their freedoms from the use of excessive and unreasonable force and deprivation of liberty without due process of law.

**COUNT III**
**Intentional Tort - Aggravated Assault**
**(Against City Defendants, County Defendants and Doe Defendants)**

128.    Plaintiffs repeat and incorporate by reference paragraphs 1 through 127 above as though fully set forth herein.

129.    A cause of action for assault occurs when one intentionally or knowingly threatens another with imminent bodily injury and uses or exhibits a deadly weapon during the commission of the assault as defined by Texas Penal Code §§ 22.01 and 22.02.  When there is not probable cause and law enforcement threatens another with imminent bodily injury, it commits an aggravated assault offense, violating a citizen's rights under the Fourth and Eighth Amendments to the U.S. Constitution and 42 U.S.C. 1983.

130.    On May 19, 2016, Applicable Defendants several men in unmarked cars and plain clothes ambushed Plaintiffs with firearms drawn and pointed at their heads.  Applicable Defendants intended to create a state of fear or danger in Plaintiffs.  Plaintiff believed Applicable Defendants would harm them and fire bullets into their heads.

131.    Applicable Defendants intentional lack of visual or audible identification is proof of their objective to create fear in Plaintiffs.

132.    A jury will find that no reasonable officer could have believed that the preconceived aggravated assault was lawful, in light of clearly established law and the information Applicable Defendants possessed.

133.    The direct and proximate result of Applicable Defendants' malicious acts is that Plaintiffs suffered severe injury including, but not limited to, personal humiliation, emotional distress, impairment of reputations, medical expense, legal expense, loss of employment, lost earnings capacity, and damage to character.

134.    Applicable Defendants' aggravated assault represents one or more willful violations of Plaintiffs' rights under the Fourth and Eighth Amendments to the U.S. Constitution and 42 U.S.C. 1983, depriving their freedoms from the use of excessive and unreasonable force and deprivation of liberty without due process of law.

## COUNT IV
### Intentional Tort - False Arrest
### (Against City Defendants, County Defendants and Doe Defendants)

135.    Plaintiffs repeat and incorporate by reference paragraphs 1 through 134 above as though fully set forth herein.

136.    This cause of action is a tort arising from a party claiming to have authority to make the arrest when, in fact, they did not.   A false arrest violates a citizen's rights to be free of unreasonable searches and seizures under the Fourth Amendment to the U.S. Constitution and 42 U.S.C. 1983.

137.    On May 18, 2016, under color and pretense of law, Ermatinger presented falsified affidavits for search warrants to Judge Jeanine Howard, causing her to issue unlawful search warrants on Plaintiffs, personally.   The search warrants commanded DPD to "examine, photograph and fingerprint" Plaintiffs "within accepted practices."   Instead, Applicable Defendants used excessive force and aggravated assault to ambush Plaintiffs, then handcuffed them against their will and took them to police headquarters against their will.

138.    Plaintiffs' arrests were unauthorized, unlawful, against their will and the restraint was unreasonable under the circumstances.

139.    Following the May 2016 false arrest, Aubrey arrived at his residence to find an eviction notice attached to his front door.   The reason cited on the notice of eviction was a violation of the lease agreement: "Arrested on Property."

140.    Applicable Defendants are not immune for their actions because they violated a clearly established Constitutional Right or law that a reasonable person would have known about. A great deal depends on what the officers knew at the time of arrest and what was happening at the time of arrest.

141.    Courts have consistently held that handcuffing is a use of force and as such must meet the reasonableness requirements of *Graham v. Connor*, 490 U.S. 386 (1989).  In the *Graham* case, the Court instructed lower courts to always ask three questions to measure the lawfulness of a particular use of force: (1) the severity of the offense suspect; (2) whether the suspect posed an immediate threat to the officer or others; and (3) whether the suspect was actively resisting or attempting to evade arrest by flight.  Here, there was no offense.  Plaintiffs were "arrested" so that DPD could be "examine, photograph and fingerprint" them.  Plaintiffs did not pose a threat to the officers and they did not resist the arrest.

142.    Moreover, Plaintiffs were victims of police brutality.  Police brutality is defined as any act of unmerited excessive and aggressive physical, mental, and/or emotional abuse, above and beyond the law, enacted upon by an individual or groups of individuals in law enforcement. Police brutality results in potentially severe mental and physical injury.

143.    Black's Law Dictionary: "Police brutality is the use of excessive and/or unnecessary force by police when dealing with civilians."  "The most obvious form of police brutality is a physical form."  "Police brutality can also take the form of false arrests, verbal abuse, psychological intimidation, sexual abuse, police corruption, racial profiling, political repression, and the improper use of tasers.

144.    Plaintiffs were deprived of their liberty without cause, arrested and taken to Dallas Police Department Headquarters, without giving consent.

145.    On October 20, 2016, under color and pretense of law, DPD unsuccessfully attempted to entrap Aubrey for prostitution.  Nevertheless, DPD proceeded with a false arrest and false imprisonment as part of its campaign to maliciously prosecute Aubrey.  To deceive the public, DPD fabricated a story about an undercover prostitution investigation of a website where Aubrey advertised his massage services.  In truth, there was no investigation and Aubrey was DPD's chosen target.

146.    Because Aubrey is not a prostitute, he would not agree to meet the undercover officer for a cocktail in the bar and there was never any communication about "masturbation and sexual intercourse," which some of the media gladly published.[7]  Additionally, Aubrey refused to accept money upfront, before services were rendered. Because Aubrey is not a prostitute, the district attorney never prosecuted the case.

147.    On October 19, 2018, the statute of limitations expired, which terminated the proceedings in favor of Aubrey. Because Aubrey is not a prostitute, his arrest for prostitution was a false arrest.

148.    Aubrey's arrest was unauthorized, unlawful, against his will and the restraint was unreasonable under the circumstances.

149.    Aubrey was deprived of his liberty without cause, and taken to Lew Sterrett Justice Center, without giving consent.  Aubrey's arrest was unauthorized, unlawful, against his will and without consent.

---

[7] DPD leaked false information to the media, attempting to justify the false arrest, false imprisonment and charge for prostitution. Though sex was never a topic of discussion between Aubrey and decoy officer, D Magazine's April 26, 2017 article, *A Place Where Something Evil Happened*, falsely stated: "Aubrey agreed to masturbation and sexual intercourse for $300."  This is a blatantly false statement.

150.    A jury will find that no reasonable officer could have believed the May 2016 and October 2016 arrests were lawful, in light of clearly established law and the information Applicable Defendants possessed.

151.    The direct and proximate result of the May 2016 and October 2016 malicious arrests is that Plaintiffs suffered severe injury including, but not limited to, personal humiliation, emotional distress, impairment of reputations, medical expense, legal expense, loss of employment, lost earnings capacity, and damage to character.

152.    Without authority stipulated in the search warrants and without Plaintiffs' consent, Applicable Defendants arrested Plaintiffs under false pretenses and violated their rights to be free of unreasonable searches and seizures under the Fourth Amendment to the U.S. Constitution and 42 U.S.C. 1983.

## COUNT V
### Intentional Tort - False imprisonment
### (Against City Defendants, County Defendants and Doe Defendants)

153.    Plaintiffs repeat and incorporate by reference paragraphs 1 through 152 above as though fully set forth herein.

154.    This cause of action is a tort arising from a party claiming to have authority, wrongfully holds a citizen against his/her will or takes a citizen into their custody against his/her will when, in fact, the party did not have authority.  False imprisonment violates a citizen's rights to be free of unreasonable searches and seizures under the Fourth Amendment to the U.S. Constitution and 42 U.S.C. §§ 1981(c) and 1983.

155.    On May 19, 2016, under color and pretense of law, Applicable Defendants used excessive force and aggravated assault to ambush Plaintiffs, handcuff them against their will and

take them to police headquarters against their will.  The detention of Plaintiffs was intentional, was performed without consent and without authority of law.

156.    The May 18, 2016 search warrants commanded DPD to "examine, photograph and fingerprint" Plaintiffs.   The search warrants did not command DPD to hold Plaintiffs in custody against their will for approximately ten (10) hours and repeatedly attempt to interrogate them.

157.    On October 20, 2016, under color and pretense of law, DPD unsuccessfully attempted to entrap Aubrey for prostitution.  Nevertheless, DPD proceeded with a false arrest and false imprisonment as part of its campaign to maliciously prosecute Aubrey.  To deceive the public, DPD fabricated a story about an undercover prostitution investigation of a website where Aubrey advertised his massage services.  In truth, there was no investigation and Aubrey was DPD's chosen target.

158.    Because Aubrey is not a prostitute, he would not agree to meet the undercover officer for a cocktail in the bar and there was never any communication about "masturbation and sexual intercourse" which some of the media gladly published.  Additionally, Aubrey refused to accept money upfront, before services were rendered. Because Aubrey is not a prostitute, the district attorney never prosecuted the case.

159.    On October 19, 2018, the statute of limitations expired, which terminated the proceedings in favor of Aubrey.  Because Aubrey is not a prostitute, his imprisonment for prostitution was a false imprisonment.

160.    Aubrey's imprisonment was unauthorized, unlawful, against his will and the restraint was unreasonable under the circumstances.

161.     Aubrey was deprived of his liberty without cause, and taken to Lew Sterrett Justice Center, without giving consent.  Aubrey's arrest was unauthorized, unlawful, against his will and without consent.

162.     Under color and pretense of law and without cause, Aubrey was deprived of his liberty without cause for approximately ten (10) hours while being held in jail.  Aubrey was imprisoned against his will until the following day when he was finally arraigned, longer than any other intake prisoner on that day.

163.     While Aubrey was unlawfully held in custody, Defendants Ermatinger and Sayers illegally trespassed into Plaintiffs' residence, without a search warrant.

164.     Aubrey's false imprisonment would have continued had a $500 bond not been posted.

165.     A jury will find that no reasonable officer could have believed the May 2016 and October 2016 imprisonments were lawful, in light of clearly established law and the information Applicable Defendants possessed.

166.     The direct and proximate result of the May 2016 and October 2016 malicious imprisonments is that Plaintiffs suffered severe injury including, but not limited to, personal humiliation, emotional distress, impairment of reputations, medical expense, legal expense, loss of employment, lost earnings capacity, and damage to character.

167.     Without authority, without probable cause and without Plaintiffs' consent, Applicable Defendants imprisoned Plaintiffs under false pretenses and violated their rights to be free of unreasonable searches and seizures under the Fourth Amendment to the U.S. Constitution and 42 U.S.C. §§ 1981(c) and 1983.

40

## COUNT VI
## Constitutional Law - Deprived of Liberty without Due Process of Law
### (Against Defendants)

168.    Plaintiffs repeat and incorporate by reference paragraphs 1 through 167 above as though fully set forth herein.

169.    No person, including Plaintiffs, shall be deprived of life, liberty, or property, without due process of law and without just compensation under the Fifth and Fourteenth Amendments to the U.S. Constitution and 42 U.S.C. §1983.

170.    Due process rules are meant to protect persons not from the deprivation, but from the mistaken or unjustified deprivation of life, liberty, or property."  Thus, the required elements of due process are those that "minimize substantively unfair or mistaken deprivations" by enabling persons to contest the basis upon which a state proposes to deprive them of protected interests.  The core of these requirements is notice and a hearing before an impartial tribunal.

171.    On May 18, 2016, Moye gathered all available media in his courtroom and acted under color of law when he alleged that Aubrey was implicated in the murder of Ira Tobolowsky, before medical examiners had even determined the cause of death.   Moye had a pecuniary interest when he made the public accusation, launching a trial by media that would forever deprive Plaintiffs a fair and impartial tribunal in the Dallas-Fort Worth area.  The Supreme Court of Texas was forced to assign the underlying case to a judge outside of Dallas County after three (3) Dallas County judges recused themselves from presiding over the case due to Moye's reckless and self-serving statement.

172.    Moye, a civil judge, blindsided Aubrey with his criminal accusation for murder. An elementary and fundamental requirement of due process in any proceeding, which is to be accorded finality, is notice reasonably calculated, under all the circumstances, to apprise