arrived, but detectives seized an Apple desktop computer and paperwork for burner phones.

cc.  "They needed to find the killer before any injuries had time to heal."

dd.  "Plainclothes detectives watched and waited until about 3:30 pm, when they saw Aubrey and Vodicka get into their car, heading out for a late lunch. Police cars surrounded the men. Detectives jumped out with guns drawn and screamed, 'Get down on the ground!'.,,"

ee.  "For the next nine hours, Aubrey was kept in an interrogation room…"

ff.  "Aubrey refused to talk without a lawyer and said he couldn't afford one. Detective Ermatinger called Assistant District Attorney Gary McDonald, who helped find a public defender and also subpoenaed Aubrey to testify before a grand jury, a tactic prosecutors sometimes use when dealing with uncooperative witnesses. A few days later, the prosecutor questioned Aubrey before jurors. It would be a violation of law for anyone to reveal what exactly was said that day, but the proceedings didn't produce an indictment.

gg.  "Ermatinger says Aubrey had red marks on both arms."

hh.  "'The doctor explained to us that it could be from the flash of a fire, it could be burns, or it could just be a sunburn,' Ermatinger says. He says too much time had passed."

ii.  "They did not have good alibis, telling detectives that at the time of the fire, they were at their apartment."

jj.  "Michael saw a hole surrounded by what looked like black paint. It appeared to have been made recently. For someone of his height—the 6 feet and 4 inches that helped get him onto the team at Trinity—it provided a clear view to the garage where his father had died."

kk.  "Detectives remembered seeing a drill at Aubrey and Vodicka's apartment and obtained warrants for another search. When they searched it the following week, they found an Apple MacBook in the process of having its hard drive wiped clean, according to a later search warrant. They seized it for testing. From the two apartments, they also collected a cordless drill and bits, two red gasoline containers, a yellow propylene tank with a torch attachment, a blue propane torch, two cans of paint, and a couple of pairs of shorts and pants."

ll.  "Ermatinger would have to wait for crime scene technicians to search the men's computers and process the juice bottle found in the garage for fingerprints."

mm. "Detective Ermatinger, now retired, says the men remain primary suspects; no one else on their list came close. He says detectives executed more search warrants on the Tobolowsky case—roughly 18—than on any other case he'd worked. Most of those dealt with Aubrey and Vodicka; others were for cell tower dumps. "They are suspects, and they are strong ones," Ermatinger says. "But I had no evidence to arrest them."

nn. "Aubrey agreed to masturbation and sexual intercourse for $300."

oo. "It had occurred to family members to take matters into their own hands. Debbie worried about keeping her boys leashed. "I don't know how serious they were, but I thought they could have very easily gone and done something stupid," she says. "I told them, 'Do you think your father would want you in jail for the rest of your life?'"

pp. "Michael filled a whiteboard with evidence and photos of Aubrey and Vodicka. He still researched other suspects, but the more he learned about the two men, the more he believed they were responsible. Michael decided to keep representing Aubrey's mother and to move forward with his dad's defamation case."

qq. "Most of the family thought Aubrey had killed Ira. But he was still free, living not far away in North Dallas."

rr. "One afternoon Ira's sister saw Aubrey in Bed Bath & Beyond, and her knees buckled."

ss. "In early October, Michael got an email from a pair of private investigators. "We are private investigators who simply have a low tolerance for scumbaggery and this case really bothers us," they wrote."

tt. "One whiteboard lists 10 suspects in his dad's death. He has crossed off only two, his mother and neighbors. Like his mother, he fears police may not have done enough work to rule out any of the rest."

uu. "Debbie had never been sued before, and she was frightened. Someone sent a blank piece of paper to her house, in an envelope with Aubrey's return address on it. To her, it seemed to be saying: I know where you live."

vv. "While believing the men killed her husband, Debbie sometimes wonders whether police have adequately ruled out the other suspects."

ww. "Family members also worry about the lack of physical evidence. While believing the men killed her husband, Debbie sometimes wonders whether police have adequately ruled out the other suspects."

xx.   "Late last year, they learned Aubrey and Vodicka had moved to Florida. The men live in a bungalow surrounded by palm trees."

yy.   Debbie cried for two days. Michael worries about her. She has been living elsewhere, paralyzed about what to do next.

zz.   With an arrest, with justice and closure, maybe Michael could move on. But not now. Because he can also hear his father saying, Get the bastard.

337.   If a statement implies the existence of undisclosed defamatory facts, then it's illegal defamation.

338.   The Article was an accumulation of every negative connotation and inference that the D Magazines could dig up and piece together, taking facts out of context and using them to defame Plaintiffs per se.   Though detectives admit they do not have even the smallest bit of evidence, D Magazine boldly alleges it solved the crime, and Plaintiffs are the criminals.

339.   To further demonize Aubrey, Thompson only includes a nasty excerpt from Aubrey's response email to Michael Tobolowsky.  She did not fairly include the completely vile content in Michael Tobolowsky's email that caused Aubrey to respond as he did.

340.   D Magazine does not clearly indicate in the Article if it accuses that Vodicka is an accomplice or an accessory to the crime/murder.  Either way, D Magazine has publically branded Vodicka as a criminal as well.

341.   The Article disclosed gross amounts of Plaintiffs' personal information, however, nothing about the other persons of interest was disclosed, proof the Article is discriminatory, malicious, unbalanced, unfair and defamatory. D Magazine grossly discriminated against Plaintiffs and did not balance the story with any information about the others, not their names and certainly not their pictures, unlike Plaintiffs.

342.    D Magazine eagerly published the fraudulent affidavits and search warrants used against Plaintiffs but failed to include those executed on other persons of interest.  D Magazine never wavered from its absolute discrimination used against Plaintiffs.

343.    The Publications were not fair or balanced.  D Magazine only includes nasty and hateful comments from a retired detective, the Tobolowsky family and the author, Thompson, who had the audacity to summarize the Tobolowsky family's thoughts, including:

> "While believing the men killed her husband, Debbie sometimes wonders whether police have adequately ruled out the other suspects," and "Most of the family thought Aubrey had killed Ira."

344.    Aubrey tendered information to Thompson that reasonably explained the truth of some matters.  Though Thompson had the truth at her fingertips, she intentionally published false facts to defame Plaintiffs, or she was recklessly indifferent to the truth so that intent may be presumed.

345.    D Magazine, Ermatinger and Sayers have engaged in a pattern of conduct, resulting in publication of defamatory and libelous statements against Plaintiffs and is liable to Plaintiffs for damages caused by their conduct.

346.    D Magazine published Promo-1, Promo-2 and Promo-3 to bait its reader's with the unanswered questions: ***Who Killed Ira Tobolowsky***, ***Who Murdered Ira Tobolowsky***, *and* ***The family thinks they know who did it***.  It would prove far too cruel for D Magazine to not have the answer but it did; Aubrey.

347.    The Article is not clear if D Magazine considers Vodicka an accomplice or an accessory to the crime/murder.

348.    The Article as a whole creates a false and defamatory impression in several respects.  Defamation by implication occurs when true statements are stated in a way that implies

a defamatory connection – or the omission of certain facts – as to create a defamatory implication. Jews for Jesus, Inc. v. Rapp, 997 So. 2d 1098, 1108 (Fla. 2008).

349.    The direct and proximate result of D Magazine, Ermatinger and Sayers' malicious acts is that Plaintiffs suffered severe injury including, but not limited to, personal humiliation, emotional distress, impairment of reputations, medical expense, legal expense, loss of employment, lost earnings capacity, damage to character, criticism, dishonor, and condemnation.

## COUNT XV
### Intentional Tort - Invasion of Privacy, Appropriation
### (Against Moye, D Magazine and City Defendants)

350.    Plaintiffs repeat and incorporate by reference paragraphs 1 through 349 above as though fully set forth herein.

351.    This claim arises from the appropriation of Plaintiffs identities and/or names in publications for benefit of others.

352.    The Fourth and Fifth Amendments to the U.S. Constitution and 42 U.S.C. §1983 protect American citizens from interference with an individual's possessory property rights or liberty by the government and protect against self-incrimination, which in turn protects the privacy of personal information.

353.    D Magazine violated Aubrey's right to privacy when it appropriated Aubrey's private image in its May 2017 article, *A Place Where Something Evil Happened,* by Jamie Thompson, for commercial purposes and without Aubrey's consent.  The unlawfully used image appears in the print version of the article and in the online version.  (*See* **Exhibit G**.)

354.    D Magazine used Aubrey's photo for profit in the sale of its magazine. The purpose of D Magazine's Article is to defame Aubrey and paint him as a criminal and the photo

is another tool used to injure Aubrey.   The nature of the Article and nonconsensual use of Aubrey image has subjected Aubrey to criticism, dishonor, and condemnation.

355.    The description underneath the photo further subjects Aubrey to public ridicule, stating:

> "Steven Aubrey—one of the suspects Dallas police detectives
>  investigated following Ira Tobolowsky's murder—during a taped
>  deposition."

356.    D Magazine admits that the source of Aubrey's photo was a deposition and that deposition is not a public record.  The deposition was not a public record because it had not been filed with the court.

357.    Courts have held that litigants have no First Amendment right to publish deposition testimony that is not filed in court, and most depositions — especially videotapes of depositions — are not filed in court. This means, however, that once the videotaped deposition testimony is filed in court without a protective order, it will become a public record, available to the public at large.

358.    D Magazine violated Vodicka's right to privacy when it appropriated his private image in its May 2017 article, *A Place Where Something Evil Happened,* by Jamie Thompson, for commercial purposes, without Vodicka's consent.  The unlawfully used image appears in the online version of the story. (*See* **Exhibit G**.)

359.    Like Aubrey's photo, D Magazine acquired Vodicka's image from a private deposition, without first getting consent.   Vodicka's deposition has not been filed in court and is not a public record.

360.    D Magazine placed Vodicka's photo and a different photo of Aubrey, this time public, at the top of a crime board, both positioned at the top of the board as "suspects" for the

murder of Ira Tobolowsky.  The staged photo defames Plaintiffs, holds them out to be guilty of capital murder.   While the Article and the picture caused serious injury to Plaintiffs, D Magazine realized commercial profits from the pictures and the injury unleashed on Plaintiffs.

361.   On may 18, 2016, Moye appropriated Aubrey's name, announcing to the media invited into his courtroom, that Aubrey was implicated in the death of Ira Tobolowsky.  Moye was outside his capacity and acting under color of law when he accused Aubrey of murder, in front of the whole world.

362.   Moye had a pecuniary interest in accusing Aubrey of criminality because it would serve as an excuse for his own.   On May 13, 2016, Moye committed aggravated assault on the Dallas North Tollway, which put his job at risk.  Moye was in the middle of a re election campaign when he pointed his loaded firearm and a woman driving next to him.  The woman took a picture of Moye in his Mercedes and posted it on Facebook asking for help to identify the gunman.

363.   It is likely extremely uncommon for a judge to invite the media to court to witness a voluntary recusal but that is what Moye did and his very damaging murder accusation diverted the media and the publics attention away from his felony offense as he planned.

364.   D Magazine realized financial profits from their May 2017 defamatory cover story that destroyed Plaintiffs' reputation and caused public hatred and ridicule.

365.   Plaintiffs, being Citizens of the United States, were subjected to deprivations of their rights, privileges, and immunities secured by the states, sustained deprivations of their personal liberties, invasions of their privacy, and violations of their civil rights, have suffered and will continue to suffer from psychological harm, mental distress, humiliation, embarrassment, fear, and defamation of their characters and reputations, were prevented from

attending to their usual duties and underwent psychological treatment, all to their damages that exceed the jurisdiction of this Court.

366.    On or before May 18, 2016, DPD appropriated a photo of Aubrey and passed it out in the courthouse acting as though Aubrey was not simply at home in his apartment. City Defendants were putting on a show to create probable cause so they could get search warrants to snoop around and invade Aubrey's privacy in yet another way.

367.    Plaintiff had no interest in speaking with the detectives and because Plaintiffs do not know anything about the murder of Ira Tobolowsky, there was nothing that could serve as probable cause for the detectives to get warrants a legally intrude on Plaintiffs.

368.    While Plaintiffs were as home, DPD were in the downtown courthouse putting on a show for the pubic, passing out photos of Aubrey and telling court personnel to be on the lookout, as though Aubrey was on the run.  Plaintiffs do not understand why someone on the run would run to the courthouse but that is where they stage show was focused.

369.    DPD has an interest in defaming Aubrey so they could try to establish probable cause.  In the end they felt their exercise of pretend hide-and-seek was not enough so they went ahead and lied on their affidavits, stating that Tobolowsky had alleged that Aubrey threatened his life with Jihad, whatever that entails.

370.    As stated above, Applicable Defendants gained some benefit from the appropriation of Plaintiffs' pictures and names.   Plaintiffs were injured each time the appropriation occurred.

371.    The direct and proximate result of the acts described above, Applicable Defendants' malicious behavior caused Plaintiffs to suffer severe injury including, but not

limited to, personal humiliation, emotional distress, impairment of reputations, medical expense, legal expense, loss of employment, lost earnings capacity, and damage to character.

## COUNT XVI
### Intentional Tort - Emotional Distress, Intentional Infliction
### (Against All Defendants)

372.    Plaintiffs repeat and incorporate by reference paragraphs 1 through 371 above as though fully set forth herein.

373.    Intentional infliction of emotional distress is a common law tort that allows individuals to recover for severe emotional distress caused by another individual who intentionally or recklessly inflicted emotional distress by behaving in an "extreme and outrageous" way.

374.    This cause of action arises from emotional shock suffered by Plaintiffs resulting from the impact of Applicable Defendants' extreme and intentional aggravated assault on May 19, 2016, conduct that would be described as outrageous, causing Plaintiffs severe and ongoing emotional distress, conduct considered shocking or scandalous by an average member of the community and the claim is also a violation under the Sixth Amendment to the U.S. Constitution and 42 U.S.C. 1983.

375.    On May 18, 2016, Moye gathered all available media in his courtroom and acted under color of law when he alleged that Aubrey was implicated in the murder of Ira Tobolowsky, before medical examiners had even determined the cause of death.   Moye had a pecuniary interest when he made the public accusation, launching a trial by media that would forever deprive Plaintiffs a fair and impartial tribunal in the Dallas-Fort Worth area.  The Supreme Court of Texas was forced to assign the underlying case to a judge outside of Dallas County after three

(3) Dallas County judges recused themselves from presiding over the case due to Moye's reckless and self-serving statement.

376.    Moye, a civil judge, blindsided Aubrey with his criminal accusation of murder. An elementary and fundamental requirement of due process in any proceeding, which is to be accorded finality, is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.  Notice must be sufficient to enable the recipient to determine what is being proposed and what he must do to prevent the deprivation of his interest.  Moye did not notice Aubrey about his planned public murder accusation.

377.    Moye's egregious and self-serving murder accusation had forever impacted Plaintiffs' lives.  The moment Moye accused Aubrey for the murder of Tobolowsky, the media saw that as a green light to decimated Plaintiffs and their reputations.  Prior to the accusation, fear of liability kept the media in check, but after Moye, an "official" spoke Plaintiffs' names, it was all over.   Moye's conduct was so evil, malicious and premeditated.  He has no regard for other humans, which is why he ratings are consistently to lowest of all Dallas County judges.  He has two publically witnessed assaults and who knows how many that the public has not seen. Plaintiffs have forever lost their faith in judges and the expectation for them to simply be fair is long gone.  Plaintiffs filed complaints with State Commission on Judicial Conduct who have disciplined Dallas judges for far less.  Somehow he is connected and untouchable.  Moye answers to nobody and was given a free pass for his felony offense.  Moye's conduct was intentional because it was planned in advance.

378.    On May 19, 2016, DPD utilized the Tactical Division for a Stake-Out and High-Risk Apprehension of Plaintiffs to execute unlawful search warrants to obtain fingerprints and

photographs of Plaintiffs.   Applicable Defendants waited, in hiding, for Plaintiffs to exit their residence.   Following the exit from their residence, Plaintiffs entered into their parked vehicle and began to back out of the driveway.   Using tactics and resources reserved for the likes of a Pablo Escobar, Applicable Defendants ambushed Plaintiffs.   Unmarked cars traveling at very high speeds blocked Plaintiffs' vehicle from every angle.    What appeared to be an attack by lawless maniacs, Applicable Defendants slammed their brakes, jumped out of their vehicles wearing unidentifiable plain clothes with firearms drawn and pointed at Plaintiffs as they descended upon Plaintiffs' vehicle.  The crazed and threatening men screamed at Plaintiffs to get out of the car and then forced them to the concrete with loaded guns at the temples of their heads. One of the gunmen, who had Vodicka pinned to the ground, said in a low voice, "You know what you did, faggot."

379.    Instead of complying with the "knock-and-announce" rule, Applicable Defendants used force that was unreasonable and violent.   It was not necessary to ambush Plaintiffs and force them to the ground with loaded firearms pointed at their heads. Plaintiffs were no armed, did not pose a threat, they did not resist arrest, and the warrant did not authorize their arrests. The search warrants commanded City Defendants to "examine, photograph and fingerprint" Plaintiffs "within accepted practices."

380.    The City of Dallas and Chief Brown failed to adequately supervise and/or discipline its employees and if they consider their actions to be "within accepted practices" then their practices are unconstitutional and they should be liable for their damage.   The excessive force was intentional conduct because it was planned in advance.

381.    Plaintiff will never ever trust law enforcement again.   Plaintiffs had never had loaded guns pointed at their heads.   Plaintiffs thought they were going to die, the reaction

Applicable Defendants expected.  Plaintiffs were humiliated in front of all of their neighbors who gazed at the spectacle that one would assume would be saved for taking down a drug lord. The apartment complex evicted Plaintiffs for "arrest on property."  DPD got as many search warrants as they requested.  Plaintiffs will never feel secure in their homes again, something they had grown to believe was a constitutional right.

382.    Plaintiffs continue to suffer emotional shock, resulting from the impact of Applicable Defendants' aggravated assault.

383.    Plaintiffs were forced to witness the assaults on each other as they occurred simultaneously.

384.    Plaintiffs were deprived of their liberty without cause, and taken to Dallas Police Department Headquarters, without giving consent.

385.    Because of Applicable Defendants' malicious actions, both Plaintiffs were held in interrogation rooms deprived of their liberty without cause for a period of approximately nine (9) hours,

386.    On May 19, 2016, Applicable Defendants in unmarked cars and plain clothes ambushed Plaintiffs with firearms drawn and pointed at their heads.  Applicable Defendants intended to create a state of fear or danger in Plaintiffs.  Plaintiff believed Applicable Defendants would harm them and fire bullets into their heads, making this an aggravated assault.

387.    Applicable Defendants intentional lack of visual or audible identification is proof of their objective to create fear in Plaintiffs.

388.    In 2016, Aubrey was falsely imprisoned twice and Vodicka once.  Because Plaintiffs do not frequent prisons or jails, losing control over ever single aspect of your life for the time in jail and extremely demoralizing and humiliating.  DPD is a sick culture of many

94

officers that think they can do whatever they like and enjoy having control over others.  It is a mental illness that spreads like a cancer.  Plaintiffs felt the need to move to another state to be free of the oppressive culture of the DPD.

389.   On October 20, 2016, under color and pretense of law, DPD initiated a criminal prosecution against Aubrey.  Though they failed to entrap Aubrey for prostitution, they proceeded with their campaign to maliciously prosecute him, beginning with a false arrest.  To deceive the public, DPD fabricated a story about an undercover prostitution investigation of a website where Aubrey advertised his massage services.  In truth, there was no investigation and instead they had a target, Aubrey.

390.   Because Aubrey is not a prostitute, he would not agree to meet the undercover officer for a cocktail in the bar and there was never any communication about "masturbation and sexual intercourse," which some of the media published to defame Plaintiffs.  Additionally, Aubrey refused to accept money upfront, before services were rendered.  Because Aubrey is not a prostitute, the district attorney never prosecuted the case.

391.   Attempting to disguise their malicious intent and deceive the public, DPD fabricated a story about an undercover prostitution investigation of a website.  Plaintiffs were targets for harassment and abuse.  Several minutes after DPD falsely arrested Aubrey for prostitution, Ermatinger and Sayers took advantage of Aubrey's false imprisonment and they illegally trespassed into Plaintiffs' residence, this time without a warrant.

392.   Plaintiffs never could feel comfortable or peaceful in their home after DPD had been there twice and Ermatinger and Sayers trespassed without a warrant.  They made sure to spin their stories for the media and tried to legitimize Aubrey's prostitution arrest.  Of course they maliciously prosecuted the case and left it on the books for two years until the statute of

limitations ran out, all the while, Aubrey was forced to pay an attorney to show up at court every two months for the case to again be passed to the next date.  It was a way for DPD to have their grimy hooks in Aubrey, purely for harassment value.  DPD's conduct was intentional because the entrapment was planned in advance.  As well, they knew they could never prosecute the bogus case but instead of dropping the charges, they let it charge stay on the books for 2 years out of spite.

393.    Moye and law enforcement all acted under color of law.  The people you think are there to protect you are really out to take from you.

394.    D Magazines defamation of Plaintiffs is unmatched.  The magazine's work is disgusting and filthy.  Plaintiffs believe that D Magazine guessed Plaintiffs would be easy targets because they moved far away.   For a publisher to convince millions of readers that Plaintiffs are murders is tough to fathom.  Putting in print, completely fabricated lies because profits over truth is the company motto.  The damage D Magazine has caused is beyond anything Plaintiff could have imagined and its disgusting Article is always waiting online to stare back and horrify anybody who happens to search Plaintiffs' names.   As long as they leave the grotesque defamatory article up, Plaintiffs live in fear of which relationship will be the next to vanish overnight.

395.    As a result of the defamation, perjured affidavits for search warrants, unlawful searches and seizures, trespass, aggravated assault, excessive force, multiple false arrests, multiple false imprisonments, and multiple malicious prosecutions, Plaintiffs, being Citizens of the United States, were subjected to deprivations of their rights, privileges, and immunities secured by the Constitution of the United States, sustained deprivations of their personal liberties, invasions of their privacy, and violations of their civil rights, have suffered and will

continue to suffer from psychological harm, mental distress, humiliation, embarrassment, fear, extreme shock and nervousness and defamation of their characters and reputations, were prevented from attending to their usual duties and underwent psychological treatment, all to their damages that exceed the jurisdiction of this Court.

396.    By reason of the above, Plaintiffs' reputations have been greatly injured and have been brought into public scandal, disrepute, and disgrace, and have suffered great emotional trauma and harm.

397.    Applicable Defendants actions have proximately resulted in material damages to Plaintiffs.

398.    Plaintiffs are entitled to recover compensatory damages, special damages and punitive damages.

## DAMAGES

399.    As a direct and proximate cause of Defendants' acts, Plaintiffs suffered injury and damages including, but not limited to, the following:

    a.   Personal humiliation;

    b.   Pecuniary or special damages;

    c.   Loss of employment and/or wages;

    d.   Loss of earnings capacity, past and future;

    e.   Loss of reputation;

    f.   Mental anguish;

    g.   Emotional distress;

    h.   Damage to character;

    i.   Pre and post-judgment interest, court costs, and attorneys fees; and

j.  Treble damages for all economic and mental anguish damages awarded.

## EXEMPLARY DAMAGES

400.    Plaintiffs are also entitled to exemplary damages for the conduct set out in this Original Complaint.  All Defendants' conduct was extreme and outrageous and conducted with malice towards Plaintiffs as described above -- all of which is incorporated by reference. Plaintiffs will provide clear and convincing evidence of Defendants' actual malice.  Plaintiffs intend to seek an award of actual damages based upon a preponderance of the evidence and an award for exemplary damages with a finding of malice.

## CONDITIONS PRECEDENT

401.    Plaintiffs reserve their rights to plead and prove the damages to which they are entitled to at the time of trial. All conditions precedent to Plaintiffs' recovery have been performed or have occurred.

## PRAYER

WHEREFORE, Plaintiffs Steven B. Aubrey and Brian E. Vodicka request that Defendants be served with service of process and that after a trial on the merits, Plaintiffs be awarded compensatory damages against Defendants, jointly and severally, in an amount not less than $40 Million ($40,000,000.00) and exemplary damages, to punish and deter Defendants, jointly and severally, in an amount not less than $80 Million ($80,000,000.00) and to all other further relief to which Plaintiffs may be entitled in equity and in law and Grant the following relief:

a. For an immediate, preliminary injunction and permanent injunction enjoining All Defendants from hosting, posting, or in any manner publishing or disseminating, whether under its legal identity or under any aliases, whether now created or created in the future, any defamatory or injurious information regarding Plaintiffs; and

b. For an Order compelling Defendant D Magazine to immediately remove from its websites: dmagazine.com, prestonhollowpeople.com and parkcitiespeople.com, as well as any and all other media and communication conduits, any and all postings of articles that mention Plaintiffs by name and/or can be attributed to or regarding either Plaintiff by reasonable logical deductive means.

## JURY DEMAND

Plaintiffs request trial by jury in this above-styled action.

Respectfully submitted,

By:  *s/ Steve B. Aubrey*
Steve Aubrey, Pro Se
2601 NW 3rd Ave
Wilton Manors, FL 33311
Telephone: (512) 666-8004
defamationperse@gmail.com

By:  *s/ Brian E. Vodicka*
Brian Vodicka
2601 NW 3rd Ave
Wilton Manors, FL 33311
Telephone: (954) 716-9375
defamationperse@gmail.com