UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

Case No. 3:19-cv-056-B

STEVEN B. AUBREY, and
BRIAN E. VODICKA,

    *Plaintiffs,*

v.

D MAGAZINE PARTNERS, L.P.;
ALLISON MEDIA, INC.;
JAMIE L. THOMPSON;
ROBERT L. ERMATINGER, JR.;
SCOTT ROBERT SAYERS;
ERIC VAUGHN MOYE;
CITY OF DALLAS;
DALLAS COUNTY, TEXAS; and
DOES 1-20, all whose true names
are unknown,

    *Defendants*.
_____/

## PLAINTIFFS' MOTION TO DISQUALIFY HAYNES AND BOONE, LLP

Plaintiffs Steven B. Aubrey and Brian E. Vodicka (collectively "Plaintiffs"), pursuant to Rule 1.09 of the Texas Disciplinary Rules of Professional Conduct ("TDRPC") and Rule 4-1.9 of the Rules Regulating the Florida Bar ("RRFB") hereby move to disqualify Haynes and Boone, LLP for conflict of interest as follows:

### FORMER LAWSUIT ALLEGEDLY CAUSES MURDER

Plaintiffs are innocent people who did not murder Ira Tobolowsky as portrayed in the D Magazine story published and written by D Magazine Partners, L.P.; Allison Media, Inc.; and Jamie L. Thompson (collectively "D Magazine"). D Magzine conducted their own trial by media to maliciously and falsely hang Plaintiffs for the murder manipulating random facts to suit

their purpose to sell subscriptions.  Part of D Magazine's story hinges on a fact that clearly caused a conflict of interest for Haynes and Boone, LLP.

D Magazine teased the public and insinuated they knew who committed the murder.  On April 26, 2017, D Magazine's online blog site, Frontburner, published:

> ***Sneak Peek: D Magazine's May Issue, Which Explores Who Killed Ira Tobolowsky[1]***

The "Sneak Peek" did not mention Plaintiffs by name.  The short article was designed to tease and entice its readers to purchase the magazine's upcoming May 2017 issue.

On May 3, 2017, D Magazine published a video on YouTube titled: *Who Murdered Ira Tobolowsky?*  The 57-second video was also designed to tease and let its readers know that D Magazine had the answer to its own question.   The video was a series of  still screens with messsages and the final two (2) screens stated:

- ***Who wanted Ira Tobolowsky dead?;*** and

- ***Read the story in D Magazine's May issue.  ON NEWSSTANDS NOW*** [2]

On May 8, 2017, D Magazine's Frontburner published an additional short article to futher tease its readers, titled:

> ***The Unsolved Murder of Ira Tobolowsky***
> ***The prominent lawyer was burned alive in his North Dallas garage.  The family thinks they know who did it.[3]***

This publication also did not metion Plaintiffs by name.

D magazine better than delivered on its promises in its May 2017 feature story.  They did went far beyond "exploring who killed Ira Tobolowsky." they boldly and falsely named

---

[1] *See* Complaint [3] Ex. D at p. 21.
[2] *See* Complaint [3] Ex. E.  YouTube link: https://www.youtube.com/watch?v=Sp6LCb5kweo
[3] *See* Complaint [3] Ex. F.

Plaintiffs as the parties responsible for the murder. D Magazine answered their own question, "who killed Ira Tobolowsky?" in the May 2017 story, titled:

### *A Place Where Something Evil Happened*[4]

Plaintiffs' names were published <u>120 times</u> throughout the story. D Magazine eliminated any possibility that anyone other than Plaintiffs could commit the murder by intentionally not publishing the names of other persons of interest. D Magazine strategically orchestrated this trial by media and they falsely declared that Plaintiff were guilty. D Magazine boasts its hard copy magazine has readership is approximately 500,000 and its online version boasts over 4 million average monthly page views.

Because there is no evidence whatsoever, connecting Plaintiffs to the crime, D Magazine created a false motive that drove them to murder. D Magazine's story describes Plaintiffs as reprehensible degenerates who had extraordinary hate and anger directed at Ira Tobolowsky. Their online article included a photo of Plaintiffs and labeled them as "Suspects."[5] The non-public photo of Plaintiffs had been modified and underneath the photo was a caption that describes the photo as "all the homemade evidence" used to solve the murder. D Magazine was abundantly clear about who they believed committed the murder.

D Magazine turned every irrelevant fact they learned about Plaintiffs into a negative inference and then published it. One of the facts D Magazine used as motive for murder was a previous lawsuit. D Magazine's story insinuated that because of Plaintiffs' former lawsuit, they were becoming increasingly desperate and capable of murder, stating:

---

[4] *See* Complaint [3] Ex. G.
[5] *See* Complaint [3] Ex. G at p. 21.

3

> "It had been a bruising couple of years for the couple. They had been involved in another contentious lawsuit in Austin, after they'd invested hundreds of thousands of dollars in a real estate deal that turned out to be a Ponzi scheme. They had to sell their $1 million house, and they moved to an apartment in Dallas. They'd spent nearly $2.3 million fighting the case and still owed about $400,000 in legal fees." [6]

In fact, Plaintiffs did spend $1 million in legal fees, not $2.3 million as published by D Magazine. D Magazine more than doubled Plaintiffs' expenses/losses, making it appear that Plaintiffs lost an additional $1.3 million, which according to the story, drove them to commit murder. Information regarding Plaintiffs' legal fees was not public information and was not filed in any case with any court, making the origins of the information suspect.

Comprising part of Plaintiffs $1 million legal fees, was the money Plaintiffs sent to H&B in payment for their services as retained counsel.

## H&B REPRESENTED PLAINTIFFS IN SAME LAWSUIT

Haynes and Boone, LLP ("H&B") represented Plaintiffs in the "contentious lawsuit" that D Magazine alleges was the motive for murder. D magazine's story falsely represented that Plaintiffs spent "nearly $2.3 million" in legal fees on the lawsuit. Plaintiffs paid $14,208.54 to H&B for its representation in the lawsuit D Magazine writes about. D Magazine's choice to use Plaintiffs' former lawsuit in their story renders the lawsuit a substantially related matter.

H&B's representation of D Magazine is adverse to Plaintiffs' interests and Plaintiffs have a justiciable interest to, among other things, ensure that the confidential information imparted to their former lawyers at H&B remains protected.

On April 23, 2013, H&B partner, Leslie C. Thorne, executed an engagement agreement on behalf of H&B for its representation of Plaintiffs Brian Vodicka and Steven Aubrey. *See*

---

[6] *See* Complaint [3] Ex. G at p. 10.

4

Agreement attached as **Exhibit A**. Brian Vodicka and Steven Aubrey signed the agreement and paid the agreed upon $2,500.00 retainer, establishing an attorney-client relationship with H&B. Invoices incurred under the agreement totaled $14,208.54. One of the invoices is attached as **Exhibit B.**

## ARGUMENT AND AUTHORITY

Professional liability insurers and risk management professionals continually stress the importance of a conflict-checking system in law firms to help identify potential conflicts at the time the attorney-client relationship is established. Consistently, it has been shown that a check for conflicts-of-interest that does not include the use of a thorough list or database will leave the firm vulnerable to an embarrassing, and potentially negligent conflict-of-interest problem.

H&B is a giant law firm with 550 lawyers, $400 million in revenue, and sixteen (16) offices all over the world, including locations in Shanghai, London and Mexico City. It was H&B's duty to ensure that conflicts of interest were identified and resolved *prior* to engagement. It is likely that H&B identified the conflict in this case prior to signing an agreement with D Magazine.

The Texas Disciplinary Rules of Professional Conduct are rules of reason that define proper conduct for purposes of professional discipline. Texas Disciplinary Rules of Professional Conduct 1.09(a)(3) states:

> Without prior consent, a lawyer who personally has formerly represented a client in a matter shall not thereafter represent another person in a matter adverse to the former client if it is the same or a substantially related matter.

H&B did not obtain prior consent and is now representing D Magazine in a case where Plaintiffs' previous lawsuit was usded to defame Plaintiffs; the same previous lawsuit in which H&B was Plaintiffs' counsel.

As Plaintiffs are Florida residents, the Rules Regulating the Florida Bar mirror those in the Texas Disciplinary Rules of Professional Conduct. In *State Farm Mut. Auto. Ins. Co. v. KAW*, 575 So. 2d 630 (1991), the Supreme Court of Florida found the ethical principle at issue is an attorney's duty to maintain the confidences of his client. That principle is embodied in two rules of professional conduct. Rule Regulating The Florida Bar 4-1.6(a) provides that "[a] lawyer shall not reveal information relating to representation of a client ... unless the client consents after disclosure to the client." The duty of confidentiality continues after termination of the attorney-client relationship. *See* Comment to rule 4-1.6.  Rule Regulating The Florida Bar 4-1.9 provides:

> A lawyer who has formerly represented a client in a matter shall not thereafter:
>
> (a) Represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents after consultation; or
>
> (b) Use information relating to the representation to the disadvantage of the former client except as rule 4-1.6 would permit with respect to a client or when the information has become generally known.
>
> The purpose of the requirement that an attorney maintain client confidences is twofold. It advances the interests of the client by encouraging a free flow of information and the development of trust essential to an attorney-client relationship. *Developments in the Law: Conflicts of Interest in the Legal Profession,* 94 Harv.L.Rev. 1244, 1316 (1981). However, it also serves a second purpose fundamental to a fair adversary system. Our legal system cannot function fairly or effectively if an attorney has an informational advantage in the form of confidences gained during a former representation of his client's current opponent. *Id.* at 1315-16; *United States v. Ostrer,* 597 F.2d 337, 340 (2d Cir.1979); *Ford v. Piper Aircraft Corp.,* 436 So.2d at 307-08 (purpose of trial court is to afford parties an impartial forum; trial court may decide that disqualification is mandated because one party has an unfair advantage over the other).
>
> We next address the issue of the appropriate standard to apply to determine whether the Schlesinger firm should be disqualified. In conflict-of-interest cases such as this arising

6

under the former Code of Professional Responsibility, one seeking to disqualify opposing counsel was required to show that (1) an attorney-client relationship existed, thereby giving rise to an irrefutable presumption that confidences were disclosed during the relationship, and (2) the matter in which the law firm subsequently represented the interest adverse to the former client was the same or substantially related to the matter in which it represented the former client. *Ford v. Piper Aircraft Corp.,* 436 So.2d at 305; *Sears, Roebuck & Co. v. Stansbury,* 374 So.2d at 1051. This standard was based on the Code of Professional Responsibility, Canon 4, which provided that an attorney should preserve the confidences and secrets of a client. *Id.* at 1053.

In *Junger Utility & Paving Co. v. Myers,* 14 F.L.W. 2650 (Fla. 1st DCA, Nov. 15, 1989), the court applied the same standard to a question of disqualification arising under the new Rules of Professional Conduct. Like the *Junger* court, we do not believe that a different standard now applies because the specific admonition to avoid the appearance of impropriety does not appear in the Rules of Professional Conduct. *See also Brent v. Smathers,* 529 So.2d 1267 (Fla. 3d DCA 1988) (disqualification required under current Rules of Professional Conduct to avoid appearance of impropriety). The Rules of Professional Conduct requiring confidentiality serve the same purposes as the confidentiality requirements of the Code of Professional Responsibility. 634*634 Similarly, the need for the irrefutable presumption continues to exist, just as under the former code. The presumption acknowledges the difficulty of proving that confidential information useful to the attorney's current client was given to the attorney. It also protects the client by not requiring disclosure of confidences previously given to the attorney. *See Government of India v. Cook Indus., Inc.,* 422 F. Supp. 1057, 1060 (S.D.N.Y. 1976) (if two actions are substantially related, court will not require proof that attorney had access to confidential information, nor give weight to attorney's assertion that he had no access to and did not possess confidential information), *aff'd,* 569 F.2d 737 (2d Cir.1978).

Two noteworthy cases which have been decided subsequent to the Supreme Courts opinion in *State Farm* as of this writing and reference that decision, both of which were decided by the First District Court of Appeal, *Lee v. Florida Department of Insurance and Treasurer,* 586 So. 2d 1185 (Fla. 1st DCA 1991) and *Kenn Air Corp. v. Gainesville-Alachua County Regional Airport Authority,* 593 So, 2d 1219 (Fla, 1st DCA 1992). These decisions reflect the spirit of *State Farm* in resolution of the disqualification issue present in those cases.

In *State Farm,* the Supreme Court flatly rejected the Fourth District's analysis that disqualification was inappropriate because there had been no showing of *actual* prejudice, which had been, or would be, caused by the representation. Here, D Magazine demonstrates actual

7

prejudice by publishing a detailed statement regarding a matter in which H&B represented Plaintiffs.

A simple conflicts check would be standard protocol for a big firm such as H&B and would have revealed and prevented this conflict. Rule 4-1.9 clearly prohibits H&B's representation of Defendants because an attorney-client relationship was formed between Plaintiffs and H&B creating a genuine threat that confidences revealed by Plaintiffs to H&B would be divulged to Defendants, and they have been.

Plaintiffs and H&B formed an attorney-client relationship, H&B's representation of D Magazine in this matter is adverse to Plaintiffs, and Plaintiffs did not, and do not, consent to the representation. H&B cannot then, without violating Rule 1.09 of the Texas Disciplinary Rules of Professional Conduct and Rule 4-1.9 of the Rules Regulating the Florida Bar, represent D Magazine in this matter. H&B must therefore be disqualified from its representation of D Magazine.

## CONCLUSION

H&B represented Plaintiffs, for nine (9) months and learned extensive private financial information about Plaintiffs. D Magazine has demonstrated their hunger for Plaintiffs' financial information and would likely publish information that H&B might improperly share about Plaintiffs. H&B may no longer have any recollection of Plaintiffs' information, but the law presumes it does. D Magazine falsely alleged Plaintiffs' lawsuit caused them to commit murder and they published false representations about the lawsuit finances. If H&B is not disqualified from this case, it will begin defending misrepresentations made by its current clients, D Magazine, and will be forced to file knowingly false documents with this Court.

H&B's prior representation of Plaintiffs is not just substantially related to the present matter; it literally is the present matter. Plaintiffs' defamation claim against D Magazine is based, in part, on the lawsuit in which H&B represented Plaintiffs, for nine (9) months. H&B's representation of D Magazine in this matter constitutes a conflict of interest; therefore, disqualification of H&B is warranted and necessary.

## PRAYER

WHEREFORE, Plaintiffs Steven B. Aubrey and Brian E. Vodicka respectfully request that the Court:

1. Grant Plaintiffs' Motion to Disqualify Haynes and Boone, LLP; and
2. Grant Plaintiffs such other and further relief to which they may be entitled.

## CERTIFICATION OF CONFERENCE

Pursuant to N.D. TX. L.R. 7.1(a)(b), Plaintiffs hereby certify that prior to filing this motion, they conferred with all parties, who may be affected by the relief sought in the motion, regarding the merits of this motion. Defendants D Magazine Partners, L.P., Allison Media, Inc., and Jamie L. Thompson oppose the motion. Defendants Dallas County, the City of Dallas, Eric Moye, Scott R. Sayers and Robert L. Ermatinger take no position on the motion.

Respectfully submitted,

By: *s/ Steve B. Aubrey*
Steven B. Aubrey, Pro Se
2601 NW 3rd Ave
Wilton Manors, FL 33311
Telephone: (512) 666-8004
defamationperse@gmail.com

By: *s/ Brian E. Vodicka*
Brian E. Vodicka, Pro Se
2601 NW 3rd Ave
Wilton Manors, FL 33311

9

Telephone: (954) 716-9375
defamationperse@gmail.com

### CERTIFICATE OF SERVICE

On April 5, 2019, I filed the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas, using the ECF system. I hereby certify that I have served all counsel and/or pro se parties of record electronically or by another manner authorized by FED. R. CIV. P. 5 (b)(2).

*s/ Steven B. Aubrey*_____
Steven B. Aubrey

# Exhibit A

# haynes*boone*

April 23, 2013                              **<u>PRIVILEGED AND CONFIDENTIAL</u>**

Brian Vodicka
Steven Aubrey
1311 Spyglass Dr
Austin TX 78746

        Re:    **Limited engagement for Brian Vodicka and Steven Aubry (collectively, "You" or "Vodicka and Aubrey")**

Dear Messrs. Vodicka and Aubrey:

        I understand that You intend to file an Amended Complaint in a currently pending action against North American Title Company *et al.* in the United States District Court for the Western District of Texas. The dispute between You and North American Title Company *et al.* that is the subject of the Complaint will hereinafter be called the "Dispute."

        On behalf of the firm of Haynes and Boone, LLP (the "Firm"), based on our telephone conversations, we understand that You wish to engage us to assist in evaluating your draft Amended Complaint. We look forward to this limited engagement and are confident that you will be pleased with the quality of our work and our responsiveness to your needs.

        The purpose of this engagement letter is to confirm the terms on which the Firm will undertake to represent You.

        **1.**    **Client Relationship**

        The Firm is being retained by You in a limited role in connection with the Dispute. Our representation pursuant to this letter does not include the representation of any entity or any other individual or with respect to any other matter. As a result, our representation in this matter does not give rise to any attorney-client relationship between the Firm's attorneys and any of Your affiliates or co-Plaintiffs. Accordingly, in most instances, our representation of You in this matter will not give rise to any conflict of interest if other clients of the firm are or become adverse to any of Your affiliates or co-Plaintiffs.

        **2.**    **Scope of Representation**

        We will provide legal services in connection with the Dispute. We understand that You want to retain us only to assist You in evaluating the Amended Complaint You intend to file, so that You can decide how to proceed. In the event that You decide to engage the Firm on a broader basis, we will discuss the terms under which the engagement will continue.

Haynes and Boone, LLP
Attorneys and Counselors
600 Congress Ave., Suite 1300
Austin, Texas 78701-3285
Phone: 512.867.8400
Fax: 512.867.8470
www.haynesboone.com

**haynes**boone

Brian Vodicka
Steven Aubrey
April 23, 2013
Page 2

3. **Staffing**

I will be the primary contact at the Firm for this representation and will be available to discuss any aspect of our representation with you. I may involve additional attorneys or support staff, as needed.

4. **Fee Arrangements**

Experience has shown that our relationship will be better if we begin with a clear understanding about our fees and the timing of their payment. You have agreed to pay us for the professional services that we render pursuant to the terms of this engagement letter and to reimburse us for the costs and expenses that we incur or pay on their behalf and charge to your account. Payment of our fees and costs is not contingent on the ultimate outcome of this engagement.

It is our normal practice to charge our clients for services rendered on the basis of the total hours worked and You have agreed to pay us on that basis. To reflect changes in market demand for services and individual experience levels, the rates are adjusted typically at the start of the fourth quarter each year. Presently, my rate is $535 per hour. The hourly rates for our attorneys currently range from $280 to $990.

Each month, in which any fees or expenses have been incurred, we will send you an invoice statement requesting that payment be made, which amount you agree to pay within 30 days after the date of the invoice. Each invoice will reflect fees charged on the basis of our hourly rates in connection with the Dispute.

It is our usual practice to require a fee retainer before we commence work for a client. For this engagement, we have agreed to assist in an evaluation of the Amended Complaint for a $2,500 retainer. In the event that You wish to engage the Firm for additional services post-dating the filing of the Amended Complaint, we have agreed that we will negotiate an additional retainer should the need for further work arise.

5. **Costs and Expenses**

Our invoices also will include charges for services and expenses customarily invoiced by law firms, in addition to fees for legal services performed in connection with the Dispute. Should this case go beyond this state, these may include travel expenses, including mileage, parking, airfare, lodging, meals and ground transportation. Further, our invoices may include charges for items and services such as computerized legal research, long distance telephone, faxes, copying, document or image productions and other non-overhead expenses incurred for your benefit. Except for specialized word processing services, we normally do not make a separate charge for secretaries' work unless there is a situation that requires overtime work.

**haynes**boone

Brian Vodicka
Steven Aubrey
April 23, 2013
Page 3

      The fees and services of third parties incurred in connection with our representation of You, if any, such as printers, experts, messenger and delivery services, process servers, court reporters, witness fees, and filing services, also will be charged to you. For any substantial expenses, You agree that You will pay the fees and expenses directly, and authorize us to make arrangements to have such third parties bill you directly. Our Firm will pay more minor expenses and bill you those for out-of-pocket expenditures made on Your behalf.

      **6.**    **Multiple Representations; Responsibility for Payments**

      You have advised us that You have agreed to be responsible for payment of our fees and expenses attributable to Your common representation a joint and several basis. Our invoices to You will be prepared on that basis, and you agree to pay us on that basis, which you acknowledge is reasonable under the circumstances. The failure of either one of You to honor the terms of this letter may provide good cause for the Firm to withdraw from the representation of any one or both of You.

      **7.**    **Responses to Auditor Inquiries**

      We are frequently asked to provide information to auditing firms regarding legal matters in which we are representing our clients. It is our practice to respond to those inquiries with the same level of care and professionalism that we use to handle Your legal work. The legal fees associated with this work may be billed to you separately or be included with one of the matters on which we are working.

      **8.**    **Discharge and Withdrawal**

      You will have the right at any time to terminate the Firm's representation by delivering written notice of termination to us. The Firm will have the right to withdraw from its representation of You at any time with their consent, or for good cause without Your consent. For example, if You do not honor the terms of this letter (including their or a third-party payor's failure to pay), or if You fail or refuse to cooperate with us or to follow our advice on a material matter, or if we become aware of any fact or circumstance that would, in our view, render our continuing representation of You ineffective, unlawful or unethical, then we will have good cause to withdraw.

      If You discharge us or we elect to withdraw, then You will take all steps necessary to free us of any obligation to perform, including by executing any documents necessary to complete the termination of the representation, and we will take all steps that, in our view, are reasonably practicable to protect their interests. If a discharge or withdrawal occurs, then You will pay us for all costs and expenses paid or incurred by us on Your behalf, and You will pay us a reasonable fee for the professional services that we have rendered to You to the date of

**haynes**boone

Brian Vodicka
Steven Aubrey
April 23, 2013
Page 4

termination, or in connection with an orderly transition, and for which we previously have not been paid.

Unless previously terminated, our representation of You with respect to any matters for which we have been engaged will terminate when we send You our final statement for services rendered. In the course of our representation of You, we likely will come into possession of copies or originals of documents or other materials belonging to you or others (collectively, "materials"). When the particular matter to which those materials relate has been concluded, we will make arrangements either to return the documents to You, retain them in our storage facilities, or to dispose of the materials. Absent any other arrangements made with You, on the expiration of five years after a matter file has been closed, all materials in the file may be destroyed. We may retain our own files, including lawyer work product, pertaining to the representation.

9.   **Consent to Joint Representation of Multiple Clients in One Matter.**

   **Potential Conflicts of Interest**

You have asked us to represent Brian Vodicka and Steven Aubry in connection with the Disputer. We have been advised that there currently are no conflicts between and/or among you in connection with this representation, and we have relied on those assurances. You understand, however, that when we undertake to represent multiple clients in connection with a single matter (such as in this case) it is possible that a conflict between the clients may arise at a later time or that additional facts may come to our or your attention that indicate that a conflict exists. Your execution of this letter indicates that You understand that your interests may conflict with those of the other jointly-represented clients, but that because of the current confluence of your interests, You are retaining the Firm to represent all of the joint clients rather than select separate counsel. Despite this waiver, you have the right at any time to withdraw from the joint representation, and obtain your own counsel.

   **Future Conflicts Among Joint Clients: Agreement to Continue Representing Selected Joint Clients**.

If a conflict develops between you and any other joint client in the future, or if you opt out of the joint representation for any reason, then you agree that the Firm may continue to represent the other joint clients.

   **Future Conflicts Among Joint Clients: Agreement to Withdraw from Representing All.**

If, in the course of our representation, we become aware of any issue where, in our opinion, the interests of the joint clients differ, then we will ask you to attempt to resolve your

haynesboone

Brian Vodicka
Steven Aubrey
April 23, 2013
Page 5

differences among yourselves, without our assistance. If you cannot resolve your differences, then we will not be able to represent any one of you on that issue. If the differences are serious enough, then we may be required to withdraw from the matter completely.

### Confidentiality of Information

You understand that, by consenting to this joint representation, you intend that all confidential communications made to us are and shall remain confidential as to parties outside this joint representation. You agree to protect from disclosure to outside parties any and all privileged and confidential information exchanged during the course of this representation. While communications designed to further the common representation should remain privileged as to outsiders, please note that communications made to us will not be privileged as to any other jointly-represented party. In other words, if we receive information from or about one of you that is relevant to the subject of our representation, then we may share that information with the others who are jointly represented. To the extent that we withdraw from our representation of you in the future, or you elect to obtain separate counsel, then any and all privileged and confidential information exchanged during the joint representation will not be disclosed by you and will remain confidential.

### 10. Entire Agreement

This letter constitutes the entire agreement between You and the Firm regarding Your engagement of the Firm to represent you with respect to the Dispute, and is subject to no oral agreements or understandings. No obligation or undertaking that is not set forth expressly in this letter shall be implied on the part of either You or the Firm. The foregoing notwithstanding, absent explicit agreement entered into between You and the Firm with respect to matters other than the Dispute, the terms and conditions of this letter will apply to all subsequent engagements of the Firm by You, and those terms and conditions shall govern any such engagement until a subsequent engagement or letter is agreed upon.

### 9. Conclusion

We are pleased to have this opportunity to represent You. If You have any questions about any aspect of our engagement or our invoices at any time, please feel free to raise those questions. It is very important that we proceed on a clear and satisfactory basis in our work for You. We are open to discussing all of these matters, including the amount of our invoices, and we encourage You to be frank about them.

**haynes**boone

Brian Vodicka
Steven Aubrey
April 23, 2013
Page 6

      If this letter correctly reflects your understanding of the limited scope, terms, and conditions of our representation of You with respect to the Dispute, please indicate Your acceptance by executing the enclosed copy of this letter in the space provided below and return it to the attention of the undersigned at our office address set forth on the first page of this letter. By executing this letter, You will be acknowledging that You have read this letter and understands its terms.

Sincerely,

*/s/ Leslie C. Thorne*

Leslie C. Thorne
Direct Phone:   512.867.8445
Direct Fax:      512.867.8615
leslie.thorne@haynesboone.com

Accepted and agreed this 23rd day of April, 2013:

By: _/s/ Brian Vodicka_
     Brian Vodicka

By: _/s/ Steven Aubrey_
     Steven Aubrey

cc:    Client Accounting

A-278971_1.doc

# Exhibit B

haynesboone

Invoice Number: 21053429
Client/Matter Number: 0050494.00001
January 07, 2014

SB Aubrey
1311 Spyglass Drive
Austin, TX 78746

Tax Identification No. 75-1312888

**Billing Attorney: Leslie C. Thorne**

*For Professional Services Through December 31, 2013*

**0050494.00001**
**Federal lawsuit**

## Professional Fees

| Date | Timekeeper | Description | Hours |
|---|---|---|---|
| 12/02/13 | Leslie C. Thorne | ▮ | ▮ |
| 12/06/13 | Leslie C. Thorne | ▮ | ▮ |
| 12/09/13 | Leslie C. Thorne | ▮ | ▮ |
| 12/17/13 | Leslie C. Thorne | ▮ | ▮ |
| 12/18/13 | Leslie C. Thorne | ▮ | ▮ |

**Chargeable Hours** ▮

**Total Fees** ▮