**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| STEVEN B. AUBREY and<br>BRIAN E. VODICKA, | §<br>§<br>§ | |
| *Plaintiffs,* | § | |
| v. | §<br>§ | CIVIL ACTION NO. 3:19-CV-0056-B |
| D MAGAZINE PARTNERS, L.P.;<br>ALLISON MEDIA, INC.;<br>JAMIE L. THOMPSON;<br>ROBERT L. ERMATINGER, JR.;<br>SCOTT ROBERT SAYERS;<br>CITY OF DALLAS;<br>DALLAS COUNTY, TEXAS; and<br>DOES 1-20, all whose true names<br>are unknown, | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | |
| *Defendants.* | §<br>§ | |

**APPENDIX IN SUPPORT OF PLAINTIFFS' MEMORANDUM IN
OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**DOCUMENT DESCRIPTION**                                                                  **PAGES**

Defendants' Records Produced: COD000065-67, 70-71, 74-75, 78-80,
83-86, 99, 2131, 2162-63, 2189, 2201-02, 2207-09, 2213, 2216-17 ..................................... 1-24

Defendant Scott Sayers' Answers to Vodicka's First Set of Interrogatories ...................... 25-42

Defendant Robert Ermatinger's Answers to Vodicka's First Set of Interrogatories ........... 43-52

Highland Dermatology Records ....................................................................................... 53-57

Capital One MasterCard Statement April-May 2016 ........................................................ 58-63

Five Declarations - Aubrey is not anti-Semitic ................................................................ 64-69

D Magazine, May 2017, A Place Where Something Evil Happened, pp. 4, 7 ...................... 70-72

April 30, 2014 Original Application, Cause No. PR-14-01486-2, Dallas
County Probate Court No. 3, requesting a trust accounting .................................................. 73-77

May 19, 2016, 9:30 pm DPD Headquarters Interview - Brian Vodicka
Ermatinger learns Aubrey never threatened Tobolowsky with Jihad ...................................... 78

May 19, 2016, 9:50 pm DPD Headquarters Interview - Brian Vodicka
Detectives were tracking credit cards beginning May 13, 2016 .............................................. 79

Photos of Aubrey's Arms May 19, 2016 -Dallas Police Department ................................... 80-83

Photos of Aubrey's Arms May 21, 2016 .............................................................................. 84-85

Photos of Aubrey's Arms August 3, 2020 ........................................................................... 86-87

Screenshot: October 20, 2016, 2:15 pm text Aubrey to "Ryan" ................................................ 88

Screenshot: October 20, 2016, 2:30 pm missed call from Vodicka to Aubrey ....................... 89

Screenshot: October 20, 2016, 2:31 pm text from Vodicka to Aubrey ................................... 90

Dallas Morning News, "Family of slain Dallas Attorney Ira Tobolowsky offers
$20,000 reward for tips" (published 6/23/16) ..................................................................... 91-93

Final Judgment Nunc Pro Tunc (3/25/16) .......................................................................... 94-95

Order Granting Defendant's Motion to Determine Vexatious Litigant and Motion for
Sanctions (2/12/2016)........................................................................................................... 96-97

Notice of Nonsuit Without Prejudice (filed 4/28/2015) ....................................................... 98-99

Petition - Cause No. DC-15-08135 (filed 7/21/2015) ...................................................... 100-106

Defendants' Records Produced: COD0002205-06 ........................................................... 107-108

Defendants' Photos: drill bits, plumbing supplies, plastic gas can ................................ 109-111

Declaration of Brian E. Vodicka .................................................................................... 112-158

Declaration of Steven B. Aubrey .................................................................................... 159-204

Respectfully submitted,

**s/ *Steven B. Aubrey***
Steven B. Aubrey, Pro Se
2601 NW 3rd Ave
Wilton Manors, FL 33311
Telephone: (512) 666-8004
defamationperse@gmail.com

**s/ *Brian E. Vodicka***
Brian E. Vodicka, Pro Se
2601 NW 3rd Ave
Wilton Manors, FL 33311
Telephone: (954) 716-9375
defamationperse@gmail.om

# CERTIFICATE OF SERVICE

On August 19, 2020, I filed the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas, using the ECF system. I hereby certify that I have served all counsel and/or pro se parties of record electronically or by another manner authorized by FED. R. CIV. P. 5 (b)(2).

**s/ *Steven B. Aubrey***
Steven B. Aubrey

iii

COMPLAINANT:                                                    SERVICE #:
                                                               FOR DET. :

## INVESTIGATIVE INFORMATION

SUBMITTING OFFICER:  **Ermatinger**    DATE: **5-17-16 (Tuesday)**

INFO OBTAINED VIA:

OBTAINED ON DATE:          AT TIME:


        TOPIC:

NARRATIVE:

Detectives Ermatinger, Richardson and Lawrence began efforts to
locate Steve Aubrey and Brian Vodicka. They were involved in civil
court proceedings with Ira Tobolowsky representing the other
parties. The court cases have been ongoing for several years during
which Aubrey has possibly made threats against the involved persons
in the court cases to include Ira Tobolowsky. The primary threat
concerns Steve Aubrey stating he is going to commit "Jihad".

Detectives are investigating the threats.

Aubrey, Steven Benton W/M/10-11-60
7777 Glen America #223 , Dallas C#512-659-7234
Vehicle : 2014 Nissan Murano Lic# CSS-5756 color white
Empolyed : Self, Masseuse
Moved to Dallas from Austin to Dallas in Feb 2016

Vodicka, Brian Edward W/M/8-9-59
7777 Glen America #223, Dallas  C#512-659-7636
Vehicle : Nissan Alltima Lic# DXV-8497 color White
He is an Attorney

830am
George Tobolowsky contacted Ermatinger by phone. He stated they are
contacting the U.S. Justice Dept regarding the "Jihad" in an effort
to have the murder and threats of Ira listed and investigated as a
hate crime.

1040am
Dallas PD Officer Herb Cotner

_____ 4 _____

Follow up required: Yes        No        Key words:_____

Supervisor Approval: _____
erm note 5-17-16              COD000070

Cotner is a Dallas Police Officer involved with Green Oaks, a mental treatment facility in Dallas. Cotner contacted DPD Homicide and informed Detective Richardson that Brian Vodicka had recently been a patient at Green Oaks. While at the treatment facility Vodicka was very upset about a Judge and an Attorney, Contact at Green Oaks is : Gail ████████. (See Det Richardson's note)


10:50am

Stacy Paddock (Ira's niece)
████████
She works at the U.S. Justice Dept , Washington DC

Paddock contacted Ermatinger by phone. Stated she arrived at Ira's on Saturday. She heard about Steve Aubrey and Brian Vodicka from Ira's family. She read the court documents regarding the lawsuit(s) Ira was involved in with Steve and Brian. Paddock stated after reviewing all the available documents she found threats and hate mail directed at Jews and Ira. She wrote a 25 page document regarding her findings and has sent it to the U.S. Attorney Office in Dallas. (Copy in murder file)

1pm
Gary Mcdonald - Dallas County Assistant DA

Detectives had contacted Justin Lord (ADA) regarding search warrants on this case. Lord was in trial and sent Mcdonald. Mcdonald discussed search warrants with detectives.

1pm
Arson Investigator D. Cherry arrived at Homicide. He brought a copy of documents he had obtained for DPD. The DFR items are in tab 30 of the murder file. Cherry had obtained warrants for Aubrey's and Vodicka's cell phones. The phone records are on a thumb drive (in murder folder).

130pm
Ermatinger, Richardson, Laurence and DFR Stephens and Cherry went to Aubrey/Vodicka's apartment in an effort to locate/contact them. They were not located. Detectives knocked on the door of apt 223 and talked to several neighbors who stated they had not heard thru the walls or seen anyone in apt 223 since Saturday 5-14-16 morning.

*DFR   Stephins   F0184*

Investigative Notes

05/18/2016

Ira Tobolowsky's law assistant:

Leigh Allen W/F ████████

████████████

████████████

Has worked for Ira for 18 years.

Always showed up to work at 8:00am.

Has access to his emails and has reviewed them.

Has not seen any threatening emails or letters.

Ira has represented the Betsy Aubrey and Buck Aubrey on 8 lawsuits filed by Steve Aubrey.

Steve Aubrey is a vexatious litigant, multiple inappropriate emails. Over a dozen cases filed. Wanted his inheritance from his mother.

Aubrey made anti-semantic comments to Ira, deposition.

Sends emails and motions continually on case.

Judge Moye made Aubrey provide addresses of where he lives.

Aubrey and Vodicka uncooperative on depositions.

Vodicka came to deposition high and had to stop deposition.

"Aubrey hated Ira."

Lawsuit against Ira in different court.  Non-suited the case.

Did not want to give depositions.  Perjure themselves.

**Other problem people:**

B & R development vs Leyton & Rebellous, "Crooked lawyer"  Kelly Dean Hollingsworth

Gravel pit -- Hutchins Texas

Ira filed a grievance with the State Bar to have Hollingsworth's license revoked, 5 years ago.

Hollingsworth filed Bankruptcy

Final hearing next week in Irving, State Bar Grievance.

Ira to be at hearing to have him dis barred.

COD000074

App. 000003

Page 2

Ira approached by a lady 1 ½ months ago: Sharon Bornstein

Had a trust fund. Stays in Motel

She was very abusive and Ira refused to represent her.

Heard her on phone. Called him 18 times over weekend.

Loaned her $100.00. Ira couldn't help her.

Sharon Bornstein: ██████████

Ira talked to her banker:  VP JP Morgan ██████████  ██


Another Deflamation lawsuit.

Steve Schopmer was his attorney.

Judy Ann Brauhman properties on Town East Blvd.

Locked up in Terrell. Ira got her out.

Judy, defaming him.

Settlement agreement.

Address: ██████████████████

10 years since he's dealt with Judy.


Ira loved Debbie. Made jokes about her.

No problems with wife.

App. 000004

COMPLAINANT:

SERVICE #:
FOR DET. :

## INVESTIGATIVE INFORMATION

SUBMITTING OFFICER: **Ermatinger**    DATE: **5-18-16(Wednesday)**
INFO OBTAINED VIA:
OBTAINED ON DATE:        AT TIME:


TOPIC: **investigation**

NARRATIVE:

9:23am
Judge Harmon - probate judge
Austin Tx
▮▮▮▮▮▮▮▮


Judge Harmon had called on 5-17-16 and Ermatinger called him
back but he did not answer. Ermaitinger contacted Judge Harmon
by phone on 5-18-16.
Judge Harmon stated he is familiar with Steve Avery and
Vodicka.. They sent a long dialogue to his court.
Aubrey/Vodicka tried to get a case moved to his court but he
denied it and determined it was a Dallas case. Two other
District Judges , Livingston and Crump have also dealt with
Aubrey and Vodicka.


10am
Detectives have been trying to locate Aubrey and Vodicka.
Steve Aubrey vs Tobolowsky had a court hearing set in Judge
Moya's Court(14th), at 600 Commerce on this date. Detectives
Ermatinger and Sayers along with DFD Stephens and Cherry went
to the court hearing. The court case is a hearing for the
Defamation case Tobolowsky vs Aubrey Case #DC1508135. The
hearing on this date was for Seeking of Cost. Detectives had
received info regarding the Defamation case and that
Tobolowsky had won the case and a large settlement. Judge
Moya stated the case was still ongoing. The judge also stated
that since Tobolowsky is now dead the case is now over and
Aubrey does not have to pay. Judge Moya also said that he was
going to Recuse himself from the case.


Judge Moya feels threatened since the Death of Tobolowsky. He
has requested security and thought he was being followed
after the death of Tobolowsky. While being followed he
displayed a handgun due to his concerns. (turns out his being
followed was probablynot related.

---

3

Follow up required: Yes        No        Key words:_____

Supervisor Approval: _____    COD000078
Document1

App. 000005

Earl Jeffers - U.S. Marshals Service

████████

Jeffers contacted detectives in the jury room of Judge Moya's Court. Jeffers stated Federal Judges that have been involved in court cases with Steve Aubrey/Vodicka are concerned for their safety since the death of Tobolowsky. The Federal Judges are Ed Kincaid and Barbara Lynn. Jeffers stated he was checking into the matter and offered his assistance to the investigation if needed.

12:30pm
In an effort to locate Aubrey and Vodicka DFW Police were contacted regarding flights for Aubrey/Vodicka. No flights were located as of 5-18-16.

230pm
Ermatinger/Sayers/Laurence/Richardson along with DFD Cherry and Stephens had been attempting to locate Aubrey/Vodicka. Detectives Richardson/Laurence had been assigned to set up surveillance on their apartment at 7777 Glen America #223 at various times. Ermatinger and Sayers arrived at the apt and decided to knock on the door of the apartment with negative results.

2:59pm   Messages
Ermatinger sent the following text message to Steve Aubrey: Mr. Aubrey. Please call me. Detective Ermatinger. Dallas Police Homicide. Ermatinger also left him a voice mail with the same type of message. Aubrey's phone number is 512 659-7234. Ermatinger also left a similar text and voice message on Vodicka's phone 512-659-7636.

During the day DFR Stephens and Cherrya had checked the KFC Store #J625002 to look at their security cameras. Detectives had received info that Aubrey or Vodicka had been at the location on this date. Stephens stated the camera was off. No info obtained.

5:22pm
Detectives Ermatinger and Laurence remained at 7777 Glen America to see if Aubrey or Vodicka would show up. Detective Sayers contacted Ermatinger by phone and stated Detectives could leave the location since it appeared Aubrey/Vodicka were in Belton Tx at a stop (Detectives were tracking their charge card(s).

5:33p - Aubrey/Vodicka appear to be fleeing
Detectives received info Aubrey/Vodicka were booking a room thru Price Line. Detectives Ermatinger and Laurence returned to Homicide. Detectives are concerned that Aubrey/Vodicka are avoiding detectives in an attempt to conceal evidence. Detectives base this on the following information:  They have not been seen at their apt since 5 14 16 in the morning. They do not answer their phones. They do not respond to phone messages. They do not respond to text messages. At

COD000079

LOW UP REQUIRED:        YES                 NO                    KEY WORDS:____
SUPERVISOR APPROVAL:

App. 000006

5:22pm their credit card is being used at a truck stop in Belton, Tx. They were booking a hotel room.

6:30pm
Ermatinger received info that Aubrey had booked a hotel room. Detective Ermatinger determined the Hotel room booked at 6:14pm was the Crown Plaza at Dallas Market Center, 7050 Stemmons Freeway. The room was paid for by Steve Aubrey. The room was booked for a person named Alexandria Krot. (once again it appears Aubrey/Vodicka are hiding). Detective Ermatinger receives info that Aubrey/Vodicka are travelling from Belton toward Dallas. Ermatinger requests surveillance at the Crown Plaza Hotel.

Contacted K. Hibbitts – Dallas PD- assigned with U.S. Marshalls
Contacted David Armstrong –DPS
Both contacts stated they would assist in locating Aubrey/Vodicka if needed.

Detectives start Search warrants (3 warrants)
Detectives Sayers and Richardson return to work. Detectives start Search warrants:

#1
Warrant for Steve Aubrey/Brian Vodicka residence at 7777 Glen America #223.

#2
Warrant for a search of Steve Aubrey's Person.
Looking for evidence of burn injuries.

#3
Warrant for a search of brian Vodicka's Person
Looking for evidence of burn injuries.

Warrants were completed and presented to Judge Geneen Howard (Dallas County 6th District Court).

LOW UP REQUIRED:      YES          NO          KEY WORDS:_____
SUPERVISOR APPROVAL:

App. 000007

COMPLAINANT:

SERVICE #:
FOR DET. :

## INVESTIGATIVE INFORMATION

SUBMITTING OFFICER: **Ermatinger**     DATE: **5-19-16**

INFO OBTAINED VIA: **Interviews**

OBTAINED ON DATE:         AT TIME:

          Interview of Brian Vodicka

NARRATIVE:

4:55pm

Ermatinger was called at home and informed Steven Aubrey and Brian
Vodicka had been located. Ermatinger returned to work. Detectives
had obtained Search warrants for them so they were transported to
homicide.

Until this time the case was assigned to the Dallas Fire Dept Arson
investigators with DPD assisting in the investigation.

On arrival at work Ermatinger was informed by Lt.Porter
(SIU/Homicide) that Ermatinger was going to be the lead investigator
on the case. Ermatinger interviewed Vodicka while Detective
Richardson interviewed Aubrey.

610pm
Room #4 at Homicide
Recorded interview
5 DVD's

Brian Vodicka

Vodicka stated he did not want to talk to detectives about the
Tobolowsky case. Stated he was an attorney but did not know anything
about these types of matters(criminal). Stated detectives should
submit written questions to his lawyer. Does not have a lawyer but
is looking for one. Stated he was out of town the last couple of
days with Alexndra Krog. Said the police followed her to the
airport. Said he has a twin brother. He was provided a copy of the

4

Follow up required: Yes         No         Key words:_____

Supervisor Approval: _____   COD000083____   _____
Ermatinger note2 5-19-16

App. 000008

search warrant. Ermatinger exited the interview room.

715pm - PES looks for signs of burns on Aubrey/Vodicka

PES Detective Roosevelt arrives at Homicide. He photographs Vodicka and inspects his person for burn injuries. No injuries are observed.

Ermatinger also checks with Detective Richardson who interviewed Aubrey. Aubrey requested a lawyer. Aubrey had also been photographed by PES and his person inspected for burn injuries. Ermatinger also checked Aubrey's arms and hands. Ermatinger observed Aubry's hand's appeared to have redness and a loss of hair on parts of his hands. His arms appeared more brown while the backs of both hands appeared to be red. (6 days since Tobolowsky was found). Also observed marks from handcuffs on wrists.

Ermatinger calls Dallas County Medical Examiners Office and talked to Field Agent. Ermatinger asked if a Doctor was available to look at Aubrey's hands. Field Agent said she would check and called Ermatinger back a few minutes later. ME Doctor would not look at the injuries. Field Agent suggested detectives contact on call doctor at Parkland Hospital Burn Unit. Detectives attempted to contact Doctor at PMH with negative results. Detectives contacted Dr Eastman who works at PMH Emergency Room. He agreed to come to Homicide and inspect Aubrey's person.

740pm - Consent to Search - Vodicka

Vodicka agrees to let detectives search his cell phone and his car. Nissan Alltima  lic# DXV-8497. The consent is obtained in the interview room and is recorded. The phone is dumped at Police HQ.

8pm - auto pound - Vodicka

Ermatinger, LT Cherry (DFD Arson), PES Roosevelt, Officer Hatch #10169 and Vodicka go to the Police Auto Pound.
Roosevelt processes and photographs Vodicka's car. The car is clean and Ermatinger did not observe any evidence to note.

Prior to leaving for auto pound Ermatinger had attempted to call Attorney Phillip Hayes twice since his name was provided by Aubrey.

App. 000009

No contact made.

8:35

Ermatinger, Officer Hatch and Vodicka return to Homicide. Vodicka has been really talkative since the first few minutes of his interview. Vodicka continued to be talkative and friendly starting on the way to the auto pound. Ermatinger repeatedly explains he cannot ask or answer questions about the Tobolowsky case. Vodicka states he wants to talk to detective and keeps talking. Detective explains to Vodicka he can talk but not until we return to the interview room where it will be recorded.

Vodicka stated:

5-12-16
- 6p to 730pm went to Mental Health Alliance
- 8pm went to In/Out Burger at Caruth/Southwestern
- Went Home – Steve was there
- 10p Went to bed

5-13-16
- 9am woke up (at apt on Glenn America) Steve was there
  Watched Kelly/Michael on TV. Made a few phone calls
- 10a-11a talked with Steve about spending $50 on Mental health
  for me
- 11amish went to Great Clips for a haircut in the Village

- Stated in 2009 Steve sent an email to his mother about the Jihad. I always tell him not to send things like that but he still does. Steve sent the one email about Jihad but in every court hearing Tobolowsky brings it up every fourth sentence. (Ermatinger noticed Vodicka became upset two times during the interview when he talked about Tobolowsky using Jihad word. Vodicka would even clench his teeth)

- Moved to Dallas on 2-15-16
- Spent 2 weeks at Green Oaks(treatment center)
- They determined he is Bipolar and gave him meds
- He has had AID's for a long time
- He has been with Steve for 20 years
- They were married in New Mexico (unsure if legal then)
- Moved to Dallas to be near his Mother (getting older) and family.
- Does not think Steve killed Ira

LOW UP REQUIRED:     YES          NO                    KEY WORDS:___
SUPERVISOR APPROVAL

- Said Steve did not sue his mother
- Said he sued the Trust his father left
- Said it is for $7,000,000 (seven Million)
- Said the news is making it out to be big money and high profile
- Said 7 million is not high profile
- Said they do not win any of the hearings
- Said Tobolowsky is a brilliant lawyer

See recording for details.

-

App. 000011



Stephen C Schoettmer

[REDACTED]

~~Judge~~ Moyer handled case

Vexatious litigant
Steven B. Aubrey   Richard Buck Aubrey

Bob Price
Ira pop. mother of Steve Aubrey
5-7 million dollars   Richard Aubrey

Steve was ben-ficiary at fathers
estate, Can't collect until his
mother dies, Aubrey would get 2-3 million
2-20-16 moved to Da. as, TX
Brian Vodicka — 7777 Glen Lakes
972-788-____ 303   Dallas, TX
April 2016 moved to Dallas TX 75225
Steven Aubrey — 7777 Glen Lakes Dr.
972-588-____   Dallas, TX
Vexatious

COD000099

App. 000012



**UTSouthwestern**
Medical Center

Alexander L. Eastman, MD, MPH, FACS
Assistant Professor of Surgery
Division of Burn/Trauma/Critical Care
Medical Director and Chief—The Rees-Jones Trauma Center at Parkland

Department of Surgery

May 20, 2016

Detective Dale Richardson
Crimes Against Persons Division
Dallas Police Department
1400 South Lamar Street
Dallas, Texas 75215

Dear Detective Richardson:

Thank you for asking me to come evaluate Mr. Steven Aubrey (W/M, DOB ▉▉▉▉) last night in the CAPERS office at Dallas Police Headquarters.

Prior to examining him, I explained to him my purpose there as a part of an investigation and obtained his verbal consent to speak with him and conduct a limited physical examination. I conducted a review of his declared medical problems and asked him of any additional problems (he stated there were none).

I then conducted a thorough physical examination of his scalp and skin overlying his head, neck, torso, hands, legs and feet. There were areas of blanching erythema in a splotchy pattern overlying both hands, wrists and forearms. In addition, there were uneven areas where it appeared there was no normal hair. It was in a nonspecific splotchy pattern and was not even at all. This could be consistent with healing, superficial thermal injury. He did not have any signs of deeper thermal injury that could be found.

In addition, he appeared to have some healing facial contusions that he attributed to a cosmetic procedure. I was unable to determine the chronicity of these injuries.

Many thanks for asking me to assist you here. Do not hesitate to contact me if I can be of any further assistance.

Respectfully,

Alexander L. Eastman, MD, MPH, FACS, DABEMS

5323 Harry Hines Blvd., Dallas, Texas 75390-9158 / Phone: 214-648-0299 / Fax 214-648-5477
alexander.eastman@utsouthwestern.edu      www.utsouthwestern.edu

COD002131

App. 000013

A.

## Ermatinger, R

| | |
|---|---|
| From: | stacy.paddack@gmail.com |
| Sent: | Tuesday, May 17, 2016 11:02 AM |
| To: | Ermatinger, R |
| Cc: | tobge@aol.com |
| Subject: | Fwd: Hate Crimes Act Death of Dallas Attorney Ira Tobolowsky--Request For Assistance |
| Attachments: | Federal Hate Crimes Act.doc; ATT00001.htm |

Dear Detective Ermatinger:

Thank you for your help!

All the best,

Stacy Paddack
301-351-7670 cell

Begin forwarded message:

> **From:** "Paddack, Stacy (EOIR)" <Stacy.Paddack@usdoj.gov>
> **Date:** May 17, 2016 at 8:47:18 AM CDT
> **To:** "stacy.paddack@gmail.com" <stacy.paddack@gmail.com>
> **Subject: Fwd: Hate Crimes Act Death of Dallas Attorney Ira Tobolowsky--Request For Assistance**

Begin forwarded message:

From: "Paddack, Stacy (EOIR)"
<Stacy.Paddack@EOIR.USDOJ.GOV<mailto:Stacy.Paddack@eoir.usdoj.gov>>
Date: May 17, 2016 at 8:40:41 AM CDT
To: "Parker, John (USATXN)" <John.Parker@usdoj.gov<mailto:John.Parker@usdoj.gov>>,
"USATXN-DallasDuty (USA)" <USATXN-DallasDuty@usdoj.gov<mailto:USATXN-
DallasDuty@usdoj.gov>>
Subject: Hate Crimes Act Death of Dallas Attorney Ira Tobolowsky--Request For Assistance

May 17, 2016
The Honorable John R. Parker
United States Attorney
Northern District of Texas
214-659-8728<tel:214-659-8728>

Dear Mr. Parker:

1

COD002162

This email and attachments serve as my request, on behalf of the family of Ira E. Tobolowsky, that Attorney General Lynch prosecute Steven Benton Aubrey and Brian Edward Vodicka under the Hate Crimes Act, 18 USC 249(a)(1), for causing the burning to death of my uncle Ira Tobolowsky because of his Jewish religion on May 13, 2016, at his home in Dallas, Texas.

We also hope that you can facilitate our request that DHS place "Steven Benton Aubrey" and "Brian Edward Vodicka" on a "no-fly" and "no-border-crossing list." Although we had been told by local law enforcement last Saturday that Aubrey and Vodicka were under surveillance, we learned last night that they are not and their whereabouts are unknown.

If possible, we'd like to meet with a member of your staff today (or as soon as possible) to discuss Federal prosecution for his death as a hate crime. Attached is an amicus brief prepared by our family, which includes significant evidence of hate speech and threats in court filings that target Ira and the Jewish religion (pages 9-24 of our brief). We hope you can use our brief to support an arrest warrant and prosecution. Of course, we can also provide copies of all referenced court documents and other evidence of threats.

Please do not hesitate to contact me (301-351-7570<tel:301-351-7570> cell), Ira's Attorney Steve Schoettmer (214 228-8792<tel:214%20228-8792>), or Ira's brother (my uncle) George Tobolowsky (214) 533-1133<tel:(214)%20533-1133>). I thank you in advance for your assistance,

Stacy Stiffel Paddack
Administrative Law Judge
United States Department of Justice
Executive Office For Immigration Review

Sent from my iPhone

2

COD002163

App. 000015

COMPLAINANT: **Tobolowsky, Ira**                SERVICE #: **114044-2016**
                                                                FOR DET. :

### INVESTIGATIVE INFORMATION

SUBMITTING OFFICER: **Ermatinger**      DATE: **5-16-17**

INFO OBTAINED VIA:

OBTAINED ON DATE:5-16-17      AT TIME:


         TOPIC: **Assist Dallas Arson Investigators**

NARRATIVE:

2pm
Ermatinger was called to a meeting by Lt. Porter regarding the
unexplained death case being investigated by the Dallas Fire Dept
Arson Investigators. DFD was requesting assistance from DPD
Homicide/SIU.

Present at meeting:

DPD
Acting Major Diorio
Lt. Proter
Sgt Garza
Detectives Sayers/Ermatinger

DFD
Lt. Cherry
Capt Stephens

Captain Stephens/Lt Cherry/Detective Sayers had responded to the
fire call on 5-13-16 and briefed everyone in the room on the case.
They stated DFD was sent on a fire call to 7435 Kenshire Ln. 9a
single family home) regarding fire in the garage. DFD had responded
and put out the fire. The victim was located in the garage between a
car and the outer wall. The victim was deceased. A plastic container
was located in front of the car containing an accelerant. Arson
Investigators suspect the victim was doused with the accelerant and
set on fire.

The victim is an attorney and recently has been involved in a
lawsuit against a Steve Aubrey. Steve Aubrey lost the case and has
made threats to the victim.

---
                              3
---

Follow up required: Yes        No        Key words:_____

Supervisor Approval: _____
tobolowsky                                    ————COD002189

COMPLAINANT:                                              SERVICE #:
                                                         FOR DET. :

### INVESTIGATIVE INFORMATION

SUBMITTING OFFICER: **Ermatinger**   DATE: **5-24-16**

INFO OBTAINED VIA:

OBTAINED ON DATE:        AT TIME:


        TOPIC: Tobolowsky's work place interviews

NARRATIVE:

1pm
**Tobolowsky Law Firm**
**4305 W Lovers Ln 214-352-0440**

Ermatinger and Sayers went to the law firm to interview co-workers.
Arson Investigators were at the location.

**Allen, Leigh W/F/          - Ira's Assistant**
972-898-3168

She has worked for Ira for18 years. Stated he is great to work for
and she would have left a long time ago if it were not Ira. Stated
she does everything for Ira. She even opens his bottle of water. She
loves Ira. Stated Ira is in pain all the time due to his physical
condition. Stated he takes medicine. She retrieved his medicine and
showed it to Ermatinger. She stated he gets a box of medicine every
month. He keeps it a work. He takes injections but does not help
him. The medicine is ENBREL 50mg. As far as she knows he keeps the
medicine at work. (see photos in this note). Allen also talked about
Aubrey and Vodicka but did not have any new info. Stated Ira makes a
lot of money and takes care of his family. She stated the office
does with out but the boys and the family go first rate. She further
explained this as if the office needs new equipment the office will
do without. She also stated she wished Ira paid her more for
everything she does. She has cancer and does chemo.

**Steve Schoettmer W/M – Lawyer in building**
C# 214-228-8792

Steve works in Ira's building as a lawyer. Steve stopped working as
a lawyer to spend time with his family and watch his son(s) play

4

Follow up required: Yes        No        Key words:_____

Supervisor Approval: _____        _____COD002201
erma note on tobo office 5-24-16

App. 000017

sports. One son has a chance to make New Orleans saints as a Linebacker. Recently he started working as a lawyer again and uses an office at Ira's building (he does not pay). Ira was spending to much time on the Aubrey/Vodicka case and hired Steve to work on the Defamation Case. Steve felt that Aubrey/Vodicka were the most likely to harm Ira. During the last deposition at Ira's office they would not leave and the police were almost called. (See recorded deposition). Steve stated Ira had other cases but they were just regular lawyer stuff and he did not suspect any of the involved parties or lawyers.

Regarding Aubrey: Aubrey Vs Betsy (mom). Aubrey's dad left thee state to Betsy. When Betsy dies Steve will be awarded his part of his father's estate. Betsy may have removed Steve Aubrey from collecting any of her part due to all the problems. At one time Steve even painted a bunch Rats/Mice different colors and released them in his mother's home.

## Faith Burk - Attorney – Law Partner
## 214-673-8688

She is Ira's Partner. She was not interviewed on this date

## Hauong Yguyen - Accountant
817-832-7199 or 817-281-8147

She was interviewed by Ermatinger/Syaers/Stephens/Cherry

She is Ira's accountant. Stated she does all his bills. She has not seen anything odd about his work accounts except about a month ago there was a check for $20,000 she was not aware of. She went to talk to Ira about it but he was in a meeting and said he would talk to her later about it. They never talked about it. She works part time for Ira and has an Autistic child so it works out good for her.

Photos of Ira's medicine

```
COMPLAINANT:                                    SERVICE #:
                                                FOR DET. :
```

**INVESTIGATIVE INFORMATION**

```
SUBMITTING OFFICER:  Ermatinger     DATE: 5-24-16
INFO OBTAINED VIA:
OBTAINED ON DATE:        AT TIME:
```

TOPIC: **Interview Debbie Tobolowsky**

NARRATIVE:

10:20am
Interview Room #3

Tobolowsky, Debra W/F ▮▮▮▮▮▮
DL# ▮▮▮▮▮▮▮

==Debbie   arrived   with   her   son   Michael   Tobolowsky   and   George Tobolowsky==. Michael and Debra were placed in the interview room. George waited in the Homicide break room. Michael is an attorney.

Lived on Kenshire since 1989
Her and Ira were born in Dallas
Ira is 8 years older. They both went to Hillcrest H.S.
Only Ira a Debra live in the house

Family Tree for Ira
George Tobolowsky/Julie is his brother
Donna Timm/Terry is Ira's sister
Donna is the family outcast. She had an affair. She would not help pay for her mothers assisted living. Ira was very angry with her but would still help her. She is a Realtor. She lives in Plano.

Family tree for Debra
Janet Martin – is Debra's sister. Lives in Florida

Parents
Both Ira and Debra's parents are deceased. Ira had a falling out with his parents to over his sister.

Kids
Janathon Tobolowsky – recently married Lindsay Torres.
Micahel Tobolowsky – Attorney who works closely with Ira

---

4

---

Follow up required: Yes        No        Key words:_____

Supervisor Approval: _____
Ermatinger note tobolowsky deb 5-24-16                    ——— COD002207

App. 000019

Zachary Tobolowsky – going to law school

Debra does not work/ volunteers
Ira works and then works at home
1978 opened his own law office
Later built his work building
Ira does Business, Real Estate and other civil law. No malpractice.
Michael and Ira are close. They meet a lot and discuss work since
they both do the same type of law. After this recorded interview a
short meeting including George Tobolowsky took place in the Homicide
break room. Michael announced (and surprised his mother and George)
by announcing he was going to take over his dad's office or merge it
with his current law officer where he is employed. Michael stated he
and Ira had been talking about it and were going to tell everyone
else.

--------------------------------------------------------------------

TIMELINE – according to Debra Tobo

630pm to 10pm
On 5-12 Thursday night, Debra and Ira had dinner at Steven Fields
Steak House (Plano?). They had dinner with Richard Galan (Hilltop
Securities) 214-987-5205. Richard is Ira's Finance Manager. He was
Debra's fathers manager and then Ira's. He also invested Debra's
Money. Richard meets with the family once a month.

10p
Ira and Debra get home. Did not stop anywhere on the way home.
No one came over to the house.

Ira worked a little and went to bed (Debra was vague here)
Debra stayed up and worked on the upcoming wedding of her son.

Ira snores and Debra usually kicks him 20times a night.

5-13 Friday
Debra does not get up until Ira leaves
Not sure of the time but around 730am(This is when Ira usually
leaves).
The door Dings (alarm system gives signal when doors open or close).
Debra gets up and goes to the restroom. Alarm company calls and
alarm pad says FIRE. Turns off alarm. Debra looks out and sees smoke
over the swimming pool. Ran back to bedroom. Got dressed, shoes,
jewelry and dog. Before she ran to bedroom opened the door between
the utility room and the garage. Garage was full of smoke. Alarm
company called. Debra told them there was smoke send help. Debra did

not call 911.

Debra exited front door and a fireman was approaching the door. FD asked where is the fire and she said in the garage. FD asked how can we get in. Debra retrieved garage door remote from computer room. Has an extra one. The garage door opener did not work. Debra went outside and made attempts to call Ira. When FD opened garage door Debra asked if there were two cars in there. FD said yes and Debra said he is in there get him out. FD called Paramedics and they took a gourney in. Paramedics came out with an empty gourney.

Ira's Routine

Debra knows Ira's habits in the morning. He enters the garage from the utility room. He opens the big door. He walks behind Debras car. He walks behind his car to the back door of his car. He places items in the back seat behind drivers seat (if he has any). He gets in the car.

Ira has a briefcase. Michael said it was found at the office. Ira had a laptop and a Dictaphone in the car. Ira does not wear jewelry or a watch. He carries a wallet. Not stolen. His phone was not stolen. Nothing known is missing.

Regarding email from night before.
News reported there was an email threatening to kill Ira on 5-12-16. Michael stated there is definitely no such email.

Person of interest

Debra and Michael stated Ira had recently been approached by a semi homeless girl about getting money (inheritance) from a bank. She would call the house at all times, including late hours (3am). Michael or Steve Shotner has her info.
------------------------------------------------------------

```
COMPLAINANT:                                          SERVICE #:
                                                      FOR DET. :
```

## INVESTIGATIVE INFORMATION

```
SUBMITTING OFFICER:  Ermatinger     DATE: 10-20-16
INFO OBTAINED VIA:
OBTAINED ON DATE:         AT TIME:
```

      TOPIC: **Steve Aubrey Arrested / Vodicka interview**
NARRATIVE:

11:50am
Detective Monsisvais #7068
Dallas Police Vice Unit

Monsisvais contacted Ermatinger on this date and stated they were working the case on Steve Aubrey for Prostitution and expected to arrest him at 2pm. Ermatinger requested he be informed that the arrest did occur.

210pm
Ermatinger was contacted by Vice unit that Aubrey had been arrested and was being charged with Prostitution (seller) M/B.
The case is reported on Dallas Case #252178-2016. (Copy in murder file).

## Phone #972-439-6381
Vice reported there was a throw down phone in Steve's car with this number pasted on top.

230pm
Interview of Brian Vodicka
Detectives Ermatinger and Sayers went to Vodicka's residence to interview him regarding the Tobolowsky case. Detectives also made a welfare check on Vodicka since he had not been seen for about 5 days.

Ermatinger and Sayers located Vodicka sleeping in his bedroom. Vodicka greeted detectives and asked Detectives to sit down. Vodicka remained in bed and appeared to be medicated. Detectives informed Vodicka Steve had been arrested and asked Vodicka if he would be ok.Vodicka stated yes but he had nowhere to go. Detectives

2

```
Follow up required: Yes        No          Key words:_____

Supervisor Approval: _____      _____
Aubrey arrest and Vodicka interview10-20-16          COD002213
```

App. 000022

==interviewed Vodicka regarding the murder case.== He denied taking part in or knowing about the murder. Stated they had never hurt anyone at any time ever. Stated the night before the murder he went to bed and Steve was at the apartment. When he woke up the next morning it was 9am. He knows it was 9am because the TV show Live with Kelly and Michael was just coming on and it was Strahan's last day on the show. When he woke up Steve was at their apartment. Vodicka stated he does not know if Aubrey left the apartment when he was sleeping. Vodicka stated due to his medication he does not know if Aubrey left during the night. **He cannot provide and alibi for Aubrey.** He also stated Steve has never told him that he killed Tobolowsky. Detectives were going to transport Vodicka to Homicide for the interview but due to his medicated condition detectives interviewed him in the apartment.

==4:03pm detectives left Vodicka's apartment.==

LOW UP REQUIRED:     YES          NO             KEY WORDS: COD002216

ᴵF1.PF]       **SUPERVISOR APPROVAL:**

App. 000023

COMPLAINANT:                                          SERVICE #:
                                                     FOR DET. :

## INVESTIGATIVE INFORMATION

SUBMITTING OFFICER: **Ermatinger**      DATE: **5-20-16**

INFO OBTAINED VIA:

OBTAINED ON DATE:           AT TIME:


       TOPIC: Holes in the fence

NARRATIVE:

George Tobolowsky , ███████████████████████

<mark>George called and informed Ermatinger they found a hole in the privacy fence at the offense location. It appears the hole was drilled and may have been used to watch the victim. He stated the hole is high.</mark>

11am
Detectives arrived at the offense location and met with George and the sons of the victim. Detectives were shown the hole in the fence. Detectives had PES Oviedo respond to the location. Ermatinger observed the hole in the fence looked suspicious. There were other holes in various places on the fence but they were obviously knot holes in a wooden privacy fence.



This hole appears to be drilled and covered with some type of paint, paste or some other unknown substance. The hole is drilled in the fence where it gives a clear view of the garage where the victim was found.PES collected the boards from the fence. (see other photos and PES report for evidence details).

_____
                          1
_____

Follow up required: Yes        No        Key words:_____

Supervisor Approval: _____   ——————— COD002217
ermatinger hole in fence 5-20-16

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

STEVEN B. AUBREY, and          §
BRIAN E. VODICKA,              §
      Plaintiffs,            §
                               §
v.                             §
                               §          CIVIL ACTION NO.
ROBERT L. ERMATINGER, JR.,     §          3:19-CV-056-B
SCOTT ROBERT SAYERS,           §
      Defendants.            §

**DEFENDANT SCOTT SAYERS' ANSWERS TO
VODICKA'S FIRST SET OF INTERROGATORIES**

To:    Plaintiffs, 2601 NW 3rd Ave, Wilton Manors, FL 33311.

       Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, the Defendant

serves the following objections and answers to Vodicka's First Set of Interrogatories.

                       Respectfully submitted,

                       CITY ATTORNEY OF THE CITY OF DALLAS

                       Christopher J. Caso
                       City Attorney

                       */s/ Lindsay Wilson Gowin*
                       Senior Assistant City Attorney
                       Texas State Bar No. 24111401
                       lindsay.gowin@dallascityhall.com

                       Devin Alexander
                       Senior Assistant City Attorney
                       Texas State Bar No. 24104554
                       devin.alexander@dallascityhall.com

Sayers' Answers to Vodicka's First Set of Interrogatories
*Aubrey et al. v. Ermatinger et al.*; Civil Cause No. 3:19-cv-0056-B          Page 1

App. 000025

7DN Dallas City Hall
1500 Marilla Street
Dallas, Texas  75201
Telephone:      214-670-3519
Telecopier:     214-670-0622

## CERTIFICATE OF SERVICE

    I certify that on May 22, 2020, a copy of the foregoing document was served on the following attorney of record in the manner indicated:

Sayers' Answers to Vodicka's First Set of Interrogatories
*Aubrey et al. v. Ermatinger et al.*; Civil Cause No. 3:19-cv-0056-B                                    Page 2

App. 000026

## OBJECTIONS AND RESPONSES TO INTERROGATORIES

**Interrogatory No. 1**: Identify by name, job description, address, phone number, and contribution made, each person who participated in verifying the "facts" in preparation of your Affidavit for Search Warrant, executed by you on May 25, 2016, seeking to search 7777 Glen America #223, Dallas, Dallas County, Texas ("**Affidavit-1**").

**Objections:** Defendant objects to this interrogatory because the phrase "verifying the 'facts'" is unduly vague and undefined. When submitting an affidavit in support of a search warrant application, the law does not require the affiant to be able to prove the veracity of every piece of information set forth in the affidavit. Probable cause may be based upon information from many types of sources, such as hearsay, witness statements, business records or other documents, information provided by other investigators, and the affiant's own knowledge and observations. Therefore, Defendant shall interpret the phrase "verifying the 'facts'" to mean gathering information used by Defendant to prepare Affidavit-1.

**Answer:** Subject to the foregoing objection, Defendant answers as follows:

The following individuals gathered information in the course of the investigation of Ira Tobolowsky's murder:

Former Dallas Police Department Detective Robert Ermatinger
c/o Lindsay Wilson Gowin
Dallas City Attorney's Office
1500 Marilla Street, 7DN
Dallas, Texas 75201
214-670-3519

Detective Scott Sayers
c/o Lindsay Wilson Gowin
Dallas City Attorney's Office
1500 Marilla Street, 7DN
Dallas, Texas 75201
(214) 670-3519

Detective Dale Richardson
Dallas Police Department
1400 S. Lamar
Dallas, Texas 75215
214-671-3001

Detective R. Laurence
Dallas Police Department
1400 S. Lamar

Sayers' Answers to Vodicka's First Set of Interrogatories
*Aubrey et al. v. Ermatinger et al.*; Civil Cause No. 3:19-cv-0056-B                                    Page 3

Dallas, Texas 75215
214-671-3001

Detective Frederick Mends
Dallas Police Department
1400 S. Lamar
Dallas, Texas 75215
214-671-3001

Detective Steve David
Dallas Police Department
1400 S. Lamar
Dallas, Texas 75215
214-671-3001

Captain S. Stephens
Dallas Fire - Rescue
1500 Marilla Street, 7th Floor
214-670-3111

Lieutenant D.  Cherry
Dallas Fire - Rescue
1500 Marilla Street, 7th Floor
214-670-3111

As permitted by Rule 33(d) of the Federal. Rules of Civil Procedure, please refer to COD ####.
Beyond that which is set forth in COD ####, Defendant does not recall which pieces of information
were gathered by each individual identified above.


**Interrogatory No. 2**: Identify by name, job description, address, phone number, and contribution
made, each person who participated in verifying the "facts" in preparation of your Affidavit for
Search Warrant, executed by you on May 25, 2016, seeking to search 8617 Southwestern Blvd.
#911, Dallas, Dallas County, Texas ("**Affidavit-2**").

**Objections:** Defendant objects to this interrogatory because the phrase "verifying the 'facts'"
is unduly vague and undefined. When submitting an affidavit in support of a search warrant
application, the law does not require the affiant to be able to prove the veracity of every piece of
information set forth in the affidavit. Probable cause may be based upon information from many
types of sources, such as hearsay, witness statements, business records or other documents,
information provided by other investigators, and the affiant's own knowledge and observations.
Therefore, Defendant shall interpret the phrase "verifying the 'facts'" to mean gathering
information used by Defendant to prepare Affidavit-2.

Sayers' Answers to Vodicka's First Set of Interrogatories
*Aubrey et al. v. Ermatinger et al.*; Civil Cause No. 3:19-cv-0056-B                                    Page 4

App. 000028

**Answer:** Subject to the foregoing objection, Defendant answers as follows:

The following individuals gathered information in the course of the investigation of Ira Tobolowsky's murder:

Former Dallas Police Department Detective Robert Ermatinger
c/o Lindsay Wilson Gowin
Dallas City Attorney's Office
1500 Marilla Street, 7DN
Dallas, Texas 75201
214-670-3519

Detective Scott Sayers
c/o Lindsay Wilson Gowin
Dallas City Attorney's Office
1500 Marilla Street, 7DN
Dallas, Texas 75201
(214) 670-3519

Detective Dale Richardson
Dallas Police Department
1400 S. Lamar
Dallas, Texas 75215
214-671-3001

Detective R. Laurence
Dallas Police Department
1400 S. Lamar
Dallas, Texas 75215
214-671-3001

Detective Frederick Mends
Dallas Police Department
1400 S. Lamar
Dallas, Texas 75215
214-671-3001

Detective Steve David
Dallas Police Department
1400 S. Lamar
Dallas, Texas 75215
214-671-3001

App. 000029

Captain S. Stephens
Dallas Fire - Rescue
1500 Marilla Street, 7th Floor
214-670-3111

Lieutenant D.  Cherry
Dallas Fire - Rescue
1500 Marilla Street, 7th Floor
214-670-3111

As permitted by Rule 33(d) of the Federal. Rules of Civil Procedure, please refer to COD 000001-99. Beyond that which is set forth in COD 000001-99, Defendant does not recall which pieces of information were gathered by each individual identified above.


**Interrogatory No. 3**: Identify by name, job description, address, phone number, and contribution made, each person who participated in verifying the "facts" in preparation of your Affidavit for Search Warrant, executed by you on May 26, 2016, seeking to search Verizon Wireless and 512-659-7234 ("**Affidavit-3**").

**Objections:** Defendant objects to this interrogatory because the phrase "verifying the 'facts'" is unduly vague and undefined. When submitting an affidavit in support of a search warrant application, the law does not require the affiant to be able to prove the veracity of every piece of information set forth in the affidavit. Probable cause may be based upon information from many types of sources, such as hearsay, witness statements, business records or other documents, information provided by other investigators, and the affiant's own knowledge and observations. Therefore, Defendant shall interpret the phrase "verifying the 'facts'" to mean gathering information used by Defendant to prepare Affidavit-3.

**Answer:** Subject to the foregoing objection, Defendant answers as follows:

The following individuals gathered information in the course of the investigation of Ira Tobolowsky's murder:

Former Dallas Police Department Detective Robert Ermatinger
c/o Lindsay Wilson Gowin
Dallas City Attorney's Office
1500 Marilla Street, 7DN
Dallas, Texas 75201
214-670-3519

App. 000030

Detective Scott Sayers
c/o Lindsay Wilson Gowin
Dallas City Attorney's Office
1500 Marilla Street, 7DN
Dallas, Texas 75201
(214) 670-3519

Detective Dale Richardson
Dallas Police Department
1400 S. Lamar
Dallas, Texas 75215
214-671-3001

Detective R. Laurence
Dallas Police Department
1400 S. Lamar
Dallas, Texas 75215
214-671-3001

Detective Frederick Mends
Dallas Police Department
1400 S. Lamar
Dallas, Texas 75215
214-671-3001

Detective Steve David
Dallas Police Department
1400 S. Lamar
Dallas, Texas 75215
214-671-3001

Captain S. Stephens
Dallas Fire - Rescue
1500 Marilla Street, 7th Floor
214-670-3111

Lieutenant D. Cherry
Dallas Fire - Rescue
1500 Marilla Street, 7th Floor
214-670-3111

As permitted by Rule 33(d) of the Federal. Rules of Civil Procedure, please refer to COD 000001-99. Beyond that which is set forth in COD 000001-99, Defendant does not recall which pieces of information were gathered by each individual identified above.

Sayers' Answers to Vodicka's First Set of Interrogatories
*Aubrey et al. v. Ermatinger et al.*; Civil Cause No. 3:19-cv-0056-B                                     Page 7

App. 000031

**Interrogatory No. 4**: Identify by name, job description, address, phone number, and contribution made, each person who participated in verifying the "facts" in preparation of your Affidavit for Search Warrant, executed by you on May 26, 2016, seeking to search Verizon Wireless and 512-659-7636 ("**Affidavit-4**").

**Objections:** Defendant objects to this interrogatory because the phrase "verifying the 'facts'" is unduly vague and undefined. When submitting an affidavit in support of a search warrant application, the law does not require the affiant to be able to prove the veracity of every piece of information set forth in the affidavit. Probable cause may be based upon information from many types of sources, such as hearsay, witness statements, business records or other documents, information provided by other investigators, and the affiant's own knowledge and observations. Therefore, Defendant shall interpret the phrase "verifying the 'facts'" to mean gathering information used by Defendant to prepare Affidavit-4.

**Answer:** Subject to the foregoing objection, Defendant answers as follows:

The following individuals gathered information in the course of the investigation of Ira Tobolowsky's murder:

Former Dallas Police Department Detective Robert Ermatinger
c/o Lindsay Wilson Gowin
Dallas City Attorney's Office
1500 Marilla Street, 7DN
Dallas, Texas 75201
214-670-3519

Detective Scott Sayers
c/o Lindsay Wilson Gowin
Dallas City Attorney's Office
1500 Marilla Street, 7DN
Dallas, Texas 75201
(214) 670-3519

Detective Dale Richardson
Dallas Police Department
1400 S. Lamar
Dallas, Texas 75215
214-671-3001

Detective R. Laurence
Dallas Police Department
1400 S. Lamar
Dallas, Texas 75215
214-671-3001

Detective Frederick Mends
Dallas Police Department
1400 S. Lamar
Dallas, Texas 75215
214-671-3001

Detective Steve David
Dallas Police Department
1400 S. Lamar
Dallas, Texas 75215
214-671-3001

Captain S. Stephens
Dallas Fire - Rescue
1500 Marilla Street, 7th Floor
214-670-3111

Lieutenant D. Cherry
Dallas Fire - Rescue
1500 Marilla Street, 7th Floor
214-670-3111

As permitted by Rule 33(d) of the Federal. Rules of Civil Procedure, please refer to COD 000001-99. Beyond that which is set forth in COD 000001-99, Defendant does not recall which pieces of information were gathered by each individual identified above.


**Interrogatory No. 5**: Identify by name, job description, address, phone number, and contribution made, each person who participated in verifying the "facts" in preparation of your Affidavit for Search Warrant, executed by you on May 31, 2016, seeking to search Plaintiffs' Apple Macbook Pro Ser#C02JPHJDV33, HP laptop Ser#CND5201WJ4, and an Apple Imac Ser#C02K816MDNCV ("**Affidavit-5**").

**Objections:** Defendant objects to this interrogatory because the phrase "verifying the 'facts'" is unduly vague and undefined. When submitting an affidavit in support of a search warrant application, the law does not require the affiant to be able to prove the veracity of every piece of information set forth in the affidavit. Probable cause may be based upon information from many types of sources, such as hearsay, witness statements, business records or other documents,

information provided by other investigators, and the affiant's own knowledge and observations. Therefore, Defendant shall interpret the phrase "verifying the 'facts'" to mean gathering information used by Defendant to prepare Affidavit-5.

**Answer:** Subject to the foregoing objection, Defendant answers as follows:

The following individuals gathered information in the course of the investigation of Ira Tobolowsky's murder:

Former Dallas Police Department Detective Robert Ermatinger
c/o Lindsay Wilson Gowin
Dallas City Attorney's Office
1500 Marilla Street, 7DN
Dallas, Texas 75201
214-670-3519

Detective Scott Sayers
c/o Lindsay Wilson Gowin
Dallas City Attorney's Office
1500 Marilla Street, 7DN
Dallas, Texas 75201
(214) 670-3519

Detective Dale Richardson
Dallas Police Department
1400 S. Lamar
Dallas, Texas 75215
214-671-3001

Detective R. Laurence
Dallas Police Department
1400 S. Lamar
Dallas, Texas 75215
214-671-3001

Detective Frederick Mends
Dallas Police Department
1400 S. Lamar
Dallas, Texas 75215
214-671-3001

Sayers' Answers to Vodicka's First Set of Interrogatories
*Aubrey et al. v. Ermatinger et al.*; Civil Cause No. 3:19-cv-0056-B                    Page 10

App. 000034

Detective Steve David
Dallas Police Department
1400 S. Lamar
Dallas, Texas 75215
214-671-3001

Captain S. Stephens
Dallas Fire - Rescue
1500 Marilla Street, 7th Floor
214-670-3111

Lieutenant D.  Cherry
Dallas Fire - Rescue
1500 Marilla Street, 7th Floor
214-670-3111

As permitted by Rule 33(d) of the Federal. Rules of Civil Procedure, please refer to COD 000001-99. Beyond that which is set forth in COD 000001-99, Defendant does not recall which pieces of information were gathered by each individual identified above.


**Interrogatory No. 6**: Identify by name, job description, address, phone number, and contribution made, each person who participated in verifying the "facts" in preparation of your Affidavit for Search Warrant, executed by you on October 5, 2016, seeking to search Google, Inc. and Plaintiffs' four (4) Gmail accounts including: steveaxxxxxx; steveaustinxxxx; massagexxxxxxx; and vodickxxxx ("**Affidavit-6**").

**Objections:** Defendant objects to this interrogatory because the phrase "verifying the 'facts'" is unduly vague and undefined. When submitting an affidavit in support of a search warrant application, the law does not require the affiant to be able to prove the veracity of every piece of information set forth in the affidavit. Probable cause may be based upon information from many types of sources, such as hearsay, witness statements, business records or other documents, information provided by other investigators, and the affiant's own knowledge and observations. Therefore, Defendant shall interpret the phrase "verifying the 'facts'" to mean gathering information used by Defendant to prepare Affidavit-6.

**Answer:** Subject to the foregoing objection, Defendant answers as follows:

The following individuals gathered information in the course of the investigation of Ira Tobolowsky's murder:

App. 000035

Former Dallas Police Department Detective Robert Ermatinger
c/o Lindsay Wilson Gowin
Dallas City Attorney's Office
1500 Marilla Street, 7DN
Dallas, Texas 75201
214-670-3519

Detective Scott Sayers
c/o Lindsay Wilson Gowin
Dallas City Attorney's Office
1500 Marilla Street, 7DN
Dallas, Texas 75201
(214) 670-3519

Detective Dale Richardson
Dallas Police Department
1400 S. Lamar
Dallas, Texas 75215
214-671-3001

Detective R. Laurence
Dallas Police Department
1400 S. Lamar
Dallas, Texas 75215
214-671-3001

Detective Frederick Mends
Dallas Police Department
1400 S. Lamar
Dallas, Texas 75215
214-671-3001

Detective Steve David
Dallas Police Department
1400 S. Lamar
Dallas, Texas 75215
214-671-3001

Captain S. Stephens
Dallas Fire - Rescue
1500 Marilla Street, 7th Floor
214-670-3111

Lieutenant D. Cherry
Dallas Fire - Rescue
1500 Marilla Street, 7th Floor
214-670-3111

As permitted by Rule 33(d) of the Federal. Rules of Civil Procedure, please refer to COD 000001-99. Beyond that which is set forth in COD 000001-99, Defendant does not recall which pieces of information were gathered by each individual identified above.

**Interrogatory No. 7**: List each fact that you personally verified in Affidavits 1-6.

**Objections:** Defendant objects to this interrogatory because the terms "fact" and "verified" are unduly vague and undefined. When submitting an affidavit in support of a search warrant application, the law does not require the affiant to be able to prove the veracity of every piece of information set forth in the affidavit. Probable cause may be based upon information gleaned from many types of sources, such as hearsay, witness statements, business records or other documents, information provided by other investigators, and the affiant's own knowledge and observations. Therefore, Defendant shall interpret the phrase "fact that you personally verified" to mean information obtained from a source Defendant believed to be reliable.

**Answer:** Subject to the foregoing objection, Defendants answers that all of the information in Affidavits 1-6 was obtained from sources Defendant believed to be reliable, such as detectives' interviews of the victim's family members, friends and associates, physical evidence from the crime scene, Defendants' own observations, and information gathered by other detectives. As permitted by Rule 33(d) of the Federal. Rules of Civil Procedure, please refer to COD 000001-99.

**Interrogatory No. 8**: List all steps, procedures, and actions taken to verify your statement that Vodicka represented Aubrey in the defamation lawsuit as you stated in Affidavits 1-6.

**Objections:** Defendant objects to this interrogatory because the phrase "all steps, procedures, and actions taken to verify your statement " is unduly vague and undefined.

**Answer:** Defendant Sayers relied on Defendant Ermatinger's three Affidavits for Search Warrants executed on May 18, 2016. On information and belief, Defendant refers Plaintiff to COD 70, 74, 78-79 as permitted by Rule 33(d) of the Federal. Rules of Civil Procedure.

**Interrogatory No. 9**: List each item that you categorized as "evidence of a criminal offense" or that "constitutes evidence tending to show that a particular person committed a criminal offense" as stated in Affidavits 1 & 2 as follows: "There is at said suspected place and premises the following item(s) constituting evidence of a criminal offense or constituting evidence tending to show that a particular person committed a criminal offense."

Sayers' Answers to Vodicka's First Set of Interrogatories
*Aubrey et al. v. Ermatinger et al.*; Civil Cause No. 3:19-cv-0056-B                    Page 13

**Objections:** None.

**Answer:**  Defendant believed (and Dallas County District Judge Bennett found) that probable cause existed to believe that certain "evidence of a criminal offense" or items that "constitute[d] evidence tending to show that a particular person committed a criminal offense" might be found at 7777 Glen America #223 (Affidavit-1) or 8617 Southwestern Blvd #911 (Affidavit-2) in Dallas, Texas. These items of evidence are set forth in detail in paragraph 2 of Affidavit-1 and paragraph 2 of Affidavit-2.

**Interrogatory No. 10**: Identify the name, address, and phone number of each Tobolowsky family member who advised detectives that complainant Tobolowsky felt threatened by Steve Aubrey because of a lawsuit that complainant Tobolowsky won when he represented the mother of Steven Aubrey, Betsy Aubrey as you stated in Affidavits 1-6.

**Objections:**  None.

**Answer:**  To the best of Defendant's knowledge, recollection and belief, Defendant Sayers refers Plaintiff to Defendant Ermatinger's Answer to Interrogatory No. 8 issued by Plaintiff Brian Vodicka.

**Interrogatory No. 11**: Identify the name, address, and phone number of persons other than Tobolowsky family members who advised detectives that complainant Tobolowsky felt threatened by Steve Aubrey.

**Objections:**  None.

**Answer:**  On information and belief, Defendant refers Plaintiff to COD 000074 and 000099, as is permitted by Rule 33(d) of the Federal Rules of Civil Procedure.

**Interrogatory No. 12**: For each name identified in Interrogatory Nos. 10 and 11, provide the specific statements made by each.

**Objections:**  None.

**Answer:**  On information and belief, Defendant refers Plaintiff to Defendant Ermatinger's Answer to Interrogatory No. 2 issued by Plaintiff Steven Aubrey, and also to COD 000074 and 000099, as is permitted by Rule 33(d) of the Federal Rules of Civil Procedure.

Sayers' Answers to Vodicka's First Set of Interrogatories
*Aubrey et al. v. Ermatinger et al.*; Civil Cause No. 3:19-cv-0056-B                                        Page 14

App. 000038

**Interrogatory No. 13**: List all steps, procedures, and actions taken to verify that complainant Tobolowsky won when he represented Betsy Aubrey as reflected in Interrogatory No. 10.

**Objections:** None.

**Answer:** On information and belief, Defendant refers Plaintiff to Defendant Ermatinger's Answer to Interrogatory No. 4 issued by Plaintiff Steven Aubrey.

**Interrogatory No. 14**: Identify the document, by title and date filed, that is the factual basis for your following statement in Affidavits 1-6: "It was aledged in the lawsuit that Steven Aubrey threatened "Jihad" the same words used to describe the wars brought by terrorists, **and against his life** which was filed in court document number 15-08135 in the 14 Judicial district court judge Eric Moye presiding."

**Objections:** None.

**Answer:** Defendant Sayers relied upon paragraph 4 of Defendant Ermatinger's May 18, 2016 affidavit submitted as part of a search warrant application for 7777 Glen America #223. Upon information and belief, Defendant Sayers also refers Plaintiff to Defendant Ermatinger's Response to Interrogatory No. 4 issued by Plaintiff Brian Vodicka.

**Interrogatory No. 15**: For each document you identify in your answer to Interrogatory No. 14, identify the page number, paragraph, and exact statement or statements that form the factual basis of the statement in Affidavits 1-6: "It was aledged in the lawsuit that Steven Aubrey threatened "Jihad" the same words used to describe the wars brought by terrorists, **and against his life** which was filed in court document number 15-08135 in the 14 Judicial district court judge Eric Moye presiding."

**Objections:** None.

**Answer:** Defendant Sayers relied upon paragraph 4 of Defendant Ermatinger's May 18, 2016 affidavit submitted as part of a search warrant application for 7777 Glen America #223. Upon information and belief, Defendant Sayers also refers Plaintiff to Defendant Ermatinger's Response to Interrogatory Nos. 4 and 5 issued by Plaintiff Brian Vodicka.

**Interrogatory No. 16**: Provide the exact statement(s) you relied on when you stated in Affidavits 1-6: "It was aledged in the lawsuit that Steven Aubrey threatened "Jihad" the same words used to describe the wars brought by terrorists, **and against his life** which was filed in court document number 15-08135 in the 14 Judicial district court judge Eric Moye presiding."

**Objections:** None.

**Answer:** Defendant Sayers relied upon paragraph 4 of Defendant Ermatinger's May 18, 2016

Sayers' Answers to Vodicka's First Set of Interrogatories
*Aubrey et al. v. Ermatinger et al.*; Civil Cause No. 3:19-cv-0056-B                          Page 15

App. 000039

affidavit submitted as part of a search warrant application for 7777 Glen America #223.

**Interrogatory No. 17**: List all steps, procedures, and actions taken to verify your statement in Affidavits 1-6: "It was aledged in the lawsuit that Steven Aubrey threatened "Jihad" the same words used to describe the wars brought by terrorists, **and against his life** which was filed in court document number 15-08135 in the 14 Judicial district court judge Eric Moye presiding."

**Objections:** Defendant objects to this interrogatory because the term "verify" is unduly vague and undefined. When submitting an affidavit in support of a search warrant application, the law does not require the affiant to be able to prove the veracity of every piece of information set forth in the affidavit. Probable cause may be based upon information from many types of sources, such as hearsay, witness statements, business records or other documents, information provided by other investigators, and the affiant's own knowledge and observations. Therefore, Defendant shall interpret this interrogatory to be seeking the information on which Defendant relied when making the statement set forth in this interrogatory.

**Answer:**  Defendant Sayers relied upon paragraph 4 of Defendant Ermatinger's May 18, 2016 affidavit submitted as part of a search warrant application for 7777 Glen America #223.  Upon information and belief, Defendant Sayers also refers Plaintiff to Defendant Ermatinger's Response to Interrogatory Nos. 4 and 5 issued by Plaintiff Brian Vodicka.

**Interrogatory No. 18**: Identify in order of importance, the five facts that you believe create the strongest and most compelling probable cause in Affidavits 1& 2.

**Objections:**  None.

**Answer:**  No particular fact is stronger or more compelling than any other for purposes of establishing probable cause in Affidavits 1 and 2.  Probable cause exists when the facts and circumstances within an officer's knowledge, and of which they have reasonably trustworthy information, are sufficient in themselves to warrant a belief that a crime has been committed.  The probable cause for the referenced affidavit was based on the sum total of all of the information and the synthesis of what the Detectives involved in this case heard, knew, and observed, including but not limited to the following: allegations that Aubrey threatened "jihad" against Tobolowsky, contentious litigation between Tobolowsky and Plaintiffs, family members' statements that Tobolowsky felt threatened by Aubrey, and detectives' unsuccessful attempts to make contact with Plaintiffs.

**Interrogatory No. 19**: Identify in order of importance, the five facts that you believe create the strongest and most compelling probable cause in Affidavits 3 & 4.

**Objections:**  None.

**Answer:**  No particular fact is stronger or more compelling than any other for purposes of establishing probable cause in Affidavits 3 and 4.  Probable cause exists when the facts and

Sayers' Answers to Vodicka's First Set of Interrogatories
*Aubrey et al. v. Ermatinger et al.*; Civil Cause No. 3:19-cv-0056-B                                              Page 16

App. 000040

circumstances within an officer's knowledge, and of which they have reasonably trustworthy information, are sufficient in themselves to warrant a belief that a crime has been committed.  The probable cause for the referenced affidavit was based on the sum total of all of the information and the synthesis of what the Detectives involved in this case heard, knew, and observed, including but not limited to the following: allegations that Aubrey threatened "jihad" against Tobolowsky, contentious litigation between Tobolowsky and Plaintiffs, family members' statements that Tobolowsky felt threatened by Aubrey, and detectives' unsuccessful attempts to make contact with Plaintiffs.

**Interrogatory No. 20**: Identify in order of importance, the five facts that you believe create the strongest and most compelling probable cause in Affidavit-5.

**Objections:** None.

**Answer:**   No particular fact is stronger or more compelling than any other for purposes of establishing probable cause in Affidavit-5.  Probable cause exists when the facts and circumstances within an officer's knowledge, and of which they have reasonably trustworthy information, are sufficient in themselves to warrant a belief that a crime has been committed.  The probable cause for the referenced affidavit was based on the sum total of all of the information and the synthesis of what the Detectives involved in this case heard, knew, and observed, including but not limited to the following: allegations that Aubrey threatened "jihad" against Tobolowsky, contentious litigation between Tobolowsky and Plaintiffs, family members' statements that Tobolowsky felt threatened by Aubrey, and detectives' unsuccessful attempts to make contact with Plaintiffs.

**Interrogatory No. 21**: Identify in order of importance, the five facts that you believe create the strongest and most compelling probable cause in Affidavit-6.

**Objections:** None.

**Answer:** No particular fact is stronger or more compelling than any other for purposes of establishing probable cause in Affidavit-6.  Probable cause exists when the facts and circumstances within an officer's knowledge, and of which they have reasonably trustworthy information, are sufficient in themselves to warrant a belief that a crime has been committed.  The probable cause for the referenced affidavit was based on the sum total of all of the information and the synthesis of what the Detectives involved in this case heard, knew, and observed, including but not limited to the following: allegations that Aubrey threatened "jihad" against Tobolowsky, contentious litigation between Tobolowsky and Plaintiffs, family members' statements that Tobolowsky felt threatened by Aubrey, and detectives' unsuccessful attempts to make contact with Plaintiffs.

## VERIFICATION

THE STATE OF TEXAS      §
                        §
COUNTY OF DALLAS        §

BEFORE ME, the undersigned authority, on this day personally appeared _Scott Sayers_, a person who proved his identity to me with a government-issued identification card, and who, being by me first duly sworn, on his oath deposed and said under penalty of perjury that he is authorized to make this Verification and he has read the answers contained in the above and foregoing Answers, and that all factual statements contained in said document are true and correct.

_Scott Sayers_
Signature

Scott Sayers
Printed Name

SUBSCRIBED AND SWORN TO before me on this the **19th** day of **May** 2020, to certify which, witness my Hand and Seal of Office.

(SEAL) 

PATRICIA SHAKE
Notary Public
STATE OF TEXAS
ID.#3586603
My Comm. Exp. May 27, 2022

Notary Public

8

App. 000042

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

STEVEN B. AUBREY, and §
BRIAN E. VODICKA, §
       Plaintiffs, §
§
v. §
§ CIVIL ACTION NO.
ROBERT L. ERMATINGER, JR., § 3:19-CV-056-B
SCOTT ROBERT SAYERS, §
       Defendants. §

**DEFENDANT ROBERT ERMATINGER'S ANSWERS TO
VODICKA'S FIRST SET OF INTERROGATORIES**

To:    Plaintiff Brian Vodicka, 2601 NW 3rd Ave, Wilton Manors, FL 33311.

        Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Defendant Robert

Ermatinger serves the following objections and answers to Vodicka's First Set of Interrogatories:

                      Respectfully submitted,

                      CITY ATTORNEY OF THE CITY OF DALLAS

                      Christopher J. Caso
                      City Attorney

                      */s/ Lindsay Wilson Gowin*
                      Senior Assistant City Attorney
                      Texas State Bar No. 24111401
                      lindsay.gowin@dallascityhall.com

                      Devin Alexander
                      Senior Assistant City Attorney
                      Texas State Bar No. 24104554
                      devin.alexander@dallascityhall.com

App. 000043

7BN Dallas City Hall
1500 Marilla Street
Dallas, Texas 75201
Telephone:     214-670-3519
Facsimile:     214-670-0622

ATTORNEYS FOR DEFENDANT ROBERT L.
ERMATINGER

## CERTIFICATE OF SERVICE

I certify that on May 22, 2020, a copy of the foregoing document was served via e-mail on Plaintiffs Steven Aubrey and Brian Vodicka at their shared e-mail address of record: defamationperse@gmail.com.

*Lindsay Wilson Gowin*
Senior Assistant City Attorney

Ermatinger's Answers to Vodicka's First Set of Interrogatories
*Aubrey et al. v. Ermatinger et al*.; Civil Cause No. 3:19-cv-0056-B                    Page 2

App. 000044

## OBJECTIONS AND ANSWERS TO INTERROGATORIES

**Interrogatory No. 1**: Identify by name, job description, address, and phone number each and every person who participated in preparing your Affidavit for Search Warrant related to Brian Edward Vodicka and executed by you on May 18, 2016 ("***Affidavit-1***").

**Objections:**   None.

**Answer:**   Former Dallas Police Department Detective Robert Ermatinger
c/o Lindsay Wilson Gowin
Dallas City Attorney's Office
1500 Marilla Street, 7DN
Dallas, Texas 75201
214-670-3519

**Interrogatory No. 2**: Identify by name, job description, address, and phone number, each and every person who participated in preparing your Affidavit for Search Warrant related to 7777 Glen America #223, Dallas, Dallas County, Texas and executed by you on May 18, 2016 ("***Affidavit-2***").

**Objections:**   None.

**Answer:**   Former Dallas Police Department Detective Robert Ermatinger
c/o Lindsay Wilson Gowin
Dallas City Attorney's Office
1500 Marilla Street, 7DN
Dallas, Texas 75201
214-670-3519

**Interrogatory No. 3**: Identify the exact statements you relied on when you stated it was alleged Steven Aubrey threatened Jihad as reflected in *Affidavit-1* as follows: "It was alleged in the lawsuit that Steven Aubrey threatened "Jihad" the same words used to describe the wars brought by terrorists, which was filed in court docket number 15-08135 in the 14th Judicial District Court Judge Eric Moye presiding."

**Objections:**  None.

**Answer:**  As permitted by Rule 33(d) of the Federal. Rules of Civil Procedure, please refer to the Petition filed on Ira Tobolowky's behalf in *Tobolowsky v. Aubrey, et al*., Case No. 15-08135, and also COD 000070-71, 74, 78-79, 85, 95.

Ermatinger's Answers to Vodicka's First Set of Interrogatories
*Aubrey et al. v. Ermatinger et al*.; Civil Cause No. 3:19-cv-0056-B                                      Page 3

App. 000045

**Interrogatory No. 4**: Identify the document by title and date filed that is the factual basis for the following statement in *Affidavit-2*:
"It was aledged in the lawsuit that Steven Aubrey threatened "Jihad" the same words used to describe the wars brought by terrorists, **and against his life** which was filed in court document number 15-08135 in the 14 Judicial district court judge Eric Moye presiding."

**Objections:**  None.

**Answer:** As permitted by Rule 33(d) of the Federal. Rules of Civil Procedure, please refer to the Petition filed on Ira Tobolowky's behalf in *Tobolowsky v. Aubrey, et al*., Case No. 15-08135, and also COD 000070-71, 74, 78-79, 85, 95. Defendant does not recall whether every concept in the specified sentence was based upon a particular document. Defendant also relied on information provided by members of the victim's family.

**Interrogatory No. 5**: Referencing the document you identify in your answer to Interrogatory No. 3, identify the page number, paragraph, and exact statement or statements that form the factual basis of the following statement in *Affidavit-2*:
"It was aledged in the lawsuit that Steven Aubrey threatened "Jihad" the same words used to describe the wars brought by terrorists, **and against his life** which was filed in court document number 15-08135 in the 14 Judicial district court judge Eric Moye presiding."

**Objections:** None.

**Answer:** Defendant refers Plaintiff to the Answer to Interrogatory No. 4 above.

**Interrogatory No. 6**: List all steps, procedures, and actions taken to verify the statement in *Affidavit-2*:
"It was aledged in the lawsuit that Steven Aubrey threatened "Jihad" the same words used to describe the wars brought by terrorists, **and against his life** which was filed in court document number 15-08135 in the 14 Judicial district court judge Eric Moye presiding."

**Objections:**  None.

**Answer:** Defendant reviewed related documents, and also relied upon information provided to him and other investigators by the victim's family and associates.  As permitted by Rule 33(d) of the Federal. Rules of Civil Procedure, Defendant refers Plaintiff to COD 000074, 78, 85-86, 99.

Ermatinger's Answers to Vodicka's First Set of Interrogatories
*Aubrey et al. v. Ermatinger et al*.; Civil Cause No. 3:19-cv-0056-B                    Page 4

App. 000046

**Interrogatory No. 7**: Regarding the statement identified in Interrogatory No. 6, explain in detail the basis for adding the phrase "and against his life" in *Affidavit-2* when the same statement was included in *Affidavit-1* did not include the phrase "and against his life."

**Objections:** None.

**Answer:** Various members of the victim's family told Defendant Ermatinger that the victim felt threatened by Plaintiff Aubrey as a result of the extremely hostile actions and language Aubrey had repeatedly directed at the victim. Defendant Ermatinger had many conversations with various members of the Tobolowsky family, and does not recall the specific statements made by each person.

**Interrogatory No. 8**: By name, address, and phone number, identify each Tobolowsky family member who advised detectives that complainant Tobolowsky felt threatened by Steve Aubrey because of a lawsuit that complainant Tobolowsky won when he represented the mother of Steven Aubrey, Betsy Aubrey as you stated in *Affidavits1 & 2*.

**Objections:** None.

**Answer:** Defendant Ermatinger had many conversations with various members of the Tobolowsky family, and does not recall the specific statements made by each person. However, he recalls that the following individuals gave information on the topic described in Interrogatory No. 8:

Stacy Paddock
Street Address Unknown
Washington, D.C.
301-351-7670

George Tobolowsky
12 Royal Way
Dallas, Texas 75229
214-533-1133

Michael Tobolowsky
Address Unknown
469-878-4515

**Interrogatory No. 9**: For each name identified in Interrogatory No. 8, provide the specific statements made by each.

**Objections:** None.

**Answer:** Defendant Ermatinger had many conversations with various members of the Tobolowsky family, and does not recall the specific statements made by each person.

Ermatinger's Answers to Vodicka's First Set of Interrogatories
*Aubrey et al. v. Ermatinger et al*.; Civil Cause No. 3:19-cv-0056-B                                    Page 5

App. 000047

**Interrogatory No. 10**: List all steps, procedures, and actions taken to verify your statement that complainant Tobolowsky had won a lawsuit as reflected in *Affidavits1 & 2* as follows: "a lawsuit that complainant Tobolowsky won when he represented the mother of Steven Aubrey, Betsy Aubrey"

**Objections:**  None.

**Answer:** Defendant relied on information he and other investigators gleaned from interviewing the victim's family members and associates, and from reviewing documents filed by parties to the lawsuit. As permitted by Rule 33(d) of the Federal. Rules of Civil Procedure, please refer to COD 000074, 78, 85-86, 99.

**Interrogatory No. 11**: List all steps, procedures, and actions taken to verify each allegation in the lawsuit in Cause No. DC-15-08135 in the 14th Judicial District Court, Dallas County, Texas.

**Objections:**  None.

**Answer:**  Defendant reviewed related documents, and also evaluated information provided to him and other investigators by the victim's family and associates.  As permitted by Rule 33(d) of the Federal. Rules of Civil Procedure, please refer to COD 000074, 78, 85-86, 99.

**Interrogatory No. 12**: Identify any document authored by Brian Vodicka in which the term "Jihad" is used in relation to Ira Tobolowsky or was ever used.

**Objections:**  None.

**Answer:** Defendant Ermatinger is not aware of any document in which Brian Vodicka used the term "Jihad" in relation to Ira Tobolowsky.

**Interrogatory No. 13**: Please set forth the factual basis for your statement that Ira Tobolowsky felt Jihad was an anti-Semitic statement [sic] word and your reason for including the factoid in *Affidavits1 & 2*:

**Objections:**  None.

**Answer:**   Several members of Ira Tobolowsky's family told Defendant Ermatinger that Ira Tobolowsky had believed that the use of the word "jihad" was anti-Semitic, and the family members shared Ira Tobolowsky's view. Affidavits submitted in support of a search warrant application are summaries and syntheses of the information known to the affiant at that time, incorporating what all of the investigators involved with the case have learned and observed. Plaintiff Aubrey's use of the word "jihad" and the Tobolowskys' reaction to it was part of the totality of the circumstances present of which Detective Ermatinger was aware at the time he sought the search warrant.

Ermatinger's Answers to Vodicka's First Set of Interrogatories
*Aubrey et al. v. Ermatinger et al.*; Civil Cause No. 3:19-cv-0056-B                                    Page 6

App. 000048

**Interrogatory No. 14**: Identify the date and time you called Brian Vodicka's phone number as stated in *Affidavit-1*.

**Objections:** None.

**Answer:** On May 18, 2016, at approximately 3:00 p.m., a telephone call was made to Brian Vodicka.

**Interrogatory No. 15**: Identify the date, time, and content of the text message that you sent Brian Vodicka, as stated in *Affidavit-1*.

**Objections:** None.

**Answer:** On May 18, 2016, at approximately 3:00 p.m., a text message was sent to Brian Vodicka. The content of the message essentially was a request for Plaintiff to call Ermatinger.

**Interrogatory No. 16**: In *Affidavit-1* you stated, "Detectives were notified that Steven Aubrey's card was used to book a hotel room at the Crowne Plaza Hotel in Dallas, Texas, but the room was booked under the name Alexandria Krot." When and how did you, or any other Dallas Police Department employee, verify that Steven Aubrey did not check into the Crowne Plaza Hotel on May 18, 2016?

**Objections: None.**

**Answer:** As permitted by Rule 33(d) of the Federal Rules of Civil Procedure, please refer to the documents Bates-stamped COD 000076-77 produced in response to Plaintiffs' First Request for Production.

**Interrogatory No. 17**: Identify the name, address, phone number, badge number and position in the department of the Dallas Police Department officers who followed, stopped and questioned Alexandra Krot at the DFW airport on May 18, 2016.

**Objections:** None.

**Answer**: Defendant does not recall the information requested in Interrogatory No. 12.

Ermatinger's Answers to Vodicka's First Set of Interrogatories
*Aubrey et al. v. Ermatinger et al.*; Civil Cause No. 3:19-cv-0056-B                                    Page 7

App. 000049

**Interrogatory No. 18**: Identify the number, expiration date and name on the face of the credit card that you represented was used at a truck stop in Belton, Texas approximately 2 ½ hours after you represented sent Brian Vodicka a text message as described in *Affidavit-1*.

**Objections:** None.

**Answer:** Detective Ermatinger does not know the number, expiration date and name on the face of the credit card in question, and does not believe that he ever knew that information.

**Interrogatory No. 19**: Identify the name, address and telephone number of the truck stop in Belton, Texas as stated in *Affidavit-1*.

**Objections:** None.

**Answer:** Detective Ermatinger does not know the name, address and telephone number of the truck stop in Belton, Texas mentioned in Affidavit-3, and does not believe that he ever knew that information.

**Interrogatory No. 20**: Please set forth the factual basis for your representation that Aubrey's card was used at a "truck stop" in Belton, Texas as stated in *Affidavit-1*.

**Objections:** None.

**Answer:** Plaintiffs' names and other identifying information were provided to investigators within the United States Marshals Service. It is Detective Ermatinger's understanding that an investigator at the United States Marshal conveyed Plaintiffs' information to personnel at financial institutions used by Plaintiffs, who then notified the investigator whenever the credit card at issue was used. The investigator then called Defendant and relayed that information.

**Interrogatory No. 21**: Explain in detail your basis for asserting Plaintiffs were hiding from the public as reflected in *Affidavit-2*, which stated, "No one answered the door and neighbors stated that they have not seen either Steven Aubrey or Brian Vodicka since Saturday the 14th of May 2016 and they have not heard any occupants walking around inside" when you were tracking Plaintiffs credit card transactions and cell phone locations, which prove Plaintiffs were completely engaged with the public on a daily going out to restaurants, grocery stores and the fitness center.

**Objections:** None.

**Answer:** The quoted sentence does not reflect an assertion that "Plaintiffs were hiding from the public."

Ermatinger's Answers to Vodicka's First Set of Interrogatories
*Aubrey et al. v. Ermatinger et al.*; Civil Cause No. 3:19-cv-0056-B                                    Page 8

App. 000050

**Interrogatory No. 22**: Identify by name, address, phone number, and date and time of contact, the "neighbors" that gave statements regarding Plaintiffs whereabouts and lack of walking around sounds as reflected in the statement identified in Interrogatory No. 21.

**Objections:** None.

**Answer:** As permitted by Rule 33(d) of the Federal Rules of Civil Procedure, please see COD 000071.

Ermatinger's Answers to Vodicka's First Set of Interrogatories
*Aubrey et al. v. Ermatinger et al.*; Civil Cause No. 3:19-cv-0056-B                                    Page 9

App. 000051

## VERIFICATION

THE STATE OF TEXAS    §
                      §
COUNTY OF DALLAS      §

BEFORE ME, the undersigned authority, on this day personally appeared  a person who proved his identity to me with a government-issued identification card, and who, being by me first duly sworn, on his oath deposed and said under penalty of perjury that he is authorized to make this Verification and he has read the answers contained in the above and foregoing Answers, and that all factual statements contained in said document are true and correct.

_____
Signature

Robert L. Ermatinger
Printed Name

SUBSCRIBED AND SWORN TO before me on this the 19th day of May 2020, to certify which, witness my Hand and Seal of Office.

(SEAL)

PATRICIA SHAKE
Notary Public
STATE OF TEXAS
ID#3586603
My Comm. Exp. May 27, 2022

_____
Notary Public

8

App. 000052



## HIGHLAND DERMATOLOGY

**AUBREY, STEVE**

55 Y old  Male, DOB: 10/11/1960
Account Number: ▮
7777 GLEN AMERICA DR, APT 223, DALLAS, TX-75225-1836
Home: 512-659-7234
Guarantor: AUBREY, STEVE    Insurance: Blue Cross Blue
Shield HMO BLUE
PCP: STEVEN POUNDERS, MD    Referring: STEVEN POUNDERS, MD
Appointment Facility: Highland Dermatology & Plastic Surgery

---

04/28/2016                                    Progress Note:  Amanda Jo Wolthoff, MD

### Reason for Appointment
1. EST/CYST REMOVAL

### History of Present Illness
Excision:
   Cyst Pt c/o cyst on the R upper back growing painful draining white material After discussing options of no treatment, ILK, I&D and excision patient elected to have cyst excised. Pt is now here for excision..

### Current Medications
**Taking**
- Aspirin 75 MG Tablet Chewable 1 tablet Once a day
- Folic Acid 1 MG Tablet 1 tablet Once a day
- Selenium 100 MCG Tablet 1 tablet Once a day
- Magnesium 300 MG Capsule 1 capsule with a meal Once a day
- Calcium 1 tab
- Multivitamin Liquid
- Fish Oil 1000 MG Capsule 1 capsule Once a day
- Vitamin D 400 UNIT Capsule 2 capsules Once a day
- ▮
- ▮

### Social History
Tobacco Use:
   Tobacco Use/Smoking  Are you a: nonsmoker .
Drugs/Alcohol:
   Do you drink alcohol?: Yes.

### Allergies
N.K.D.A.

### Review of Systems
All Other Systems:
   Review of Systems (ROS) **A focused review of systems was performed including Constitutional / Symptom and Integumentary and was notable for no other skin complaints and the patient is otherwise feeling well.**.

### Examination
**Exam Performed:**
   Multi-Focal Exam A multi-focal exam was performed including the following:, head (including face), back.
**General Examination:**
   GENERAL APPEARANCE: in no acute distress, well developed, well nourished.
*Lesions:
   Neoplasm Uncertain Behavior 16mm irregular, erythematous, subcutaneous nodule R upper back.

---

Patient: AUBREY, STEVE   DOB: 10/11/1960    Progress Note: Amanda Jo Wolthoff, MD   04/28/2016
*Note generated by eClinicalWorks EMR/PM Software (www.eClinicalWorks.com)*

https://txplsuapp.ecwcloud.com/mobiledoc/jsp/catalog/xml/printMultipleChartOptions.jsp?...  4/10/2017

App. 000053

## Assessments
1. Neoplasm of uncertain behavior of skin - D48.5 (Primary)

## Treatment
### 1. Neoplasm of uncertain behavior of skin
Start Tramadol HCl Tablet, 50 MG, 1-2 tablet as needed, Orally, every 6 hrs, 07 days, 30, Refills 0
Notes: Excision today; see procedure note below for details.

## Procedures
AW: Excision:
  Excision  Plan: Elliptical Excision Diagnosis: EIC doubt otherIndication: Painful, growing, not healing.
Location: R upper back Preop Size: 1.6cm. Margins: 0.0 cm. Total Excised Diameter: 1.6cm. Procedure: The
area was prepped with Alcohol and Betadine and draped in the usual fashion. Anesthesia: local infiltration-1%
lidocaine with epinephrine (3cc total). An elliptical excision was performed, on the LOCATION, with a 15 blade.
The margin was drawn around the clinically apparent lesion. An elliptical shape was then drawn on the skin
incorporating the lesion and margins. Incisions were then made along these lines to the appropriate tissue
plane and the lesion was extirpated. The lesion was excised to the layer of the adipose tissue. Intermediate
layered repair was performed. Undermining was performed with blunt dissection. Hemostasis was achieved
with electrocautery. Estimated Blood Loss: minimal. Complications: none. The dermal sutures were 4-0 Vicryl.
Epidermal closure was achieved with 5-0 Prolene (simple running). The final wound length was 3.8cm.
Bacitracin + dry sterile dressing were applied. I reviewed with the patient in detail post-care instructions.
Patient is not to engage in any heavy lifting, exercise, or swimming for the next 14 days. Should the patient
develop any fevers, chills, bleeding, severe pain patient will contact the office immediately. Suture removal in 14
days. Consent was obtained from the patient. The risks and benefits to therapy were discussed in detail.
Specifically, the risks of infection, scarring, bleeding, prolonged wound healing, incomplete removal, allergy to
anesthesia, nerve injury and recurrence were addressed. Prior to the procedure, the treatment site was clearly
identified and confirmed by the patient. All components of Universal Protocol/PAUSE Rule completed.

## Preventive Medicine
*Skin Counseling:
  Excision Consult  Location: R upper back Indication Pre-op Size: _ Review : An extensive history and exam
was performed with attention to the tumor size, anatomic location, duration and histologic growth pattern and
the patient's overall medical status and co-morbidities. Treatment Options : The treatment options for patient's
skin cancer were reviewed with the patient in detail. These include local excision, Mohs surgery,
electrodessication and curettage, sentinel lymph node biopsy, topical chemotherapy and possible systemic
chemotherapy. Given the indications and histologic features of the patient's tumor the patient has agreed to
proceed with local excision. Risks and Benefits : The rationale for excision was explained to the patient. The
risks and benefits to therapy were discussed in detail. Specifically, the risks of infection, scarring, bleeding,
dehiscence, hematoma, prolonged wound healing, incomplete removal, allergy to anesthesia, nerve injury, and
recurrence were addressed. The treatment site was clearly identified and confirmed by the patient. Follow Up :
The patient will be scheduled for excision in the next few weeks. After the appropriate surgical follow-up, the
patient will be referred back to their referring physician for further care .
*Skin Lesion:
  Neoplasm Uncertain Behavior of Skin  Instructions: Neoplasms of Uncertain Behavior can be observed,
biopsied or surgically removed depending on the level of clinical suspicion. Contact Office if: patient develops
any new lesions that fail to heal, ulcerate or bleed. .

## Procedure Codes
11402 EXC TR-EXT B9 MARG 1.1-2 CM
12032 LAYER CLOSURE OF WOUND(S)

## Follow Up
2 Weeks (Reason: SR)

Patient: AUBREY, STEVE   DOB: 10/11/1960   Progress Note: Amanda Jo Wolthoff, MD   04/28/2016
Note generated by eClinicalWorks EMR/PM Software (www.eClinicalWorks.com)

https://txplsuapp.ecwcloud.com/mobiledoc/jsp/catalog/xml/printMultipleChartOptions.jsp?...  4/10/2017

App. 000054



**Electronically signed by DR. AMANDA WOLTHOFF MD on 04/28/2016 at 05:10 PM CDT**
**Sign off status: Completed**

Highland Dermatology & Plastic Surgery
3607 Oak Lawn Avenue, Ste 200
Dallas, TX 75219-4311
Tel: 469-941-4212
Fax: 469-941-4199

Patient: AUBREY, STEVE   DOB: 10/11/1960   Progress Note: Amanda Jo Wolthoff, MD   04/28/2016

*Note generated by eClinicalWorks EMR/PM Software (www.eClinicalWorks.com)*

| Dermatopathology | Physician Inquiries: (214) 237-1660 |
|---|---|

Physician: Amanda Jo Wolthoff, MD
Account: Highland Dermatology-G40966
Ste 200
3607 Oak Lawn Ave
Dallas, TX 75219

 **ProPath**®

| | |
|---|---|
| Accession #: | **SS16-60297** |
| Taken: | 4/28/2016 |
| Received: | 4/28/2016 |
| Reported: | 4/29/2016 |
| Requisition: | D001289085 |

PATIENT NAME: **Aubrey, Steve**          DOB: **10/11/1960 (Age: 55)**          GENDER: M
MRN:          15711

## Final Diagnosis

**A.  Skin, right upper back:**
   **- Epidermoid cyst.**

gxm2/4/29/2016
ICD Code(s):  A; L72.0

***Electronically Signed Out***
Robert M. Law, MD
Board Certified Dermatopathologist

## Microscopic Description

A.  The stain quality is adequate unless specified otherwise.  Histologic sections are of skin.  There is a dermally based unilocular cyst lined by stratified squamous epithelium with a granular cell layer.  The cyst contents are comprised of basket-woven keratogenous debris.

## Gross Description     Services performed: ProPath, 1355 River Bend Dr, Dallas, TX 75247

A.  Submitted in formalin and designated "right upper back" are a gray, firm, circumscribed nodule with an attached skin ellipse and fatty tissue measuring 2.0 x 1.1 x 0.9 cm.  The skin ellipse is 2.0 x 0.6 cm.  The specimen is inked green.  There is a 0.8 cm cyst containing white soft material.  A representative section is submitted as (A1).

MRP/slg

## Clinical History

EIC doubt other; D48.5 Neoplasm of uncertain behavior

**ProPath Services, LLP  ·  1355 River Bend Drive  ·  Dallas, TX 75247**
**(214) 638-2000 or (800) 258-1253  ·  Fax: (214) 237-1731**

App. 000056



**AUBREY, STEVE**

55 Y old  Male, DOB: 10/11/1960
Account Number: ▆
7777 GLEN AMERICA DR, APT 223, DALLAS, TX-75225-1836
Home: 512-659-7234
Guarantor: AUBREY, STEVE   Insurance: Blue Cross Blue
Shield HMO BLUE Payer ID: ▆
PCP: STEVEN POUNDERS, MD   Referring: STEVEN POUNDERS, MD
Appointment Facility: Highland Dermatology & Plastic Surgery

05/13/2016                                                          SR:  Amanda Jo Wolthoff, MD

**Current Medications**
None

**Reason for Appointment**
1. S/R

**Electronically signed by DR. AMANDA WOLTHOFF MD on 04/21/2017 at 12:37 PM CDT**

**Sign off status: Pending**

**Highland Dermatology & Plastic Surgery**
**3607 Oak Lawn Avenue, Ste 200**
**Dallas, TX 75219-4311**
**Tel: 469-941-4212**
**Fax: 469-941-4199**

Patient: AUBREY, STEVE   DOB: 10/11/1960   Progress Note: Amanda Jo Wolthoff, MD   05/13/2016

Note generated by eClinicalWorks EMR/PM Software (www.eClinicalWorks.com)



**Page 1 of 3**
Customer Service 1-800-955-7070
www.capitalone.com

Apr. 16 - May. 15, 2016   30 Days in Billing Cycle

**LATE PAYMENT WARNING:** If we do not receive your minimum payment by your due date, you may have to pay a late fee of up to $35.00 and your APRs may be increased up to the Penalty APR of 29.65%.

World MasterCard                                    Account ending in 4252

| NEW BALANCE | MINIMUM PAYMENT | DUE DATE |
|---|---|---|
| $0.00 | $0.00 | Jun 12, 2016 |

PLEASE PAY AT LEAST THIS AMOUNT

Revolving Credit Limit: $30,000.00          Cash Advance Credit Limit: $15,000.00
Available Revolving Credit: $30,000.00     Available Credit for Cash Advances: $15,000.00

| Previous Balance | | Payments and Credits | | Fees and Interest Charged | | Transactions | | New Balance |
|---|---|---|---|---|---|---|---|---|
| ($10,698.41) | – | $0.00 | + | $0.00 | + | $10,698.41 | = | $0.00 |

## TRANSACTIONS

**PAYMENTS, CREDITS & ADJUSTMENTS FOR STEVE B AUBREY #4252**

**TRANSACTIONS FOR STEVE B AUBREY #4252**

| | | | |
|---|---|---|---|
| 1 | 13 APR | WHATABURGER 1013DALLASTX | $6.92 |
| 2 | 13 APR | WAL-MART #5823DALLASTX | $7.79 |
| 3 | 15 APR | FEDEX 782838507676MEMPHISTN | $25.75 |
| 4 | 15 APR | WM SUPERCENTER #5823DALLASTX | $23.38 |
| 5 | 15 APR | IKEA-FRISCOFRISCOTX | $215.40 |
| 6 | 15 APR | CHIPOTLE 0314DALLASTX | $8.98 |
| 7 | 15 APR | THE HOME DEPOT 6503DALLASTX | $19.38 |
| 8 | 15 APR | BODY LOGIC 80066233FARMERS BRANCTX | $39.51 |
| 9 | 16 APR | QT 904    08009045DALLASTX | $30.24 |
| 10 | 16 APR | CHICK-FIL-A #02801DALLASTX | $3.24 |
| 11 | 17 APR | WM SUPERCENTER #5823DALLASTX | $10.22 |
| 12 | 17 APR | THE HOME DEPOT 6804DALLASTX | $17.33 |
| 13 | 18 APR | TX DPS DLAUSTINTX | $11.00 |
| 14 | 18 APR | TX DPS DLAUSTINTX | $11.00 |
| 15 | 18 APR | THE HOME DEPOT 6503DALLASTX | $123.58 |

Transactions continue on page 2

## REWARDS INFORMATION - STEVE B AUBREY

| | |
|---|---|
| PREVIOUS AVAILABLE REWARDS BALANCE | 43,123 |
| REWARDS EARNED THIS PERIOD | 11,437 |
| (reflects transactions posted during this billing cycle) | |
| AVAILABLE BALANCE AS OF 05/15/2016 | 54,560 |

**For up-to-date rewards tracking, visit**
**www.capitalone.com**

## INTEREST CHARGE CALCULATION

**Your Annual Percentage Rate (APR)** is the annual interest rate on your account.

| Type of Balance | Annual Percentage Rate (APR) | Balance Subject to Interest Rate | Interest Charge |
|---|---|---|---|
| Purchases | 15.15% P | $0.00 | $0.00 |
| Cash Advances | 25.15% P | $0.00 | $0.00 |

P,L,D,F = Variable Rate. See reverse of page 1 for details

PLEASE RETURN PORTION BELOW WITH PAYMENT OR LOG ON TO WWW.CAPITALONE.COM TO MAKE YOUR PAYMENT ONLINE.

1  5178058471834252  15  0000000000000000000

**Account ending in 4252**

| Due Date | New Balance | Minimum Payment | Amount Enclosed |
|---|---|---|---|
| Jun 12, 2016 | $0.00 | $0.00 | . |

PLEASE PAY AT LEAST
THIS AMOUNT

**ENJOY 24/7 ACCESS TO YOUR ACCOUNT**
Log in and manage your account online at www.capitalone.com

• Pay bills
• Check your balance
• Review transactions

400018

STEVE B AUBREY
7777 GLEN AMERICA DR APT 223
DALLAS, TX 75225-1836



Capital One Bank (USA), N.A.
P.O. Box 60599
City of Industry, CA 91716-0599

1  5178058471834252  15  0000000000000000000



**Page 2 of 3**
Customer Service 1-800-955-7070
www.capitalone.com

| Apr. 16 - May. 15, 2016 | 30 Days in Billing Cycle |
|---|---|

---

**World MasterCard**  Account ending in 4252

| NEW BALANCE | MINIMUM PAYMENT | DUE DATE |
|---|---|---|
| $0.00 | $0.00 | Jun 12, 2016 |

| | |
|---|---|
| Revolving Credit Limit: | $30,000.00 |
| Available Revolving Credit: | $30,000.00 |
| Cash Advance Credit Limit: | $15,000.00 |
| Available Credit for Cash Advances: | $15,000.00 |

| Previous Balance | – | Payments and Credits | + | Fees and Interest Charged | + | Transactions | = | New Balance |
|---|---|---|---|---|---|---|---|---|
| ($10,698.41) | | $0.00 | | $0.00 | | $10,698.41 | | $0.00 |

---

## TRANSACTIONS CONTINUED

**TRANSACTIONS FOR STEVE B AUBREY #4252 (CONTINUED)**

| | | | |
|---|---|---|---|
| 16 | 18 APR | KAZE JAPANESE HIBACHIDALLASTX | $32.93 |
| 17 | 19 APR | AMAZON MKTPLACE PMTSAMZN.COM/BILLWA | $109.99 |
| 18 | 19 APR | CENTRAL MARKET #552DALLASTX | $41.12 |
| 19 | 19 APR | WAL-MART #5823DALLASTX | $28.45 |
| 20 | 20 APR | THE UPS STORE 0355DALLASTX | $6.00 |
| 20 | 20 APR | TACO BUENO DALLAS 13DALLASTX | $6.16 |
| 20 | 20 APR | THE HOME DEPOT 6804DALLASTX | $6.67 |
| 23 | 21 APR | FERNANDO'S MEXICAN CUI214-351-9010TX | $41.81 |
| 24 | 21 APR | TACO BUENO DALLAS 13DALLASTX | $5.19 |
| 25 | 23 APR | AMAZON MKTPLACE PMTSAMZN.COM/BILLWA | $12.25 |
| 26 | 23 APR | NETFLIX.COMLOS GATOSCA | $10.81 |
| 27 | 23 APR | SENTRY GROUP05853814900NY | $16.24 |
| 28 | 23 APR | THE UPS STORE 0355DALLASTX | $6.00 |
| 29 | 23 APR | TRADER JOE'S #401 QPSDALLASTX | $33.99 |
| 30 | 24 APR | AMAZON MKTPLACE PMTSAMZN.COM/BILLWA | $14.99 |
| 31 | 24 APR | SNUFFERS - PARK CITIESDALLASTX | $27.88 |
| 32 | 25 APR | PEPBOYS STORE 179DALLASTX | $10.81 |
| 33 | 25 APR | KFC J625002  21050026DALLASTX | $5.15 |
| 34 | 25 APR | WAYFAIR*WAYFAIRWAYFAIR.COMMA | $178.60 |
| 35 | 26 APR | VZWRLSS*APOCC VISE800-922-0204NJ | $118.91 |
| 36 | 27 APR | USR-ELECTRICBILL08556003859TX | $49.22 |
| 37 | 27 APR | QT 904   08009045DALLASTX | $27.36 |
| 38 | 28 APR | EL FENIX-NORTHWESTDALLASTX | $38.81 |
| 39 | 28 APR | TACO BUENO DALLAS 4DALLASTX | $7.77 |
| 40 | 28 APR | TRADER JOE'S #401 QPSDALLASTX | $20.84 |
| 41 | 28 APR | TOM THUMB STOR00036087DALLASTX | $9.46 |
| 42 | 29 APR | CICIS PIZZA STORE 795DALLASTX | $8.64 |
| 43 | 30 APR | TWC*TIME WARNER CABLE888-TWCABLETX | $15.07 |
| 44 | 01 MAY | ROMAS PIZZA & PASTA GRDALLASTX | $33.15 |
| 45 | 01 MAY | ETT*NORTHBRIDGERENT801-8775491TX | $1,393.09 |
| 46 | 01 MAY | TACO BUENO DALLAS 13DALLASTX | $7.99 |
| 47 | 01 MAY | THE HOME DEPOT 6804DALLASTX | $3.97 |
| 48 | 02 MAY | HOWARD WANGS CHINA GRIDALLASTX | $29.40 |
| 49 | 03 MAY | QT 904   08009045DALLASTX | $33.13 |
| 50 | 03 MAY | THE HOME DEPOT 6804DALLASTX | $2.14 |
| 51 | 03 MAY | WHATABURGER 1013DALLASTX | $6.92 |
| 52 | 03 MAY | WHATABURGER 1013DALLASTX | $3.62 |
| 53 | 04 MAY | CICIS PIZZA STORE 795DALLASTX | $8.64 |
| 54 | 04 MAY | PROPERTY PAYMENTRENTGOLETACA | $1,413.27 |
| 55 | 05 MAY | EL FENIX-NORTHWESTDALLASTX | $20.21 |
| 56 | 05 MAY | THE HOME DEPOT 6804DALLASTX | $10.01 |
| 57 | 05 MAY | THE HOME DEPOT 6804DALLASTX | $4.19 |
| 58 | 06 MAY | TARGET   00000554DALLASTX | $36.78 |
| 59 | 06 MAY | GRINDR8778877815CA | $35.94 |
| 60 | 08 MAY | PAPPADEAUX SEAFOOD KITRICHARDSONTX | $54.25 |
| 61 | 08 MAY | WAL-MART #5823DALLASTX | $35.50 |
| 62 | 08 MAY | WHATABURGER 1013DALLASTX | $6.92 |
| 63 | 09 MAY | TACO BUENO DALLAS 13DALLASTX | $6.69 |
| 64 | 09 MAY | ADOBE800-833-6687CA | $10.65 |

**TRANSACTIONS FOR STEVE B AUBREY #4252 (CONTINUED)**

| | | | |
|---|---|---|---|
| 65 | 10 MAY | CHEVRON 0175382AUSTINTX | $28.25 |
| 66 | 10 MAY | TACO BELL #030144AUSTINTX | $4.95 |
| 67 | 10 MAY | TACO CABANA 20278AUSTINTX | $7.42 |
| 68 | 11 MAY | MCDONALD'S F8056BEE CAVETX | $4.98 |
| 69 | 11 MAY | IN *SPARRE PROCESS SER512-5225625TX | $60.00 |
| 70 | 12 MAY | TRADER JOE'S #401 QPSDALLASTX | $51.28 |
| 71 | 12 MAY | WAL-MART #5823DALLASTX | $44.55 |
| 72 | 13 MAY | TRADER JOE'S #401 QPSDALLASTX | $8.97 |
| 73 | 13 MAY | WAL-MART #5823DALLASTX | $9.00 |
| 74 | 14 MAY | CREDIT BALANCE REFUND | $4,981.22 |

**Total for STEVE B AUBREY #4252**  **$9,801.92**

**TRANSACTIONS FOR BRIAN VODICKA #0957**

| | | | |
|---|---|---|---|
| 75 | 14 APR | LOVE S COUNTRY00001230OKLAHOMA CITYOK | $26.29 |
| 76 | 15 APR | IN-N-OUT BURGER #258DALLASTX | $6.44 |
| 77 | 15 APR | HOOK LINE & SINKERDALLASTX | $14.29 |
| 78 | 15 APR | HOOK LINE & SINKERDALLASTX | $20.43 |
| 79 | 16 APR | TOM THUMB STOR00036087DALLASTX | $19.76 |
| 80 | 16 APR | TRADER JOE'S #401 QPSDALLASTX | $23.77 |
| 81 | 17 APR | CICIS PIZZA STORE 795DALLASTX | $17.28 |
| 82 | 18 APR | KRISPY KREME DALLAS 25DALLASTX | $1.98 |
| 83 | 20 APR | MY FAMILYS PIZZADALLASTX | $10.73 |
| 84 | 20 APR | 4RAISING CANE'S #154DALLASTX | $7.13 |
| 85 | 21 APR | TACO BUENO DALLAS 13DALLASTX | $5.08 |
| 86 | 21 APR | COMMUNITY, A WALGREENSDALLASTX | $3.65 |
| 87 | 21 APR | COMMUNITY, A WALGREENSDALLASTX | $29.07 |
| 88 | 25 APR | KRISPY KREME DALLAS 25DALLASTX | $5.49 |
| 89 | 25 APR | HOWARD WANGS CHINA GRIDALLASTX | $16.57 |
| 90 | 28 APR | KRISPY KREME DALLAS 25DALLASTX | $8.49 |
| 91 | 28 APR | TACO BUENO DALLAS 13DALLASTX | $6.16 |
| 92 | 28 APR | CHICKEN EXPRESS - NC EDALLASTX | $6.92 |
| 93 | 01 MAY | PSV*STANSBERRY RESEAR866-6271362MD | $99.00 |
| 94 | 04 MAY | NEWSWEEK LLC800-631-1040NY | $39.99 |
| 95 | 04 MAY | COURTS/USBC-TX-PG210-472-6720TX | $350.00 |
| 96 | 04 MAY | PACER800-676-6856IR800-676-6856TX | $82.70 |
| 97 | 08 MAY | IN-N-OUT BURGER #258DALLASTX | $6.12 |
| 98 | 09 MAY | TACO BUENO DALLAS 13DALLASTX | $4.51 |
| 99 | 09 MAY | TACO BUENO DALLAS 13DALLASTX | $1.29 |
| 100 | 09 MAY | TACO BUENO DALLAS 13DALLASTX | $4.84 |
| 101 | 12 MAY | IN-N-OUT BURGER #258DALLASTX | $6.77 |
| 102 | 13 MAY | PAYPAL *   ALT2148712420CA | $50.00 |
| 103 | 13 MAY | CREMONA BISTRODALLASTX | $21.74 |

**Total for BRIAN VODICKA #0957**  **$896.49**

▶ **Total Transactions This Period $10,698.41**

**FEES**

Total Fees This Period  $0.00

Transactions continue on page 3



**Page 3 of 3**
Customer Service 1-800-955-7070
www.capitalone.com

Apr. 16 - May. 15, 2016     30 Days in Billing Cycle

**World MasterCard**                                          Account ending in 4252

| NEW BALANCE | MINIMUM PAYMENT | DUE DATE |
|---|---|---|
| $0.00 | $0.00 | Jun 12, 2016 |

| Revolving Credit Limit: | $30,000.00 |
|---|---|
| Available Revolving Credit: | $30,000.00 |
| Cash Advance Credit Limit: | $15,000.00 |
| Available Credit for Cash Advances: | $15,000.00 |

| Previous Balance | | Payments and Credits | | Fees and Interest Charged | | Transactions | | New Balance |
|---|---|---|---|---|---|---|---|---|
| ($10,698.41) | − | $0.00 | + | $0.00 | + | $10,698.41 | = | $0.00 |

## TRANSACTIONS CONTINUED

**INTEREST CHARGED**

| | |
|---|---|
| Total Interest This Period | $0.00 |

**TOTALS YEAR TO DATE**

| | |
|---|---|
| Total Fees This Year | $75.10 |
| Total Interest This Year | $0.00 |



**Page 1 of 3**
Customer Service 1-800-955-7070
www.capitalone.com

May. 16 - Jun. 15, 2016    31 Days in Billing Cycle

---

World MasterCard

Account ending in 4252

| NEW BALANCE | MINIMUM PAYMENT | DUE DATE |
|---|---|---|
| $4,925.92 | $49.00 | Jul 12, 2016 |

PLEASE PAY AT LEAST THIS AMOUNT

Revolving Credit Limit: $30,000.00          Cash Advance Credit Limit: $15,000.00

Available Revolving Credit: $25,074.08      Available Credit for Cash Advances: $15,000.00

**MINIMUM PAYMENT WARNING:**   If you make only the minimum payment each period, you will pay more in interest and it will take you longer to pay off your balance. For example:

| Payment Amount Each Period If No Additional Charges Are Made | Approximate Time to Pay Off Statement Balance | Estimated Total Cost |
|---|---|---|
| Minimum Payment | 23 Years | $10,819 |
| $171 | 3 Years | $6,160 |

Your estimated savings if you pay off this balance in 3 years:          $4,659

If you would like information about credit counseling services, call 1-888-326-8055.

**LATE PAYMENT WARNING:**   If we do not receive your minimum payment by your due date, you may have to pay a late fee of up to $35.00.

---

| Previous Balance | | Payments and Credits | | Fees and Interest Charged | | Transactions | | New Balance |
|---|---|---|---|---|---|---|---|---|
| $0.00 | − | $5,542.02 | + | $0.00 | + | $10,467.94 | = | $4,925.92 |

---

## TRANSACTIONS

**PAYMENTS, CREDITS & ADJUSTMENTS FOR STEVE B AUBREY #4252**

| | | |
|---|---|---|
| 1 | 31 MAY ELECTRONIC PAYMENT | ($5,000.00) |
| 2 | 31 MAY CREDIT-TRAVEL REWARD | ($390.20) |
| 3 | 31 MAY CREDIT-TRAVEL REWARD | ($31.82) |
| 4 | 31 MAY CREDIT-TRAVEL REWARD | ($33.70) |
| 5 | 09 JUN  RED LION HOTELS/INNSSEATACWAARRIVE: 06/09/16 | ($86.30) |
| | DEPART: 06/09/16 FOLIO#: 127238260 | |
| | PH#: 206-246-5535 | |

**TRANSACTIONS FOR STEVE B AUBREY #4252**

| | | |
|---|---|---|
| 1 | 13 MAY TACO BELL 00160016 2248DALLASTX | $6.77 |
| 2 | 14 MAY WHATABURGER 1013DALLASTX | $6.92 |
| 3 | 15 MAY WAL-MART #5823DALLASTX | $25.56 |
| 4 | 16 MAY ATT*BILL PAYMENT800-288-2020TX | $123.46 |
| 5 | 16 MAY WM SUPERCENTER #5823DALLASTX | $6.00 |
| 6 | 16 MAY CICIS PIZZA STORE 795DALLASTX | $8.64 |
| 7 | 16 MAY OFFICE DEPOT #322DALLASTX | $86.57 |
| 8 | 16 MAY BODY LOGIC 80066233FARMERS BRANCTX | $39.51 |
| 9 | 18 MAY KFC J625002  21050026DALLASTX | $7.09 |

Transactions continue on page 2

---

## REWARDS INFORMATION - STEVE B AUBREY

| | |
|---|---|
| PREVIOUS AVAILABLE REWARDS BALANCE | 54,560 |
| REWARDS EARNED THIS PERIOD | 20,761 |
| (reflects rewards posted during this billing cycle) | |
| REDEEMED THIS PERIOD | (45,572) |
| AVAILABLE BALANCE AS OF 06/15/2016 | 29,749 |

For up-to-date rewards tracking, visit
www.capitalone.com

---

## INTEREST CHARGE CALCULATION

Your Annual Percentage Rate (APR)  is the annual interest rate on your account.

| Type of Balance | Annual Percentage Rate (APR) | Balance Subject to Interest Rate | Interest Charge |
|---|---|---|---|
| Purchases | 15.15% P | $0.00 | $0.00 |
| Cash Advances | 25.15% P | $0.00 | $0.00 |

P,L,D,F = Variable Rate. See reverse of page 1 for details

---

PLEASE RETURN PORTION BELOW WITH PAYMENT OR LOG ON TO WWW.CAPITALONE.COM TO MAKE YOUR PAYMENT ONLINE.

1  5178058471834252  15  4925925000000049005

**Account ending in 4252**

| Due Date | New Balance | Minimum Payment | Amount Enclosed |
|---|---|---|---|
| Jul 12, 2016 | $4,925.92 | $49.00 | . |

PLEASE PAY AT LEAST
THIS AMOUNT

**ENJOY 24/7 ACCESS TO YOUR ACCOUNT**
Log in and manage your account online at www.capitalone.com
• Pay bills
• Check your balance
• Review transactions

400018

STEVE B AUBREY
7777 GLEN AMERICA DR APT 223
DALLAS, TX 75225-1836

Capital One Bank (USA), N.A.
P.O. Box 60599
City of Industry, CA 91716-0599

1  5178058471834252  15  4925925000000049005



**Page 2 of 3**
Customer Service 1-800-955-7070
www.capitalone.com

May. 16 - Jun. 15, 2016    31 Days in Billing Cycle

| World MasterCard | | Account ending in 4252 |
|---|---|---|
| **NEW BALANCE** | **MINIMUM PAYMENT** | **DUE DATE** |
| $4,925.92 | $49.00 | Jul 12, 2016 |

| | |
|---|---|
| Revolving Credit Limit: | $30,000.00 |
| Available Revolving Credit: | $25,074.08 |
| Cash Advance Credit Limit: | $15,000.00 |
| Available Credit for Cash Advances: | $15,000.00 |

| Previous Balance | | Payments and Credits | | Fees and Interest Charged | | Transactions | | New Balance |
|---|---|---|---|---|---|---|---|---|
| $0.00 | − | $5,542.02 | + | $0.00 | + | $10,467.94 | = | $4,925.92 |

---

### TRANSACTIONS CONTINUED

**TRANSACTIONS FOR STEVE B AUBREY #4252 (CONTINUED)**

| 10 | 19 MAY PLN*PRICELINE HOTELS800-657-9168CT | $74.63 |
|---|---|---|
| | ARRIVE: 05/18/16 DEPART: 05/19/16 FOLIO#: CROWNE PL | |
| | PH#: 800-657-9168 | |
| 11 | 20 MAY WM SUPERCENTER #3341DALLASTX | $12.95 |
| 12 | 21 MAY IN-N-OUT BURGER #258DALLASTX | $7.63 |
| 13 | 22 MAY NETFLIX.COMNETFLIX.COMCA | $10.81 |
| 14 | 22 MAY MARIANO'S HACIENDADALLASTX | $39.53 |
| 15 | 22 MAY TRADER JOE'S #401 QPSDALLASTX | $8.67 |
| 16 | 22 MAY RACETRAC486   00004861DALLASTX | $33.86 |
| 17 | 23 MAY WM SUPERCENTER #5823DALLASTX | $23.97 |
| 18 | 23 MAY LAW OFFICE OF PHILLIPDALLASTX | $3,000.00 |
| 19 | 23 MAY CSA TRAVEL PROTECT08588102387CA | $126.00 |
| 20 | 23 MAY HOLLAND AMERICA LINE RSEATTLEWA | $1,562.88 |
| 21 | 24 MAY HOWARD WANGS CHINA GRIDALLASTX | $34.73 |
| 22 | 26 MAY VZWRLSS*APOCC VISE800-922-0204NJ | $118.91 |
| 23 | 26 MAY PLN*PRICELINE HOTELS800-657-9168CT | $104.80 |
| | ARRIVE: 05/27/16 DEPART: 05/28/16 FOLIO#: RED LION | |
| | PH#: 800-657-9168 | |
| 24 | 26 MAY USR-ELECTRICBILL08556003859TX | $35.51 |
| 25 | 26 MAY CASUAL MALE #9422DALLASTX | $135.31 |
| 26 | 27 MAY JACK IN THE BOX #8428SEATACWA | $9.07 |
| 27 | 27 MAY TACO BELL 308200308205SEATACWA | $7.61 |
| 28 | 28 MAY LYFT   *RIDE FRI 6AM8552800278CA | $31.82 |
| 29 | 28 MAY DENNY'S #7865SEATTLEWA | $12.94 |
| 30 | 28 MAY RED LION HOTELS/INNSSEATACWA | $86.30 |
| | ARRIVE: 05/27/16 DEPART: 05/28/16 FOLIO#: 127238260 | |
| | PH#: 206-246-5535 | |
| 31 | 30 MAY TWC*TIME WARNER CABLE888-TWCABLETX | $15.07 |
| 32 | 30 MAY ALASKA CACHE AND LIQUOJUNEAUAK | $10.33 |
| 33 | 02 JUN PROPERTY PAYMENTRENTGOLETACA | $1,357.55 |
| 34 | 04 JUN TARGET    00000554DALLASTX | $7.61 |
| 35 | 04 JUN AA INFLIGHT MC FACET 4PHOENIXAZ | $9.99 |
| 36 | 04 JUN EXXONMOBIL  99032203DALLASTX | $31.31 |
| 37 | 04 JUN THE WASH RACKDALLASTX | $5.00 |
| 38 | 04 JUN SNUFFERS - PARK CITIESDALLASTX | $19.54 |
| 39 | 04 JUN WESTERDAMSEATTLEWA | $64.41 |
| 40 | 05 JUN UBER  JUN04 US OVCG5866576139CA | $29.74 |
| 41 | 05 JUN THE WASH RACKDALLASTX | $5.25 |
| 42 | 05 JUN BEST BUY MHT  00000588DALLASTX | $1,373.68 |
| 43 | 05 JUN WAL-MART #5823DALLASTX | $64.79 |
| 44 | 08 JUN PLN*PRICELINE HOTELS800-657-9168CT | $409.04 |
| | ARRIVE: 06/08/16 DEPART: 06/12/16 FOLIO#: OMNI AUST | |
| | PH#: 800-657-9168 | |
| 45 | 08 JUN TRADER JOE'S #401 QPSDALLASTX | $13.95 |
| 46 | 09 JUN ADOBE800-833-6687CA | $10.65 |
| 47 | 13 JUN WALGREENS #4012DALLASTX | $3.13 |
| 48 | 13 JUN HOWARD WANGS CHINA GRIDALLASTX | $33.15 |

**TRANSACTIONS FOR STEVE B AUBREY #4252 (CONTINUED)**

| 49 | 14 JUN USPS 48222502230204440DALLASTX | $19.83 |
|---|---|---|
| 50 | 14 JUN DICKEYS TX-622DALLASTX | $8.66 |
| | **Total for STEVE B AUBREY #4252** | **$9,281.13** |

**TRANSACTIONS FOR BRIAN VODICKA #0957**

| 51 | 10 MAY ASAAUSTINTX | $75.00 |
|---|---|---|
| 52 | 14 MAY CENTRAL MARKET #552DALLASTX | $5.41 |
| 53 | 14 MAY CENTRAL MARKET #552DALLASTX | $47.09 |
| 54 | 16 MAY KROGER #0518DALLASTX | $29.91 |
| 55 | 18 MAY CEFCO 54BELTONTX | $2.14 |
| 56 | 18 MAY MCDONALD'S F25433DALLASTX | $7.12 |
| 57 | 20 MAY UBER  MAY20 US QJTYK8665761039CA | $5.00 |
| 58 | 20 MAY LYFT *RIDE FRI 11AM8552800278CA | $9.49 |
| 59 | 20 MAY LYFT *RIDE FRI 2PM8552800278CA | $8.83 |
| 60 | 21 MAY IN-N-OUT BURGER #258DALLASTX | $6.12 |
| 61 | 23 MAY AMERICAN  00123742267574080004337300TX | $390.20 |
| | TK#: 0012374226757 PSGR: VODICKA/BRIAN | |
| | ORIG: DFW, DEST: SEA | |
| | S/O: O CARRIER: AA SVC: S | |
| | ORIG: SEA, DEST: DFW | |
| | S/O: X CARRIER: AA SVC: Q | |
| 62 | 23 MAY AMERICAN  00123742267585080004337300TX | $390.20 |
| | TK#: 0012374226758 PSGR: AUBREY/STEVE | |
| | ORIG: DFW, DEST: SEA | |
| | S/O: O CARRIER: AA SVC: S | |
| | ORIG: SEA, DEST: DFW | |
| | S/O: X CARRIER: AA SVC: Q | |
| 63 | 24 MAY COMMUNITY, A WALGREENSDALLASTX | $37.47 |
| 64 | 25 MAY TACO BUENO DALLAS 13DALLASTX | $2.58 |
| 65 | 26 MAY EATZI'SDALLASTX | $10.80 |
| 66 | 27 MAY DENNY'S #7865SEATTLEWA | $12.61 |
| 67 | 27 MAY MANGO THAI CUISINESEATACWA | $16.24 |
| 68 | 28 MAY UBER TECHNOLOGIES INC8665761039CA | $33.70 |
| 69 | 04 JUN UBER  JUN04 US UMO4C8665761039CA | $32.00 |
| 70 | 07 JUN CENTRAL MARKET #552DALLASTX | $19.60 |
| 71 | 08 JUN IN-N-OUT BURGER #258DALLASTX | $6.12 |
| 72 | 09 JUN TRADER JOE'S #401 QPSDALLASTX | $39.18 |
| | **Total for BRIAN VODICKA #0957** | **$1,186.81** |

▶ **Total Transactions This Period $10,467.94**

**FEES**

| Total Fees This Period | $0.00 |
|---|---|

**INTEREST CHARGED**

| Total Interest This Period | $0.00 |
|---|---|

Transactions continue on page 3

App. 000062



**Page 3 of 3**
Customer Service 1-800-955-7070
www.capitalone.com

May. 16 - Jun. 15, 2016    31 Days in Billing Cycle

**World MasterCard**                    Account ending in 4252

| NEW BALANCE | MINIMUM PAYMENT | DUE DATE |
|---|---|---|
| **$4,925.92** | **$49.00** | **Jul 12, 2016** |

| Revolving Credit Limit: | $30,000.00 |
|---|---|
| Available Revolving Credit: | $25,074.08 |
| Cash Advance Credit Limit: | $15,000.00 |
| Available Credit for Cash Advances: | $15,000.00 |

| Previous Balance | | Payments and Credits | | Fees and Interest Charged | | Transactions | | New Balance |
|---|---|---|---|---|---|---|---|---|
| $0.00 | − | $5,542.02 | + | $0.00 | + | $10,467.94 | = | $4,925.92 |

---

**TRANSACTIONS CONTINUED**

**TOTALS YEAR TO DATE**

| | |
|---|---|
| Total Fees This Year | $75.10 |
| Total Interest This Year | $0.00 |

App. 000063

## DECLARATION

I have known Steven B. Aubrey for approximately twenty (20) years. I have resided with Steve Aubrey for approximately twenty (20) years. I have personal knowledge that he has ever been, not for a second, an Anti-Semite. He has actually always had many friends that were of the Jewish faith. It is disgusting and egregious for anybody to refer to Steve Aubrey as Anti-Semitic.

I have been intimately and personally observing the dilatory procedural tactics of the Defendant's lawyer, Ira Tobolowsky. It is obvious to me that all of these diversionary tactics are a ruse to deflect this Court's attention away from Plaintiff's right to accountings as provided by law in the Texas Trust Code.

Over the last fifteen (15) years I have studied eight (8) publications of Rabbi Harold S. Kushner. The Rabbi Kushner books I have read include:

        a) **When Bad Things Happen to Good People;**

        b) **The Lord is My Sheppard;**

        c) **Living a Life That Matters;**

        d) **How Good Do We Have To Be;**

        e) **Who Needs God;**

        f) **When All You've Ever Wanted Isn't Enough;**

        g) **Commanded To Live; and**

        h) **Overcoming Life's Disappointments.**

Even though Steve Aubrey has not read these books, I have discussed my understandings, perceptions and conclusions derived from these teachings. Steve Aubrey's respect for the wisdom for Rabbi Kushner is polar-opposite from Tobolowsky's insidious and defamatory accusations filed with this Court.

In the twenty (20) years that I have known Steve Aubrey he has never exhibited any prejudice against any person for their race, color, faith, gender, or sexual orientation. He has always been very kind, sympathetic and considerate to all minorities suffering any kind of hardship.

I personally observed the dilatory tactics of Ira Tobolowsky when he filed a false vacation notice to manipulate the court's docket. I personally witnessed Ira Tobolowsky encourage his client/witness to ignore and violate a lawfully issued subpoena duces tecum, requesting highly relevant records, after missing the deadline to lawfully file a motion to quash.

It is discouraging for me to watch Ira Tobolowsky treat the justice system and this Court in a manner that is inconsistent with the teachings of Rabbi Kushner.

My name is Brian Edward Vodicka. My date of birth is August 9, 1959, and my address is 5701 S Mopac Expy. Apt 2017, Austin, Texas 78749, U.S.A.

I declare under penalty of perjury, under the laws of the State of Texas, that the foregoing statements are true and correct and within my personal knowledge.

Executed in Travis County, State of Texas, on the 21st day of September 2014.

Brian Edward Vodicka

## DECLARATION

I have known Steven B. Aubrey for more than (15) fifteen years.  He has been a close and personal friend for all of those years.  Steve is not an anti-Semite.  In the fifteen years I have known him, he has never once made a topic out of Jewish faith, religion or people.  I have actually never heard him say the word Jew or Jewish.

My name is David Edward Bandas.  My date of birth is September 13, 1952, and my address is 1200 Baylor St. Apt 201, Austin, Texas 78703, U.S.A.

I declare under penalty of perjury, under the laws of the State of Texas, that the foregoing statements are true and correct and within my personal knowledge.

Executed in Travis County, State of Texas, on the 20th day of September 2014.

David Edward Bandas

## DECLARATION

I have known Steven B. Aubrey for more than (17) seventeen years. He has been and is one of my closest and personal friends for all of those years. Most of the years that I have known Steve we have spoken every single day. Steve is not Anti-Semitic. In the seventeen years I have known him, he has never once made a topic out of Jewish faith, religion or people. I have actually never heard him say the word Jew or Jewish.

My name is Allen Britton Thomas. My date of birth is September 19, 1965, and my address is 1015 Burgundy St., New Orleans, LA 70116, U.S.A.

I declare under penalty of perjury that the foregoing statements are true and correct and within my personal knowledge.

Executed in Orleans Parrish, State of Louisiana, on the 21st day of September 2014.

*Allen Britton Thomas*

Allen Britton Thomas

SEP-21-2014 10:14 PM   ALLEN THOMAS PHD          5042185988          P.01

## DECLARATION

I have known Steven B. Aubrey for more than (14) fourteen years.  He has been a close and personal friend for all of those years and we have vacationed together on numerous occasions.  Steve is not Anti-Semitic.  In the fourteen years I have known him, he has never once made a topic out of Jewish faith, religion or people.  I have actually never heard him say the word Jew or Jewish.

My name is Gary James Edward French.  My date of birth is June 23, 1970, and my address is 6421 Saint Bernard Ave., New Orleans, LA 70122, U.S.A.

I declare under penalty of perjury that the foregoing statements are true and correct and within my personal knowledge.

Executed in Orleans Parrish, State of Louisiana, on the 21st day of September 2014.


Gary James Edward French

App. 000068

## DECLARATION

I have known Steven B. Aubrey for more than twelve (12) years. He has been a close friend for all of those years. I have even helped Steve Aubrey move residences two times. Steve is not an anti-Semite. In the twelve years I have known him, I do not recall Steve ever speaking about the Jewish faith, religion or its people. I have actually never heard him say the word Jew or Jewish.

My name is Randall T. Sargent. My date of birth is July 7, 1964 and my address is 2307 Windsor Rd., House 2, Austin, Texas 78703, U.S.A.

I declare under penalty of perjury, under the laws of the State of Texas, that the foregoing statements are true and correct and within my personal knowledge.

Executed in Travis County, State of Texas, on the 21st day of September 2014.

Randall T. Sargent

App. 000069

Case 3:19-cv-00056-B    Document 179    Filed 08/20/20    Page 73 of 207    PageID 4276





CRIME

# 'A Place Where Something Evil Happened'

**Ira Tobolowsky, a prominent lawyer, was burned alive in his North Dallas garage. A strong suspect quickly emerged. So why can't the cops solve the case?**

A homicide detective named Scott Sayers arrived at the house wearing a button-down and tie. Detectives routinely respond to house fires involving deaths, but Dallas' 34-member homicide unit was stretched thin in May of last year; they'd already caught 10 murders in the past week. The detective asked Debbie: "Do you think this was an accident, or could someone have done this?"

"What do you mean?" she asked. She couldn't think of anyone who wanted to hurt her husband.

Sayers poked around, then told the family that Dallas Fire-Rescue would lead the investigation. Investigators combed through the wrecked garage, trampled by firefighters wielding axes and high-pressure hoses. They had broken through walls and tossed the family's belongings from a second-story media room into the swimming pool. While firefighters were trained to use the least destructive measures—to help preserve evidence—that took a back seat to putting down flames.

It appeared that Ira had made it down the steps into the garage, walked past his wife's car, and approached the driver's side of his Lexus. They found his burned body there, lying in a small space between the closed driver's side door and a wall lined with mops and brooms. He still had his wallet and phone. Had Ira's car caught fire? His phone? Investigators searched for flammable liquids, examining shelves packed with Clorox wipes, Windex, and



a and Debbie with their three sons, (from left) Zach, Michael, and Jonathan, at a wedding in 2015.

Before the flight, Michael had learned the fire might have been set intentionally. The thought infused his grief with rage. Cramped in his window seat, Michael felt his hands aching and realized both fists were clenched. All he could think about was *Who*?

Back in Dallas, by midmorning, fire investigators still hadn't roped off the house with police tape. Relatives and friends walked all over the yard. TV reporters broadcast live from the cul-de-sac. The investigators kept asking whether Ira had enemies. Sure, family members said, nearly every lawyer makes enemies. Ira had practiced law for more than 45 years. They could run through a list of people Ira had defeated or angered at one time or another. But among them, one stood out.

App. 000072

7/30/2014 3:41:20 PM
JOHN F. WARRE
COUNTY CLER
DALLAS COUNT`

PR-14-01486-2

**CAUSE NO. _____**

| | | |
|---|---|---|
| **STEVEN B. AUBREY, Beneficiary of the Trust created in the Will of Richard Buck Aubrey, Deceased; STEVEN B. AUBREY Individually,** | § § § § | **IN THE PROBATE COURT** |
| *PLAINTIFF* | § | |
| | § | |
| **v.** | § § | **NO. _____** |
| **BETSY STIRRATT AUBREY, Independent Executor of the Estate of Richard Buck Aubrey, Deceased, and as Trustee of the Testamentary Trusts created under the will of Richard Buck Aubrey, Deceased,** | § § § § § § | |
| *DEFENDANT* | § | **DALLAS COUNTY, TEXAS** |

_____

**ORIGINAL APPLICATION**
_____

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW Steven B. Aubrey (**"Plaintiff"**), complaining of Betsy Stirratt Aubrey, Independent Executor ("**Defendant**"), files this Original Application, respectfully showing unto the Court as follows:

### I. Discovery Level

Discovery is intended to be conducted under Level 2 of Tex. R. Civ. P. 190.3.

### II. Parties

Plaintiff Steven B. Aubrey is an individual residing in Travis County, Texas.

Defendant Betsy Stirratt Aubrey is an individual residing in Dallas County, Texas and may be served with process at 3920 Hockaday Dr., Dallas, Texas 75229.

### III. Jurisdiction and Venue

This Court has jurisdiction of the subject matter of this cause of action and the parties thereto. Venue is proper in Dallas County, Texas pursuant to ESTATES CODE §33.003.

1

App. 000073

### IV.  Demand For Accounting

On January 10, 2014, Plaintiff sent a letter to Defendant demanding two separate accountings.  One pursuant to TEXAS ESTATES CODE § 404.001 and the other pursuant to TEXAS TRUST CODE § 113.151.  (See Exhibit A).  The formal demand was sent certified mail and was received by Defendant on January 15, 2014. (See Exhibit B). It has now been over 90 days and Defendant has failed to deliver either of the statements of accounting as required by law. Plaintiff files this suit requesting this Court compel Defendant to deliver an accounting statement for the Estate of Richard Buck Aubrey, Deceased and one for the Testamentary Trusts created under the will of Richard Buck Aubrey, Deceased.

### V.  Multiple Deed Transfers

On June 27, 2013, property located in Travis County, Texas and once part of the Estate of Richard Buck Aubrey, Deceased, transferred ownership three times on this single day.  Two of the transfers were without consideration and were in violation of PROP. CODE § 113.053(a)(3). Defendant conveyed the property from the Trust (denuding the corpus of the Trust) to herself individually. (See Exhibit C).  Defendant, as an individual, then conveyed the property to her son Richard Buck Aubrey, Jr. (See Exhibit D). Richard Buck Aubrey, Jr. then conveyed and sold the property to an authentic buyer, for consideration. (See Exhibit E).  However, in this Special Warranty Deed, Richard Buck Aubrey, Jr. used an address that does not belong to him.  He uses the address of Richard Buck Aubrey, Deceased.

This multi-layer transaction was a shell game designed to strip the corpus of the trust and secret the trust assets.  The use of the wrong address, along with the play on names, was likely to attribute the capital gain to the trust and avoid paying taxes to the Internal Revenue Service.

### VI.  Removal of Independent Executor

Defendant has not shown good faith in administering the trust and performing the duties imposed on her by common law pursuant to PROP. CODE § 113.051.  Defendant has breached

App. 000074

her fiduciary duty on several levels, by self-dealing and is willfully ignoring the law and must be removed from the trust for her violations under PROP. CODE § 113.082 (a)(1)(2)(3) and (b).  The pattern of secreting properties has been ongoing since 2007; therefore, Plaintiff requests the removal of independent executor without notice pursuant to ESTATES CODE § 404.003.

## VII.  Prayer

WHEREFORE, PREMISES CONSIDERED, Plaintiff requests the accountings (required by law) to be compelled, removal of the independent executor without notice and judgment for all relief requested herein as well as all such other and further relief, both general and special, at law or in equity, to which Plaintiffs may be entitled.

Respectfully submitted,

/s/ Steven B. Aubrey
Steven B. Aubrey, Pro Se
5701 S Mo Pac Expy, Apt 416
Austin, TX 78749
Telephone: (512) 659-7234
Facsimile:   (512) 727-8001
steveaubrey1@gmail.com

App. 000075

# Exhibit  A

January 10, 2014          *70101060000036650090*

Ms. Betsy Stirratt Aubrey
3920 Hockaday Drive
Dallas Texas 75229

*Via certified mail, return receipt requested # **7010 1060 0000 3665 0090***

RE:    The estate of Richard Buck Aubrey (the "Aubrey Estate"), The Marital Trust created under Richard Buck Aubrey's Last Will and Testament (the "Marital Trust") and the Family Trust created under Richard Buck Aubrey's Last Will and Testament (the "Family Trust").

Dear Betsy:

This letter is being written to you in your capacities as: (1) independent executor of the Aubrey Estate, (2) as trustee of the Marital Trust and (3) as trustee of the Family Trust.

Please consider this letter to be a formal demand for an accounting of the Aubrey Estate pursuant to Texas Estates Code § 404.001 (formerly Texas Probate Code § 149A).

Please consider this letter to be a formal demand for a written statement of accounts of the Marital Trust pursuant to Texas Trust Code § 113.151.

Please consider this letter to be a formal demand for a written statement of accounts for the Family trust pursuant to Texas Trust Code § 113.151.

Thank you,


Steven Benton Aubrey


Exhibit  A

App. 000077

**May 19, 2016 9:30 pm DPD Headquarters Interview - Det. Ermatinger and Brian Vodicka**
Det. Ermatinger learns Aubrey never threatened Tobolowsky, with Jihad or otherwise.

## Video only visible when opened in Adobe Reader.

## Press ▶ on lower left hand corner to play video.

## To replay, close document and open again.



**May 19, 2016 9:52 pm DPD Headquarters Interview - Det. Ermatinger and Brian Vodicka**
Detectives were tracking credit cards starting May 13, 2016, the date of the fire/death.

## Video only visible when opened in Adobe Reader.

## Press ▶ on lower left hand corner to play video.

## To replay, close document and open again.



May 19, 2016



Excessively tight
handcuffs left marks.

**May 19, 2016**



Excessively tight
handcuffs left marks.



May 19, 2016



May 19, 2016





August 8, 2020





August 8, 2020



●●●●○ Verizon   LTE      4:48 PM          ※ 33% ▉

**‹** Recents                              Edit



# P

mobile   mobile   video   mail

## October 20, 2016

2:30 PM   **Missed Call**

2:29 PM   **Missed Call**

mobile ☆
(512) 659-7636

Notes

        

Favorites   Recents   Contacts   Keypad   Voicemail

●●●○○ Verizon 📶     6:18 PM     29% 🔋 ⚡





P



Thursday 2:12 PM

I love you    2:12 PM

Someone knocking I can't see anybody    2:31 PM

Friday 4:17 PM

I still think you should text/ contact Phillip Hayes    4:17 PM

And ask him what? What do we want Him to do?    4:20 PM

He may have or be able to get Intel    4:20 PM

    iMessage 

App. 000090



78°   **Tuesday, August**



**Crime**

# Family of slain Dallas attorney Ira Tobolowsky offers $20,000 reward for tips

Facebook         Twitter         Email         **2** Comments         Print

**By Tasha Tsiaperas** 🐦 ✉
The Dallas Morning News

Published: 23 June 2016 03:45 PM
Updated: 23 June 2016 04:01 PM

The family of one of Dallas' most beloved lawyers is offering a $20,000 reward to anyone with information in his mysterious death.

Rumors have swirled since 68-year-old Ira Edwin Tobolowsky was found dead May 13 in the garage of his North Dallas home after firefighters extinguished a blaze there.

The fire was originally called "suspicious in nature," but the case

App. 000091

Family of slain Dallas attorney Ira Tobolowsky offe...          http://www.dallasnews.com/news/crime/headlines...

was quickly handed over to Dallas police homicide detectives. Those close to Tobolowsky suggested he may have been killed because of one of his cases.

CrimeStoppers has added $5,000 to the reward. Anyone with information that leads to an arrest could receive up to $25,000.

Dallas police have released few details about the investigation and have not named any suspects.

Tobolowsky's three sons, Zachary, Michael and Jonathan, issued a public plea for help Thursday at Dallas police headquarters. They said they hope the money might encourage someone to come forward.

"There's also legitimate fear by the community that something this heinous could happen to such a good person, that God forbid that something happens to them or their family if they come forward," said Michael Tobolowsky.

The diminutive attorney suffered from a lifelong chronic condition that made it difficult for him to walk, and friends said Tobolowsky would have been unable to defend himself.

The lawyer, who once successfully argued a case before the U.S. Supreme Court, was well-liked and respected in the Dallas legal community. His funeral drew nearly 1,000 people to Congregation Shearith Israel.

"It's very clear at this point how much our dad meant to so many people and how many questions we have about the current situation and how few answers we have to those questions," said Zachary Tobolowsky.

Family of slain Dallas attorney Ira Tobolowsky offe...          http://www.dallasnews.com/news/crime/headlines...

Ira Tobolowsky's friends and family said he would never back down from a fight and was known as a protector.

"Our dad was always the guy who protected others," Michael Tobolowsky said. "We feel like it's our turn to step up and do anything we possibly can to try to help the police find the information they need to find the person who did this to our dad."

Though some have said Tobolowsky may have been killed because of his legal work, his sons said Thursday that they don't know if that was likely.

"We have no idea," Michael Tobolowsky said. "We'd all kind of like to think that it was, because in our minds that makes it easier to solve. That's just a hope more than anything."

Police officials didn't answer questions at the news conference. Records show detectives have talked to two men against whom Tobolowsky filed a defamation suit.

That lawsuit gained attention after Tobolowsky's death. The judge presiding over the case was given extra security immediately after Tobolowsky was killed and later stepped down from the case, because he said it might be connected to the lawyer's slaying.

But police have not commented on whether the men involved in the lawsuit were considered suspects.

Tobolowsky's family has said he didn't express fear or concern in the days leading up to his death.

"He was such a strong guy that even if he did fear something, he wouldn't have let us on, because he would've just thought it would've made us more scared for him," Jonathan Tobolowsky said.

CAUSE NO. DC-15-11685

| | | |
|---|---|---|
| STEVEN B. AUBREY | § | IN THE DISTRICT COURT |
| | § | |
| | § | |
| v. | § | 14TH JUDICIAL DISTRICT |
| | § | |
| BETSY S. AUBREY; Trustee of the | § | |
| Aubrey Family Trust created under the Will | § | |
| of Richard Buck Aubrey, Deceased | § | DALLAS COUNTY, TEXAS |

## ~~AMENDED AND RESTATED~~ FINAL JUDGMENT   Nʊɴᴇ  Pᴀᴅ  Tᴜɴᴄ

ON THIS DATE this Court enters this ~~Amended and Restated~~ Final Judgment ("Final Judgment") of this case.
*N. P. T.*

On February 12, 2016, this Court determined Plaintiff to be a Vexatious Litigant. As of February 12, 2016, this Court has ordered that Plaintiff Steven Benton Aubrey has been declared a Vexatious Litigant pursuant to Tex.Civ.Prac.&Rem.Code §11.054.

On February 12, 2016, this Court ordered that on and after February 12, 2016, Plaintiff Steven Benton Aubrey shall not file another lawsuit against the following individuals without first seeking and securing the written approval of the Dallas County Administrative Judge; to wit: Betsy Stirratt Aubrey; Richard Buck Aubrey, Jr.; the Aubrey Family Trust; Aubrey Family, LLC; Ira E. Tobolowsky; Faith G. Burk; Tobolowsky & Burk, PC; David P. Hendricks; and David P. Hendricks, PLLC.

On February 12, 2016, this Court granted Defendant sanctions against Steven Benton Aubrey in the amount of $250,000.00. On February 12, 2016, it was ordered by this Court that Betsy Stirratt Aubrey have Judgment against Steven Benton Aubrey in the amount of $250,000.00.

On February 12, 2016, this Court ordered that within 10 days of February 12, 2016, Plaintiff, as a Vexatious Litigant, was to provide security in this case in the amount of $150,000.00 pursuant to Tex.Civ.Prac.&Rem.Code §11.055. Plaintiff failed to timely provide such security, and on March 11, 2016, this Court dismissed with prejudice Plaintiff's lawsuit against Defendant. Concurrently with the dismissal with prejudice of Plaintiff's lawsuit, Defendant took a nonsuit of her Counterclaim.

**AMENDED AND RESTATED FINAL JUDGMENT** - Page 1

The Orders hereinabove previously granted are hereby made the Final Judgment of this Court. All relief not contained in this Final Judgment is hereby denied. Execution will issue if the monetary judgments above set out are not timely paid.

SIGNED: MARCH 3𝒮, 2016.

_____
Judge Presiding

**AMENDED AND RESTATED FINAL JUDGMENT** - Page 2

443A CC[439

CAUSE NO. DC-15-11685

| | | |
|---|---|---|
| STEVEN B. AUBREY | § | IN THE DISTRICT COURT |
| | § | |
| | § | |
| v. | § | 14TH JUDICIAL DISTRICT |
| | § | |
| BETSY S. AUBREY; Trustee of the | § | |
| Aubrey Family Trust created under the Will | § | |
| of Richard Buck Aubrey, Deceased | § | DALLAS COUNTY, TEXAS |

## ORDER GRANTING DEFENDANT'S MOTION TO DETERMINE VEXATIOUS LITIGANT AND MOTION FOR SANCTIONS

ON THE 12TH DAY OF FEBRUARY, 2016, came on to be considered Defendant Betsy S. Aubrey's Motion to Determine Vexatious Litigant and Motion for Sanctions ("Motion"). Plaintiff appeared in person and by and through his newly appointed counsel of record, Brian Vodicka. Defendant Betsy Aubrey appeared by and through her counsel of record, Ira E. Tobolowsky. The Court, after considering the Motion, the evidence and argument of counsel, finds that Steven B. Aubrey is a vexatious litigant and that Defendant's Motion should be granted. It is therefore

ORDERED, ADJUDGED AND DECREED that Defendant's Motion to Determine Vexatious Litigant is GRANTED. It is further

ORDERED, ADJUDGED AND DECREED that Plaintiff is determined to be a vexatious litigant pursuant to Tex.Civ. Prac. & Rem. Code §11.054. It is further

ORDERED, ADJUDGED AND DECREED that Plaintiff shall furnish, within ten (10) days of the date of this Order, security in this cause in the amount of $ 150,000 ("Security") pursuant to Tex.Civ. Prac. & Rem. Code §11.055. It is further

ORDERED, ADJUDGED AND DECREED that if Plaintiff fails to furnish the Security as ordered above within ten (10) days of the date of this Order, this case may be dismissed with prejudice pursuant to Tex.Civ. Prac. & Rem. Code §11.056. It is further

ORDERED, ADJUDGED AND DECREED that Plaintiff shall not file another lawsuit against Betsy Stirratt Aubrey, Richard Buck Aubrey, Jr., the Aubrey Family Trust, Aubrey Family, LLC, Ira E. Tobolowsky, Faith G. Burk, Tobolowsky & Burk, PC, David P. Hendricks and/or David P. Hendricks, PLLC, or any of them, without first seeking and securing the approval in writing of the Dallas County Administrative Judge.

**ORDER GRANTING MOTION FOR VEXATIOUS LITIGANT AND FOR SANCTIONS** - Page 1

App. 000096

The Court further finds that Plaintiff should be sanctioned for bringing this lawsuit. The Court finds that Plaintiff has brought this lawsuit for an improper purpose, including harassment, delay, and/or increasing the cost of litigation. The Court further finds that Plaintiff's Petition is groundless. Therefore, it is

ORDERED, ADJUDGED AND DECREED that Plaintiff shall pay Defendant the sum of $_____ as a just sanction in this case.

The Court further finds that Defendant Betsy Stirratt Aubrey is entitled to recover $_____ as reasonable and necessary attorney fees against Plaintiff. It is therefore

ORDERED, ADJUDGED AND DECREED that Defendant Betsy Stirratt Aubrey have judgment against Plaintiff Steven B. Aubrey in the amount of $_____ as reasonable and necessary attorney fees and costs.

SIGNED THIS ____ DAY OF FEBRUARY, 2016.

_____
Judge Presiding

**ORDER GRANTING MOTION FOR VEXATIOUS LITIGANT AND FOR SANCTIONS** - Page 2

App. 000097

FILED
4/28/2015 4:10:37 PM
JOHN F. WARREN
COUNTY CLERK
DALLAS COUNTY

**CAUSE NO. PR-14-01486-2**

| | | |
|---|---|---|
| **STEVEN B. AUBREY**, Individually, as Beneficiary of the Aubrey Family Trust created under the Will of Richard Buck Aubrey, Deceased, and derivatively on behalf of the **AUBREY FAMILY TRUST** created under the Will of Richard Buck Aubrey, Deceased; | § § § § § § § § § | **IN THE PROBATE COURT** |
| *Plaintiff,* | § § | |
| **v.** | § § | **NO. 2** |
| **BETSY STIRRATT AUBREY**, Individually, and as Trustee of the Aubrey Family Trust created under the Will of Richard Buck Aubrey, Deceased; **RICHARD BUCK AUBREY, JR.**; **IRA E. TOBOLOWSKY; FAITH G. BURK; TOBOLOWSKY & BURK, P.C.**; **DAVID P. HENDRICKS, ATTY, CPA; AND DAVID P. HENDRICKS, PLLC** | § § § § § § § § § § § | |
| *Defendants.* | § | **DALLAS COUNTY, TEXAS** |

---

### NOTICE OF NONSUIT WITHOUT PREJUDICE

---

Plaintiff Steven B. Aubrey respectfully files this Notice of Nonsuit. Pursuant to Texas Rule of Civil Procedure 162, Plaintiff hereby gives notice that he is taking a nonsuit of the entire case without prejudice, including claims severed by the Court April 24, 2015, but not yet assigned a cause number by the Clerk.

Respectfully submitted,

By: */s/ Brian Vodicka*
    Brian Vodicka
    State Bar No. 20598250
    5701 S Mo Pac Expy, Apt 2017
    Austin, Texas 78749
    Telephone: (512) 659-7636
    VodickaLaw@yahoo.com

    ATTORNEY FOR PLAINTIFF

App. 000098

**Certificate Of Service**

I hereby certify that on the 29th day of April 2015, a true and correct copy of the foregoing document has been delivered in accordance with TEX. R. CIV. P. 21 to all counsel of record as follows:

**Via Email: buck@buckloans.com**
Richard Buck Aubrey, Jr., Pro Se
7161 Kendallwood
Dallas, Texas 75240
Telephone: (214) 207-0440

**Via Fax: (214) 352-0662**
Ira Tobolowsky
4305 West Lovers Lane
Dallas, Texas 75209
ATTORNEY FOR DEFENDANT

**Via Email: faithburk@tblawfirm.net**
Faith G. Burk
4305 West Lovers Lane
Dallas, Texas 75209
ATTORNEY FOR DEFENDANT

**Via Email: dphendr@sbcglobal.net**
David P. Hendricks
DAVID P. HENDRICKS, PLLC
7557 Rambler Road
Dallas, Texas 75231
ATTORNEY FOR DEFENDANT

*/s/ Brian Vodicka*
Brian Vodicka

2

App. 000099

FILED
DALLAS COUNTY
7/20/2015 8:35:49 AM
FELICIA PITRE
DISTRICT CLERK

Gay Smith

DC-15-08135

CAUSE NO. _____

| | | |
|---|---|---|
| IRA E. TOBOLOWSKY | § | IN THE DISTRICT COURT |
| | § | |
| VS. | § | 14TH-A JUDICIAL DISTRICT |
| | § | |
| STEVEN B. AUBREY and | § | |
| BRIAN EDWARD VODICKA | § | DALLAS COUNTY, TEXAS |

## PETITION

COMES NOW IRA E. TOBOLOWSKY ("Plaintiff"), complaining of STEVEN B. AUBREY ("Defendant Aubrey") and BRIAN EDWARD VODICKA ("Defendant Vodicka") (sometimes collectively, "Defendants"), and files this Petition for defamation showing as follows:

### Discovery Plan

1.      Discovery in this case should be conducted in accordance with Level 2, Tex.R.Civ.P., Rule 190.3.

### Relief Sought

2.      Plaintiff seeks monetary relief greater than $200,000.00 and less than $1,000,000.00.

### Parties

3.1      Plaintiff is an individual resident of Dallas County, Texas, and is before this Court for all purposes.

3.2      Defendant Aubrey is an individual resident of Travis County, Texas, and may be served with process at  5701 S. Mo Pac Expwy., Apt 2017, Austin, Travis County, Texas  78749

3.3      Defendant Vodicka is an individual resident of Travis County, Texas, and may be served with process at  5701 S. Mo Pac Expwy., Apt 2017, Austin, Travis County, Texas  78749.

**Jurisdiction and Venue**

4.1     This Court has both subject matter and personal jurisdiction of the Defendants. Plaintiff seeks monetary damages within the jurisdictional limits of this Court for defamatory statements made by the Defendants, and each of them, regarding Plaintiff while Plaintiff resided in Dallas County, Texas.  Further, all or substantially all of the acts and actions about which Plaintiff complains in this Petition occurred in Dallas County, Texas.

4.2     Venue is proper in Dallas County, Texas, pursuant to, *inter alia*, Texas Civil Practice & Remedies Code, Section 15.017, which states, in part, that a suit for damages for libel, slander, or invasion of privacy shall be brought and maintained in the county in which the Plaintiff resided at the time of the accrual of the cause of action.

**Facts and Causes of Action**

5.     In or about 2013, Defendant Aubrey filed a lawsuit against his older brother, Richard Buck Aubrey, Jr. ("Buck Aubrey"), in Travis County, Texas.  Shortly thereafter, Defendant Aubrey filed a lawsuit against his own mother, Betsy Aubrey ("Betsy Aubrey"), in Dallas County, Texas.

6.     Prior to filing these lawsuits Defendant Aubrey declared war against his mother and brother, and then pursued a hostile course of action to harass, intimidate and embarrass them, not only to other family members, but also to friends and acquaintances.  Defendant Aubrey openly referred to his war against his mother and brother as a "Jihad," the same word used to describe the wars brought by terrorists.  The filing of these lawsuits by Defendant Aubrey was an escalation of Defendant Aubrey's "Jihad."

7.     When Betsy Aubrey was sued by Defendant Aubrey, she hired Plaintiff as her attorney.  When Plaintiff undertook to represent Betsy Aubrey in the lawsuit, Defendant Aubrey

PETITION - Page 2

App. 000101

expanded his "Jihad" against his mother and brother to also include Plaintiff, merely because Plaintiff represented his mother.

8.      In furtherance of Defendant Aubrey's "Jihad," Defendant Aubrey, in or about August 2014,  commenced a course of unethical and illegal behavior against Plaintiff and his representation of Betsy Aubrey consisting of, *inter alia*,  intentional lies, fraud, defamatory statements, and "dirty tricks," all in an effort to intimidate, harass, embarrass, and discredit Plaintiff and force Plaintiff to cease his representation of Betsy Aubrey in the lawsuit.

9.      Commencing in or about August 2014 and continuing throughout the litigation and even after Defendant Aubrey voluntarily nonsuited his lawsuit, Defendant Aubrey intentionally, maliciously, and willfully made and published to third parties numerous defamatory statements about Plaintiff, Plaintiff's ethics, and Plaintiff's conduct.   These malicious, intentional, and willful defamatory statements attacked not only Plaintiff, but also Plaintiff's reputation, Plaintiff's honesty, Plaintiff's integrity, and Plaintiff's practice of law.

10.    Because of Plaintiff's representation of Betsy Aubrey in the lawsuit, Defendant Aubrey had no success in his "Jihad" against his mother.  As a result, in December 2014, Defendant Aubrey persuaded his life mate/room mate Defendant Vodicka to re-activate his law license and to undertake to assist Defendant Aubrey in the lawsuit.  Commencing in or about December 2014, Defendant Vodicka undertook to assist Defendant Aubrey in carrying out Defendant Aubrey's "Jihad" against Betsy Aubrey and her attorney, Plaintiff.

11.    By early 2015, neither of the Defendants were having any success in the lawsuit against Betsy Aubrey primarily because of Plaintiff's representation of Betsy Aubrey.  As a result, in early 2015 Defendants decided to escalate their "Jihad" and sued, *inter alia*, Plaintiff.

**PETITION** - Page 3

App. 000102

12.     During the course of the litigation against Betsy Aubrey, and later during the course of the litigation against Betsy Aubrey and Plaintiff, Defendant Vodicka intentionally, maliciously, and willfully made and published to third parties defamatory statements about Plaintiff, Plaintiff's ethics, Plaintiff's integrity, and Plaintiff's practice of law.  These malicious, intentional, and willful defamatory statements attacked not only Plaintiff, but also Plaintiff's reputation, Plaintiff's honesty, Plaintiff's integrity, and Plaintiff's practice of law.

13.     The statements made by the Defendants, and each of them, were defamatory, injured Plaintiff and Plaintiff's reputation, and exposed Plaintiff to public hatred, contempt, ridicule, and financial injury.  Further, the Defendants' defamatory statements attacked Plaintiff, Plaintiff's integrity, Plaintiff's honesty, and Plaintiff's practice of law.  Defendants' defamatory statements suggest and attribute to Plaintiff moral turpitude, dishonesty, and professional and business impropriety, and criminal activity.  Further, Defendants' defamatory statements are so obviously hateful and hurtful to Plaintiff's reputation that such statements constitute defamation *per se*.

14.     In addition to presumed damages, Plaintiff has suffered damages, including the loss of reputation and mental anguish, far in excess of the minimum jurisdictional requirements of this Court, for all of which damages, Plaintiff sues the Defendants.

15.     The Defendants' defamatory statements were false, and known by Defendants to be false when made.  To the extent that Defendants now contend that such defamatory statements are privileged by way of judicial privilege, Plaintiff contends that such privilege would not apply because Defendants' defamatory statements were made deliberately, willfully, maliciously, and with the intent to carry out a "Jihad" against, *inter alia*, Plaintiff.  Additionally, Plaintiff contends that judicial privilege would also not apply because Defendants' defamatory statements were deliberately,

**PETITION** - Page 4

willfully, and maliciously republished by Defendants after Defendant Aubrey filed his Notice of Nonsuit and the lawsuit was over.

16.     Because of the volume of defamatory statements and/or because of the seriousness of the accusations against Plaintiff by Defendants, and/or because the defamatory statements were republished by Defendants after the Notice of Nonsuit of the lawsuit, Plaintiff contends that such actions by the Defendants, and each of them, disallow the Defendants from claiming, or attempting to claim, judicial privilege.  Plaintiff therefore alleges that the defamatory statements made by the Defendants, and each of them, are not privileged, and/or should not be privileged under Texas law. In support of withholding the application of judicial privilege, Plaintiff would show that the Defendants, and each of them, have purposefully exploited and abused any privilege by Defendants' ulterior motives.

17.     Further, in support of withholding the application of judicial privilege, Plaintiff would show that the Defendants filed a totally groundless, baseless, harassing, and frivolous lawsuit against Plaintiff in which Defendants deliberately made willful and malicious defamatory statements against Plaintiff, publishing to third parties all of these defamatory statements solely as part of their "Jihad" in an effort to cause severe harm to Plaintiff, which severe harm Plaintiff did in fact suffer.

18.     Additionally, Plaintiff would show that Defendants, and each of them, should not be allowed to exploit the privilege for judicial proceedings when the Defendants, and each of them, have ulterior, malicious and willful motives.

19.     Plaintiff would show that as a direct and proximate result of the deliberate, willful, and malicious defamatory statements made by the Defendants, and each of them, Plaintiff's reputation has been severely damaged, and will continue to be severely damaged in the future

PETITION - Page 5

App. 000104

because of both the volume of willful defamatory statements as well as the very nature and content of the willful and malicious defamatory statements.  As a direct and proximate result of Defendants' tortious "Jihad" and defamatory statements, Plaintiff has suffered, and continues to suffer, not only presumed damages, but also extreme mental anguish, public humiliation and embarrassment, and other damages, for all of which damages Plaintiff hereby sues the Defendants, and each of them.

20.     Because the acts and actions of the Defendants, and each of them, were intentional, willful, and malicious, and because the Defendants, and each of them, have acted with specific intent to cause injury to Plaintiff and to damage and destroy Plaintiff's welfare and reputation, Plaintiff hereby seeks to recover against each Defendant punitive damages in the maximum amount permitted by law.

21.     Plaintiff hereby requests each Defendant to make Disclosures as required by the Texas Rules of Civil Procedure.

22.     Plaintiff hereby demands trial by jury.

WHEREFORE, PREMISES CONSIDERED, Plaintiff requests that Defendants be required to appear and answer herein, and that upon trial hereof, Plaintiff have judgment against the Defendants as follows:

a.     Judgement against each Defendant for Plaintiff's actual damages in an amount within the jurisdictional limits of this Court and proven at time of trial;

b.     Judgment against the Defendants resulting from Defendants' illegal and unlawful "Jihad" and proven at time of trial;

c.     Judgment against the Defendants resulting from their illegal and unlawful conspiracy and proven at time of trial;

<u>PETITION</u> - Page 6

App. 000105

d.  Judgment for exemplary damages against each Defendant in a sum determined by the trier of fact and as allowed by law;

e.  Judgment against each Defendant for presumed damages;

f.  Prejudgment and post judgment interest as allowed by law;

g.  Reasonable and necessary attorney fees as part of punitive damages;

h.  Costs of suit; and

i.  such other and further relief, at law or in equity, to which Plaintiff may be justly entitled.

Respectfully submitted

*Stephen C Schoettmer*

Stephen C. Schoettmer
State Bar ID No. 17800400
4305 W. Lovers Lane
Dallas, Texas  75209

Telephone:(214) 228-8792
Facsimile:(214) 352-0662
steve.schoettmer1@gmail.com

ATTORNEY FOR PLAINTIFF

**PETITION** - Page 7

COMPLAINANT:                                        SERVICE #:
                                                    FOR DET. :

## INVESTIGATIVE INFORMATION

SUBMITTING OFFICER: **Ermatinger**      DATE: **10-13-16**

INFO OBTAINED VIA: **phone**

OBTAINED ON DATE:          AT TIME:


     TOPIC: Debbie Tobolowsky  / And Dallas PD Vice Unit

NARRATIVE:
Ermatinger called Debbie on the phone and she stated she was
concerned for the safety of her son Michael since he was in court
proceedings with Aubrey. She was very worried about the situation
and felt Aubrey may harm her son.

Debbie asked if Ermatinger had talked with Tim Price the
Psychiatrist who Ira contacted about Aubrey. Ira had wanted Price to
complete a profile on Aubrey but refused.

## Tim Price – Psychriatist
972-679-6030

Ermatigner and Sayers talked to Price on the speaker phone. Price
stated he had been contacted by Ira about Aubrey. Price stated he
had never refused a job or request from Ira but he did in this case.
He did not ever evaluate Aubrey but stated from what Ira told him
the man is crazy and sues everyone. Price stated after Ira was
killed he felt he should contact Dallas PD and inform them Aubrey
maybe a suspect. Price stated he went to the NC Police Station and
talked to an Officer. The officer did not seem interested.
(Ermatinger never received any info from NC).

Price stated he would assist in any way in the future by looking at
Mental Health records and giving his opinion but he did not want his
name involved in the case. He stated he did not want his name used
in the case because he fears retaliation or a lawsuit from Aubrey or
Vodicka.

## Dallas PD Vice Unit
## Saul Monsisvais #7068

Ermatinger had received info regarding Steve Aubrey on a Web Sight
                                     2

Follow up required: Yes      No      Key words:_____

Supervisor Approval: _____        _____ COD002205
erm note debbie T and Vice unit 10-13-16            App. 000107

offering Massages. The Sight is a Gay sight and appears to be very sexual. Ermatinger requested Monsisvais to again check into the possibility that Aubrey is a male prostitute and if so to make cases. Mosisvais checked for web sights on previous date with negative results. Detective Sayers at Homicide pulled up Aubrey's Massage services on " Masseurfinder.com". This info was sent to the vice Detective who stated he would work on it.







UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

STEVEN B. AUBREY, and          §
BRIAN E. VODICKA,              §
                               §
           *Plaintiffs,*       §
v.                             §          CIVIL ACTION NO. 3:19-CV-056-B
                               §
D MAGAZINE PARTNERS, L.P., et al., §
                               §
           *Defendants.*       §

## DECLARATION OF BRIAN E. VODICKA

1.   My name is Brian E. Vodicka. I am more than 21 years old and I have never been convicted of a felony or crime of moral turpitude.  I am fully competent to make this declaration and all of the facts set forth herein are based on my personal knowledge and are true and correct.

2.   Defendants Robert Ermatinger ("Ermatinger") and Scott Sayers ("Sayers") were Defendants assigned to investigate the murder of Ira Tobolowsky ("Tobolowsky") and with the help of certain Tobolowsky family members, they deflected attention from where it most logically pointed. Instead of investigating Tobolowsky's manifold of businesses and business partners, Ermatinger and Sayers used extralegal means to harass, torment, embarrass, and injure Steven Aubrey ("Aubrey") and me, making us the scapegoats for murder and gathering irrelevant information on us with search warrants based on false information.  Defendants had ample evidence indicating we were not involved in Tobolowsky's murder, including an electronic trail and eyewitnesses.

## SEARCH WARRANT AFFIDAVITS

3.   Ermatinger and Sayers (collectively "Defendants") confirmed by oath and executed before various judges, nine (9) falsified search warrant affidavits that caused nine (9) unlawful search warrants to be issued and used against Aubrey and me. Because we have no connection to the murder, Defendants resorted to fabricating demonstrably false statements and outright lies to support a finding of probable cause. Ermatinger and Sayers lied, twisted true facts into false facts, fabricated false facts and impressions, and omitted key information to shape false impressions to support a finding of probable cause. Without the fabrication and falsity, there was nothing to support a finding of probable cause. I reviewed each search warrant affidavit ("SWA") executed by Defendants, including:

   a)   SWA No. 3: Steven Aubrey; May 18, 2016 (Doc. 169-1 at 8-9.);

   b)   SWA No. 4: Brian Vodicka; May 18, 2016 (Doc. 169-1 at 12-13.);

    c)   SWA No. 5: 7777 Glen America Drive, Apt. 223, Dallas; May 18, 2016 (Doc. 169-1 at 15-16.);

    d)   SWA No. 6: 7777 Glen America Drive, Apt. 223, Dallas; May 25, 2016 (Doc. 169-1 at 21-23.);

    e)   SWA No. 7: 8617 Southwestern Blvd. Apt. 911, Dallas; May 25, 2016 (Doc. 169-1 at 27-29.);

    f)   SWA No. 8: Verizon Wireless - Steven Aubrey; May 26, 2016 (Doc. 169-1 at 33-34.);

    g)   SWA No. 9: Verizon Wireless - Brian Vodicka; May 26, 2016 (Doc. 169-1 at 37-38.);

    h)   SWA No. 10: Three Computers; May 31, 2016 (Doc. 169-1 at 41-43.); and

    i)   SWA No. 11: Google, Inc.; October 5, 2016  (Doc. 169-1 at 46-53.).

Ermatinger executed SWA Nos. 3, 4 and 5 on May 18, 2016. Sayers executed SWA Nos. 6, 7, 8, 9, 10 and 11 from May 25 - October 5, 2016. Cites to records that prove the falsity in the SWAs are included.

4.   Seven (7) of the affidavits (SWA Nos. 5-11) included the same demonstrably false statements, which had they been absent from Defendants' SWAs, those SWAs would not have supported a finding of probable cause. The provably false statements, fabricated by Ermatinger and later plagiarized by Sayers, include:

    A.   It was aledged [sic] in the lawsuit that Steven Aubrey threatened "Jihad" the same words used to describe the wars brought by terrorists, **<u>and against his life</u>** which was filed in court document number 15-08135 in the 14 Judicial district court judge Eric Moye presiding.

    B.   Family members advised detectives that complainant Tobolowsky felt threatened by Steve Aubrey because of a law suit [sic] that complainant Tobolowsky won when he represented the mother of Steven Aubry [sic], Betsy Aubrey.

    C.   During the investigation Detectives discovered that the victim Ira Tobolowky [sic] was involved in a civil defamation lawsuit with Steven Aubrey and his partner Brian Vodicka who was representing him.

Ermatinger added the false fact about Aubrey threatening Tobolowsky's life in his SWA No. 5. His first two affidavits, SWA Nos. 3 and 4, did not yet include "and against his life," therefore, the statement was not false but was grossly misleading. It stated:

2

D.     It was aledged [sic] in the lawsuit that Steven Aubrey threatened "Jihad" the same words used to describe the wars brought by terrorists, which was filed in court document number 15-08135 in the 14 Judicial district court judge Eric Moye presiding.

By way of egregious and repulsive implication, and through Defendants' intentional omission of material information known to them, Ermatinger and Sayers created a false narrative to trick the judges into issuing at least nine (9) search warrants used against Aubrey and me. The SWAs contained the following misleading statements, which convey that Aubrey hated Jews and that we were hiding, both false.

E.     Ira Tobolowsky is of Jewish descend [sic] and felt Jihad was an anti-semitic [sic] statement.

F.     Neighbors stated that they have not seen either Steven Aubrey or Brian Vodicka since Saturday the 14th of May 2016 and they have not heard any occupants walking around inside.

G.     It is believed that who ever set the complainant on fire may have suffered serious burns and is hiding from public site as to prevent their injuries from being seen by the public as well as detectives (not in SWA Nos. 8 and 9).

Curiously, Ermatinger's first two affidavits (SWA Nos. 3 and 4) did not have the six (6) misspelled words/names that appeared in his third and final affidavit, SWA No. 5. As well, SWA No. 5 was also different because it included the new phrase, "and against his life," to the jihad statement. Sayers plagiarized Ermatinger's SWA No. 5, with the misspellings and the added death threat, as evidenced in his affidavits. Following is my analysis of the three (3) demonstrably false statements and four (4) statements that create a false narrative:

5.     **A.     It was aledged [sic] in the lawsuit that Steven Aubrey threatened "Jihad" the same words used to describe the wars brought by terrorists, and against his life which was filed in court document number 15-08135 in the 14 Judicial district court judge Eric Moye presiding.**

This statement is false. Over the course of one year and seven days, Tobolowsky made NINETY-SEVEN (97) "jihad" allegations directed at Aubrey and me but Tobolowsky never alleged a threat against his life. Ermatinger knew there was not an allegation of a threat against Tobolowsky's life because his first two affidavits (SWA Nos. 3 and 4) correctly stated, "It was aledged [sic] in the lawsuit that Steven Aubrey threatened 'Jihad,'" though it was misleading because Aubrey did not. Tobolowsky simply enjoyed making the wild and baseless allegations in his frivolous pleadings. Ermatinger decided to take the misleading, but true, statement and spice it up by adding his fabricated "and against his life," intentionally turning it into a death threat allegation.

3

6.   Because there was not a motive for Aubrey and/or me to murder Tobolowsky, Ermatinger and Sayers fabricated a false one about a court document that states Aubrey threatened Tobolowsky life with "jihad." Ermatinger's SWA Nos. 3 and 4 did not include the death threat "and against his life."  He added the death threat to his SWA No. 5. (Doc. 169-1 at 9, 13 and 16.) Thereafter, Sayers used the fabricated statement of fact in all of his SWAs. Before Sayers began perjuring himself in SWA Nos. 6 and 7, executed on May 25, 2016, Ermatinger interviewed me for approximately seven (7) hours on May 19, 2016. (He punished Aubrey for insisting on having a lawyer present by locking him up in an interview room for the same amount of time, without food or use of a restroom.) During my interview with Ermatinger I made it abundantly clear that Aubrey only used the term "jihad" in a letter to his mother, before he knew Tobolowsky. I repeated the information and Ermatinger acknowledged that he understood. The following was stated in the May 19, 2016 interview:

| | | |
|---|---|---|
| 9:30:31 pm | Ermatinger | What threw the light on him…he uses words like "I'm going to commit a jihad on you." What the hell does that mean? |
| | Vodicka | Well okay. Let me…let me clarify that statement. Let me clarify that statement. |
| 9:31:40 pm | Vodicka | He sent one email that he should not have said, that was in, that was in….this is 2016....and that was what? 2009? |
| | Ermatinger | 2009? |
| | Vodicka | One email in the heat of anger just when he found out and I'm telling you the spin on the one email has never stopped. |
| | Ermatinger | Ok well that's continuing today. |
| | Vodicka | And and and you see Tobolowsky, you see Schoettmer… |
| | Ermatinger | So that's 2009 was the first time he said that Jihad thing? |
| | Vodicka | Was only, only time, only time. |
| | Ermatinger | Steve sent an email. Ok. It goes that far back. Wow. |
| | Vodicka | Only time, only time, only time and I told him he should not have sent it and he said it was just his way of releasing his anger. |
| | Ermatinger | Who'd he send that to? |
| | Vodicka | His mother. |
| | Ermatinger | Okay                    (App. at 78.) |

4

7.   Tobolowsky NEVER alleged that Aubrey threatened his life. Ermatinger swore to the veracity of his intentionally fabricated death threat statement. It was/is an inflammatory lie with no basis in reality. Ermatinger had the audacity to attest to the false fabricated fact that Tobolowsky alleged that Aubrey threatened his life and the allegation was in a court document. His false statement of fact was designed to shock and alarm the criminal court judges to whom Defendants' affidavits were submitted and to paint calm and quiet Aubrey as a violent, rage-filled terrorist. Aubrey never threatened "jihad" against Tobolowsky and he never threatened Tobolowsky's life, as is clear from the face of documents filed in Case DC-15-08135. Shockingly, Sayers used the exact same false death threat statement even after my interview with Ermatinger where it was made crystal clear that Aubrey never used the term "jihad" while we knew Tobolowsky.

8.   In July 2015, Tobolowsky sued Aubrey and me for defamation, alleging that we had undertaken "jihad" to punish him for his "successful" representation of Betsy Aubrey. Tobolowsky had plucked the inflammatory word "jihad" out of context from a personal e-mail Aubrey sent to his mother in 2013 (months before any litigation and six months before Aubrey had heard the name "Tobolowsky") and studded it throughout the complaint. In November 2015, three days after the horrific terrorist attack in Paris that left over 130 people dead, hundreds more injured and much of the world still reeled in shock, Tobolowsky filed a first amended complaint that doubled the use of the inflammatory word "jihad" from the original complaint; he also included a completely fabricated assertion that Aubrey and I published a document "stating that Tobolowsky had become Muslim and had joined ISIS," which was as absurd as the almost humorously hyperbolic use of "jihad." Tobolowsky could never produce evidence to back up any of his nonsensical "jihad" claims in his July 2015 Petition, including:

- Defendant Aubrey expanded his "Jihad" against his mother and brother to also include Plaintiff.

- In furtherance of Defendant Aubrey's "Jihad," Defendant Aubrey... commenced a course of unethical and illegal behavior against Plaintiff and his representation of Betsy Aubrey.

- Because of Plaintiff's representation of Betsy Aubrey in the lawsuit, Defendant Aubrey had no success in his "Jihad" against his mother.

- Defendant Vodicka undertook to assist Defendant Aubrey in carrying out Defendant Aubrey's "Jihad" against Betsy Aubrey and her attorney, Plaintiff.

- In early 2015 Defendants decided to escalate their "Jihad" and sued, *inter alia,* Plaintiff.

- Defendants' defamatory statements were made deliberately, willfully, maliciously, and with the intent to carry out a "Jihad" against, *inter alia,* Plaintiff.

5

- Defendants deliberately made willful and malicious defamatory statements against Plaintiff, publishing to third parties all of these defamatory statements solely as part of their "Jihad" in an effort to cause severe harm to Plaintiff.

- As a direct and proximate result of Defendants' tortious "Jihad"...

- Judgment against the Defendants resulting from Defendants' illegal and unlawful "Jihad" and proven at time of trial. (App. 99-103.)

Aubrey and I were the targets of 97 relentless, senseless, and baseless "jihad" allegations. It appeared that Tobolowsky simply enjoyed the pleasure of the legal gamesmanship in a field that he influenced and controlled.

9.   Ermatinger and Sayers had knowledge their affidavits were not truthful and Ermatinger's fabricated addition of a death threat goes beyond reckless disregard for the truth; it was an intentional lie.

10.   **B. Family members advised detectives that complainant Tobolowsky felt threatened by Steve Aubrey because of a law suit [sic] that complainant Tobolowsky won when he represented the mother of Steven Aubry [sic], Betsy Aubrey.**

This statement is false. The false statement was material to support the finding of probable cause. Without a motive connecting Aubrey to Tobolowsky's murder, Ermatinger and Sayers fabricated a false one in which Aubrey was angry because he lost to Tobolowsky. First, during his lifetime, Tobolowsky never won a lawsuit against Aubrey or me either as a party or counsel for a party. Anger because of losing a lawsuit cannot serve as motive. Moreover, all of the records indicate that Tobolowsky did not feel threatened by Aubrey or by anybody, established by interviews with various media publications and especially in interviews by Ermatinger and Sayers.

11.   On May 24, 2016, Ermatinger interviewed Tobolowsky's wife Debbie and his son Michael. Ermatinger's notes:

> News reported there was an email threatening to kill Ira on 5-12-16. Michael stated there is definitely no such email. (App. at 21.)

In fact, Ermatinger's investigative report reflects that Debbie and Michael Tobolowsky never even mentioned Aubrey or me. His report concludes with a section titled "Person of interest" and throughout the entire interview there was just one person that concerned Debbie and Michael Tobolowsky even though the girl had not threatened Tobolowsky. Ermatinger's report states:

> Debra and Michael stated Ira had recently been approached by a semi homeless girl about getting money (inheritance) from a bank. She would call the house at all times, including late hours (3am). Michael and Steve Shotner [Schoettmer] have her info. (App. at 21.)

6

App. 000117

12.   Ermatinger's interview reflects that only one person of interest was discussed in the interview with Debbie Tobolowsky and it was not Aubrey or me.  The report also reflects that there was no discussion regarding anti-Semitism or anything that would suggest Tobolowsky's Jewish religion or ethnicity was connected to the crime.

13.   As well Dallas Fire-Rescue Capt. Stephens investigative notes reflect the same information detailed in Ermatinger's investigative report. Capt. Stephens's notes identify by name the one person of interest that Debbie and Michael Tobolowsky had talked about during Ermatinger's interview. His notes state:

> Ira approached by a lady 1½ months ago: Sharon Bornstein
> Had a trust fund. Stays in Motel
> She was very abusive and Ira refused to represent her.
> Heard her on phone. Called him 18 times over weekend.
> Loaned her $100.00. Ira can't help her.
> Sharon Bornstein: [redacted]
> Ira talked to her banker: VP JP Morgan [redacted]  (App. at 4.)

14.   Sayers gave an interview to *D Magazine* for its May 2017 story, "A Place Where Something Evil Happened" by Jamie Thompson. The article stated:

> A homicide detective named Scott Sayers arrived at the house wearing a button-down and tie. The detective asked Debbie: "Do you think this was an accident, or could someone have done this?"
>
> "What do you mean?" she asked. She couldn't think of anyone who wanted to hurt her husband. (App. at 71.)

15.   The article captures the first impressions of Michael Tobolowsky, stating:

> Before the flight, Michael had learned the fire might have been set intentionally. All he could think about was, Who? (App. at 72.)

16.   On June 23, 2016, over five weeks after Ira Tobolowsky's death, the *Dallas Morning News* article "Family of Slain Dallas Attorney Ira Tobolowsky Offers $20,000 Reward for Tips" by Tasha Tsiaperas stated:

> Though some have said Tobolowsky may have been killed because of his legal work, his sons said Thursday that they don't know if that was likely. 'We have no idea,' [his son] Michael Tobolowsky said. ... Tobolowsky's family has said he didn't express fear or concern in the days leading up to his death." (App. at 93.)

17.   Capt. Stephens with Dallas Fire-Rescue interviewed Leigh Allen, Tobolowsky's legal assistant for 18 years, on May 18, 2016. His investigative notes state:

> Has access to his emails and has reviewed them.

Has not seen any threatening emails or letters. (App. at 3.)

18.   The many records and interviews of Tobolowsky's wife, sons, and legal assistant for 18 years all confirm that they have ever "seen any threatening emails or letters," "couldn't think of anyone who wanted to hurt" Tobolowsky, think it is unlikely that Tobolowsky was killed because of his legal work, and they said Tobolowsky "didn't express fear or concern in the days leading up to his death." All of the records prove that no Tobolowsky family member said Tobolowsky felt threatened by Aubrey, or anybody.

19.   My Interrogatory No. 10 to Sayers stated:

> Identify the name, address, and phone number of each Tobolowsky family member who advised detectives that complainant Tobolowsky felt threatened by Steve Aubrey because of a lawsuit that complainant Tobolowsky won when he represented the mother of Steven Aubrey, Betsy Aubrey as you stated in Affidavits 1-6.
>
> **Answer:** To the best of Defendant's knowledge, recollection and belief, Defendant Sayers refers Plaintiff to Defendant Ermatinger's Answer to Interrogatory No. 8 issued by Plaintiff Brian Vodicka. (App. at 38.)

20.   To the best of Sayers's knowledge, recollection and belief, he refers me to Ermatinger's answers?   That is a nonsensical no answer. Because Sayers completely relied on Ermatinger's false statements of fact in Sayers's' six SWAs, he was unable to answer and instead, directed me to Ermatinger's answers that stated Ermatinger,

> "had many conversations with various members of the Tobolowsky family, and does not recall the specific statements made by each person." (App. at 38.)

21.   As a senior detective, Ermatinger took copious notes with meticulous detail but there is absolutely nothing about something as serious as the complainant feeling threatened by Aubrey.

22.   **C.   During the investigation Detectives discovered that the victim Ira Tobolowky [sic] was involved in a civil defamation lawsuit with Steven Aubrey and his partner Brian Vodicka who was representing him.**

 This statement is false. Aubrey and I were both party defendants in this frivolous case filed by Tobolowsky. I never represented Aubrey in this case.

23.   I believe this false statement was fabricated with reckless disregard for the truth to separate Aubrey from me and set him up to be responsible for "jihad" and for the murder. Tobolowsky's "jihad" lawsuit made fantastical "jihad" *allegations* directed at *both* Aubrey and me. Additionally, because the name Tobolowsky was mistakenly misspelled just one time in this one sentence, it proves that Sayers blindly copypasted the statement from Ermatinger's affidavit. "Tobolowky" first appeared in Ermatinger's SWA No. 5 (Doc. 169-1 at 16) and then in Sayers's SWA Nos. 6, 7, 8, 9 and 11 (Doc. 169-1 at 22, 28, 34, 38 and 48).

8

24.    **D.   It was alleged in the lawsuit that Steven Aubrey threatened "Jihad" the same words used to describe the wars brought by terrorists, which was filed in court document number 15-08135 in the 14th Judicial District Court Judge Eric Moye presiding.**

This was Ermatinger's first edition "jihad" statement (SWA Nos. 3 and 4). Ermatinger's second edition (SWA No. 5) includes the misspelled word "aledged" and the added "and against his life" that transforms the misleading statement into a death threat. The "jihad" statements have never been proven and were simply Tobolowsky's use of senseless hyperbole.

25.   Before Ermatinger included the four words that made the statement a death threat, it was just a very misleading statement because on July 21, 2015, Tobolowsky had in fact filed a "jihad" lawsuit against Aubrey and me that contained multiple frivolous and fanatical "jihad" allegations, including:

- Defendant Vodicka undertook to assist Defendant Aubrey in carrying out Defendant Aubrey's "Jihad" against Betsy Aubrey and her attorney, Plaintiff;

- In early 2015 Defendants decided to escalate their "Jihad" and sued, *inter alia*, Plaintiff; and

- Defendants' defamatory statements were made deliberately, willfully, maliciously, and with the intent to carry out a "Jihad" against, *inter alia*, Plaintiff.

26.   Defendants might have researched the court documents and personally read Tobolowsky's bizarre and never before seen use of the term "jihad" and then possibly determine if there was any basis for the wild allegations. Defendants should have attempted to determine if I did, in fact, assist Aubrey in carrying out his jihad against my mother and Tobolowsky. They should have searched for evidence that support Tobolowsky's allegations that Aubrey and I sued Tobolowsky to escalate our "jihad" or evidence to prove defamatory statements could be made with the intent to carry out a "Jihad" against Tobolowsky. But Defendants failed to investigate the allegations.

27. In fact, Tobolowsky had a continuum of endless applications to use with "jihad." Like a blue-plate special, he would fabricate new and delusional definitions for "jihad" on a regular basis and then attribute it to Aubrey or Aubrey and me. Tobolowsky's first round of "jihad" allegations was in Defendant's First Amended Answer filed on January 13, 2015, in Cause No. PR-14-01486-3 in Dallas County, Texas Probate Court No. 3. Two of Tobolowsky's first round of "jihad" definitions included:

- as part of his Jihad, gathered financial information about the Family Trust and its assets and then filed false claims with the IRS against the Defendants for tax fraud and tax evasion.

9

App. 000120

- as part of his Jihad, began filing numerous lawsuits against both Defendant Betsy Aubrey (including the instant lawsuit) and against Defendant Richard Buck Aubrey, Jr.

It is difficult at best to see how Tobolowsky's original "jihad" definitions comport with his definitions just six (6) months later. (*Id.* ¶ 25.) How does Aubrey's "jihad" that includes filing claims with the IRS for tax fraud and tax evasion; and filing numerous lawsuits against his mother and brother (the original claims) have anything to do with escalating our "jihad" by suing Tobolowsky and our defamatory statements made with the intent to carry out a "Jihad" against Tobolowsky. Tobolowsky just made it all up as he went along. This was Tobolowsky's "jihad" not mine and not Aubrey's.

28.   Allegations are just unproven claims of wrongdoing. Tobolowsky made 97 "jihad" allegations directed at Aubrey and me and nobody, including Tobolowsky, has ever been able to prove the fanatical and nonsensical "jihad" allegations. Aubrey only used the term one time in an email to his mother, before he knew the name "Tobolowsky." Tobolowsky fabricated his "jihad" legal filings to make Aubrey and me look like terrorists and instead of Defendants investigating to see if there was any truth to support them, instead, they chose to present judges the false narrative that Aubrey was a radical who had threatened Tobolowsky with "jihad."

### 29.   **E.   Ira Tobolowsky is of Jewish descend [sic] and felt Jihad was an anti-semitic [sic] statement.**

This statement is grossly misleading. Ermatinger's disgusting and underhanded statement, without reference to where the information originates, was strategically place to imply that Aubrey is anti-Semitic. The statement immediately followed Ermatinger's fabricated death threat allegation that stated Aubrey threatened "jihad" against Tobolowsky's life. Because there was not a motive for Aubrey or me to murder Tobolowsky, Ermatinger fabricated a motive in which Aubrey hated Jews and because Tobolowsky was Jewish, Aubrey murdered him. Yes, Tobolowsky may have been Jewish and yes, he may have felt jihad was an anti-Semitic statement, but Ermatinger and Sayers should have questioned why someone who is Jewish and felt jihad was anti-Semitic was so unusually connected to the term, remembering that Tobolowsky made 97 "jihad" allegations against Aubrey and me and out of the 97, he *never* alleged "jihad" was anti-Semitic. Tobolowsky would never have known Aubrey knew the term "jihad" had he not gone digging through his client's old letters and email.

30.   Aubrey only used the "jihad" term once in an email sent to his mother, who is not Jewish, before Aubrey or I had ever heard of the name "Tobolowsky" and upon information and belief, Aubrey's mother did not know Tobolowsky at that time as well. However, attacking and destroying a person's reputation is a specialty of Ermatinger and Sayers and they go to great lengths to do it. Defendants' records reflect that they were the organizers of a conspiracy to entrap Aubrey for a prostitution charge and further destroy his name, which had been highly respected for 55 years. Nobody wants to have lunch with an "anti-Semitic" "terrorist" "prostitute."

31.   Tobolowsky's obsession with "jihad" paralleled his passion for spiritual opportunism, the use of religion for personal gain. Evangelicals are well known for using religion for financial

and political gain. Exploiting religion is as old as religion itself, which is what Tobolowsky did when he falsely accused that Aubrey was an anti-Semite. Tobolowsky was not the only one exploiting religious discrimination; his niece, Stacy Paddack, is guilty of spiritual opportunism as are Ermatinger and Sayers, who included the above religious prejudice statement to support a finding of probable cause and gave them the search warrants they sought.

32.   In fact, it was Tobolowsky himself who mocked the Jewish religion. Tobolowsky, Aubrey and I were in a court hearing before Judge Ingrid Warren in approx. July 2015. Tobolowsky chuckled out loud because he said he was working during the Jewish high holidays. He was able to get Judge Warren to laugh along with him when he told her that so long as she did not tell his rabbi, then everything would be fine. Tobolowsky was mocking the importance of the Jewish high holiday, yet he called Aubrey an anti-Semite simply because Aubrey did not know the dates of the high holiday. Does this indicate that Tobolowsky was also an anti-Semite?

33.   In 2014, Tobolowsky first raised his false "anti-Semite" claim as a diversion and stalling tactic employed to prevent Aubrey from deposing Buck Aubrey and his CPA, David Hendricks. Aubrey unknowingly attempted to schedule a deposition during the Jewish holiday, Rash Hashanah. Tobolowsky pounced on the opportunity and pretended he was hurt and offended that Aubrey did not know the dates of Jewish holidays and he branded Aubrey an anti-Semite. I personally executed a declaration in the underlying probate case, as did four (4) other people, that refuted Tobolowsky's branding Aubrey with the anti-Semite label.

34.   It is irrefutable that for the 25 years I have known Aubrey, has never said or written anything derogatory about Jews or the Jewish faith. Nor have I ever heard anybody allege such nonsense until my recent discovery that Tobolowsky's niece, Stacy Paddack, falsely accused that Aubrey had written anti-Semitic statements. However, the U.S. Justice Department did not find Stacy Paddack's claims viable, as she was unable to produce documents to support her baseless allegations. Not even Tobolowsky dared to make that empty claim as there was no evidence that Aubrey ever made negative comments about Jews, because he did not. Tobolowsky was attempting to tie anti-Semitism around Aubrey's neck based upon his lack of knowledge regarding Jewish holidays. Even Tobolowsky never claimed that Aubrey said or wrote anything about Jews or Jewish faith. The more Aubrey alleged that Tobolowsky was simply using his religion to avoid depositions in the case, the more Tobolowsky accused that he was anti-Semitic.

35.   Ermatinger and Sayers took Tobolowsky's flare for creative fabricated facts to another level by combining "jihad" with anti-Semitism, stating: **"Ira Tobolowsky is of Jewish descend [sic] and felt Jihad was an anti-semitic [sic] statement."** Not even Tobolowsky could conjure up this interesting combination of religious hate. Defendants can't expect the Court to believe that Tobolowsky "felt" that "jihad was an anti-semitc statement" when he never alleged it once in all of his 97 "jihad" allegations filed against Aubrey and me. Tobolowsky made every other kind of ridiculous claim imaginable, but not that jihad was anti-Semitic. (*Id*. ¶ 7.) Once again, Defendants' most alarming statements of "fact" have no records to support the statements. Here, the three (3) SWAs filed by Ermatinger and six (6) by Sayers, include this statement concerning how Tobolowsky "felt."

11

36.  Tobolowsky never even alleged that "jihad" was anti-Semitic in his "jihad" lawsuit, likely because it never crossed his mind. Ermatinger and Sayers fabricated the statement to tie around Aubrey's neck. What Tobolowsky "felt" about "jihad" is a study in itself as he used the term 97 times in court filings over the course of 372 days, but his undocumented feelings about "jihad" are irrelevant to Aubrey or me, irrelevant to finding of probable cause, and were included in Defendants' SWAs for improper purposes.  Neither Ermatinger nor Sayers know what Tobolowsky felt because he was deceased and they had not previously been friends with him.

37.   **F.   Neighbors stated that they have not seen either Steven Aubrey or Brian Vodicka since Saturday the 14th of May 2016 and they have not heard any occupants walking around inside.**

Defendants fabricated their baseless motive that Aubrey hated Jews; Tobolowsky was Jewish; so Aubrey wanted to murder Tobolowsky. To further support a finding of probable cause Ermatinger and Sayers promoted the false narrative that Aubrey and I were on hiding or on run.

38.   For reasons unknown, Ermatinger and Sayers affidavits contain "facts" that contradict other facts in the same affidavits. Ermatinger's SWA Nos. 3 and 4 and Sayers's SWA No. 10 prove that Aubrey and I were in and out of our home per usual.

> Detective R. Laurence #9191 and Detective D. Richardson #6361 initially observed the blinds in the window of apartment #223, the first window south of the front door, were open and slightly angled upwards with a darkened background. Detectives Laurence and Richardson left the location for a while and when they returned they observed the blinds to the same window closed and angled downward with a light on in the background, which indicated that someone had been in the apartment. (Doc. 189-1 at 9, 13, 42.)

If they knew we were going in and out of our home, why would they make the statement about the neighbors (whom they fail to identify)?

39. The records produced in this case reflect that on May 21, 2016, Detective D. Richardson assisted Ermatinger "with a canvass of the neighbors regarding the murder." Like Ermatinger, Detective D. Richardson takes very detailed notes as part of his duties as a detective. He listed each neighbor by address and name and wrote what each of them had observed. This is the same Detective D. Richardson who Ermatinger and Sayers allege talked to our neighbors (but did not take notes this time) and said the neighbors had not seen us.

40. Because Defendants' allegation that we were in and out of our home is supported with specific notes about windows, blinds and lights; this can serve as a legitimate fact. Ermatinger's and Sayers's blanket statement about what neighbors heard and saw is not supported by anything and is a lie.

41. Ermatinger and Sayers did not produce any records that support his claim that our neighbors had not seen or heard us since May 14, 2106, indicating this is just another fabricated lie. Like his fabricated blanket statement that Tobolowsky "felt jihad was anti-Semitic,"

App. 000123

Ermatinger believes his affidavits are opportunities to exercise his creative writing skills and truth is not encouraged. Ermatinger includes false statements and false impressions in his SWAs to support a finding of probable cause. Sayers just copies and uses anything manufactured by Ermatinger.

42.   Additionally, Ermatinger admitted that he was tracking our credit cards. (App. at 79.) He also admitted that in addition to knowledge of the date we made a charge, they knew the exact time of the charge. The credit card statement reflects that between the morning of Tobolowsky's murder on May 13, 2016, and the time Ermatinger presented his sworn affidavits to a judge on May 18, 2016, we were frequently seen in public using our credit cards to eat in restaurants eight (8) times, shop in grocery stores five (5) times, and visit various other stores three (3) times. Before Ermatinger and Sayers signed and presented their affidavits for search warrants to judges, they had knowledge that contradicted their statements of fact in their respective affidavits.

43.   The Trader Joe's charge was the result of Aubrey's solo trip to the store to buy groceries on the same day and morning of the murder, May 13, 2016. The transaction occurred at approximately 9:05 am, less than 75 minutes after the murder (Dallas Fire-Rescue responded to the fire at 7:52 am) and Ermatinger knew it. (App. at 79.) Aubrey and I were not hiding from the public. Ermatinger and Sayers had all of the credit card proof plus they knew we had an out of town house guest, a licensed physician, and they knew about Aubrey's visit to his dermatologist's office. Ermatinger and Sayers had that information in their possession, yet made a conscientious decision to keep that information concealed from two different judges, Howard and Bennett.

44.   Ermatinger knew we were both frequently out in public view and were both using our credit cards in Dallas, Texas. Sayers just copypasted and presented the same misleading information six (6) additional times to judges AFTER we had been located AT OUR APARTMENT before being locked up at DPD headquarters for more than seven (7) hours. Sayers's regurgitation of this false narrative is more egregious than Ermatinger's creation of the narrative because Sayers knew more of the truth after May 19, 2016, reflecting his intention to include the false facts.

45.   **G.  It is believed that who ever set the complainant on fire may have suffered serious burns and is hiding from public site as to prevent their injuries from being seen by the public as well as detectives** (not in SWA Nos. 8 and 9).

Ermatinger and Sayers were completely aware that Aubrey and I were not hiding from public view and that we did not have burns on their bodies. After my false arrest and during the improper detention on May 19, 2016, Ermatinger interviewed me and I told him that Aubrey had been to see his dermatologist, *a medical doctor who specializes in skin*, for a scheduled appointment, ironically, just hours after the fire and Tobolowsky's death on May 13, 2016. Days after, I followed up on what would be exculpatory evidence regarding the burns and left Ermatinger a voice message encouraging him to follow up on Aubrey's dermatologist appointment. I believe Ermatinger and Sayers did not follow up because Ermatinger had personally seen Aubrey's unburned arms and the burn theory was a red herring. When

13

Ermatinger and Sayers illegally entered my personal residence on October 20, 2016, to interview me, Ermatinger admitted that he did not follow up on Aubrey's dermatologist appointment that took place just a few hours after the fire/murder.

46.   Ermatinger and Sayers failed to investigate Aubrey's appointment with the skin specialist and Ermatinger failed to admit that when he personally inspected Aubrey's arms, there were no burns. Nevertheless, with knowledge of the truth, Sayers proceeded to use the false fact about burns in six additional affidavits for search warrants that caused six more unlawful search warrants to be issued. He presented falsified affidavits beginning on May 25, 2016, and he continued to rely on the false facts for 4½ months, presenting his last known fraudulent affidavit for search warrant on October 5, 2016, all used the same false information that we "may have suffered serious burns and is [they are] hiding from public site as to prevent their injuries from being seen by the public." (Doc. 169-1 at 21-52.)

47.   When Ermatinger and Sayers conducted a warrantless entry into my personal residence to conduct a interview on October 20, 2016, I was surprised to learn from Defendants that there was no follow-up or investigation into Aubrey's appointment with the dermatologist just hours following Tobolowsky's death. A business record affidavit from Highland Dermatology authenticates Aubrey's visit and the doctor's previous instructions for Aubrey to refrain from exhaustive physical activity due to possible rupture of the sutures on his back.  (App. at X.)

48.   The day after I was interviewed by Defendants, for approx. 7 hours into the late night of May 19, 2016, Aubrey and I met with a criminal attorney. He advised that we take our own pictures to ensure DPD's photos would not be altered.  The following day, I took multiple pictures of Aubrey's arms positioned in front of that day's copy of the Dallas Morning News for proof of the date. Just like the photos taken of Aubrey's arms at police headquarters (App. at 83-86.), the photos I took show that Aubrey had no burns. However we noticed that taking pictures with a flash did not capture the fine hairs on Aubrey's arms. We went outside in the bright sunlight and after figuring out just the right angle to get the shot, my photos show the fine hairs on his arms and hands, contradicting the E.R. physician's misdiagnosis that hair was missing. The fine hairs can be seen in my pictures. (App. at 87-88.) If Ermatinger or Dr. Eastman had bothered to look at Aubrey's hands and arms closely, they would have noticed that that no hair was missing. While Dr. Eastman is not dermatologist or a skin specialist, almost anybody is capable of recognizing hair. The DPD doctor stated in his evaluation of Aubrey:

> There were uneven areas where it appeared there was no normal hair. It was in a nonspecific splotchy pattern and was not even at all. (App. at 16.)

I believe Dr. Eastman made the fraudulent representation because he did not want his time to have been wasted so late at night, or he wanted to bolster Ermatinger's weak case, or his vision is very poor and he sees splotchy patterns where others do not, problematic for an E.R. physician. The same fine hairs were on Aubrey's arms on May 13, 2016, the day he went to his dermatologist for a prescheduled visit, which was the same day and the fire/death. Aubrey never suffered from any burns that week and the same fine hairs are on Aubrey's arms today (August 8, 2020) and there are no "uneven areas" with missing hair in a "nonspecific splotchy pattern"

14

App. 000125

that is not even at all." (App. at 89-90.) The pictures were taken directly under a table lamp to capture the hair on Aubrey's arms.

49.   Ermatinger fabricated the above demonstrably false statements and misleading statements (*Id.* ¶¶ 5-48.) that created a false narrative, which included:

- Tobolowsky stated in a court document that Aubrey threatened to kill him with jihad;

- Unidentified Tobolowsky family members told Ermatinger that Tobolowsky was scared of Aubrey;

- Aubrey was the only one being sued for jihad;

- When we decided to escalate our jihad, Aubrey and I sued Tobolowsky;

- Unidentified persons told Ermatinger that Tobolowsky felt jihad was anti-Semitic;

- Unidentified neighbors, with whom we were inseparable, suddenly did not see us;

- Aubrey and I had burns so we were hiding from public view;

- Aubrey has terrorist origins and he hates Jews; and

- Because Tobolowsky was Jewish, Aubrey killed him with jihad.

Ermatinger's SWAs purported a false motive and a false allegation that Aubrey and I were hiding, which neither is true. His SWAs demonstrate reckless disregard for the truth at a minimum and his false and misleading statements were material in supporting a finding of probable cause.

50.   The records reflect that the six (6) SWAs executed by Sayers were based solely on hearsay.  My Interrogatory No. 7: "List each fact that you personally verified in Affidavits 1-6." Answer: "Subject to the foregoing objection, Defendants answers that all of the information in Affidavits 1-6 was obtained from sources Defendant believed to be reliable…" (App. at 37.) Because the false statements of fact and false narrative contained in Ermatinger's three (3) SWAs was based on alleged hearsay, Sayers's SWAs that followed are based entirely on hearsay based upon hearsay, not on "verified facts" that Defendants personally represented to the judges.

51.   In addition to their nine (9) SWAs, Ermatinger and Sayers drafted search warrants for the judges to sign and the warrants included the following: "I find the verified facts stated by affiant…" But Defendants were committing aggravated perjury when presenting a document with nothing but unverified facts. They relied on hearsay and the hearsay came from untrustworthy sources.

52.  In violation of Texas law and at risk to be fined and/or imprisoned, Ermatinger and Sayers perjured themselves repeatedly in SWA Nos. 3, 4, 5, 6, 7, 8, 9, 10, and 11, tricking all judges (who read them) into issuing unlawful search warrants.

**ERMATINGER'S AND SAYERS'S OCTOBER 2016 WARRANTLESS ENTRY**

53.  Ermatinger and Sayers made a warrantless entry into my home without exigent circumstances. They have unsuccessfully tried to rewrite history and call it a welfare check, but in truth, the corrupt detectives were illegally conducting another interview. It is a criminal offense for people to enter homes that do not belong to them and that applies to police officers who don't have warrants or a potential emergency concerning the resident.

54.  Ermatinger and Sayers conspired with other DPD officers to develop an elaborate sting and harassment operation falsely arresting Aubrey and then using that as an excuse for Defendants' warrantless entry into our residence on October 20, 2016, to interview me while Aubrey was falsely imprisoned. The plan failed because their timing was off and Aubrey is not a prostitute. Ermatinger and Sayers had already illegally trespassed into my residence before Aubrey was entrapped for the prostitution charge. The records produced in response to discovery requests combined with my records prove Defendants' "welfare check" alibi was a sham. Ermatinger's investigative report for October 20 is appropriately titled, "Steve Aubrey Arrested / Vodicka Interview." (App. at 22.)

55.  Just as Aubrey was being led away in handcuffs across town, I awoke to find Ermatinger perched on the bed beside me. Ermatinger immediately informed me that Aubrey had been arrested without telling me the charge. The purpose of Aubrey's arrest was to not only humiliate Aubrey but also to separate Aubrey from me for a lengthy period hoping that I would make unguarded statements without Aubrey or counsel for protection. Ermatinger's and Sayers's illegal entry into the intimate space of our bedroom was to shock, upset, and disorient me and to elicit discombobulated, Depakote- and Seroquel-fueled statements in which I would self-incriminate, incriminate Aubrey, and/or provide recorded material for purposes other than law enforcement, such as programming content. I did none of those things. I questioned Ermatinger and Sayers about why they did not "followed up" with Highland Dermatology; the false story they had peddled in their sworn affidavits; and I stressed on the need to "follow the money" to solve Tobolowsky's murder, not providing Ermatinger and Sayers the "content" they sought.

56.  At no time did Ermatinger or Sayers state they were checking on my welfare during their unwelcome and warrantless intrusion into my home without reason. Ermatinger conspired with Sayers and Dallas Police Vice Unit Detective Monsisvais ("Monsisvais") to attempt to entrap Aubrey for prostitution. The entrapment was unsuccessful and resulted in an illegal false arrest instead.

57.  "Ermatinger had received info regarding Steve Aubrey on a Web Sight offering Massages." (App. at 107-8.).  Whoever told Ermatinger this also said the website appeared to be sexual.  With that information alone and a big dose of wishful thinking, Ermatinger (a homicide detective) decided to conspire with others to make a case for prostitution against Aubrey. Ermatinger told Sayers and Sayers (a homicide detective) spent part of his day thumbing through

16

gay web sites until he finally found Aubrey's massage ad on "Masseurfinder.com." Sayers contacted Monsisvais, who said he would entrap Aubrey for prostitution. (App. at 108.)

58.   Ermatinger's Investigative Information for October 20, 2016, titled: "Steve Aubrey Arrested / Vodicka Interview," reflects that Ermatinger was counting on Aubrey to be arrested at 2pm:

> 11:50am
> Monsisvais contacted Ermatinger on this date and stated they were working the case on Steve Aubrey for Prostitution and expected to arrest him at 2pm. Ermatinger requested he be informed that the arrest did occur. (App. at 22.)

Ermatinger made plans accordingly. He and Sayers would be at our residence at 2pm to interview me. However, Aubrey had shifted the time of his appointment with the vice cop "Ryan" to 2:15 pm. Aubrey arrived at the hotel at exactly 2:15 pm (App. at 88.) and still make his way through the parking area and the large hotel to meet his "massage client."

59. But Ermatinger and Sayers had already knocked on the door of our residence, made their way to the management office of the property to lie to the manager about a welfare check to get a key to our residence, and likely had already illegally entered our residence and had begun harassing me before Aubrey was falsely arrested. To make his story look legitimate, Ermatinger lied in his October 20, 2016 investigative notes so that he could say that *both* detectives went to do a welfare check on me because they had learned of Aubrey's arrest *and* were concerned about how I would deal with the news of the arrest. Ermatinger's report falsely states that Aubrey was arrested at 2:10 pm, before he had even arrived at the hotel.

> 2:10pm
> Ermatinger was contacted by Vice unit that Aubrey had been arrested and was being charged with Prostitution. (App. at 22.)

60.   But Aubrey had not even arrived at the Hilton Anatole for his appointment with "Ryan." Aubrey saved his text messages from that day, which reflect that at 2:15pm, Aubrey sent a text to "Ryan" which stated: "Just parked." (App. at 88.) As the text reflects, Aubrey did not valet park, he parked in the self-parking lot of the Anatole, a massive hotel complex. The following day, I drove Aubrey to pick up his car at the Anatole. Aubrey showed me where he had parked his car, which was gone because Ermatinger's gang impounded his car to further harass and punish us. The self-park area would have required approximately 10 more minutes for Aubrey to unload his massage table and supplies, walk through the parking lot, navigate the hotel, and make his way to the room number given him by "Ryan," likely at 2:25 pm.

61.   Yet Ermatinger's notes reflect that 20 minutes after he heard Aubrey was arrested at 2:10 pm, he and Sayers drove to my apartment complex and he began his interview with me at 2:30 pm, stating:

> 230pm
> Interview of Brian Vodicka
> Detectives Ermatinger and Sayers went to Vodicka's residence to interview him regarding the Tobolowsky case.
>
> Detectives interviewed Vodicka regarding the murder case. He denied taking part in or knowing about the murder. Stated they had never hurt anyone at any time ever.
>
> Detectives were going to transport Vodicka to Homicide for the interview but due to his medicated condition detectives interviewed him in the apartment.
>
> 4:03pm detectives left Vodicka's apartment. (App. at 22-23.)

But since Aubrey was actually arrested at about 2:30 pm, it would have been impossible for Ermatinger and Sayers to receive the news of the arrest, drive a minimum of 15 minutes to our residence, knock on the door for five or six minutes, go to retrieve a key from the property manager, and begin their welfare check (interview) at 2:30 pm. Even if the arrest had occurred at 2:10 pm per Ermatinger's falsified notes, it would have been impossible to fit all of that in and begin the interview at 2:30 pm. If Aubrey had been arrested 30 minutes earlier than the actual time he was arrested, Defendants could have just barely used Aubrey's arrest as an excuse for their illegal visit, but the records prove it did not happen that way. And on what authority were Detectives "going to transport Vodicka to Homicide for the interview but due to his medicated condition detectives interviewed him in the apartment."

62.   Ermatinger and Sayers have spun a story without any inkling that Aubrey had saved screenshots of my texts and phone activity from October 20, 2016. Their long and unwelcome interview likely started at approximately 2:32 or 2:33 pm because I sent Aubrey a text at 2:31, "Someone knocking. I can't see anybody." (App. at 90.) My text to Aubrey immediately followed my two (2) unanswered calls to him at 2:29 and 2:30 pm, the same time Aubrey was falsely arrested. The second time I called I left a message that someone was knocking at the door but by the time I got there, I could not see anybody. While I was calling, leaving a voice message and sending a text to Aubrey, Ermatinger and Sayers had gone to the property management office to lie to them about a welfare check and get a key. Neither Ermatinger, Sayers, or the apartment manager attempted to call me by phone on this day.

63.   I provide a true and correct copy of that text message and recognize the date, time, and substance of that message I sent. (App. at 90.) My first attempt to reach Aubrey was at 2:29. That indicates that I had already walked from my bedroom to the front door at 2:28 but nobody was there, indicating that Ermatinger and Sayers had left by 2:27 to walk to the management office to lie about a welfare check as a false inducement and procure a key to my personal residence. Defendants both affirm in their declarations that they knocked on my door for 5-6 minutes before going to the office to get the key, which indicates they began knocking at 2:21 or 2:22, the same time Aubrey was making his way through the hotel parking lot and into the hotel itself, before reaching the door of his client, Ryan at approximately 2:25 pm.

18

64.   Documents and records dictate the true timeline of events on October 20, 2016, during the hour of 2:00 pm:

2:10      Ermatinger falsely states Aubrey was arrested. (App. at 22.) Impossible.

2:15      Aubrey sent "Ryan" a text message, "Just parked." (App. at 88.)

2:21-22  Detectives began knocking "five to six minutes." (Doc. 169-1 at 63, 71.)

2:25      Aubrey arrived at Ryan's door in the hotel.

2:26-27  Detectives stop knocking and went to get the key. (Doc. 169-1 at 63, 71.)

2:28       I walk from bedroom to check the front door and saw nobody.

2:29       I tried to call Aubrey. (App. at 89.)

2:30      Aubrey was arrested (plus or minus one minute)

2:30       I tried to call Aubrey and left a voice message. (App. at 89.)

2:31       I sent a text message to Aubrey, then fell back asleep (App. at 90.)

2:32+     Detectives illegally entered my residence to interview me.

Records prove that at 2:29 Vodicka attempted to contact me as a result of Defendants' knocking. Ermatinger's and Sayers's declarations are their proof that they started knocking on my door at 2:21-22. Records prove that Aubrey was not arrested at 2:10 or at 2:15. The records prove that Ermatinger and Sayers began knocking on my door prior to the arrest of Aubrey, not after. This is critical to the veracity of Defendants' declarations that purport the reason for the warrantless entry was a welfare check on me. Their elaborate sting and harassment operation was designed to illegally enter my residence to interview me.

65.   Defendants disingenuous story about concern for my health and welfare does not fit the timeline that is supported by the records. (Doc. 168 at 10-11.) The Brief in Support of their Motion for Summary Judgment on Qualified Immunity ("Brief") (Doc. 168.), filed by Ermatinger and Sayers paints a completely false picture for this Court; one where Ermatinger and Sayers had no idea Aubrey would be arrested for prostitution, stating:

On October 20, 2016, DPD officers arrested Aubrey for prostitution. Because Detectives Ermatinger and Sayer were actively investigating Aubrey for the Tobolowsky murder, they were notified of the arrest. They also know from experience that Aubrey would be unable to contact Vodicka to tell Vodicka that Aubrey was been arrested and that Vodicka may need to make other health-related arrangements. Therefore, Detectives Ermatinger and Sayers decided to stop by Plaintiffs' apartment to let Vodicka know what had happened and make

19

App. 000130

sure that Vodicka would be safe and cared for in Aubrey's absence. When Defendants arrived, they knocked loudly on Vodicka's apartment door, identified themselves and called his name for five to six minutes. (Doc. 168 at 10-11.)

Because Defendants can't use Aubrey's arrest as an alibi for a welfare check, there is no exception to the warrant requirement and their unwelcome entry into my residence illegal.

66.   If Ermatinger had been the least bit interested in my welfare, he could have called me as he had previously done in May 2016. If Ermatinger was interested in my welfare, he would not have slithered into my dark bedroom, sat at the foot of my bed touching my leg, and then further shock me with the implication that Aubrey was arrested for Tobolowsky's murder. Everything Ermatinger and Sayers did on October 20, 2016, was illegal and detrimental to my welfare. Following Ermatinger's and Sayers's intrusion on my privacy. I never again felt safe in that apartment.

67.   No matter how many DPD officers were engaged to attempt to entrap Aubrey, no matter how many work hours Sayers spent looking through gay websites, no matter how much of the city's tax dollars were spent on the room at the Anatole, a prostitution charge cannot be prosecuted unless you actually arrest a prostitute. Defendants' interview was extremely expensive.

## THE BRIEF AND DISPUTED FACTS

68.   I have reviewed the Brief filed by Ermatinger and Sayers. Defendants are attempting to rewrite history and fabricate even more false facts to convince this Court that the finding of probable cause was valid whether or not the representations in the affidavits were false. Ermatinger and Sayers double down on the lies they previously presented to other judges. The first 12 pages of the Brief are deceptively titled "Undisputed Facts." It has no less than *twenty* (20) "undisputed facts," which I absolutely DISPUTE as they are provably false, inaccurate, and/or misleading. Cites to records that prove the falsity in the Brief are included. The *disputed* facts are detailed below:

69.   **"Undisputed Fact" No. 1** "When Detective Sayers asked her who could possibly have wanted to kill the victim, Mrs. Tobolowsky identified Plaintiffs Steven Aubrey and Brian Vodicka." (Doc.168 at 2.)

This "undisputed fact" is false and was fabricated specifically for this lawsuit. The statement contradicts all of the interviews given by Tobolowsky family members and Debbie Tobolowsky, which all reflect that she could not think of anybody who wanted to hurt her husband, Ira Tobolowsky ("Tobolowsky"). In fact, Sayers's statement directly contradicts his own quoted statement included in *D Magazine*.  (Id. ¶ 12.)

70.   Sayers forgot that he had already told D Magazine the truth reflecting Debbie Tobolowsky's initial reactions regarding someone wanting to hurt her husband. The records completely contradict Sayers's recollections of his first encounter with Debbie Tobolowsky, and

contradict all immediate family interviews and even Debbie and Michael Tobolowsky's interviews with the Dallas Police Department ("DPD"). *D Magazine* story also captured the first impressions of Tobolowsky's son, Michael, stating:

> Before the flight, Michael had learned the fire might have been set intentionally. All he could think about was, Who? (App. at 72.)

71. Ermatinger was the lead detective assigned to the Tobolowsky investigation. He interviewed Debbie and her son, Michael Tobolowsky, on May 24, 2016. Her brother in law, George Tobolowsky, joined them but not in the interview room. Ermatinger conducted a lengthy interview and took copious notes for his investigative report that began with details about the timeline beginning the night before the fire. Ermatinger's report included details about Tobolowsky's anger towards his sister, Donna Timm/Terry, who had an affair and was a family outcast. The report explains that Tobolowsky did not have a relationship with his parents and blamed it on his sister, Donna, which mimics Aubrey's family situation except it was Aubrey's mother who had the affair. Ermatinger's detailed notes reflect that Aubrey's name and my name were never even mentioned during the interview.

72. Moreover, throughout Debbie Tobolowsky's interview with Ermatinger, she never indicated that her husband was threatened or felt threatened by anybody, which comports with the D Magazine interview in 2017,which states that she could not think of anyone who would want to hurt her husband. Tobolowsky's legal assistant of 18 years who also said she had not seen any threatening emails or letters. (App. at 3.) Because Tobolowsky's wife, son, and legal assistant were not aware of any threats from anybody, upon information and belief, there were none.

73. For purposes of this lawsuit, Sayers fabricated this new allegation in which he arrived at the scene of the fire/death, he asked Debbie Tobolowsky who may have wanted to kill her husband and she identified Aubrey and me. The shocking allegation did not find its way into the SWAs because it was just recently fabricated for this lawsuit. Such an explosive statement was not included in Sayers's motion to dismiss (Doc. 71.) or his reply in support of his motion (Doc. 90.) because Ermatinger and Sayers had not yet fabricated it. Clearly, this statement would have been a game-changer to support a finding of probable cause, possibly even more compelling than Defendants' false claim about Aubrey and a threat to Tobolowsky's life. While this statement was fabricated too late for use in the SWAs, the new lie has been designed specifically for this Court, to tip the scales of facts supporting probable cause, hoping the Court would be so convinced by the barrage of deceptive allegations that it would overlook the falsity of he SWAs. It is beyond comprehension that Defendants failed to use such distressing information if Debbie Tobolowsky had immediately identified Vodicka and me at the scene of the fire. To date, all records contradict Defendants' new allegation, including Sayers's 2017 interview.

74. On the afternoon of May 17, 2016, "Lieutenant Cherry delivered documents [to Ermatinger] from DF-R's investigation and a thumb drive containing a large volume of cell phone records received in response to Lieutenant Cherry's subpoenas." (Doc. 169-1 at 67.) The cell phone records, included text messages and location data from May 10 - May 16, 2016 for the phones belonging to Aubrey and me. (Doc. 169-1 at 2.) Ermatinger had proof in the cell phone

21

location data that neither of us was hiding from public view. The location data Ermatinger and Sayers had in their possession proved that Aubrey and I were all over Dallas but not at the scene of the crime. This critical information was intentionally omitted by Ermatinger in his preparation, review and execution of his three Search Warrant Affidavits he presented the following day, May 18, 2016, late at night, when he appeared before Judge Jeannine Howard and swore upon his oath the "verified fact" that we were in hiding, out of public sight, to conceal burns on their bodies. Ermatinger had proof in his possession that contradicted his sworn statements to Judge Howard. Soon after, Sayers relied on Ermatinger's same false information, lies, and lies by omission, which he copypasted into his own affidavits for search warrants and presented to Dallas County District Judge Jeanine Bennett to obtain multiple search warrants upon our personal residences, computers, email and cell phone providers.

75.   After Ermatinger tried to contact Aubrey and me, we began searching for a criminal attorney to avoid any missteps, as criminal investigations were completely foreign to us. The advice of friends and of everything searchable on the Internet was to not speak with detectives except through legal counsel.

76.   Ermatinger's May 16, 2016 investigative report reflects that he had our cell phone records with location data (App. at 16.), reflecting our true whereabouts, prior to Ermatinger and Sayers executing upon their oaths as duly licensed peace officers, their May 18, 25, 26, 31, 2016 and October 5, 2016 affidavits for search warrants that stated we were hiding from the public. (Doc. 169-1 at 10, 14, 17, 24, 30, 35, 39, 44, 54-55.)

77.   As well, our credit card statement that includes the period May 13-19, 2016, proves we were constantly seen in public places with daily visits to restaurants and grocery stores and finally, on May 19, 2016, Ermatinger admitted that he had been tracking our credit cards, stating:

- "I know you stopped at McDonald's last night."
- "I know you stopped and got gas in Belton."
- "I knew you went to Trader Joe's." (App. at 79.)

78. **"Undisputed Fact" No. 2**   "In 2013, Steven Aubrey filed a lawsuit to contest his late father's will." (Doc. 169-1 at 2.)

This "undisputed fact" is irrefutably false. I was Aubrey's partner before his father died and have been since and he has never contested his father's will. Aubrey filed a request for an accounting in Probate Court No. 3 of Dallas County, Texas on April 30, 2014. (App. at 73-77.) Dallas attorney Jack Wilburn, who specializes in probate matters, originally represented Aubrey. Aubrey was *not* "contesting" his father's will; but he relied on the provisions of his father's will to demand an accounting and proper administration of his late father's estate. I personally sat at the breakfast table with Betsy Aubrey one morning at her house as she complained to Aubrey that she did not have any money, yet she knew the properties in the trust had to be making some money. I witnessed Betsy Aubrey ask Aubrey to meet with Buck and find out what Buck was doing with the money.  The result of that intervention was the discovery that Buck had tricked their mother, Betsy Aubrey, years earlier into transferring two (2) of the trust properties (valued

at approximately $5M) to Buck's personal LLC. Buck had complete control of the bank account and statements related to the income producing property formally owned by the trust. The properties had national tenants with long-term leases and the landlord with Buck's LLC. He had the property, the tenants and the bank account all in the name of his personal LLC. Buck was siphoning off the income for his own personal gain, not for the benefit of Aubrey's mother, Betsy. During the course of the probate litigations, Aubrey's intention was to get the two properties that generate over $300,000 per year back into the Trust and to get an independent trustee appointed so Buck could not continue misappropriating the income generated by the trust.

79. **<u>"Undisputed Fact" No. 3</u>** "With the goal of gaining immediate access to his [Aubrey's] $2-3 million inheritance." (Doc. 168 at 3.)

This "undisputed fact" is irrefutably false.  Neither Aubrey nor his younger brother Thomas Aubrey ("Tom") ever demanded or sought one penny from the trust. Aubrey's intentions and goals were to get the trust properties away from Buck's LLC and registered back into the name of the Aubrey Family Trust; and to obtain some independent oversight of the income from the trust. I recall that Tobolowsky had relied on 10-year backdated deed (s) that called into question Tobolowsky's narrative that the trust properties had been properly administered. The notes from the investigative file indicate that the bogus information regarding me wanting access to my inheritance was given to a detective by Stephen C. Schoettmer ("Schoettmer"), Tobolowsky's frequent legal and business partner. This comes as no surprise to me as Schoettmer was instrumental in directing the investigation away from all of Tobolowsky's obscure business arrangements. Schoettmer is known to lie as much as Ermatinger and Sayers and he lied to Defendants who for unknown reasons never verify anything. Instead, detectives assume that everything they hear is truthful and verified. The handwritten information appears to be written contemporaneously on a notepad with "Stephen C. Schoettmer" at the top of the page. The notes state, in part:
> "5-7 million dollars"
> "Steve was beneficiary of father's estate."
> "Can't collect until his mother dies."
> "Aubrey would get 2-3 million"  (App. at 35.)

Hearsay is not the same thing as verification of facts.

80. **<u>"Undisputed Fact" No. 4</u>**  "Mrs. Aubrey prevailed, the court ruled her son could not access his sizeable inheritance until her death." (Doc. 168 at 3.)

This "undisputed fact" is irrefutably false. I began representing Aubrey approx. Dec 10, 2014, and I convinced Aubrey in April 2015 to non-suit his case because it became clear to me that the Dallas County Probate Court was determined to ignore Aubrey's standing as a beneficiary and his legal right to an accounting of the Aubrey Family Trust in accordance with the Texas Property Code. In my opinion, the Dallas County Probate Courts were not going to allow Aubrey to "follow-the-money" of the income generated by the corpus of the Aubrey Family Trusts properties. There was never any ruling about inheritance in the case and inheritance was never made an issue because it has never been an issue.

App. 000134

81.   **<u>"Undisputed Facts" Nos. 5, 6, 7</u>** "Roughly two months prior to the murder, the presiding judge ruled in Tobolowsky's favor, ordered Aubrey and Vodicka to pay $550,000 in damages to Tobolowsky." (Doc. 168 at 3.)

These "undisputed facts" include three provably false facts within in one single statement. Judge Eric Moye ordered Aubrey, alone, to pay $250,000 (not $550,000) to Betsy Aubrey, not Tobolowsky, all determined in an ex parte order emanating from an ex parte hearing. (App. at 94.) (Aubrey appealed that ruling to the 5th Court of Appeals, Dallas and the court ruled that Judge Moye abused his discretion and reversed the order for sanctions that Ermatinger and Sayers rely upon for their false representation.) I was not a party to the lawsuit and during an ex parte hearing, Judge Moye struck through my name as Aubrey's counsel before signing Tobolowsky's prepared order that determined Aubrey was a vexatious litigant. (App. at 96.) Here again, Ermatinger and Sayers failed to verify easy to prove facts reflected in the court records. Instead they relied on hearsay for information fed to them by others and failed to do the simplest verification of facts before they swore to them under oath.

82.   "Ms. Allen said that Aubrey…had been designated as a vexatious litigant." (Doc. 168 at 5.) This designation irrefutably contradicts a prior ruling that Aubrey was not a vexatious litigant. Ms. Allen failed to tell Defendants that Tobolowsky forum shopped his motion after it was first denied at hearing to determine Aubrey was a vexatious litigant before visiting Travis County District Judge Charles Ramsey. This evidentiary hearing lasted 4 hours and Tobolowsky appeared on behalf of Betsy Aubrey in the case. Billing records produced by opposing counsel indicated Tobolowsky was very involved behind the scenes and paying for the argument of that motion. Tobolowsky only waited 28 days after Judge Ramsey denied the motion and then he filed it in a Dallas County district court that favored Tobolowsky, Judge Eric Moye's court. Tobolowsky represented the same movant, presented the same cases, and arranged for an ex parte hearing with Judge Moye who ruled that Aubrey was a vexatious litigant, contradicting the order from the Travis County court.

83.   Both Ermatinger and Sayers failed to read any of the court records to verify the related statements of fact they used in their affidavits. Instead, they relied entirely on hearsay. Ermatinger and Sayers demonstrated reckless disregard for the truth when they fabricated information/facts, falsely stated that the information/facts were in the court records, and swore, under oath, to the truthfulness of the statement or facts.

84.   **<u>"Undisputed Fact" No. 8</u>** "During the deposition, Aubrey and Vodicka refused to abide by the rules and insulted Tobolowsky." (Doc. 168 at 3.)

This "undisputed fact" is irrefutably false. We behaved according to the rules in my deposition, which was taken by Tobolowsky's attorney of record Stephen Schoettmer. We did not insult Tobolowsky. This information is hearsay.  Leigh Allen lied to Lt. Cherry and Capt. Stephens about the deposition that she did not attend. (App. at 3.) Lt. Cherry and Capt. Stephens delivered the same false information to Ermatinger and Sayers. (App. 58, 65.) Ermatinger and Sayers were relying on hearsay based upon more hearsay for this "undisputed fact."

App. 000135

85.   Violating of our due process of law rights is a reoccurring theme imposed on us by Tobolowsky's attorney, Schoettmer. He also violated Texas Rule of Civil Procedure 203.3(c), continually refusing to make Aubrey's March 17, 2016 deposition and my March 2016 deposition, available to us for inspection and copying. Rule 203.3(c) states: "The party receiving the original deposition transcript or non-stenographic recording must make it available upon reasonable request for inspection and copying by any other party." The Court only needs to obtain the video deposition of Aubrey and me, which proves we conducted ourselves in a professional manner at Tobolowsky's office.

86.   **<u>"Undisputed Fact" No. 9</u>** "Aubrey had made multiple references to jihad in the course of the litigation." (Doc. 168 at 3.)

This "undisputed fact" is irrefutably false and was newly fabrication for the Brief and the Court, included to mislead the Court and for improper purposes and harassment. This fabrication did not make it into the falsified affidavits for search warrants presented by Ermatinger and Sayers and it did not make it into their motions to dismiss, but now we get to deal with it.

87.   Aubrey *never* made a single reference to jihad in the course of the litigations including the Aubrey Family Trust probate/accounting proceedings, Aubrey's defamation suit against Buck Aubrey, and/or his trespass to try title suit over the waste of one of the trust properties (the day care facility which was flipped three times in one day so 100% of the corpus of this trust property could be paid to Buck).  Over the 25½ years that I have known Aubrey, he is only known to have made only one reference to Jihad in one email addressed to his mother, long before Aubrey ever knew Tobolowsky. (App. at 78.) Aubrey used the term in reference to his mother because she had made references to "jihad" in email previous to Aubrey's first and last time use of the term. During the course of one year and seven days (January 13, 2015 through January 20, 2016), Tobolowsky filed 14 court documents that made "jihad" 97 allegations and one reference to "ISIS."

88.   On November 13, 2015, Paris suffered multiple horrific terrorist attacks in which 130 people were killed and 413 people were injured. This was one of the first of its kind and millions of people around the world grief stricken, mourning, and glued to the television. THREE DAYS LATER, demonstrating absolute lack of sensitivity, Tobolowsky and his attorney, Schoettmer, filed a first amended petition in Tobolowsky's defamation case against me, based on terrorism. The grotesque filing included 10 "jihad" allegations and for the first time ever, one reference to "ISIS." Aubrey and I became somewhat fearful of Schoettmer and Tobolowsky and believed the filing was a threat of sorts. With a hearing scheduled only one week after the petition was filed, Aubrey wrote a letter to the clerk of the court with the subject, URGENT ATTENTION REQUIRED FOR EXTRA SECURITY. As well, I watched Aubrey place a call to the FBI to report what appeared to be a terroristic threat from Schoettmer and Tobolowsky.

89.   Tobolowsky's ritualistic and repetitive use of "jihad" is was very similar to symptoms associated with Tourette's syndrome, which most agree is the result of some biological imbalances within the brain. Tourette's appears to have some genetic/hereditary element and can also potentially be triggered by highly stressful events. It may also be brought about by immune disorders, or even medications. I recently learned that Tobolowsky was taking the powerful

App. 000136

medication, Enbrel 50mg, by injection. I do not know if Tobolowsky's uncontrollable use of the word "jihad" spilled over into his legal work that did not involve us. I have read court documents that reflect Tobolowsky had filed a defamation suit against his former client, Judy Brauman, before he filed the "jihad" suit against Aubrey and me.  Schoettmer represented Tobolowsky in the normal defamation suit filed against Judy Brauman and he represented Tobolowsky in the defamation through jihad suit against Aubrey and me.

90.    Aubrey never made a Jihad reference to Tobolowsky at any time. He used the term once and only once, in an email to Betsy Aubrey, his mother, in response to her email and her use of the term first. Like Tobolowsky, Ermatinger and Sayers did not miss the opportunity to throw the word "jihad" in their search warrant affidavits to alarm its readers. Now, they are doubling down on their fraudulent representations, expanding the Jihad fantasy, stating in their Brief:

> "Aubrey had made multiple references to 'jihad' in the course of the litigation."
> (Doc. 168 at 3.)

Ermatinger and Sayers also swear to the truth of this statement in their Declarations:

> "Aubrey had made multiple references to 'jihad.'" (Doc. 169-1 at 59, 67.)

Similar to the affirmations in their search warrant affidavits, Ermatinger's and Sayers's Declarations both affirm:

> "I have personal knowledge of the facts set forth herein, and all of the statements I have made in this declaration are true and correct." (Doc. 169-1 at 57, 65.)

Ermatinger and Sayers conclude their declarations with the following oath:

> "I, Scott Sayers declare, certify, and state under penalty of perjury that the foregoing is true and correct." (Doc. 169-1 at 64.)

> "I, Robert L. Ermatinger, Jr. declare, certify, and state under penalty of perjury that the foregoing is true and correct." (Doc. 169-1 at 64.)

Clearly, Ermatinger and Sayers do not have personal knowledge that the facts are true because they simply are not. Both stated that "Aubrey had made multiple references to 'jihad,'" and the statement is not true or correct, they both should be punished under the penalty of perjury. Ermatinger and Sayers have not ever seen, nor can they produce a written document authored by Aubrey that threatens Tobolowsky with Jihad. There is no existing document that reflects Aubrey threatening Tobolowsky with Jihad in any way, other than the one email to Betsy Aubrey. This was stressed over and over again at my interview at DPD headquarters the night of May 19, 2016. (App. at 78.)  So for each search warrant that was executed after May 18, 2016 (Sayers's affidavits), Sayers had knowledge from Ermatinger's interview that Aubrey never threatened Jihad against Tobolowsky and never threatened Jihad against Tobolowsky's life. I have never known of a document that reflects Aubrey threatened anybody and I know of nobody who has ever seen or alleged Aubrey has ever been in a physical altercation.

26

91.   Leigh Allen, Tobolowsky's legal assistant for 18 years, told Capt. Stephens with Dallas Fire-Rescue that she has never seen any threatening emails or letters. (App. at 3.) So where are the threats that have never been seen? Jihad threats must be Tobolowsky folklore, tales preserved amongst the family.

92.   I took the oral depositions of both Betsy Aubrey on December 8, 2014, and Thomas Aubrey on December 10, 2014. I was present for the deposition of Richard Buck Aubrey, Jr. on August 14, 2014.  All three, Aubrey's mother and two brothers, testified that they had never known Aubrey to have a physical altercation with any other human being.

93.   **"Undisputed Fact" No. 10** "The Tobolowsky's explained that they are Jewish, and that they and the victim believed that Aubrey's references to Jihad were antisemitic threats to Ira Tobolowsky's safety and life." (Doc. 168 at 3.)  (*Id*. ¶¶ 25-31.)

This "undisputed fact" is false. Ermatinger and Sayers are doubling down on the false statement presented in all of their SWAs alleging that Tobolowsky felt Jihad was anti-Semitic. (*Id*. ¶¶ 29-36.) Records prove Defendants fabricated that for the SWAs and here for this Court the they are expanding on the lie by falsely giving it the support of "The Tobolowsky's." So now, in addition to Tobolowsky, his family members suddenly speak up and claim that they and Tobolowsky all believed my references to jihad were antisemitic [sic] threats to Tobolowsky's life, remembering that Tobolowsky never alleged the same in any of his 97 "jihad" allegations; remembering that this frightening allegation never made it into any of Defendants' SWAs; remembering that it is not reflected in any of Defendants' interview notes with family members; remembering this is just like Ermatinger's other blanket statements that fail to reference which family members; remembering that for years there was only the one fabricated death threat attributed to Aubrey and it was found in Defendants' SWAs, which falsely stated the threat was in a court document; and recognizing that suddenly, Aubrey is accused of multiple death threats related to his multiple references to jihad, which nobody has been able to identify.

94.   Anything written or alleged regarding Aubrey's references to "jihad" is a scam and is an intentional misrepresentation made to judges and the courts. Tobolowsky's and now Defendants' continual and repeated references to "jihad" and me ad nauseam does not make it so. Aubrey only ever referenced "jihad" one time when he directed it at his mother who is not Jewish. Only Betsy Aubrey has standing to complain about a "jihad" reference and perhaps she could allege the reference was anti-Gentile. On August 5, 2014, Tobolowsky began an anti-Semite smear campaign against Aubrey, splashing it around in the underlying probate case that only requested an accounting for relief. (App. at 73-77.) I prepared and executed a declaration, along with four others, that refuted this fantastical claim that Aubrey was anti-Semitic. (App. at 64-69.)

95.   Though Betsy Aubrey was not his client, Tobolowsky would parade her around the courtrooms during hearings because she was old and frail and it gave the false appearance that Aubrey was being cruel to his mother. I do know from taking Betsy Aubrey's deposition that she could not pay him for his legal billings, as she did not even know the name of the bank that had the account for the stolen trust properties that generate over $300,000 per year. The properties were, and still are, owned by Buck Aubrey who has the money to pay Tobolowsky and others attorneys to keep Steve Aubrey from getting an accounting of the Aubrey Family Trust.

96.   Aubrey and I traveled through Europe and visited Dachua in Southern Germany an important destination in our itinerary. This was my third time to visit this particular concentration camp and it was Aubrey's first. The impact of standing in the concentration camp where so many Jews were brutalized and then murdered was numbing. What happened there represented the absolute darkest side of humanity. We spoke very little during the visit because there are no words when you stand on the ground where some of the world's worst atrocities occurred. Before meeting Aubrey, I had made a trip to Poland and visited Auschwitz concentration camp nearly thirty years ago, with my long time friend, John Kartovsky.

97.   "Ermatinger received a call from George Tobolowsky who told him that the Tobolowsky family was contacting the United States Department of Justice in an effort to have Aubrey's "jihad" comments and Tobolowsky's subsequent murder investigated as a hate crime." (Doc. 168 at 3-4.) I have never seen or met or interacted with Tobolowsky's brother, George Tobolowsky but the records reflect that from the time of Tobolowsky's murder, George Tobolowsky has fervently and suspiciously used spiritual opportunism to direct the investigation and attention onto Aubrey and me and away from Tobolowsky's many multi-million dollar business dealings. It is unfathomable that Defendants never interviewed a single business related connection to Tobolowsky. It is unfathomable that nobody who shared office space with Tobolowsky was interviewed beyond his legal assistant. It is unfathomable that Dallas Fire-Rescue and the Dallas Police Department ("DPD") failed to interview the three criminals who had shared the office at 3405 West Lovers Lane with Tobolowsky for more than three decades. Records indicate that Tobolowsky had been business partners with these criminals, he would represent them in their legal disputes, and the criminals, Marc Birnbaum, Stephen Birnbaum and Schoettmer have been parties to major disputes.

98.   Records reflect that in 1997, Marc A. Birnbaum pled guilty to charges of conspiracy to defraud the United States and conspiracy to commit bankruptcy fraud, based in part for secretly paying insiders $498,995 from a $10.2 million loan, self-dealing $134,000 to himself personally, which he shared with business partner Lawrence Lambert. 4305 West Lovers Lane has been the business address of convicted felon Marc Birnbaum for decades and remained his address while he was in prison. At the time of Tobolowsky's death, Apartment Maintenance Services, Inc., was managed and operated by Ira E. Tobolowsky and convicted felon Marc A. Birnbaum.

99.   Records reflect that Stephen L. Birnbaum, Marc Birnbaum's brother and business partner, uses the same business address and he had been fined $1.7 million in 1994 after being sued by the FDIC and defended by Tobolowsky.

**4305 West Lovers Lane**

100.   4305 West Lovers Lane is the address that very possibly holds some answers to the murder of Ira Tobolowsky. But because Defendants oddly failed to interview any of Tobolowsky's business partners, the truth will never be known. 4305 West Lovers Lane is the address of Schoettmer's one-person law firm, the Law Office of Stephen C. Schoettmer. He had been Tobolowsky's business partner for many decades; he has committed fraud on the courts on several occasions, and stole Aubrey's identity and impersonated him while maintaining an office

28

at 4305 West Lovers Lane. Schoettmer has been associated with this address beginning in 1990 or earlier.

101. At the time of Tobolowsky's murder in May 2016, Tobolowsky was personally involved in two-multiyear legal cases involving vast sums of money. The first, as related in open court filings, was a struggle over control of a patent worth hundreds of millions of dollars. As with most of Tobolowsky's business interests, his true role in the legal dispute over the patent was obscured. A second case involved a hidden struggle hinted at between the lines of sparse probate court filings. In a third case, a real estate investor named one of Tobolowsky's long-time companies (shared with Marc Birnbaum, at 4305 West Lovers Lane) as a defendant for its role in a fraudulent mortgage transaction, a suit filed just weeks before Tobolowsky's death.

102. However, immediately after Tobolowsky's gruesome murder in May 2016, the DPD chose not to examine the multiple avenues of inquiry afforded by Tobolowsky's complex and shadowy family and business interests. Instead, the DPD and certain members of the judiciary chose to publicly identify Aubrey and me as suspects, leaving all of Tobolowsky's business interests untouched, unexamined, and uninvestigated.

103. George Tobolowsky shares some interests in the office address 4305 West Lovers Lane, including the services of accountant David P. Hendricks. I have personal knowledge that David P. Hendricks prepared a fraudulent accounting that was admitted as an exhibit to a Dallas County Probate Court. Corporate government documents accessible online reflect that George Tobolowsky is entwined with David P. Hendricks in multiple businesses. George Tobolowsky is secretary/treasurer for The Abe Zale Foundation and David P. Hendricks prepares the foundation's tax returns. George Tobolowsky is secretary/treasurer for Miracle of Pentecost Foundation Inc. and David P. Hendricks prepares the foundation's tax returns. If the fraudulent work of David P. Hendricks became known, it could be very problematic for George Tobolowsky, the Tobolowsky family, and others who office at 4305 West Lovers Lane.

104. George Tobolowsky has been instrumental in steering the murder investigation away from 4305 West Lovers Lane and away from his brother's extensive business endeavors, some involving George Tobolowsky. Ermatinger's investigative reports reflect:

- On May 13, 2016, George Tobolowsky and his wife were at the scene of the crime.

- On May 17, 2016, George Tobolowsky contacted Ermatinger a said he was contacting the U.S. Justice Department in an effort to have the murder and Jihad threats investigated as a hate crime. (App. at 1.)

- On May 20, 2016, George Tobolowsky asked Ermatinger to meet him to talk and be briefed on the investigation.

- On May 21, 2016, George Tobolowsky called Ermatinger to talk about the hole in the fence. (App. at 24.)

- On May 24, 2016, George Tobolowsky joined Debbie and Michael Tobolowsky for Debbie Tobolowsky's official interview at DPD headquarters. After the recorded interview with Debbie Tobolowsky, Ermatinger had a meeting with George Tobolowsky in the Homicide break room. (App. at 19.)

**Stacy Paddack**

105. On May 17, 2016, Schoettmer joined forces with George Tobolowsky and his niece, Stacy Paddack, to fabricate a jihad motive for the murder and influence the direction of the murder investigation. Stacy Paddack worked for the U.S. Justice Department in Washington, D.C. and she flew to Dallas to pull strings and knock on doors to assist Schoettmer and George Tobolowsky with directing the focus of the investigation onto us and away from their businesses at 4305 West Lovers Lane. Stacy Paddack ("Paddack") lied to Ermatinger telling him that she had read the court documents and "she found threats and hate mail directed at Jews and Ira." (App. at 2.) That is a false allegation and unfortunately Ermatinger and Sayers were to busy doing welfare checks to read the court documents for themselves.

106. Upon information and belief, George Tobolowsky and Schoettmer blocked DPD from investigating any of Tobolowsky's business relationships, which includes relationships with themselves and the Birnbaum brothers. With Paddack's help, Schoettmer and George Tobolowsky pushed everybody, including DPD, to focus the investigation on Aubrey and me, the guys without a motive. Ermatinger's investigative reports indicate all of the persons of interest were not involved in any of the opaque Tobolowsky businesses. The persons include:

- Marc Richman - he is an attorney and worked on a case with Tobolowsky;

- Susan Sobel stated that she thinks an illegal citizen killed Tobolowsky;

- Susan Harrimum stated that he ex-boyfriend lost money to Tobolowsky in a case;

- Tobolowsky filed a grievance with the State Bar to have Kelly Hollingsworth disbarred;

- Sharon Bornstein - the homeless girl who called Tobolowsky 18 times over the weekend;

- Judy Brauman - Tobolowsky and Schoettmer sued her for defamation. She was Toblowsky's former client;

- Alexandra Krot - friend of Aubrey and Vodicka; and

- Marti Doran saw a white male walking a little white dog on at about 5:30 pm on the evening of the fire.

107. Immediately after the murder, Paddock flew to Dallas and joined forces with Schoettmer and George Tobolowsky to develop a bogus 25-page amicus brief loaded with false accusations. The next morning, on May 17, 2016, she submitted the deceptive brief to Hallie Tichenor with the FBI and she sent a letter of introduction to Judge John Parker, Northern District of Texas. Her letter was a request that Aubrey and I be prosecuted under the Hate Crime Act and that we would be placed on a "no-fly" and  "no-border-crossing" lists. She stated that the attached amicus brief could support our arrest, warrant, and prosecution. She finished her letter by revealing the names of her partners in the witch-hunt (not a surprise), stating, "please do not hesitate to call me…Steve Schoettmer...or George Tobolowsky." The letter and amicus brief were sent to the judge at 8:40 am so in the span of three days, two guys, heavily entrenched in activities at 4305 West Lovers Lane, cooked up a jihad motive with us as the scapegoats and had another Tobolowsky relative who had connections, fly into town to present the falsified brief and knock on doors. (App. at 14-15.)

108.   Ironically, Schoettmer was the co-creator of Tobolowsky's Jihad lawsuit filed against Aubrey and me for purposes of harassment and judicial abuse. (He is also the one who stole Aubrey's identity and impersonated him to access Aubrey's financial accounts.) Schoettmer absolutely knew that the jihad allegations were a scam and had no basis in fact because he helped fabricate them. Paddack's signed the brief so either she just accepted the hearsay as fact for her document or she did read the court document, realized there were not jihad or anti-Semitic content, and lied to the courts and judges saying the opposite as have many involved with this litigation. Her brief begins with her loose comparison of Aubrey and I with Hitler because Hitler set Jews on fire as part of his plan to exterminate Jews and according to Paddock we set Tobolowsky on fire simply because he was a Jew. She states in her brief:

> Additionally, Aubrey's frequent terrorist rhetoric and threats, including both verbal and written statements in court documents, related to waging "jihad" war (Aubrey's term) on Mr. Tobolowsky relate to Mr. Tobolowsky's Jewish religion.

Aubrey frequent terroristic rhetoric and threats? There are none and if someone could finally point to just one of these threats, but nobody can. Instead, certain people continue to talk about them as though they exist. And Aubrey has verbal and written statements in court documents that involve waging "jihad" on Tobolowsky? Nobody has ever been able to locate the magic "court document" that reflects Aubrey was waging "jihad" on Tobolowsky. Just because Tobolowsky and Schoettmer filed a Jihad lawsuit against Aubrey and me, the crazed allegations remained just that.

109.   Paddack proceeds to lie in her brief stating, "Mr. Tobolowsky also received numerous verbal and email threats from Aubrey." We know that is a lie because 1) no email threat has *ever* been produced; 2) nobody has ever alleged that they heard Aubrey make a verbal threat; 3) Tobolowsky himself never alleged any verbal or email threats in his "jihad" lawsuit against us; and 4) Leigh Allen, Tobolowsky's legal assistant for 18 years, told Captain Stephens that she "has not seen any threatening emails or letters." (App. at 3.) Paddack is simply dishonest as she intentionally misrepresented and fabricated facts just like Defendants. George Tobolowsky, Schoettmer and Paddack reached way to far and failed to have us investigated for a hate crime

against Jews but they were successful in directing the spotlight on Aubrey and me and the spotlight never went anywhere else, just like Ermatinger and Sayers.

110.   Aubrey and Tobolowsky bickered back and forth about religious holidays which does not indicate a hate crime against Jews. One can bet that if the influences of Paddack and the rest of the Tobolowsky clan could not convince the U.S. Justice Department or the FBI that this was a hate crime, then it was not a hate crime. Paddack's wild allegations were made without proof and without basis and the U.S. Justice Department did not take the bait, unlike Ermatinger and Sayers.

111.   Aubrey and I have hired Jewish lawyers, one in particular, Brian Zimmerman.  We lost everything, roughly $3 million, because at trial he failed to present 90% of our evidence and he sold us down the river. Beyond our extreme resentment and disappointment in him, I have never considered threatening him and I never blamed his betrayal against us on his Jewish faith, religion or ethnicity. We never threatened in any form or fashion our Jewish lawyer who destroyed our lives, as we had known them. How can Defendants justify the attention directed at us in this investigation?  No doubt, Tobolowsky was a major nuisance to us, yet he never got his hands in our pockets.  In the grand scheme of things happening in our lives, Tobolowsky just was not that important to us. People like Schoettmer, George Tobolowsky and Paddack oddly tried to make our relationship with the victim something that it wasn't. Literally before the fire had been extinguished at the Tobolowsky home, Schoettmer had interviewed with the Dallas Morning News and stated that he and Tobolowsky were involved in a "high-profile" case, speaking about the frivolous jihad defamation suit. Labeling the case "high-profile" is laughable as it was so low profile, Aubrey and I attended less than half of the scheduled hearings for the case.

112.   There were never any "jihad" threats to Tobolowsky; just the one time Aubrey used it in an email to his mother before any of us knew the name Tobolowsky. I made this fact painfully clear during my May 19, 2016 interview with Ermatinger. I told his emphatically twice that the term Jihad was used only one time in an email to his mother. Ermatinger acknowledged that he completely understood. (App. at 78.)

113.   Other than hearsay, no proof was ever adduced to reflect that Aubrey had made "jihad" threats but the hearsay was used to support a finding of probable cause and trick Dallas County Criminal district judges. Ermatinger and Sayers egregiously fabricated the demonstrably false statement that Aubrey threatened Tobolowsky's life. It seems that their nine (9) counts of aggravated perjury would be enough but Defendants double down again and boldly lie to this Court transforming the one false and never proven statement about a Jihad threat into a bigger new lie alleging Aubrey made multiple "jihad" comments, stating: "Aubrey's 'jihad' comments." (Doc. 168 at 3.) As well, in their sworn Declarations, Ermatinger and Sayers both declare: "Aubrey had made multiple references to 'jihad.'"  (Doc. 169-1 at 59, 67.) Defendants are completely aware this is false and they are intentionally lying to this Court. I suppose the additional lies to this Court are an attempt to cover for the first one in that if Aubrey made multiple references to "jihad" then even though the one is without basis, there are others to make up for the one. But there was never even the first one that Ermatinger and Sayers alleged was against Tobolowsky's life.

App. 000143

114.   Ermatinger absolutely knew his "jihad" representations to this Court and other courts are false. Sayers did not personally verify any facts included in his affidavits for search warrants. Almost everything, if not everything, that Sayers attested to as truthful was hearsay. Sayers was spoon-fed false information from other investigators, including Ermatinger. He blindly relied on the information and swore to its truth in his affidavits and here in his Declaration. (Doc. 169-1.)

115.   Not only did Sayers rely on Ermatinger's May 18, 2016 affidavit, he copypasted Ermatinger's false statements verbatim into his search warrant affidavits, misspelled words and all, to support a finding of probable cause. To the best of my knowledge and belief, Sayers did not even bother to read the copypasted statements because the same (9) misspelled words in the statements in Ermatinger's SWAs remained the same misspelled words in statements copypasted by Sayers into his SWAs. The copypaste statements Sayers pirated include:

- Any combustible [sic] liquids or empty containers that are similar to the items found at the crime scene;

- Any combustible [sic] liquids or empty containers that are similar to the items found at the crime scene; (Ermatinger and Sayers included this exact statement in their affidavits twice.)

- Any egnitable [sic] liquids or evidence of any egnitable [sic] liquids that could have been spilled on the floor that can be sent to a laboratory and compared to evidence found at the scene;

- Detectives discovered that the victim Ira Tobolowky [sic] was involved in a civil defamation lawsuit with Steven Aubrey and his partner Brian Vodicka who was representing him;[1]

- Family members advised detectives that complainant Tobolowsky felt threatened by Steve Aubrey because of a law suit [sic] that complainant Tobolowsky won when he represented the mother of Steven Aubry [sic], Betsy Aubrey;

- It was aledged [sic] in the lawsuit that Steven Aubrey threatened "jihad" the same words used to describe the wars brought by terrorists, and against his life which was filed in court document number 15-08135 in the 14 Judicial district court judge Eric Moye presiding; and

- Ira Tobolowsky is of Jewish descend [sic] and felt Jihad was an anti-semitic statement.

Odds are insurmountable that Ermatinger and Sayers are both challenged with spelling the exact the same words in their separate and independent search warrant affidavits.

116.   Ermatinger and Sayers both failed to identify a statement in which Aubrey threatened Jihad against Tobolowsky's life. Just like Tobolowsky did in his frivolous defamation suit

---

[1] I did not represent Aubrey in this case.

33

against Vodicka and me, Ermatinger and Sayers try to get away with just guiding us in the general direction for the answer but never can identify the exact statement because it does not exist. In Sayers's Answers to Vodicka's First Set of Interrogatories signed on May 22, 2020, he admits he just grabbed the information from Ermatinger's affidavits.

> **Interrogatory No. 15:**   For each document you identify in your answer to Interrogatory No. 14, identify the page number, paragraph, and exact statement or statements that form the factual basis of the statement in Affidavits 1-6: "It was aledged in the lawsuit that Steven Aubrey threatened "jihad" the same words used to describe the wars brought by terrorists, **and against his life** which was filed in court document number 15-08135 in the 14 Judicial district court judge Eric Moye presiding."
>
> **Answer:** Defendant Sayers relied upon paragraph 4 of Defendant Ermatinger's May 18, 2016 affidavit submitted as part of a search warrant application for 7777 Glen America #223. Upon information and belief, Defendant Sayers also refers Plaintiff to Defendant Ermatinger's Response to Interrogatory Nos. 4 and 5 issued by Plaintiff Brian Vodicka.

What? Upon information and belief Sayers refers Plaintiff?  I am unsure how to interpret this answer but it could indicate that Sayers thinks it is possible that he relied on Ermatinger's responses, but he can't be sure. In Ermatinger's Answers to Vodicka's First Set of Interrogatories signed on May 22, 2020, he admits in his answer to No. 4 that the "jihad" threat is not in a court document, stating in his answer:

> **Answer:** As permitted by Rule 33(d) of the Federal. Rules of Civil Procedure, please refer to the Petition filed on Ira Tobolowsky's behalf in *Tobolowsky v. Aubrey, et al.*, Case No. 15-08135, and also COD 000070-71, 74, 78-79, 85, 95. Defendant does not recall whether every concept in the specified sentence was based upon a particular document. Defendant also relied on information provided by members of the victim's family.
>
> (Ermatinger's Interrogatory No. 5 Answer: "Defendant refers Plaintiff to the Answer to Interrogatory No. 4 above.)

117.   Ermatinger does not recall if the "concept" was based on a document? Ermatinger signed an affidavit that specifically stated the concept (death threat) was based on a *court document* and Sayers signed six search warrant affidavits that said the same. This information that Ermatinger suddenly remembers was provided to him by Tobolowsky family members was not in the notes he took when he interviewed family members. Now we are supposed to believe that he remembered nonspecific family members told him that I threatened Tobolowsky's life and the death threat did not make it into his notes?

118. The interrogatory did not request an explanation of how Ermatinger fabricated the false statement that he and Sayers used repeatedly to support a finding of probable cause and the statement was material to the finding of probable cause. In Ermatinger's Answer to Interrogatory

No. 5, he stated, "Defendant also relied on information provided by members of the victim's family." However, in response to my discovery requests, Ermatinger's investigative reports indicate the only members of the Tobolowsky family that he interviewed were Debbie and Michael and they did not tell Ermatinger that Tobolowsky was threatened by anybody.

119.   Because Sayers states that he relied on Ermatinger's affidavit and on his answer to the Interrogatory No. 4, Sayers is admitting there is no court document that contains a "jihad" death threat as well. Sayers used poor judgment when he plagiarized most of what was included in Ermatinger's SWAs and passed it off as his work in his SWAs without verifying the facts. But exhibiting even worse judgment, Sayers chose to depend on Ermatinger for his source of information.

120.   The investigative reports include meticulous detail and it is inconceivable that Ermatinger failed to take notes when the victim's family mentioned that Aubrey made a death threat. Ermatinger was backed into a corner when pressed to identify a statement in the court document regarding a "jihad" threat to Tobolowsky's life because the statement was fabricated and false. Ermatinger now tries to shift away from the "court document" that supported his statement and he fabricated an new basis, which is "information provided by members of the victim's family."

121. Ermatinger's own records reflect that no family member alleged that Tobolowsky was threatened by anybody. Ermatinger's May 24, 2016 interview with Debbie and Michael Tobolowsky indicates that they never mentioned Vodicka or me and never said anything at all about the defamation lawsuit, about Jihad, or about threats. Ermatinger did include in his report that both Debbie and Michael told him about a homeless girl that would call Tobolowsky at 3 am and Ermatinger put that information under the heading, "Person of Interest." (App. at 21.)

122.   Ermatinger's answer to the interrogatory does not take into consideration his interview with me on May 19, 2016. Ermatinger was the student when they discussed "jihad" allegations. (App. at 78.)

123.   Ermatinger's consistent lack of truthfulness would cause the average person to believe he is lying about getting the information from members of the victim's family. He conveniently can't remember which family member told him (and he has no notes) that Aubrey threatened Tobolowsky's life with Jihad, a fact that undoubtedly is worthy of being written into the notes.

124.   Finally, the statement: "It was aledged in the lawsuit that Steven Aubrey threatened "jihad" the same words used to describe the wars brought by terrorists, **and against his life** which was filed in court document number 15-08135…" is a false statement. Ermatinger knew it was false because he fabricated it and Sayers was too lazy to verify any of the facts and as he stated in his discovery responses, he just relied on Ermatinger. Sayers is just a copypaste guy who swears under penalty of perjury to the truth of the statements in his affidavits and in his declaration supporting his Brief, irrespective of the truth. Ermatinger and Sayers are dishonest and untrustworthy jaded detectives whose useful years are long gone if they were ever useful at all.  Sayers should join Ermatinger in retirement.

App. 000146

125.   Intentionally lying to judges is a criminal offense.  The lies Ermatinger and Sayers imposed upon various judges caused them to issue illegal search warrants that have caused irreparable injury to Aubrey and me. I believe that Ermatinger has committed aggravated perjury at least three times and Sayers has committed aggravated perjury at least six times.  Without consequences they will continue to do the same and the pattern of police violating the rights of citizens continues.

126. **"Undisputed Fact" No.11**   "Ms. Paddock told Detective Ermatinger that she had discussed the victim's interactions with Aubrey and Vodicka, reviewed documents related to the lawsuits, and found threats and hate mail directed at Jews generally and at Tobolowsky in particular." (Doc. 168 at 4.)

 This "undisputed fact" is irrefutably false.  If she "found threats and hate mail directed at Jews generally and at Tobolowsky in particular;" then where is it?  If Paddack "found threats and hate mail" she should have been able to share the proof. But she did not because, in truth, she did not find anything. Paddack failed to show the U.S. Justice Department what she found and it lost interest in her claims as well. Paddack, lied to Ermatinger telling him that she had read the court documents and "she found threats and hate mail directed at Jews and Ira." (App. at 2.) Ermatinger was too lazy to read the court documents and Sayers was too busy looking through gay websites to read the documents. As a general rule, Sayers would just copy someone else's SWA and sign his name on the document. (*Id*. ¶¶ 96-100.)

127.  **"Undisputed Fact" No.12** "Tobolowsky represented Aubrey's parents in eight lawsuits that Aubrey had filed against them." (Doc. 168 at 5.)

This "undisputed fact" is irrefutably false. Aubrey's father passed away in August 2004. Prior to his death, I had many conversations with Dr. Aubrey and he was never caught up in litigation and the only attorney it seemed he had hired was Dallas, Texas attorney Don Malouf who drafted Dr. Aubrey's Last Will and Testament that I believe was signed in 1990. That same Will was admitted into Dallas Probate Court No. 3 after Dr. Aubrey passed away and was the same document I relied on that names Aubrey as beneficiary to a trust under the Will. Aubrey never sued his mother. He did sue his mother in her capacity as trustee of the Aubrey Family Trust and Tobolowsky represented Aubrey's brother Buck because he had stolen the trust properties, which gave him the big money to pay the $600,000 in legal fees charged by Tobolowsky to cover up the whole mess.

128.   Ermatinger and Sayers fabricated the new false fact to make it appear that Aubrey can't get along with anybody. I know he admired and loved his father before and after his father died in August 2004. Aubrey's entire family was very close, always enjoyed holidays together and took family trips often. Everything was fine until a few years after Aubrey's father passed away and Aubrey discovered that his brother Buck had stripped millions of dollars of assets from the family trust. Aubrey's efforts to make things right with the trust blew up in his face and fractured the family forever.

129.  **"Undisputed Fact" No. 13** "Ms. Allen said Aubrey and Vodicka were so uncooperative during a deposition that Tobolowsky was forced to stop the deposition." (Doc. 168 at 5.)

App. 000147

This "undisputed fact" is irrefutably false. Ms. Allen was not present at my deposition to personally witness how well behaved we always are. Ermatinger and Sayers are relying on hearsay, which means none of them have any idea what they are talking about. Proof of our good behavior is in the video of the deposition that is in the possession of Tobolowsky's attorney, Schoettmer, who has repeatedly refused to provide Aubrey's deposition to Aubrey or my deposition to me.

130. **"Undisputed Fact" No. 14** "Ms. Allen said that Aubrey hated Tobolowsky and made anti-Semitic comments to Tobolowsky during the deposition" (Doc. 168 at 5.)

This "undisputed fact" is irrefutably false and represents abusive lying and hearsay. Ms. Allen was not at my deposition. At no time did Aubrey suddenly start talking about Jews or the Jewish religion. The ridiculous Jihad and anti-Semite attacks against Aubrey are false and the video of the deposition would prove it.

131. "Defendants learned from Earl Jeffers of the United States Marshal's Service that Aubrey and Vodicka had pursued lawsuits in federal court as well, and had exhibited similar behavior in the course of those lawsuits." (Doc. 168 at 5.)   This statement is nonsensical. Behavior similar to what? Aubrey and I always act in a completely civilized and respectful manner in every federal courtroom, state courtroom, county courtroom and justice of the peace courtroom.

132. **"Undisputed Fact" No. 15** "Jeffers told Defendants that Judge Ed Kincaid and Judge Barbara Lynn had both expressed safety concerns regarding Aubrey and Vodicka in the wake of Tobolowsky's murder." (Doc. 168 at 5.)

While this "undisputed fact" could potentially be true, it is highly unlikely because we never had a case filed in their courts, we had never been in front of either of these judges and we did not know these judges. If Jeffers spends time contacting random judges and asking if they are scared of us and Judge Kincaid and Judge Lynn said that they were, then the statement is truthful. Ermatinger consistently relies on hearsay based upon hearsay. And because Sayers gets all of his information from Ermatinger, he relies on hearsay based upon hearsay that is based upon hearsay. I will dispute this "fact."

133. **"Undisputed Fact" No. 16** "Detective Ermatinger called Aubrey and Vodicka, and left voicemail messages." (Doc. 168 at 5.)

This "undisputed fact" is irrefutably false. Detective Ermatinger has never left me a voicemail message.

134. **"Undisputed Fact" No. 17** "Aubrey's credit card had been used [May 18, 2016] at a truck stop in Belton, Texas, a town roughly two hours south of Dallas." (Doc. 168 at 6.)

This "undisputed fact" is irrefutably false. Aubrey never left Dallas city limits for the entire month of May in 2016 and at all times Aubrey had possession of his credit card. The credit card statement reflects the same. (App. at 61.) In fact, Ermatinger's May 18, 2016 investigation report

37

App. 000148

reflects that Aubrey's credit card was used at a KFC store in Dallas on the same date as his report. (App. at 6.)  And while the false statement was used in the affidavits to give the false impression that Aubrey and I were fleeing Dallas, Ermatinger's report states: "Detective Ermatinger receives info that Aubrey/Vodicka are traveling from Belton toward Dallas." (App. at 7.) He knew that Aubrey was not with me because he was in Dallas and the statement indicates detectives are tracking our phones, again proving Aubrey was in Dallas. The CEFCO convenience store where I used my credit card, while Aubrey was in Dallas, was not a "truck stop," a fabricated homophobic connotation implying a seedy place that attracts gay men. During the 7½ hours the Ermatinger interviewed me on May 19, 2016, he admitted that he was tracking our credit cards. (App. at 79.)

135.   Ermatinger and Sayers knew the truth that Aubrey's credit card was not used in Belton and I was not at a "truck stop." They included the false facts in their affidavits, knowing they would present the fabrications under oath to judges, intending to falsify the basis for probable cause to trick the judges into issuing search warrants.   The quickest and easiest way to get the search warrants sought by Ermatinger and Sayers was to lie in their search warrant affidavits, applying their ends justifies the means theory.

136.   **<u>"Undisputed Fact" No. 18</u>** "Vodicka said that Aubrey had also sent one email referring to Jihad to Tobolowsky." (Doc. 168 at 7-8.)

This "undisputed fact" is irrefutably false and goes far beyond reckless disregard for the truth.  . Ermatinger and Sayers put the lie in their Brief and then they each attested to the truth of this false statement in their declarations. Defendants just can't stop lying to this Court. I clearly remember my interview with Ermatinger and I never told him that Aubrey sent a jihad email to Tobolowsky. I told him repeatedly that Aubrey never sent a jihad email to Tobolowsky and the video reflects that Ermatinger completely understood me. Ermatinger even repeated what I said and he seemed to be taking notes about our topic of discussion. I told Ermatinger that Aubrey sent one email to his mother and it was the "only time, only time, only time." (*Id*. ¶ 6.) (App. at 78.)

137.   The Brief states that I told Ermatinger that Aubrey sent a one letter to Tobolowsky referring to jihad and Ermatinger has personal knowledge that this representation to this Court is a bold lie. And such a lie is indisputably material. Because Sayers relies on hearsay only for his "verified" information, the same bold lie belongs to him as well. Falsely stating the I said Aubrey sent a jihad e-mail to Tobolowsky is a game changer that would alarm any judge who would believe it was truthful, but it was not. Defendants are fabricating these lies specifically for this case and this Court.

138.   **<u>"Undisputed Fact" No. 19</u>** "Vodicka was photographed, fingerprinted and was released at the conclusion of his interview." (Doc. 168 at 8.)

This "undisputed fact" is irrefutably false. DPD never took my fingerprints.

139.   **<u>"Undisputed Fact" No. 20</u>** "Ermatinger and Sayers…<u>were</u> notified of the arrest [Aubrey's]." "In situations where a sole or primary caregiver is <u>arrested</u>, both Detective

Ermatinger and Detective Sayers had a practice of contacting the <u>arrested</u> caregiver's dependents to let them know that the caregiver <u>had been arrested</u>, spare them the concern and anxiety that would be caused by a caregiver's unexplained absence, check on their welfare, and make sure that the dependents are able to make alternative arrangements. Therefore, Detectives Ermatinger and Sayers decided to stop by Plaintiffs' apartment to let Vodicka know what <u>had happened</u> and make sure that Vodikca would be safe and cared for in Aubrey's absence" (Doc. 168 at 10,11; Doc. 169-1 at 70, 71.) (Underscores added to emphasize that this text is quoted in past tense, indicating that the event being referred to had already occurred.)

These "undisputed facts" are irrefutably false. Ermatinger and Sayers conspired with other DPD officers to develop an elaborate sting and harassment operation in which Aubrey was to be arrested, which would then be used as an excuse for Defendants' warrantless entry into my residence on October 20, 2016. The plan failed because Ermatinger and Sayers had already illegally trespassed into our residence before Aubrey was falsely arrested for prostitution. (*Id.* ¶¶ 53-58.)

140.   Ermatinger and Sayers have the audacity represent to this Court that after they learned about Aubrey's arrest, they went to our apartment "to let Vodicka know what had happened and make sure that Vodicka would be safe and cared for in Aubrey's absence." This is the 20th and final lie included in Defendants' Brief. Defendants had no idea that we had records that prove they were already trying to get into our residence and interview Vodicka before I had been arrested.

> On October 20, 2016, DPD officers arrested Aubrey for prostitution. (Doc. 121, Third Am. Compl. ¶¶ 224, 233.) Because Detectives Ermatinger and Sayer were actively investigating Aubrey for the Tobolowsky murder, they were notified of the arrest. (Doc. 168 at 10.)

> Detectives Ermatinger and Sayers decided to stop by Plaintiffs' apartment to let Vodicka know *what had happened* and make sure that Vodicka would be safe and cared for in Aubrey's absence. (Emphasis added.) (Doc. 168 at 11.)

Their representation to the Court sounds very genteel, humane and empathetic. But in truth, Defendants' were scheming and planning a conspiracy that was under-handed, cruel, evil and criminal. Defendants did not decide "to stop by," they were positioned at our front door ready to pounce, waiting for the call that Aubrey had been arrested. After Defendants' helped themselves into my home and entered my darkened bedroom, Ermatinger scared me by touching my leg to wake me up and then he stated: "We arrested Steve." The intention was for me to believe Aubrey had been arrested for the murder of Tobolowsky. With evil intention, throughout their interview, they never told me what the charge was against Aubrey. At the very end as they were leaving my bedroom and home, they told me Aubrey had been arrested for prostitution. But, the records reflect they were too eager to terrorize me so they pushed the timeline and knocked on the door well before Aubrey's arrest, proving their visit was for improper purposes.

141.   The evidence in the records does not support the fabricated storyline that Ermatinger and Sayers are selling in their Brief and Declarations. In fact, the evidence supports my

allegations that Defendants engaged in an illegal sting operation to entrap and falsely arrest Aubrey so they would be unencumbered to harass me with their warrantless search and investigative interview. Their Brief asserts that Defendants perform routine welfare checks *after* someone has been arrested. The records support the indisputable timeline that reflects Defendants were banging on front door of our personal residence *before* Aubrey was falsely arrested. Ermatinger and Sayers are trying to sell this Court on the idea that welfare checks are one of their primary responsibilities as homicide detectives. In truth, they lack the skills and instincts to be effective homicide detectives and if Ermatinger were still employed by DPD, he and Sayers would be more successful if they were in charge of a new DPD welfare check division. (*Id.* Timeline ¶ 64.)

142. Ermatinger's investigative notes for October 20, 2016, include the title: Steve Aubrey Arrest / Vodicka Interview. His notes reflect that he and Sayers illegally entered our residence and they harassed me with an interview, not a welfare check. Instead of investigating murders, the two homicide detectives spent an inordinate amount of time designing the sting for my arrest and simultaneous illegal entry into our residence to mercilessly scare and harass me. Defendants' use of extra legal means ultimately failed to entrap Aubrey for prostitution and failed to produce anything beneficial for the Tobolowsky murder investigation.

## FALSE IMPLICATIONS

143. "Detective Richardson recalled seeing a drill and drill bits at Plaintiffs' apartment when he previously helped search the apartment pursuant to the May 19, 2016 search warrant." (Doc. 168 at 8.) Ermatinger and Sayers act as though they found a smoking gun in our apartment because Aubrey had a cordless drill. They failed to mention that the storage closet on our porch was stuffed with every kind of tool Aubrey could possibly put in there, including a chain saw, orbital sander, circular saw, reciprocating saw, hammer drill and more. They also failed to mention that they took and giant container with every kind of drill bit imaginable, including multiple sizes of hole saw bits (each old and very used), many sizes of very long and very short spade bits, and dozens of regular drill bits, long and short and very used. (App. at 109.) Because there was one hole in Tobolowsky's fence, Defendants took many of Aubrey's tools likely worth one thousand dollars, the majority, which could not have made the hole they were concerned about. Though the Brief implies that having a cordless drill is peculiar, Defendants' own photograph gives more understanding that the drill and container of bits had a long history with Aubrey.

144. "Detectives also recovered at that location a drill and related tools, a propane tank and torch attachment, and two plastic gas cans." (Doc. 168 at 9.) Defendants did recover a propane tank and torch attachment but the Brief leaves that fact hanging as though a murderer would take a bulky and heavy propane torch to start a fire. A propane torch needs something else to light it so there would be no use for a propane torch in such a situation. Defendants were fully aware that nobody would use a propane torch to light a fire. They also knew the torch was part of a large container full of plumbing supplies, which makes perfect sense. Defendants are master and pulling objects away from what makes them relevant the photos they produced do give logic and reason for a propane torch. (App. at 110.) The Brief intentionally omits the relevant information to give the Court a false impression.

145.   The "two plastic gas cans" might be out of place for some people but not for Aubrey who had used them to hold gas for his lawn equipment, which was stored in another storage closet. Defendants took pictures of the gas cans and the pictures reflect that (two-stroke) was written on the side of the container. That means that the gas in the container was mixed with two-stroke oil, which is required for operation of small gas powered motors. (App. at 111.) Not only do Defendants know that someone would not take two gas cans to do whatever was done in Tobolowsky's garage, it would not be necessary to add oil to the gas. Moreover, their picture indicates the gas container was very dusty and had not been used in a long period of time.

146.   "….and two cans of primer paint." (Doc. 168 at 9.)   Ermatinger and Sayers failed to include other information relevant to the two cans of primer paint. They were white, one water base and the other oil base. Ermatinger and Sayers produced photos of the fence with the drilled hole and the fence was a typical faded brown/grey color, it was not a white fence. (App. at 24.) They included this information about the two cans of primer paint to imply it was connected to the fence with the hole in which "the interior of the holes had been painted the same color as the exterior of the fence, making the holes far less noticeable." (Doc. 169-1 at 8.) Thinking this implication all the way through, it implies the murderer used two cans of white primer (water-based and oil-based) to first paint one (or two) coats of primer on the hole and then return to paint the final color. I find Sayers theory is beyond extraordinary and crosses the line of preposterous. Of course, Sayers omitted in his affidavits for search warrants that the colors of the paint found in Aubrey's garage did not match up with the color of Tobolowsky's fence, which would lead someone to believe that the multiple cans of primer and multiple cans of paint were intended for something other than Tobolowsky's fence.

147.   "When detectives entered Plaintiffs' apartment at 7777 Glen America, they found an Apple MacBook laptop. The laptop's disk utility application was actively deleting and erasing files from its hard drive." That is one of a few truthful statements. The laptop was the computer used for Aubrey's massage business. It contained his entire client list and contact information for hundreds of clients. Aubrey backed onto a remote hard drive everything on the computer and then erased the computer as a precaution against Defendants getting additional unlawful search warrants and returning to harass us further, which they did. Aubrey foresaw how Ermatinger and Sayers could destroy his business by harassing Aubrey's clients (they later destroyed it by falsely arresting him for prostitution). (Our other computers that were unlawfully seized and searched, did not contain any of Aubrey's business information. That was all on his laptop.)

148.   Defendants never missed an opportunity to prove us right and show how dirty and underhanded they could be.  Because they were tracking our credit cards, they became aware that Aubrey booked a room for our friend who was visiting from Detroit, Dr. Alexandra Krot. They harassed her when they stopped and identified her at the DFW airport.  They gave that information to the person that should not be given anything personal, Michael Tobolowsky. Because Defendants were tracking our phones, they were aware that Aubrey's brother, Tom, had contacted Aubrey on the afternoon of the fire/murder.  Defendants also felt compelled to give that information to Michael Tobolowsky. First, Michael Tobolowsky and Schoettmer executed a subpoena duces tecum through the civil "jihad" defamation case on Alexandra Krot's bank, looking for charges that would represent payment for a hit man, according to Michael Tobolowsky. Next, Michael Tobolowsky filed a Rule 202 petition against Alexandra Krot and

Thomas Aubrey for purposes of investigating potential wrongful death claims. Information he expected to learn from our friend and Aubrey's brother included:

    a.  the "plan" to commit the capital murder / wrongful death of Ira E. Tobolowsky;

    b.  the series of events that occurred on May 13, 2016, which resulted in the capital murder/ wrongful death of Ira E. Tobolowsky;

    c.  the identity of the individual(s) who murdered/ caused the wrongful death of Ira E. Tobolowsky;

    d.  the identity of the individual(s) who acted or served as accessories, accomplices, and/ or who otherwise participated in the capital murder / wrongful death of Ira E. Tobolowsky; and

    e.  information pertaining to the destruction or hiding of evidence relevant to the capital murder/ wrongful death of Ira E. Tobolowsky.

Michael Tobolowsky's brother, Jonathan, went to Thomas Aubrey's workplace where he has worked for 25 years and is a senior marketing manager. According to Thomas Aubrey, Jonathan entered the workplace, ignored the receptionist and screamed that he had a subpoena for Thomas Aubrey like it was some kind of a raid. Michael Tobolowsky and his two brothers deposed Thomas Aubrey.  As well, the three of them flew to Detroit, MI to depose Alexandra Krot for an entire day. This represents the kind of unruly, erratic and imbalanced behavior Tobolowsky's sons are capable of.

149.   Any private information in the hands of Ermatinger and Sayers is destined to be used to harm others. Upon information and belief, DPD has given Michael Tobolowsky the entire investigative file for the murder of Ira Tobolowsky, something that is never done and is against the laws of the state. Time will tell how he will abuse the confidential health information, etc. Defendants and the Court can take note that our other computers that were unlawfully seized and searched, did not contain any of Aubrey's business information. It was all on his laptop.

## CONCLUSION

150.   Ermatinger's SWAs, Brief, and declaration all include statements of false facts that resemble proclamations without any reference to the origin of the false information. Because Ermatinger fabricated these false "proclamations" the information is his. Examples include:

- Ira Tobolowsky is of Jewish descend [sic] and felt Jihad was an anti-semitic [sic] statement; and

- Aubrey had made multiple references to jihad in the course of the litigation;

Sayers just copypasted whatever Ermatinger proclaimed.

App. 000153

151.  Interspersed among the proclamations with no origin, Ermatinger would include more statements of false facts, which seemed to have origins of significant importance but they were cloudy and opaque.  These statements would be attributed to "family members" or "neighbors." However, upon searching for the source of the information, there never is a record of anybody contributing to the declarations other than Ermatinger himself. Examples include:

- Family members advised detectives that complainant Tobolowsky felt threatened by Steve Aubrey;

- The Tobolowskys explained that they are Jewish, and that they and the victim believed that Aubrey's references to jihad were anti-Semitic threats to Ira Tobolowsky's safety and life; and

- Neighbors stated that they have not seen either Steven Aubrey or Brian Vodicka since Saturday the 14th of May 2016 and they have not heard any occupants walking around inside.

Sayers just copypasted whatever Ermatinger declared.

152.  Each of Ermatinger's false statements of this nature are material to support a finding of probable cause. Stating that according to "family members" the victim believed that my references to "jihad" were threats to his life is a material and alarming statement. If taken as true, the reader understands that Tobolowsky feared for his life because of me and the family knew it. Of course this is a totally fabricated lie because records prove that I never made a "jihad" allegation towards Tobolowsky and I never threatened Tobolowsky. Moreover, none of this false information regarding "jihad" was discussed or alleged in the interviews with the family but the interviews did establish that there had been no threats from anybody, myself included.

153.  Ermatinger's SWA Nos. 3, 4 and 5 are just buckets of false statements and omissions that create a false narrative so that Ermatinger could trick the judges into finding probable cause that, in truth, did not exist. Sayers's SWA Nos. 6, 7, 8, 9, 10 and 11 are the same.

154. With reckless disregard for the truth, both Ermatinger and Sayers committed aggravated perjury each time they intentionally presented one of their falsified search warrant affidavits to a judge, causing an unlawful search warrant to be issued.

155.  Ermatinger and Sayers decided the best was to avoid liability for their flagrant practice of lying in their affidavits was to double-down on the falsity and fabricate new lies specifically for this Court. Defendants added "family members" to be responsible for the lies, thereby escaping culpability, giving the lies an appearance of legitimacy, and definitely establishing the lies materiality. The Brief attempts to wear down the Court through endless repetition of nonexistent "jihad" fabrications all sworn as truthful in Defendants' declarations.

156. Sayers is not as skilled as Ermatinger when it comes to lie fabrication. He made an enormous misstep going out on a limb and attributing a lie to a single person, Debbie Tobolowsky. Ermatinger would never be so foolish. Possibly they are aware that between them,

Ermatinger is the better liar and for that reason, Sayers nearly always just copypastes whatever Ermatinger fabricates. For the Brief, Sayers stepped outside his comfort zone and included the following demonstrably false statement:

> When Detective Sayers asked her who could possibly have wanted to kill the victim, Mrs. Tobolowsky identified Plaintiffs Steven Aubrey and Brian Vodicka.

It is difficult to believe that a statement so alarming, damaging, and material did not make it into any of the SWAs. It is difficult to believe that this information was not mentioned in either of Debbie Tobolowsky's interviews with detectives. It is difficult to believe that Debbie Tobolowsky's and her family's interviews with the media contradicts this statement. It is very difficult to believe that Sayers decided to just recently fabricate this statement specifically for his this Court to consider after he was personally interviewed by D Magazine and he stated that Debbie Tobolowsky could not think of anybody who would want to harm her husband. Sayers should have said "family members" identified Plaintiffs Steven Aubrey and Brian Vodicka, but he did not. He attributed his lie to a specific person making his lie demonstrably false.

157.   Sayers relied solely on hearsay from Ermatinger and from other self-interested persons (i.e. Schoettmer and George Tobolowsky) who have all failed to produce a single document to support the echo chamber of false allegations regarding threats against Jews, threats against Tobolowsky, and my greed for inheritance. Ermatinger and Sayers rely on repeating the same baseless claims over and again with tireless repetition in an echo chamber, gambling that this Court will accept their fabrications as truth.

158.   Rather than evaluate all of the exculpatory evidence concerning Vodicka and me on October 20, 2016, Ermatinger and Sayers instead thought their resources were best spent devising a sting operation to falsely me for prostitution while they made a warrantless entry into our residence to interview Vodicka, again.  The scheme hinged on Defendants' gamble that I was a prostitute and required at least 10 DPD officers who could have been protecting the citizens of Dallas. However, Defendants bet on the wrong guy, because I am not a prostitute and they added two more criminal offenses to their stack when they illegally entered our residence. Ermatinger and Sayers could have been interviewing the convicted felon and other criminals who shared office space with Tobolowsky and shared businesses with him, instead they wanted to interview Vodicka one more time. Ermatinger and Sayers ignored the exculpatory evidence that was related to Vodicka and me, including:

- Phone location data, which proved where we were on May 13, 2016 and proved that we both were in public site constantly, not hiding;

- Detectives were tracking our credit cards, which proved that we both were in public site constantly, not hiding;

- Identification of our friend Alexandra Krot who stayed in the hotel booked under her name; the room was not a hideout for us;

- Ermatinger's visual proof confirming that Aubrey's arms were not burned;

- Follow up on Aubrey's dermatologist appointment that occurred just hours after the fire and murder;

- There was not a single jihad comment made by Aubrey or me directed at Tobolowsky or at anybody in any court document and there were absolutely no threats of any nature directed at Tobolowsky or any judge anywhere; and

- Immediate family members had no idea who would have wanted to hurt Tobolowsky, which is proven in Sayers own interview with D Magazine.

159.   Ermatinger and Sayers took the above exculpatory evidence and/or irrelevant facts and flipped them upside down to use against us. Defendants were either too lazy to find a legitimate suspect, not bright enough to find a true suspect, or maybe they were directed to focus on Vodicka and avoid investigating or interviewing the business associates of Tobolowsky, including his business partner and officemate for several decades, convicted felon Marc Birnbaum.

160. Moreover, Defendants' false statements of fact used to support a finding of probable cause are all directed at me and should not be in the SWAs used against Vodicka alone. The SWAs and corresponding search warrants executed against Vodicka include:

- SWA No. 4: Brian Vodicka; May 18, 2016 (Doc. 169-1 at 12-13.);

- SWA No. 9: Verizon Wireless - Brian Vodicka; May 26, 2016 (Doc. 169-1 at 37-38.); and

- SWA No. 11: Google, Inc.; October 5, 2016  (Doc. 169-1 at 46-53.).

There are no statements about me, true or false, that support a finding of probable cause against me. Absent the demonstrably false statements concerning Aubrey, Defendants' SWAs (above) do not support a finding of probable cause. Ermatinger and Sayers improperly impugned my reputation by impugning Aubrey's reputation in their affidavits used against me, including the following statements, which are irrelevant to me:

- Family members advised detectives that complainant Tobolowsky felt threatened by Steve Aubrey because of a lawsuit that complainant Tobolowsky won when he represented the mother of Steven Aubrey, Betsy Aubrey; (SWA Nos. 4, 9, 11.)

- It was alleged in the lawsuit that Steven Aubrey threatened "Jihad" the same words used to describe the wars brought by terrorists, which was filed in court docket number 15-08135 in the 14th Judicial District Court Judge Eric Moye presiding; and (SWA No. 4.)

- It was alleged in the lawsuit that Steven Aubrey threatened "Jihad" the same words used to describe the wars brought by terrorists, and against his life which was filed

App. 000156

in court document number 15-08135 in the 14 Judicial district court judge Eric Moye presiding. (SWA Nos. 9, 11.)

Statements concerning Aubrey cannot be used for a finding of probable cause against me, even if they are fabricated and false. The lazy detectives should have fabricated false statements of fact on my behalf to go after me personally. But the did not and the finding of probable cause against me was based entirely on allegations against Aubrey.

161.   Regarding the October 20, 2016, illegal entry into my personal residence, Ermatinger and Sayers lied in their declarations, stating:

> We first tried for at least a full minute to rouse Vodicka by calling his name, but Vodicka did not stir. I [Detective Ermatinger] then grasped Vodicka's foot and shook it until Vodicka eventually woke up. Vodicka was groggy and disoriented for several minutes, but eventually became oriented. Vodicka greeted us and asked us to sit down.
> (Doc. 169-1 at 63,71.)

Here Defendants are trying to bolster their "welfare check" excuse by falsely implying I was so medicated that I was "disoriented" and may not have know my location or identity. Waking up to these strange men (one sitting on my bed next to me) was much more disturbing than Defendants' rewritten history.

162.   The records reflect that I had been wide awake just a couple of minutes, if not moments, before Ermatinger's and Sayers's intrusion into my home and bedroom. They had already woken me up when they knocked on my door before they went to get the key and when I woke up the first time, nobody "grasped Vodicka's foot and shook it until Vodicka eventually woke up." I was not in a coma; I was just taking a nap. If it took someone shaking my foot to wake me enough to be "groggy and disoriented for several minutes" then I would not have been capable of responding to the knocks on the door, walk to the front door to see who was knocking, return back to my bedroom and start trying to contact Aubrey with one unanswered call at 2:29 pm and another at 2:30. (App. at 89.) On my second unanswered call, I left a voicemail for Aubrey telling him that someone was knocking at the door but when I got there I could not see anybody. Then at 2:31, I sent Aubrey a text, stating: "Someone knocking I can't see anybody."(App. at 90.) I believe I was responsive to knocks at my front door. I was not a victim of too much medication, as Defendants' would suggest; I was the victim of two creepers sneaking into my darkened bedroom and intentionally trying to shock and scare me.

163.   I had just closed my eyes and was barely asleep when I was startled because some unknown person sat down on my bed and put his hand on my leg, and softly spoke my name, "Brian." Ermatinger's records reflect they started the interview at 2:30 pm. My more accurate records prove the interview could not have started until after 2:31, therefore Defendants must have sat down on my bed and touched me right after 2:31, which means I had just closed my eyes. I was not disoriented, I woke up instantly not "eventually," and I did not "greet" them and ask them to sit down. Ermatinger took that liberty to sit on my bed next to me before I knew he had sneaked into my room. As well, Defendants are lying about shaking my foot until I

"eventually woke up." I have severely damaged nerves in my feet due to neuropathy and if Ermatinger had grasped my foot and shook it, I would have been screaming in pain.

164.   The harassment and abuse did not stop with a creepy detective sitting next to me in bed. The first thing Ermatinger said was, "We arrested Steve." The intention was for me to think Aubrey had been arrested for the murder of Tobolowsky. We were all silent waiting for someone to say something. I finally broke the silence and said, "That's impossible." I then asked Defendants why they had not followed up on Aubrey's appointment with his dermatologist a few hours after the fire/death of Tobolowsky, which was further proof there were never any burns. This exculpatory evidence was never presented to whichever judges they continued to present their affidavits that contained the same fabricated and false facts Ermatinger and Sayers had used in their previous search warrant affidavits.

165.   I was forced to sit through an additional interview with unwelcome and uninvited detectives. It is peculiar that neither of Defendants attempted to call and check on my welfare and also seems like a waste of resources to send two homicide detectives from downtown to check on my welfare rather than an officer working the area. However, Defendants appear to have a wide range of responsibilities that includes murder investigation, prostitution detection, welfare checks and cruising through the gay websites.

I declare under penalty of perjury that the foregoing statements are true and correct.

Executed in Broward County, State of Florida, on the 19th day of August 2020.

*/s/ **Brian E. Vodicka**____*
Brian E. Vodicka

App. 000158

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| STEVEN B. AUBREY, and | § | |
| BRIAN E. VODICKA, | § | |
| | § | |
| *Plaintiffs,* | § | |
| v. | § | CIVIL ACTION NO. 3:19-CV-056-B |
| | § | |
| D MAGAZINE PARTNERS, L.P., et al., | § | |
| | § | |
| *Defendants.* | § | |

**DECLARATION OF STEVEN B. AUBREY**

1.   My name is Steven B. Aubrey. I am more than 21 years old and I have never been convicted of a felony or crime of moral turpitude.  I am fully competent to make this declaration and all of the facts set forth herein are based on my personal knowledge and are true and correct.

2.   Defendants Robert Ermatinger ("Ermatinger") and Scott Sayers ("Sayers") were Defendants assigned to investigate the murder of Ira Tobolowsky ("Tobolowsky") and with the help of certain Tobolowsky family members, they deflected attention from where it most logically pointed. Instead of investigating Tobolowsky's manifold of businesses and business partners, Ermatinger and Sayers used extralegal means to harass, torment, embarrass, and injure Brian Vodicka ("Vodicka") and me, making us the scapegoats for murder and gathering irrelevant information on us with search warrants based on false information.  Defendants had ample evidence indicating we were not involved in Tobolowsky's murder, including an electronic trail and eyewitnesses.

**SEARCH WARRANT AFFIDAVITS**

3.   Ermatinger and Sayers (collectively "Defendants") confirmed by oath and executed before various judges, nine (9) falsified search warrant affidavits that caused nine (9) unlawful search warrants to be issued and used against Vodicka and me. Because we have no connection to the murder, Defendants resorted to fabricating demonstrably false statements and outright lies to support a finding of probable cause. Ermatinger and Sayers lied, twisted true facts into false facts, fabricated false facts and impressions, and omitted key information to shape false impressions to support a finding of probable cause. Without the fabrication and falsity, there was nothing to support a finding of probable cause. I reviewed each search warrant affidavit ("SWA") executed by Defendants, including:

a)   SWA No. 3: Steven Aubrey; May 18, 2016 (Doc. 169-1 at 8-9.);

b)   SWA No. 4: Brian Vodicka; May 18, 2016 (Doc. 169-1 at 12-13.);

c)   SWA No. 5: 7777 Glen America Drive, Apt. 223, Dallas; May 18, 2016 (Doc. 169-1 at 15-16.);

d)   SWA No. 6: 7777 Glen America Drive, Apt. 223, Dallas; May 25, 2016 (Doc. 169-1 at 21-23.);

e)   SWA No. 7: 8617 Southwestern Blvd. Apt. 911, Dallas; May 25, 2016 (Doc. 169-1 at 27-29.);

f)   SWA No. 8: Verizon Wireless - Steven Aubrey; May 26, 2016 (Doc. 169-1 at 33-34.);

g)   SWA No. 9: Verizon Wireless - Brian Vodicka; May 26, 2016 (Doc. 169-1 at 37-38.);

h)   SWA No. 10: Three Computers; May 31, 2016 (Doc. 169-1 at 41-43.); and

i)   SWA No. 11: Google, Inc.; October 5, 2016  (Doc. 169-1 at 46-53.).

Ermatinger executed SWA Nos. 3, 4 and 5 on May 18, 2016. Sayers executed SWA Nos. 6, 7, 8, 9, 10 and 11 from May 25 - October 5, 2016. Cites to records that prove the falsity in the SWAs are included.

4.   Seven (7) of the affidavits (SWA Nos. 5-11) included the same demonstrably false statements, which had they been absent from Defendants' SWAs, those SWAs would not have supported a finding of probable cause. The provably false statements, fabricated by Ermatinger and later plagiarized by Sayers, include:

A.   It was aledged [sic] in the lawsuit that Steven Aubrey threatened "Jihad" the same words used to describe the wars brought by terrorists, **and against his life** which was filed in court document number 15-08135 in the 14 Judicial district court judge Eric Moye presiding.

B.   Family members advised detectives that complainant Tobolowsky felt threatened by Steve Aubrey because of a law suit [sic] that complainant Tobolowsky won when he represented the mother of Steven Aubry [sic], Betsy Aubrey.

C.   During the investigation Detectives discovered that the victim Ira Tobolowky [sic] was involved in a civil defamation lawsuit with Steven Aubrey and his partner Brian Vodicka who was representing him.

Ermatinger add the false fact that I threatened Tobolowsky's life in his SWA No. 5. His first two affidavits, SWA Nos. 3 and 4, did not yet include "and against his life," therefore, the statement was no longer false but was grossly misleading. It stated:

       D.     It was aledged [sic] in the lawsuit that Steven Aubrey threatened "Jihad" the same words used to describe the wars brought by terrorists, which was filed in court document number 15-08135 in the 14 Judicial district court judge Eric Moye presiding.

By way of egregious and disgusting implication, and through Defendants' intentional omission of material information known to them, Ermatinger and Sayers created a false narrative to trick the judges into issuing at least nine (9) search warrants used against Vodicka and me.  The SWAs contained the following misleading statements, which convey that I hated Jews and that we were hiding, both false.

       E.     Ira Tobolowsky is of Jewish descend [sic] and felt Jihad was an anti-semitic [sic] statement.

       F.     Neighbors stated that they have not seen either Steven Aubrey or Brian Vodicka since Saturday the 14th of May 2016 and they have not heard any occupants walking around inside.

       G.     It is believed that who ever set the complainant on fire may have suffered serious burns and is hiding from public site as to prevent their injuries from being seen by the public as well as detectives (not in SWA Nos. 8 and 9).

Curiously, Ermatinger's first two affidavits (SWA Nos. 3, 4) did not have the six (6) misspelled words/name that were reflected in his third and final affidavit (SWA No. 5). Not only did Ermatinger's third and final affidavit suddenly reflect misspellings that had been correct, it also included the new "and against his life" phrase to the jihad statement. Sayers plagiarized Ermatinger's affidavit with the misspellings and the added threat, evidenced in his affidavits. Following is my analysis of the three (3) demonstrably false statements and four (4) statements that create a false narrative:

    5.    **A.**    **It was aledged [sic] in the lawsuit that Steven Aubrey threatened "Jihad" the same words used to describe the wars brought by terrorists, and against his life which was filed in court document number 15-08135 in the 14 Judicial district court judge Eric Moye presiding.**

This statement is false. Over the course of one year and seven days, Tobolowsky made NINETY-SEVEN (97) "jihad" allegations directed at Vodicka and me but Tobolowsky never alleged a threat against his life. Ermatinger knew there was not an allegation of a threat against Tobolowsky's life because his first two affidavits (SWA Nos. 3 and 4) correctly stated, "It was aledged [sic] in the lawsuit that Steven Aubrey threatened 'Jihad,'" though it was misleading because I did not. Tobolowsky simply enjoyed making the wild and baseless allegations in his frivolous pleadings. Ermatinger decided to take the misleading, but true, statement and spice it up by adding his fabricated "and against his life," intentionally turning it into a death threat allegation.

6.  Because there was not a motive for Vodicka and/or me to murder Tobolowsky, Ermatinger and Sayers fabricated a false one about a court document that states I threatened Tobolowsky life with "jihad." Ermatinger's SWA Nos. 3 and 4 did not include the death threat "and against his life."  He added the death threat to his SWA No. 5. (Doc. 169-1 at 9, 13 and 16.) Thereafter, Sayers used the fabricated statement of fact in all of his SWAs. Before Sayers began perjuring himself in SWA Nos. 6 and 7, executed on May 25, 2016, Ermatinger interviewed me for approximately seven (7) hours on May 19, 2016. (He punished me for insisting on having a lawyer present by locking me up in an interview room for the same amount of time, without food or use of a restroom.) Reflected in the video produced  in response to discovery requests, when Vodicka was interviewed by Ermatinger, he made it abundantly clear that I only used the term "jihad" in a letter to my mother, before I knew Tobolowsky. Vodicka repeated the information and Ermatinger acknowledged that he understood. The following was stated in the May 19, 2016 interview:

| | | |
|---|---|---|
| 9:30:31 pm | Ermatinger | What threw the light on him…he uses words like "I'm going to commit a jihad on you." What the hell does that mean? |
| | Vodicka | Well okay. Let me…let me clarify that statement. Let me clarify that statement. |
| 9:31:40 pm | Vodicka | He sent one email that he should not have said, that was in, that was in….this is 2016....and that was what? 2009? |
| | Ermatinger | 2009? |
| | Vodicka | One email in the heat of anger just when he found out and I'm telling you the spin on the one email has never stopped. |
| | Ermatinger | Ok well that's continuing today. |
| | Vodicka | And and and you see Tobolowsky, you see Schoettmer… |
| | Ermatinger | So that's 2009 was the first time he said that Jihad thing? |
| | Vodicka | Was only, only time, only time. |
| | Ermatinger | Steve sent an email. Ok. It goes that far back. Wow. |
| | Vodicka | Only time, only time, only time and I told him he should not have sent it and he said it was just his way of releasing his anger. |
| | Ermatinger | Who'd he send that to? |
| | Vodicka | His mother. |
| | Ermatinger | Okay                    (App. at 78.) |

4

App. 000162

7.   Tobolowsky NEVER alleged that I threatened his life. Ermatinger swore to the veracity of his intentionally fabricated death threat statement. It was/is an inflammatory lie with no basis in reality. Ermatinger had the audacity to attest to the false fabricated fact that Tobolowsky alleged that I threatened his life and the allegation was in a court document. His false statement of fact was designed to shock and alarm the criminal court judges to whom Defendants' affidavits were submitted and to paint me as a violent, rage-filled terrorist. I never threatened "jihad" against Tobolowsky and I never threatened his life, as is clear from the face of documents filed in Case DC-15-08135. Shockingly, Sayers used the exact same false death threat statement even after Vodicka's interview with Ermatinger where it was made crystal clear that I never used the term "jihad" while we knew Tobolowsky.

8.   In July 2015, Tobolowsky sued Vodicka and me for defamation, alleging that we had undertaken "jihad" to punish him for his "successful" representation of Betsy Aubrey. Tobolowsky had plucked the inflammatory word "jihad" out of context from a personal e-mail I sent to my mother in 2013 (months before any litigation and six months before I had heard the name "Tobolowsky") and studded it throughout the complaint. In November 2015, three days after the horrific terrorist attack in Paris that left over 130 people dead, hundreds more injured and much of the world still reeled in shock, Tobolowsky filed a first amended complaint that doubled the use of the inflammatory word "jihad" from the original complaint; he also included a completely fabricated assertion that Vodicka and I published a document "stating that Tobolowsky had become Muslim and had joined ISIS," which was as absurd as the almost humorously hyperbolic use of "jihad." Tobolowsky could never produce evidence to back up any of his nonsensical "jihad" claims in his July 2015 Petition, including:

- Defendant Aubrey expanded his "Jihad" against his mother and brother to also include Plaintiff.

- In furtherance of Defendant Aubrey's "Jihad," Defendant Aubrey... commenced a course of unethical and illegal behavior against Plaintiff and his representation of Betsy Aubrey.

- Because of Plaintiff's representation of Betsy Aubrey in the lawsuit, Defendant Aubrey had no success in his "Jihad" against his mother.

- Defendant Vodicka undertook to assist Defendant Aubrey in carrying out Defendant Aubrey's "Jihad" against Betsy Aubrey and her attorney, Plaintiff.

- In early 2015 Defendants decided to escalate their "Jihad" and sued, *inter alia,* Plaintiff.

- Defendants' defamatory statements were made deliberately, willfully, maliciously, and with the intent to carry out a "Jihad" against, *inter alia,* Plaintiff.

5

- Defendants deliberately made willful and malicious defamatory statements against Plaintiff, publishing to third parties all of these defamatory statements solely as part of their "Jihad" in an effort to cause severe harm to Plaintiff.

- As a direct and proximate result of Defendants' tortious "Jihad"...

- Judgment against the Defendants resulting from Defendants' illegal and unlawful "Jihad" and proven at time of trial. (App. 99-103.)

Vodicka and I were the targets of 97 relentless, senseless, and baseless "jihad" allegations. It appeared that Tobolowsky simply enjoyed the pleasure of the legal gamesmanship in a field that he influenced and controlled.

9.   Ermatinger and Sayers had knowledge their affidavits were not truthful and Ermatinger's fabricated addition of a death threat goes beyond reckless disregard for the truth; it was an intentional lie.

10.   **B.   Family members advised detectives that complainant Tobolowsky felt threatened by Steve Aubrey because of a law suit [sic] that complainant Tobolowsky won when he represented the mother of Steven Aubry [sic], Betsy Aubrey.**

This statement is false. The false statement was material to support the finding of probable cause. Without a motive connecting me to the Tobolowsky's murder, Ermatinger and Sayers fabricated a false one in which I was angry because Tobolowsky represented my mother and she won the suit. However, during Tobolowsky's lifetime he *never* won in any lawsuit that involved me , so there was no anger on my behalf or motive to harm anybody. Moreover, all of the records indicate that Tobolowsky did not feel threatened by me or by anybody, which was established in multiple family member interviews with the media and especially in interviews by Ermatinger and Sayers.

11.   On May 24, 2016, Ermatinger interviewed Tobolowsky's wife Debbie and his son Michael. Ermatinger's notes:

> News reported there was an email threatening to kill Ira on 5-12-16. Michael stated there is definitely no such email. (App. at 21.)

In fact, Ermatinger's investigative report reflects that Debbie and Michael Tobolowsky never even mentioned Vodicka or me. His report concludes with a section titled "Person of interest" and throughout the entire interview there was just one person that concerned Debbie and Michael Tobolowsky even though the girl had not threatened Tobolowsky. Ermatinger's report states:

> Debra and Michael stated Ira had recently been approached by a semi homeless girl about getting money (inheritance) from a bank. She would call the house at all times, including late hours (3am). Michael and Steve Shotner [Schoettmer] have her info. (App. at 21.)

12.   Ermatinger's interview reflects that only one person of interest was discussed in the interview with Debbie Tobolowsky and it was not Vodicka or me. The report also reflects that there was no discussion regarding anti-Semitism or anything that would suggest Tobolowsky's Jewish religion or ethnicity was connected to the crime.

13.   As well Dallas Fire-Rescue Capt. Stephens investigative notes reflect the same information detailed in Ermatinger's investigative report. Capt. Stephens's notes identify by name the one person of interest that Debbie and Michael Tobolowsky had talked about during Ermatinger's interview. His notes state:

> Ira approached by a lady 1½ months ago: Sharon Bornstein
> Had a trust fund. Stays in Motel
> She was very abusive and Ira refused to represent her.
> Heard her on phone. Called him 18 times over weekend.
> Loaned her $100.00. Ira can't help her.
> Sharon Bornstein: [redacted]
> Ira talked to her banker: VP JP Morgan [redacted]  (App. at 4.)

14.   Sayers gave an interview to *D Magazine* for its May 2017 story, "A Place Where Something Evil Happened" by Jamie Thompson. The article stated:

> A homicide detective named Scott Sayers arrived at the house wearing a button-down and tie. The detective asked Debbie: "Do you think this was an accident, or could someone have done this?"
>
> "What do you mean?" she asked. She couldn't think of anyone who wanted to hurt her husband. (App. at 71.)

15.   The article captures the first impressions of Michael Tobolowsky, stating:

> Before the flight, Michael had learned the fire might have been set intentionally. All he could think about was, Who? (App. at 72.)

16.   On June 23, 2016, over five weeks after Ira Tobolowsky's death, the *Dallas Morning News* article "Family of Slain Dallas Attorney Ira Tobolowsky Offers $20,000 Reward for Tips" by Tasha Tsiaperas stated:

> Though some have said Tobolowsky may have been killed because of his legal work, his sons said Thursday that they don't know if that was likely. 'We have no idea,' [his son] Michael Tobolowsky said. ... Tobolowsky's family has said he didn't express fear or concern in the days leading up to his death." (App. at 93.)

17.   Capt. Stephens with Dallas Fire-Rescue interviewed Leigh Allen, Tobolowsky's legal assistant for 18 years, on May 18, 2016. His investigative notes state:

> Has access to his emails and has reviewed them.

Has not seen any threatening emails or letters. (App. at 3.)

18.   The many records and interviews of Tobolowsky's wife, sons, and legal assistant for 18 years all confirm that they have ever "seen any threatening emails or letters," "couldn't think of anyone who wanted to hurt" Tobolowsky, think it is unlikely that Tobolowsky was killed because of his legal work, and they said Tobolowsky "didn't express fear or concern in the days leading up to his death." All of the records prove that no Tobolowsky family member said Tobolowsky felt threatened by Vodicka, me, or anybody.

19.   My Interrogatory No. 10 to Sayers stated:

> Identify the name, address, and phone number of each Tobolowsky family member who advised detectives that complainant Tobolowsky felt threatened by Steve Aubrey because of a lawsuit that complainant Tobolowsky won when he represented the mother of Steven Aubrey, Betsy Aubrey as you stated in Affidavits 1-6.
>
> **Answer:** To the best of Defendant's knowledge, recollection and belief, Defendant Sayers refers Plaintiff to Defendant Ermatinger's Answer to Interrogatory No. 8 issued by Plaintiff Brian Vodicka. (App. at 38.)

20.   To the best of Sayers's knowledge, recollection and belief, he refers me to Ermatinger's answers?  That is a nonsensical no answer. Because Sayers completely relied on Ermatinger's false statements of fact in Sayers's' six SWAs, he was unable to answer and instead, directed me to Ermatinger's answers that stated Ermatinger,

> "had many conversations with various members of the Tobolowsky family, and does not recall the specific statements made by each person." (App. at 38.)

21.   As a senior detective, Ermatinger took copious notes with meticulous detail but there is absolutely nothing regarding the complainant feeling threatened by Aubrey, which irrefutably would have been worthy of noting.

22.   **C.   During the investigation Detectives discovered that the victim Ira Tobolowky [sic] was involved in a civil defamation lawsuit with Steven Aubrey and his partner Brian Vodicka who was representing him.**

This statement is false. Vodicka and I were both party defendants in this frivolous case filed by Tobolowsky and Vodicka never represented me in this case.

23.   I believe this false statement was fabricated with reckless disregard for the truth to separate Vodicka from me and set me up to be responsible for "jihad" and for the murder. Tobolowsky's frivolous "jihad" lawsuit made unintelligible "jihad" *allegations* directed at *both* Vodicka and me. Additionally, because "Tobolowsky" was mistakenly misspelled just one time in this one sentence, it proves that Sayers blindly copypasted the statement from Ermatinger's affidavit as Sayers's affidavits have the mistake.  "Tobolowky" first appeared in Ermatinger's

8

SWA No. 5 (Doc. 169-1 at 16) and then in Sayers's SWA Nos. 6, 7, 8, 9 and 11 (Doc. 169-1 at 22, 28, 34, 38 and 48).

24.   **D.   It was alleged in the lawsuit that Steven Aubrey threatened "Jihad" the same words used to describe the wars brought by terrorists, which was filed in court document number 15-08135 in the 14th Judicial District Court Judge Eric Moye presiding.**

This was Ermatinger's first edition "jihad" statement (SWA Nos. 3 and 4). Ermatinger's second edition (SWA No. 5) includes the misspelled word "aledged" and the added "and against his life" that transforms the misleading statement into a death threat. The "jihad" statements have never been proven and were simply Tobolowsky's use of senseless hyperbole.

25.   Before Ermatinger included the four words that made the statement a death threat, it was just a very misleading statement because on July 21, 2015, Tobolowsky had in fact filed a "jihad" lawsuit against Vodicka and me that contained multiple frivolous and fanatical "jihad" allegations, including:

- Defendant Vodicka undertook to assist Defendant Aubrey in carrying out Defendant Aubrey's "Jihad" against Betsy Aubrey and her attorney, Plaintiff;

- In early 2015 Defendants decided to escalate their "Jihad" and sued, *inter alia*, Plaintiff; and

- Defendants' defamatory statements were made deliberately, willfully, maliciously, and with the intent to carry out a "Jihad" against, *inter alia*, Plaintiff.

26.   Defendants might have researched the court documents and personally read Tobolowsky's bizarre and never before seen use of the term "jihad" and then possibly determine if there was any basis for the wild allegations. Defendants should have attempted to determine if Vodicka did, in fact, assist me in carrying out my jihad against my mother and Tobolowsky. They should have searched for evidence that support Tobolowsky's allegations that Vodicka and I sued Tobolowsky to escalate our "jihad" or evidence to prove defamatory statements could be made with the intent to carry out a "Jihad" against Tobolowsky. But Defendants failed to investigate the allegations.

27. In fact, Tobolowsky had a continuum of endless applications to use with "jihad." Like a blue-plate special, he would fabricate new and delusional definitions for "jihad" on a regular basis and then attribute it to me, stating his latest version was "Aubrey's jihad." Tobolowsky's first round of "jihad" allegations was in Defendant's First Amended Answer filed on January 13, 2015, in Cause No. PR-14-01486-3 in Dallas County, Texas Probate Court No. 3. Two of Tobolowsky's first round of "jihad" definitions included:

App. 000167

- as part of his Jihad, gathered financial information about the Family Trust and its assets and then filed false claims with the IRS against the Defendants for tax fraud and tax evasion.

- as part of his Jihad, began filing numerous lawsuits against both Defendant Betsy Aubrey (including the instant lawsuit) and against Defendant Richard Buck Aubrey, Jr.

It is difficult at best to see how Tobolowsky's original "jihad" definitions comport with his definitions just six (6) months later. (*Id.* ¶ 25.) How does my "jihad" that includes filing claims with the IRS for tax fraud and tax evasion; and filing numerous lawsuits against my mother and brother (the original claims) have anything to do with escalating Vodicka and my "jihad" by suing Tobolowsky and our defamatory statements made with the intent to carry out a "Jihad" against Tobolowsky. Tobolowsky just made it all up as he went along. This was Tobolowsky's "jihad" not mine.

28.   Allegations are just unproven claims of wrongdoing. Tobolowsky made 97 "jihad" allegations directed at Vodicka and me and nobody, including Tobolowsky, has ever been able to prove the fanatical and nonsensical "jihad" allegations. I only used the term one time in an email to his mother, before he knew the name "Tobolowsky." Tobolowsky fabricated his "jihad" legal filings to make Vodicka and me look like terrorists and instead of Defendants investigating to see if there was any truth to support them, instead, they chose to present judges the false narrative that I was a radical who had threatened Tobolowsky with "jihad."

29.   **E.   Ira Tobolowsky is of Jewish descend [sic] and felt Jihad was an anti-semitic [sic] statement.**

This statement is grossly misleading. Ermatinger's disgusting and underhanded statement, without reference to where the information originates, was strategically place to imply that I am anti-Semitic. The statement immediately followed Ermatinger's fabricated death threat allegation that stated I threatened "jihad" against Tobolowsky's life. Because there was not a motive for Vodicka or me to murder Tobolowsky, Ermatinger fabricated a motive in which I hated Jews and because Tobolowsky was Jewish, I murdered him. Yes, Tobolowsky may have been Jewish and yes, he may have felt jihad was an anti-Semitic statement, but Ermatinger and Sayers should have questioned why someone who is Jewish and felt jihad was anti-Semitic was so unusually connected to the term, remembering that Tobolowsky made 97 "jihad" allegations against Vodicka and me and out of the 97, he *never* alleged "jihad" was anti-Semitic. Tobolowsky would never have known I knew the term "jihad" had he not gone digging through his client's old letters and email.

30.   I only used the "jihad" term once in an email sent to my mother, who is not Jewish, before Vodicka or I had ever heard of the name "Tobolowsky" and upon information and belief, my mother did not know Tobolowsky at that time as well. However, attacking and destroying a person's reputation is a specialty of Ermatinger and Sayers and they go to great lengths to do it. Defendants' records reflect that they were the organizers of a conspiracy to entrap me for a prostitution charge and further destroy my name, which had been highly respected for 55 years. Nobody wants to have lunch with an "anti-Semitic" "terrorist" "prostitute."

10

31.   Tobolowsky's obsession with "jihad" paralleled his passion for spiritual opportunism, the use of religion for personal gain. Evangelicals are well known for using religion for financial and political gain. Exploiting religion is as old as religion itself, which is what Tobolowsky did when he falsely accused that I was an anti-Semite. Tobolowsky was not the only one exploiting religious discrimination; his niece, Stacy Paddack, is guilty of spiritual opportunism as are Ermatinger and Sayers, who included the above religious prejudice statement to support a finding of probable cause and gave them the search warrants they sought.

32.   In fact, it was Tobolowsky himself who mocked the Jewish religion. Tobolowsky, Vodicka and I were in a court hearing before Judge Ingrid Warren in approx. July 2015. Tobolowsky chuckled out loud because he said he was working during the Jewish high holidays. He was able to get Judge Warren to laugh along with him when he told her that so long as she did not tell his rabbi, then everything would be fine. Tobolowsky was mocking the importance of the Jewish high holiday, yet he called me an anti-Semite simply because I did not know the dates of the high holiday. Does this indicate that Tobolowsky was also an anti-Semite?

33.   In 2014, Tobolowsky first raised his false "anti-Semite" claim as a diversion and stalling tactic employed to prevent me from deposing Buck Aubrey and his CPA, David Hendricks. I unknowingly attempted to schedule a deposition during the Jewish holiday, Rash Hashanah. Tobolowsky pounced on the opportunity and pretended he was hurt and offended that I did not know the dates of Jewish holidays and he branded me an anti-Semite. Vodicka and four (4) other people executed a declaration in the underlying probate case, contradicting Tobolowsky's baseless accusation that I am an anti-Semite.

34.   I have never said or written anything derogatory about Jews or the Jewish faith. Nor has anybody ever alleged such nonsense until my recent discovery that Tobolowsky's niece, Stacy Paddack, falsely accused that Aubrey had written anti-Semitic statements. However, the U.S. Justice Department did not find Stacy Paddack's claims viable, as she was unable to produce documents to support her baseless allegations. Not even Tobolowsky dared to make that empty claim as there was no evidence that I ever made negative comments about Jews, because I did not. Tobolowsky was attempting to tie anti-Semitism around my neck based upon my lack of knowledge regarding Jewish holidays. Even Tobolowsky never claimed that I said or wrote anything about Jews or Jewish faith. The more I alleged that Tobolowsky was simply using his religion to avoid depositions in the case, the more Tobolowsky accused that I was anti-Semitic.

35.   Ermatinger and Sayers took Tobolowsky's flare for creative fabricated facts to another level by combining "jihad" with anti-Semitism, stating: **"Ira Tobolowsky is of Jewish descend [sic] and felt Jihad was an anti-semitic [sic] statement."** Not even Tobolowsky could conjure up this interesting combination of religious hate. Defendants can't expect the Court to believe that Tobolowsky "felt" that "jihad was an anti-semitc statement" and he never alleged it once in his 97 "jihad" allegations filed against me. Tobolowsky made every other kind of ridiculous claim imaginable, but not that jihad was anti-Semitic. (*Id*. ¶ 7.) Once again, Defendants' most alarming statements of "fact" have no records to support the statements. Here, the three (3) SWAs filed by Ermatinger and six (6) by Sayers, include this statement concerning how Tobolowsky "felt."

11

36.  Tobolowsky never even alleged that "jihad" was anti-Semitic in his "jihad" lawsuit, likely because it never crossed his mind. Ermatinger and Sayers fabricated the statement to tie around my neck. What Tobolowsky "felt" about "jihad" is a study in itself as he used the term 97 times in court filings over the course of 372 days, but his undocumented feelings about "jihad" are irrelevant to me, irrelevant to finding of probable cause, and were included in Defendants' SWAs for improper purposes.  Neither Ermatinger nor Sayers know what Tobolowsky felt because he was deceased and they had not previously been friends with him.

37.  **F.  Neighbors stated that they have not seen either Steven Aubrey or Brian Vodicka since Saturday the 14th of May 2016 and they have not heard any occupants walking around inside.**

Defendants fabricated their baseless motive that I hated Jews; Tobolowsky was Jewish; so I wanted to murder Tobolowsky. To further support a finding of probable cause, Ermatinger and Sayers promoted the false narrative that Vodicka and I were on hiding or on run.

38.  For reasons unknown, Ermatinger and Sayers affidavits contain "facts" that contradict other facts in the same affidavits. Ermatinger's SWA Nos. 3 and 4 and Sayers's SWA No. 10 prove that Vodicka and I were in and out of our home per usual.

> Detective R. Laurence #9191 and Detective D. Richardson #6361 initially observed the blinds in the window of apartment #223, the first window south of the front door, were open and slightly angled upwards with a darkened background. Detectives Laurence and Richardson left the location for a while and when they returned they observed the blinds to the same window closed and angled downward with a light on in the background, which indicated that someone had been in the apartment. (Doc. 189-1 at 9, 13, 42.)

If they knew we were going in and out of our home, why would they make the statement about the neighbors (whom they fail to identify)?

39.  The records produced in this case reflect that on May 21, 2016, Detective D. Richardson assisted Ermatinger "with a canvass of the neighbors regarding the murder." Like Ermatinger, Detective D. Richardson takes very detailed notes as part of his duties as a detective. He listed each neighbor by address and name and wrote what each of them had observed. This is the same Detective D. Richardson who Ermatinger and Sayers allege talked to our neighbors (but did not take notes this time) and said the neighbors had not seen us.

40.  Because Defendants' allegation that we were in and out of our home is supported with specific notes about windows, blinds and lights; this can serve as a legitimate fact. Ermatinger's and Sayers's blanket statement about what neighbors heard and saw is not supported by anything and is a lie.

41.  Ermatinger and Sayers did not produce any records that support his claim that our neighbors had not seen or heard us since May 14, 2106, indicating this is just another fabricated lie. Like his fabricated blanket statement that Tobolowsky "felt jihad was anti-Semitic,"

Ermatinger believes his affidavits are opportunities to exercise his creative writing skills and truth is not encouraged. Ermatinger includes false statements and false impressions in his SWAs to support a finding of probable cause. Sayers just copies and uses anything manufactured by Ermatinger.

42. Additionally, Ermatinger admitted that he was tracking our credit cards. (App. at 79.) He also admitted that in addition to knowledge of the date we made a charge, they knew the exact time of the charge. The credit card statement reflects that between the morning of Tobolowsky's murder on May 13, 2016, and the time Ermatinger presented his sworn affidavits to a judge on May 18, 2016, we were frequently seen in public using our credit cards to eat in restaurants eight (8) times, shop in grocery stores five (5) times, and visit various other stores three (3) times. Before Ermatinger and Sayers signed and presented their affidavits for search warrants to judges, they had knowledge that contradicted their statements of fact in their respective affidavits.

43. The Trader Joe's charge was the result of my solo trip to the store to buy groceries on the same day and morning of the murder, May 13, 2016. The transaction occurred at approximately 9:05 am, less than 75 minutes after the murder (Dallas Fire-Rescue responded to the fire at 7:52 am) and Ermatinger knew it. (App. at 79.) Vodicka and I were not hiding from the public. Ermatinger and Sayers had all of the credit card proof plus they knew we had an out of town house guest, a licensed physician, and they knew about my visit to his dermatologist's office. Ermatinger and Sayers had that information in their possession, yet made a conscientious decision to keep that information concealed from two different judges, Howard and Bennett.

44. Ermatinger knew we were both frequently out in public view and were both using our credit cards in Dallas, Texas. Sayers just copypasted and presented the same misleading information six (6) additional times to judges AFTER we had been located AT OUR APARTMENT before being locked up at DPD headquarters for more than seven (7) hours. Sayers's regurgitation of this false narrative is more egregious than Ermatinger's creation of the narrative because Sayers knew more of the truth after May 19, 2016, reflecting his intention to include the false facts.

45. **G. It is believed that who ever set the complainant on fire may have suffered serious burns and is hiding from public site as to prevent their injuries from being seen by the public as well as detectives** (not in SWA Nos. 8 and 9).

Ermatinger and Sayers were completely aware that Vodicka and I were not hiding from public view and that we did not have burns on their bodies. After my false arrest and during the improper detention on May 19, 2016, I told one of Defendants that I had been to see my dermatologist, *a medical doctor who specializes in skin,* for a scheduled appointment, ironically, just hours after the fire and Tobolowsky's death on May 13, 2016. I believe Ermatinger and Sayers did not follow up because Ermatinger had personally seen my unburned arms and the burned arms theory was a red herring.

46. Ermatinger and Sayers failed to investigate my appointment with the skin specialist and Ermatinger failed to admit that when he personally inspected my arms, there were no burns.

Nevertheless, with knowledge of the truth, Sayers proceeded to use the false fact about burns in six additional affidavits for search warrants that caused six more unlawful search warrants to be issued. He presented falsified affidavits beginning on May 25, 2016, and he continued to rely on the false facts for 4½ months, presenting his last known fraudulent affidavit for search warrant on October 5, 2016, all used the same false information that we "may have suffered serious burns and is [they are] hiding from public site as to prevent their injuries from being seen by the public." (Doc. 169-1 at 21-52.)

47.   A business record affidavit from Highland Dermatology authenticates my visit on May 13, 2016, and the doctor's previous instructions for me to refrain from exhaustive physical activity due to possible rupture of the sutures on his back.  (App. at X.)

48.   The day after I was falsely arrested and held against my will for more than 7 hours into the late night of May 19, 2016, Vodicka and I met with a criminal attorney. He advised that we take our own pictures to ensure DPD's photos would not be altered.  The following day, Vodicka took multiple pictures of my arms positioned in front of that day's copy of the Dallas Morning News for proof of the date. Just like the photos taken of my arms at police headquarters (App. at 83-86.), photos that Vodicka took show that I had no burns. However we noticed that just like the pictures taken at DPD headquarters, taking pictures with a flash did not capture the fine hairs on my arms. I believe that any legitimate physician would admit that hair that has been burned by fire, would take weeks, if not months, to grow back. To capture images with the hair we went outside in the bright sunlight, and at just the right angle, the photos show the fine hairs on his arms and hands, contradicting the E.R. physician's misdiagnosis that hair was missing. The fine hairs can be seen in my pictures. (App. at 87-88.) If Ermatinger or Dr. Eastman had bothered to look at Aubrey's hands and arms closely, they would have noticed that that no hair was missing. While Dr. Eastman is not dermatologist or a skin specialist, almost anybody is capable of recognizing hair. The DPD doctor stated in his evaluation of me:

> There were uneven areas where it appeared there was no normal hair. It was in a nonspecific splotchy pattern and was not even at all. (App. at 16.)

I believe Dr. Eastman made the fraudulent representation because he did not want his time to have been wasted so late at night, or he wanted to bolster Ermatinger's weak case, or his vision is very poor and he sees splotchy patterns where others do not, problematic for an E.R. physician. The same fine hairs were on my arms on May 13, 2016, the day I went to see my dermatologist for a prescheduled visit, which was the same day and the fire/death. I never suffered from any burns that week and the same fine hairs are on my arms today (August 8, 2020) and there are no "uneven areas" with missing hair in a "nonspecific splotchy pattern" that is "not even at all." (App. at 89-90.) The pictures were taken directly under a table lamp to capture the hair on my arms.

49.   Ermatinger fabricated the above demonstrably false statements and misleading statements (*Id*. ¶¶ 5-48.) that created a false narrative, which included:

- Tobolowsky stated in a court document that Aubrey threatened to kill him with jihad;

14

- Unidentified Tobolowsky family members told Ermatinger that Tobolowsky was scared of Aubrey;

- Aubrey was the only one being sued for jihad;

- When we decided to escalate our jihad, Aubrey and I sued Tobolowsky;

- Unidentified persons told Ermatinger that Tobolowsky felt jihad was anti-Semitic;

- Unidentified neighbors, with whom we were inseparable, suddenly did not see us;

- Aubrey and I had burns so we were hiding from public view;

- Aubrey has terrorist origins and he hates Jews; and

- Because Tobolowsky was Jewish, Aubrey killed him with jihad.

Ermatinger's SWAs purported a false motive and a false allegation that Vodicka and I were hiding, which neither is true. His SWAs demonstrate reckless disregard for the truth at a minimum and his false and misleading statements were material in supporting a finding of probable cause.

   50.   The records reflect that the six (6) SWAs executed by Sayers were based solely on hearsay.  My Interrogatory No. 7: "List each fact that you personally verified in Affidavits 1-6." Answer: "Subject to the foregoing objection, Defendants answers that all of the information in Affidavits 1-6 was obtained from sources Defendant believed to be reliable…" (App. at 37.) Because the false statements of fact and false narrative contained in Ermatinger's three (3) SWAs was based on alleged hearsay, Sayers's SWAs that followed are based entirely on hearsay based upon hearsay, not on "verified facts" that Defendants personally represented to the judges.

   51.   In addition to their nine (9) SWAs, Ermatinger and Sayers drafted search warrants for the judges to sign and the warrants included the following: "I find the verified facts stated by affiant…" But Defendants were committing aggravated perjury when presenting a document with nothing but unverified facts. They relied on hearsay and the hearsay came from untrustworthy sources.

   52.   In violation of Texas law and at risk to be fined and/or imprisoned, Ermatinger and Sayers perjured themselves repeatedly in SWA Nos. 3, 4, 5, 6, 7, 8, 9, 10, and 11, tricking all judges (who read them) into issuing unlawful search warrants.

## ERMATINGER'S AND SAYERS'S OCTOBER 2016 WARRANTLESS ENTRY

   53.   Ermatinger and Sayers made a warrantless entry into my home without exigent circumstances. They have unsuccessfully tried to rewrite history and call it a welfare check, but in truth, the corrupt detectives were illegally conducting another interview. It is a criminal

App. 000173

offense for people to enter homes that do not belong to them and that applies to police officers who don't have warrants or a potential emergency concerning the resident.

54.   Ermatinger and Sayers conspired with other DPD officers to develop an elaborate sting and harassment operation, falsely arresting me and then using that as an excuse for Defendants' warrantless entry into our residence on October 20, 2016, to interview Vodicka while I was falsely imprisoned. The plan failed because their timing was off and I am not a prostitute. Ermatinger and Sayers had already illegally trespassed into our residence before my false arrest for prostitution. The records produced in response to discovery requests combined with my records prove Defendants' "welfare check" alibi was a sham. Ermatinger's investigative report for October 20 is appropriately titled, "Steve Aubrey Arrested / Vodicka Interview." (App. at 22.)

55.   The records indicate that Ermatinger and Sayers had already taken action to illegally enter our personal residence before my false arrest.

56.   Ermatinger conspired with Sayers and Dallas Police Vice Unit Detective Monsisvais ("Monsisvais") to attempt to entrap me for prostitution. The entrapment was unsuccessful and resulted in an illegal false arrest instead.

57.   "Ermatinger had received info regarding Steve Aubrey on a Web Sight offering Massages." (App. at 107-8.).  Whoever told Ermatinger this also said the website appeared to be sexual.  With that information alone and a big dose of wishful thinking, Ermatinger (a homicide detective) decided to conspire with others to make a case for prostitution against me. Ermatinger told Sayers and Sayers (a homicide detective) spent part of his day thumbing through gay web sites until he finally found my massage ad on "Masseurfinder.com." Sayers contacted Monsisvais, who said he would entrap me for prostitution. (App. at 108.)

58.   Ermatinger appropriately titled his Investigative Information for October 20, 2016: "Steve Aubrey Arrested / Vodicka Interview."  The notes reflect that Ermatinger was counting on my false arrest to occur at 2pm:

> 11:50am
> Monsisvais contacted Ermatinger on this date and stated they were working the case on Steve Aubrey for Prostitution and expected to arrest him at 2pm. Ermatinger requested he be informed that the arrest did occur. (App. at 22.)

Ermatinger made plans accordingly. He and Sayers would be at our residence at 2pm to interview Vodicka. However, I had shifted the time of my appointment with vice cop "Ryan" to 2:15 pm. My records prove that I arrived at the hotel at exactly 2:15 pm (App. at 88.) but then I still needed to unpack my table and supplies, make my way through the self park lot, navigate the expansive Anatole Hotel and locate "Ryan's" room, unpack the supplies and set up the massage table, repeatedly refuse "Ryan's" offers to pay me the cash up front (because I am not a prostitute), and then be arrested for prostitution at approx. 2:28 or 2:29 pm.

59.   But Ermatinger and Sayers had already knocked on the door of our residence, made their way to the management office of the property to lie to the manager about a welfare check to

16

get a key to our residence, and likely had already illegally entered our residence and had begun harassing Vodicka before I was falsely arrested. To make his story look legitimate, Ermatinger lied in his October 20, 2016 investigative notes so that he could say that *both* detectives went to do a welfare check on Vodicka because they had learned of my arrest and were concerned about how Vodicka would deal with the news of the arrest. Ermatinger's report falsely states that I was arrested at 2:10 pm, before I had even arrived at the hotel.

> 2:10pm
> Ermatinger was contacted by Vice unit that Aubrey had been arrested and was being charged with Prostitution. (App. at 22.)

60.   But I had not even arrived at the Hilton Anatole for my appointment with "Ryan." I saved screenshots of my text messages from that day, which correctly reflect that at 2:15pm, I sent a text to the "Ryan," stating: "Just parked." (App. at 88.) The text exhibit is an exact copy of the original text and has not been altered in any way. As the text reflects, I did not valet park. I parked in the self-parking lot of the giant Hilton Anatole. After unpacking my massage table and supplies, I made my way through the self-park area, loaded down with my table and supplies, and into the lobby of the massive hotel complex. I waited a couple of minutes in line at the front desk to ask how to get to the room indicated by "Ryan." I then made my way to the elevator and took it to the appropriate floor. Ryan answered the door and the first thing he said was, "You brought a table?" (I assume prostitutes do not usually drag big tables around with them and "Ryan" has been led to believe they were legitimately entrapping a prostitute.) It was about 2:25 pm by the time I made it to Ryan's room. I entered the hotel room and began unpacking and setting up my table and chatted with Ryan, who went to the bathroom and returned with cash, which he tried to give me. Because I offer a legitimate service, I never accept money up-front and only accept payment after the client is satisfied with the massage. (I believe that there is not a prostitute alive who would not accept, if not demand, the money up-front.) This proved to be a problem with the false prostitution charge, a problem Ermatinger and Sayers never expected to encounter in a million years because moral and ethical behavior is completely foreign to them. After Aubrey set up the table and talked to Ryan about the money, an additional 4 or 5 minutes ran on the clock when Ryan excused himself.  Immediately multiple officers entered the hotel room and falsely arrested me at approximately 2:30 pm.

61.   Yet Ermatinger's notes reflect that 20 minutes after he learned I had been arrested at 2:10 pm, he and Sayers drove to our apartment complex and they began their 90-minute welfare check (interview) with Vodicka at 2:30 pm, stating:

> 230pm
> Interview of Brian Vodicka
> Detectives Ermatinger and Sayers went to Vodicka's residence to interview him regarding the Tobolowsky case.
>
> Detectives interviewed Vodicka regarding the murder case. He denied taking part in or knowing about the murder. Stated they had never hurt anyone at any time ever.

Detectives were going to transport Vodicka to Homicide for the interview but due to his medicated condition detectives interviewed him in the apartment.

4:03pm detectives left Vodicka's apartment. (App. at 22-23.)

But since I was actually arrested at about 2:30 pm, it would have been impossible for Ermatinger and Sayers to receive the news of the arrest, drive a minimum of 15 minutes to our residence, knock on the door for five or six minutes, go to retrieve a key from the property manager, and begin their 90-minute welfare check (interview) at 2:30 pm. Even if the arrest had occurred at 2:10 pm per Ermatinger's falsified notes, it would have been impossible to fit all of that in and begin the interview at 2:30 pm.  If I had been arrested 30 minutes earlier than the actual time of the arrest, Defendants could have just barely used my arrest as an excuse for their illegal visit, but the records prove it did not happen that way. And on what authority were Detectives "going to transport Vodicka to Homicide for the interview but due to his medicated condition detectives interviewed him in the apartment."

62.  Ermatinger and Sayers have spun a story without any inkling that I had saved screenshots of texts and phone activity from October 20, 2016. Their 90-minute unwelcome interview likely started at approximately 2:32 or 2:33 pm because Vodicka sent me a text at 2:31, "Someone knocking. I can't see anybody." (App. at 90.) His text to me immediately followed his two (2) unanswered calls to me at 2:29 and 2:30 pm, the same time I was falsely arrested. The second time Vodicka called he left a message that someone was knocking at the door but by the time he got there, he could not see anybody. While Vodicka was calling, leaving a voice message and sending a text to me, Ermatinger and Sayers had gone to the property management office to lie to them about a welfare check and get a key.

63.  I provide a true and correct copy of that text message and I recognize the date, time, and substance of that message I received. (App. at 90.) Vodicka's first attempt to reach me was at 2:29. That indicates that he had already walked from the bedroom to the front door at 2:28 but nobody was there, which indicates that Ermatinger and Sayers had left by 2:27 to walk to the management office to lie about a welfare check as a false inducement and procure a key to my personal residence. Defendants both affirm in their declarations that they knocked on our door for 5-6 minutes before going to the office to get the key, which indicates they began knocking at 2:21 or 2:22, the same time I was making my way through the hotel parking lot and into the hotel itself and before reaching the door of my client, Ryan at approximately 2:25 pm.

64.  Documents and records dictate the true timeline of events on October 20, 2016, during the hour of 2:00 pm:

2:10    Ermatinger falsely states I was arrested. (App. at 22.) Impossible.

2:15    I sent "Ryan" a text message, "Just parked." (App. at 88.)

2:21-22  Detectives began knocking "five to six minutes." (Doc. 169-1 at 63, 71.)

2:25    I arrived at Ryan's door in the hotel.

18

2:26-27  Detectives stop knocking and went to get the key. (Doc. 169-1 at 63, 71.)

2:28      Vodicka walked from bedroom to check the front door and saw nobody.

2:29      Vodicka tried to call me. (App. at 89.)

2:30      I was arrested. (plus or minus one minute)

2:30      Vodicka tried to call me and left a voice message. (App. at 89.)

2:31      Vodicka sent a text message to me. (App. at 90.)

2:32+    Detectives illegally entered my residence to interview Vodicka.

Records prove that at 2:29 Vodicka attempted to contact me as a result of Defendants' knocking. Ermatinger's and Sayers's declarations are their proof that they started knocking on our door for five or six minutes, at 2:21-22. Records prove that I was not arrested at 2:10 or even at 2:15. The records prove that Ermatinger and Sayers began knocking on our door prior to my arrest, not after. This is critical to the veracity of Defendants' declarations that purport the reason for the warrantless entry was a welfare check on Vodicka. Their elaborate sting and harassment operation was designed to illegally enter our residence to interview Vodicka for 90 minutes.

65.  Defendants disingenuous story about concern for my health and welfare does not fit the timeline that is supported by the records. (Doc. 168 at 10-11.) The Brief in Support of their Motion for Summary Judgment on Qualified Immunity ("Brief") (Doc. 168.), filed by Ermatinger and Sayers paints a completely false picture for this Court; one where Ermatinger and Sayers had no idea Aubrey would be arrested for prostitution, stating:

> On October 20, 2016, DPD officers arrested Aubrey for prostitution. Because Detectives Ermatinger and Sayer were actively investigating Aubrey for the Tobolowsky murder, they were notified of the arrest. They also know from experience that Aubrey would be unable to contact Vodicka to tell Vodicka that Aubrey was been arrested and that Vodicka may need to make other health-related arrangements. Therefore, Detectives Ermatinger and Sayers decided to stop by Plaintiffs' apartment to let Vodicka know what had happened and make sure that Vodicka would be safe and cared for in Aubrey's absence. When Defendants arrived, they knocked loudly on Vodicka's apartment door, identified themselves and called his name for five to six minutes. (Doc. 168 at 10-11.)

Because Defendants can't use my arrest as an alibi for a welfare check, there is no exception to the warrant requirement and their unwelcome entry into my residence illegal.

66.  If Ermatinger had been the least bit interested in Vodicka's welfare, he could have called his as he had previously done in May 2016. Everything Ermatinger and Sayers did on October 20, 2016, was illegal and detrimental to Vodicka's welfare.

App. 000177

67.   No matter how many DPD officers were engaged to attempt to entrap Aubrey, no matter how many work hours Sayers spent looking through gay websites, no matter how much of the city's tax dollars were spent on the room at the Anatole, a prostitution charge cannot be prosecuted unless you actually arrest a prostitute. Defendants' interview was extremely expensive.

## THE BRIEF AND DISPUTED FACTS

68.   I have reviewed the Brief filed by Ermatinger and Sayers. Defendants are attempting to rewrite history and fabricate even more false facts to convince this Court that the finding of probable cause was valid whether or not the representations in the affidavits were false. Ermatinger and Sayers double down on the lies they previously presented to other judges. The first 12 pages of the Brief are deceptively titled "Undisputed Facts." It has no less than *twenty* (20) "undisputed facts," which I absolutely DISPUTE as they are provably false, inaccurate, and/or misleading. Cites to records that prove the falsity in the Brief are included. The *disputed* facts are detailed below:

69.   **"Undisputed Fact" No. 1** "When Detective Sayers asked her who could possibly have wanted to kill the victim, Mrs. Tobolowsky identified Plaintiffs Steven Aubrey and Brian Vodicka." (Doc.168 at 2.)

This "undisputed fact" is false and was fabricated specifically for this lawsuit. The statement contradicts all of the interviews given by Tobolowsky family members and Debbie Tobolowsky, which all reflect that she could not think of anybody who wanted to hurt her husband, Ira Tobolowsky ("Tobolowsky"). In fact, Sayers's statement directly contradicts his own quoted statement included in *D Magazine*.  (Id. ¶ 12.)

70.   Sayers forgot that he had already told D Magazine the truth reflecting Debbie Tobolowsky's initial reactions regarding someone wanting to hurt her husband. The records completely contradict Sayers's recollections of his first encounter with Debbie Tobolowsky, and contradict all immediate family interviews and even Debbie and Michael Tobolowsky's interviews with the Dallas Police Department ("DPD"). *D Magazine* story also captured the first impressions of Tobolowsky's son, Michael, stating:

> Before the flight, Michael had learned the fire might have been set intentionally.
> All he could think about was, Who? (App. at 72.)

71.   Ermatinger was the lead detective assigned to the Tobolowsky investigation. He interviewed Debbie and her son, Michael Tobolowsky, on May 24, 2016. Her brother in law, George Tobolowsky, joined them but not in the interview room. Ermatinger conducted a lengthy interview and took copious notes for his investigative report that began with details about the timeline beginning the night before the fire.   Ermatinger's report included details about Tobolowsky's anger towards his sister, Donna Timm/Terry, who had an affair and was a family outcast. The report explains that Tobolowsky did not have a relationship with his parents and blamed it on his sister, Donna, which mimics my family situation except it was my mother who

had the affair. Ermatinger's detailed notes reflect that Vodicka's name and my name were never even mentioned during the interview.

72.   Moreover, throughout Debbie Tobolowsky's interview with Ermatinger, she never indicated that her husband was threatened or felt threatened by anybody, which comports with the D Magazine interview in 2017,which states that she could not think of anyone who would want to hurt her husband. Tobolowsky's legal assistant of 18 years who also said she had not seen any threatening emails or letters. (App. at 3.) Because Tobolowsky's wife, son, and legal assistant were not aware of any threats from anybody, upon information and belief, there were none.

73.   For purposes of this lawsuit, Sayers fabricated this new allegation in which he arrived at the scene of the fire/death, he asked Debbie Tobolowsky who may have wanted to kill her husband and she identified Vodicka and me. The shocking allegation did not find its way into the SWAs because it was just recently fabricated for this lawsuit.  Such an explosive statement was not included in Sayers's motion to dismiss (Doc. 71.) or his reply in support of his motion (Doc. 90.) because Ermatinger and Sayers had not yet fabricated it. Clearly, this statement would have been a game-changer to support a finding of probable cause, possibly even stronger than Defendants' false claim about me and a threat to Tobolowsky's life.  While this statement was fabricated too late for use in the SWAs, the new lie has been designed specifically for this Court, to tip the scales of facts supporting probable cause, hoping the Court would be so convinced by the barrage of deceptive allegations that it would overlook the falsity of he SWAs. It is beyond comprehension that Defendants failed to use such distressing information if Debbie Tobolowsky had immediately identified Vodicka and me at the scene of the fire. To date, all records contradict Defendants' new allegation, including Sayers's 2017 interview.

74.   On the afternoon of May 17, 2016, "Lieutenant Cherry delivered documents [to Ermatinger] from DF-R's investigation and a thumb drive containing a large volume of cell phone records received in response to Lieutenant Cherry's subpoenas." (Doc. 169-1 at 67.) The cell phone records, included text messages and location data from May 10 - May 16, 2016 for the phones belonging to Vodicka and me. (Doc. 169-1 at 2.) Ermatinger had proof in the cell phone location data that neither of us was hiding from public view. The location data Ermatinger and Sayers had in their possession proved that Vodicka and I were all over Dallas but not at the scene of the crime. This critical information was intentionally omitted by Ermatinger in his preparation, review and execution of his three Search Warrant Affidavits he presented the following day, May 18, 2016, late at night, when he appeared before Judge Jeannine Howard and swore upon his oath the "verified fact" that we were in hiding, out of public sight, to conceal burns on their bodies. Ermatinger had proof in his possession that contradicted his sworn statements to Judge Howard. Soon after, Sayers relied on Ermatinger's same false information, lies, and lies by omission, which he copypasted into his own affidavits for search warrants and presented to Dallas County District Judge Jeanine Bennett to obtain multiple search warrants upon our personal residences, computers, email and cell phone providers.

75.   After Ermatinger tried to contact Vodicka and me, we began searching for a criminal attorney to avoid any missteps, as criminal investigations were completely foreign to us. The

21

advice of friends and of everything searchable on the Internet was to not speak with detectives except through legal counsel.

76.   Ermatinger's May 16, 2016 investigative report reflects that he had our cell phone records with location data (App. at 16.), reflecting our true whereabouts, prior to Ermatinger and Sayers executing upon their oaths as duly licensed peace officers, their May 18, 25, 26, 31, 2016 and October 5, 2016 affidavits for search warrants that stated we were hiding from the public. (Doc. 169-1 at 10, 14, 17, 24, 30, 35, 39, 44, 54-55.)

77.   As well, our credit card statement that includes the period May 13-19, 2016, proves we were constantly seen in public places with daily visits to restaurants and grocery stores and finally, on May 19, 2016, Ermatinger admitted that he had been tracking our credit cards, stating:

- "I know you stopped at McDonald's last night."
- "I know you stopped and got gas in Belton."
- "I knew you went to Trader Joe's." (App. at 79.)

78.   **<u>"Undisputed Fact" No. 2</u>**   "In 2013, Steven Aubrey filed a lawsuit to contest his late father's will." (Doc. 169-1 at 2.)

This "undisputed fact" is irrefutably false. I have never contested my father's will. I filed a request for an accounting in Probate Court No. 3 of Dallas County, Texas on April 30, 2014. (App. at 73-77.) I relied on the provisions in my father's will to demand an accounting and the proper administration of my late father's estate. My mother, Betsy Aubrey, started complaining that she did not have any money because she knew the income producing properties in the trust were generating income and she did not see any of it. Unfortunately, she was letting my brother, Buck Aubrey, manage the properties for her and he was pocketing all of the sizable proceeds. My mother asked if I would join my younger brother, Tom, to meet with Buck and find out what Buck was doing with the money.  The result of that intervention was the discovery that Buck had tricked their mother, Betsy Aubrey, years earlier into transferring two (2) of the trust properties (valued at approximately $5M) to Buck's personal LLC. Buck had complete control of the bank account and statements related to the income producing property formally owned by the trust. The properties had national tenants with long-term leases and the landlord with Buck's LLC. He had the property, the tenants and the bank account all in the name of his personal LLC. Buck was siphoning off the income for his own personal gain, not for the benefit of my mother, Betsy. During the course of the probate litigations, my intention was to get the two properties, which generate over $300,000 per year, back into the Trust and to get an independent trustee appointed so Buck could not continue misappropriating the income generated by the trust.

79.   **<u>"Undisputed Fact" No. 3</u>** "With the goal of gaining immediate access to his [Aubrey's] $2-3 million inheritance." (Doc. 168 at 3.)

This "undisputed fact" is irrefutably false.  Neither my younger brother Thomas Aubrey ("Tom") nor I ever demanded or sought one penny from the trust. My intentions and goals were to get the

App. 000180

trust properties away from Buck's LLC and registered back into the name of the Aubrey Family Trust; and to obtain some independent oversight of the income from the trust. Tobolowsky had knowingly relied on 10-year backdated deed (s) that called into question Tobolowsky's narrative that the trust properties had been properly administered. The notes from the investigative file indicate that the bogus information regarding me wanting access to my inheritance was given to a detective by Stephen C. Schoettmer ("Schoettmer"), Tobolowsky's frequent legal and business partner. This comes as no surprise to me as Schoettmer was instrumental in directing the investigation away from all of Tobolowsky's obscure business arrangements. Schoettmer is known to lie as much as Ermatinger and Sayers and he lied to Defendants who for unknown reasons never verify anything. Instead, detectives assume that everything they hear is truthful and verified. Schoettmer is the one who was caught impersonating me while trying to access my financial accounts in 2017. He stole my identity and was tape recorded making multiple attempts while saying that he was me. The handwritten information appears to be written contemporaneously on a notepad with "Stephen C. Schoettmer" at the top of the page. The notes state, in part:

> "5-7 million dollars"
> "Steve was beneficiary of father's estate."
> "Can't collect until his mother dies."
> "Aubrey would get 2-3 million"  (App. at 35.)

Hearsay is not the same thing as verification of facts.

80.   **"Undisputed Fact" No. 4**   "Mrs. Aubrey prevailed, the court ruled her son could not access his sizeable inheritance until her death." (Doc. 168 at 3.)

This "undisputed fact" is irrefutably false. In July 2015, I filed a notice of non-suit in the case because it became clear to me that the Dallas County Probate Court was determined to ignore my standing as a beneficiary and my legal right to an accounting of the Aubrey Family Trust in accordance with the Texas Property Code and my late father's will. I was tired with everyone chasing his or her tails in what was an incredibly simple and clear issue. There was never any ruling about inheritance in the case and inheritance was never made an issue because it has never been an issue.

81.   **"Undisputed Facts" Nos. 5, 6, 7**   "Roughly two months prior to the murder, the presiding judge ruled in Tobolowsky's favor, ordered Aubrey and Vodicka to pay $550,000 in damages to Tobolowsky." (Doc. 168 at 3.)

These "undisputed facts" include three provably false facts within in one single statement.  Judge Eric Moye ordered me, alone, to pay $250,000 (not $550,000) to Betsy Aubrey, not Tobolowsky, all determined in an ex parte order emanating from an ex parte hearing. (App. at 94.) (I appealed that ruling to the 5th Court of Appeals, Dallas and the court ruled that Judge Moye abused his discretion and reversed the order for sanctions that Ermatinger and Sayers rely upon for their false representation.) Vodicka was not a party to the lawsuit and during an ex parte hearing, Judge Moye struck through Vodicka's name as my counsel before signing Tobolowsky's prepared order that determined I was a vexatious litigant. (App. at 96.) Here again, Ermatinger and Sayers failed to verify easy to prove facts reflected in the court records. Instead they relied

on hearsay for information fed to them by others and failed to do the simplest verification of facts before they swore to them under oath.

82.    "Ms. Allen said that Aubrey…had been designated as a vexatious litigant." (Doc. 168 at 5.) This designation irrefutably contradicts a prior ruling that I was not a vexatious litigant. Ms. Allen failed to tell Defendants that Tobolowsky forum shopped his motion after it was first denied at hearing to determine I was a vexatious litigant before visiting Travis County District Judge Charles Ramsey. This evidentiary hearing lasted 4 hours and Tobolowsky appeared on behalf of Betsy Aubrey in the case. Billing records produced by opposing counsel indicated Tobolowsky was very involved behind the scenes and paying for the argument of that motion. Tobolowsky only waited 28 days after Judge Ramsey denied the motion and then he filed it in a Dallas County district court that favored Tobolowsky, Judge Eric Moye's court. Tobolowsky represented the same movant, presented the same cases, and arranged for an ex parte hearing with Judge Moye who ruled that I was a vexatious litigant, contradicting the order from the Travis County court.

83.    Both Ermatinger and Sayers failed to read any of the court records to verify the related statements of fact they used in their affidavits. Instead, they relied entirely on hearsay. Ermatinger and Sayers demonstrated reckless disregard for the truth when they fabricated information/facts, falsely stated that the information/facts were in the court records, and swore, under oath, to the truthfulness of the statement or facts.

84.    **<u>Undisputed Fact</u>" No. 8**    "During the deposition, Aubrey and Vodicka refused to abide by the rules and insulted Tobolowsky." (Doc. 168 at 3.)

This "undisputed fact" is irrefutably false. We behaved according to the rules in my deposition, which was taken by Tobolowsky's attorney of record Stephen Schoettmer. We did not insult Tobolowsky. This information is hearsay.  Leigh Allen lied to Lt. Cherry and Capt. Stephens about the deposition that she did not attend. (App. at 3.) Lt. Cherry and Capt. Stephens delivered the same false information to Ermatinger and Sayers. (App. 58, 65.) Ermatinger and Sayers were relying on hearsay based upon more hearsay for this "undisputed fact."

85.    Violating of our due process of law rights is a reoccurring theme imposed on us by Tobolowsky's attorney, Schoettmer. He also violated Texas Rule of Civil Procedure 203.3(c), continually refusing to make available my March 17, 2016 deposition and my March 2016 deposition, for inspection and copying. Rule 203.3(c) states: "The party receiving the original deposition transcript or non-stenographic recording must make it available upon reasonable request for inspection and copying by any other party." The Court only needs to obtain the video depositions of Vodicka and me, which proves we conducted ourselves in a professional manner at Tobolowsky's office.

86.    **<u>Undisputed Fact</u>" No. 9** "Aubrey had made multiple references to jihad in the course of the litigation." (Doc. 168 at 3.)

This "undisputed fact" is irrefutably false and was newly fabrication for the Brief and the Court, included to mislead the Court and for improper purposes and harassment. This fabrication did

not make it into the falsified affidavits for search warrants presented by Ermatinger and Sayers and it did not make it into their motions to dismiss, but now we get to deal with it.

87.   I *never* made a single reference to jihad in the course of the litigations including the Aubrey Family Trust probate/accounting proceedings, my defamation suit against Buck Aubrey, and/or my trespass to try title suit over the waste of one of the trust properties (the day care facility which was flipped three times in one day so 100% of the corpus of this trust property could be paid to Buck).  In my entire life, I have only made one reference to "jihad" in one email addressed to his mother, long before I ever knew Tobolowsky. (App. at 78.) I used the term in reference to my mother because she had made references to "jihad" in email previous to my first and last time use of the term. During the course of one year and seven days (January 13, 2015 through January 20, 2016), Tobolowsky filed 14 court documents that made "jihad" 97 allegations and one reference to "ISIS."

88.   On November 13, 2015, Paris suffered multiple horrific terrorist attacks in which 130 people were killed and 413 people were injured. This was one of the first of its kind and millions of people around the world grief stricken, mourning, and glued to the television. THREE DAYS LATER, demonstrating absolute lack of sensitivity, Tobolowsky and his attorney, Schoettmer, filed a first amended petition in Tobolowsky's defamation case against me, based on terrorism. The grotesque filing included 10 "jihad" allegations and for the first time ever, one reference to "ISIS." Vodicka and I became somewhat fearful of Schoettmer and Tobolowsky and believed the filing was a threat of sorts. With a hearing scheduled only one week after the petition was filed, I wrote a letter to the clerk of the court with the subject, URGENT ATTENTION REQUIRED FOR EXTRA SECURITY. As well, I placed a call to the FBI to report what appeared to be a terroristic threat from Schoettmer and Tobolowsky.

89.   Tobolowsky's ritualistic and repetitive use of "jihad" is was very similar to symptoms associated with Tourette's syndrome, which most agree is the result of some biological imbalances within the brain. Tourette's appears to have some genetic/hereditary element and can also potentially be triggered by highly stressful events. It may also be brought about by immune disorders, or even medications. I recently learned that Tobolowsky was taking the powerful medication, Enbrel 50mg, by injection. I do not know if Tobolowsky's uncontrollable use of the word "jihad" spilled over into his legal work that did not involve us. I have read court documents that reflect Tobolowsky had filed a defamation suit against his former client, Judy Brauman, before he filed the "jihad" suit against Vodicka and me.  Schoettmer represented Tobolowsky in the "normal" defamation suit filed against Judy Brauman and he represented Tobolowsky in the defamation through "jihad" suit against us.

90.   I never made a "jihad" reference to Tobolowsky at any time. I used the term once and only once, in an email to Betsy Aubrey, my mother, in response to her email and her use of the term first. Like Tobolowsky, Ermatinger and Sayers did not miss the opportunity to throw the word "jihad" in their search warrant affidavits to alarm those who read it. Now, they are doubling down on their fraudulent representations, expanding the Jihad fantasy, stating in their Brief :

> "Aubrey had made multiple references to 'jihad' in the course of the litigation."
> (Doc. 168 at 3.)

25

App. 000183

Ermatinger and Sayers also swear to the truth of this statement in their Declarations:

> "Aubrey had made multiple references to 'jihad.'" (Doc. 169-1 at 59, 67.)

Similar to the affirmations in their search warrant affidavits, Ermatinger's and Sayers's Declarations both affirm:

> "I have personal knowledge of the facts set forth herein, and all of the statements I have made in this declaration are true and correct." (Doc. 169-1 at 57, 65.)

Ermatinger and Sayers conclude their declarations with the following oath:

> "I, Scott Sayers declare, certify, and state under penalty of perjury that the foregoing is true and correct." (Doc. 169-1 at 64.)

> "I, Robert L. Ermatinger, Jr. declare, certify, and state under penalty of perjury that the foregoing is true and correct." (Doc. 169-1 at 64.)

Clearly, Ermatinger and Sayers do not have personal knowledge that the facts are true because they simply are not. Both stated that "Aubrey had made multiple references to 'jihad,'" and the statement is not true or correct, they both should be punished under the penalty of perjury. Ermatinger and Sayers have not ever seen, nor can they produce a written document authored by me that threatens Tobolowsky with jihad. There is no existing document that reflects Aubrey threatening Tobolowsky with jihad in any way, other than the one email to Betsy Aubrey. This was stressed over and over again in Vodicka's interview at DPD headquarters the night of May 19, 2016. (App. at 78.)  So for each search warrant that was executed after May 18, 2016 (Sayers's affidavits), Sayers had knowledge from Ermatinger's interview that I never threatened jihad against Tobolowsky and never threatened Jihad against Tobolowsky's life. I have never known of a document that reflects I threatened anybody and I know of nobody who has ever seen or alleged that I have ever been in a physical altercation.

91.   Leigh Allen, Tobolowsky's legal assistant for 18 years, told Capt. Stephens with Dallas Fire-Rescue that she has never seen any threatening emails or letters. (App. at 3.) So where are the threats that have never been seen? The jihad threats can only be attributed to Tobolowsky folklore, tales preserved amongst the family.

92.   During the depositions of Betsy Aubrey on December 8, 2014, Thomas Aubrey on December 10, 2014, and Richard Buck Aubrey, Jr. on August 14, 2014, my mother and two brothers testified that they had never known me to have a physical altercation with any other human being.

93.   **<u>Undisputed Fact</u>" No. 10** "The Tobolowsky's explained that they are Jewish, and that they and the victim believed that Aubrey's references to Jihad were antisemitic threats to Ira Tobolowsky's safety and life." (Doc. 168 at 3.)  (*Id*. ¶¶ 25-31.)

This "undisputed fact" is false. Ermatinger and Sayers are doubling down on the false statement presented in all of their SWAs alleging that Tobolowsky felt Jihad was anti-Semitic. (*Id.* ¶¶ 29-36.) Records prove Defendants fabricated that for the SWAs and here for this Court the they are expanding on the lie by falsely giving it the support of "The Tobolowsky's."  So now, in addition to Tobolowsky, his family members suddenly speak up and claim that they and Tobolowsky all believed my references to jihad were antisemitic [sic] threats to Tobolowsky's life, remembering that Tobolowsky never alleged the same in any of his 97 "jihad" allegations; remembering that this frightening allegation never made it into any of Defendants' SWAs; remembering that it is not reflected in any of Defendants' interview notes with family members; remembering this is just like Ermatinger's other blanket statements that fail to reference which family members; remembering that for years there was only the one fabricated death threat attributed to me and it was found in Defendants' SWAs, which falsely stated the threat was in a court document; and recognizing that suddenly, I am accused of multiple death threats related to my multiple references to jihad, which nobody has been able to identify.

94.    Anything written or alleged regarding my references to "jihad" is a scam and is an intentional misrepresentation made to judges and the courts. Tobolowsky's and now Defendants' continual and repeated references to "jihad" and me ad nauseam does not make it so. I only ever referenced "jihad" one time when he directed it at his mother who is not Jewish. Only Betsy Aubrey has standing to complain about a "jihad" reference and perhaps she could allege the reference was anti-Gentile. On August 5, 2014, Tobolowsky began an anti-Semite smear campaign against me, splashing it around in the underlying probate case that only requested an accounting for relief. (App. at 73-77.) Vodicka prepared and executed a declaration, along with four others, that refuted this fantastical claim that I was anti-Semitic. (App. at 64-69.)

95.    Though Betsy Aubrey was not his client, Tobolowsky would parade her around the courtrooms during hearings because she was old and frail and it gave the false appearance that I was being cruel to my mother. Betsy Aubrey revealed in her deposition than she could not pay Tobolowsky for his legal billings, as she did not even know the name of the bank that had the account for the stolen trust properties, which generate over $300,000 per year. The properties were, and still are, owned by Buck Aubrey who had the money to pay Tobolowsky and others attorneys to keep me from getting an accounting of the Aubrey Family Trust.

96.    Vodicka and I traveled through Europe and visited Dachua in Southern Germany, one of the significant destinations in our itinerary. The impact of standing in the concentration camp where so many Jews were brutalized and then murdered was numbing. What happened there represented the absolute darkest side of humanity. Little was said during our visit there because there are no words when you stand on the very ground where some of the world's worst atrocities occurred. I did not want to go there because I harbor ill feelings towards Jews.

97.    "Ermatinger received a call from George Tobolowsky who told him that the Tobolowsky family was contacting the United States Department of Justice in an effort to have Aubrey's "jihad" comments and Tobolowsky's subsequent murder investigated as a hate crime." (Doc. 168 at 3-4.) I have never seen or met or interacted with Tobolowsky's brother, George Tobolowsky but the records reflect that from the time of Tobolowsky's murder, George Tobolowsky has fervently and suspiciously used spiritual opportunism to direct the investigation

App. 000185

and attention onto Vodicka and me and away from Tobolowsky's many multi-million dollar business dealings. It is unfathomable that Defendants never interviewed a single business related connection to Tobolowsky. It is unfathomable that nobody who shared office space with Tobolowsky was interviewed beyond his legal assistant. It is unfathomable that Dallas Fire-Rescue and the Dallas Police Department ("DPD") failed to interview the three criminals who had shared the office at 3405 West Lovers Lane with Tobolowsky for more than three decades. Records indicate that Tobolowsky had been business partners with these criminals, he would represent them in their legal disputes, and the criminals, Marc Birnbaum, Stephen Birnbaum and Schoettmer have been parties to major disputes.

98.   Records reflect that in 1997, Marc A. Birnbaum pled guilty to charges of conspiracy to defraud the United States and conspiracy to commit bankruptcy fraud, based in part for secretly paying insiders $498,995 from a $10.2 million loan, self-dealing $134,000 to himself personally, which he shared with business partner Lawrence Lambert. 4305 West Lovers Lane has been the business address of convicted felon Marc Birnbaum for decades and remained his address while he was in prison. At the time of Tobolowsky's death, Apartment Maintenance Services, Inc., was managed and operated by Ira E. Tobolowsky and convicted felon Marc A. Birnbaum.

99.   Records reflect that Stephen L. Birnbaum, Marc Birnbaum's brother and business partner, uses the same business address and he had been fined $1.7 million in 1994 after being sued by the FDIC and defended by Tobolowsky.

**4305 West Lovers Lane**

100.  4305 West Lovers Lane is the address that very possibly holds some answers to the murder of Ira Tobolowsky. But because Defendants oddly failed to interview any of Tobolowsky's business partners, the truth will never be known. 4305 West Lovers Lane is the address of Schoettmer's one-person law firm, the Law Office of Stephen C. Schoettmer. He had been Tobolowsky's business partner for many decades; he has committed fraud on the courts on several occasions, and stole Aubrey's identity and impersonated him while maintaining an office at 4305 West Lovers Lane. Schoettmer has been associated with this address beginning in 1990 or earlier.

101.  At the time of Tobolowsky's murder in May 2016, Tobolowsky was personally involved in two-multiyear legal cases involving vast sums of money. The first, as related in open court filings, was a struggle over control of a patent worth hundreds of millions of dollars. As with most of Tobolowsky's business interests, his true role in the legal dispute over the patent was obscured. A second case involved a hidden struggle hinted at between the lines of sparse probate court filings. In a third case, a real estate investor named one of Tobolowsky's long-time companies (shared with Marc Birnbaum, at 4305 West Lovers Lane) as a defendant for its role in a fraudulent mortgage transaction, a suit filed just weeks before Tobolowsky's death.

102.  However, immediately after Tobolowsky's gruesome murder in May 2016, the DPD chose not to examine the multiple avenues of inquiry afforded by Tobolowsky's complex and shadowy family and business interests. Instead, the DPD and certain members of the judiciary

chose to publicly identify Vodicka and me as suspects, leaving all of Tobolowsky's business interests untouched, unexamined, and uninvestigated.

103.  George Tobolowsky shares some interests in the office address 4305 West Lovers Lane, including the services of accountant David P. Hendricks. I have personal knowledge that David P. Hendricks prepared a fraudulent accounting that was admitted as an exhibit to a Dallas County Probate Court. Corporate government documents accessible online reflect that George Tobolowsky is entwined with David P. Hendricks in multiple businesses. George Tobolowsky is secretary/treasurer for The Abe Zale Foundation and David P. Hendricks prepares the foundation's tax returns. George Tobolowsky is secretary/treasurer for Miracle of Pentecost Foundation Inc. and David P. Hendricks prepares the foundation's tax returns. If the fraudulent work of David P. Hendricks became known, it could be very problematic for George Tobolowsky, the Tobolowsky family, and the various criminal who office at 4305 West Lovers Lane.

104.  George Tobolowsky has been instrumental in steering the murder investigation away from 4305 West Lovers Lane and away from his brother's extensive business endeavors, some involving George Tobolowsky. Ermatinger's investigative reports reflect:

- On May 13, 2016, George Tobolowsky and his wife were at the scene of the crime.

- On May 17, 2016, George Tobolowsky contacted Ermatinger a said he was contacting the U.S. Justice Department in an effort to have the murder and Jihad threats investigated as a hate crime. (App. at 1.)

- On May 20, 2016, George Tobolowsky asked Ermatinger to meet him to talk and be briefed on the investigation.

- On May 21, 2016, George Tobolowsky called Ermatinger to talk about the hole in the fence. (App. at 24.)

- On May 24, 2016, George Tobolowsky joined Debbie and Michael Tobolowsky for Debbie Tobolowsky's official interview at DPD headquarters. After the recorded interview with Debbie Tobolowsky, Ermatinger had a meeting with George Tobolowsky in the Homicide break room. (App. at 19.)

**Stacy Paddack**

105.  On May 17, 2016, Schoettmer joined forces with George Tobolowsky and his niece, Stacy Paddack, to fabricate a jihad motive for the murder and influence the direction of the murder investigation. Stacy Paddack worked for the U.S. Justice Department in Washington, D.C. and she flew to Dallas to pull strings and knock on doors to assist Schoettmer and George Tobolowsky with directing the focus of the investigation onto us and away from their businesses at 4305 West Lovers Lane. Stacy Paddack ("Paddack") lied to Ermatinger telling him that she had read the court documents and "she found threats and hate mail directed at Jews and Ira."

App. 000187

(App. at 2.) That is a false allegation and unfortunately Ermatinger and Sayers were to busy doing welfare checks to read the court documents for themselves.

106.  Upon information and belief, George Tobolowsky and Schoettmer blocked DPD from investigating any of Tobolowsky's business relationships, which includes relationships with themselves and the Birnbaum brothers. With Paddack's help, Schoettmer and George Tobolowsky pushed everybody, including DPD, to focus the investigation on Vodicka and me, the guys without a motive. Ermatinger's investigative reports indicate all of the persons of interest were not involved in any of the opaque Tobolowsky businesses. The persons include:

- Marc Richman - he is an attorney and worked on a case with Tobolowsky;

- Susan Sobel stated that she thinks an illegal citizen killed Tobolowsky;

- Susan Harrimum stated that he ex-boyfriend lost money to Tobolowsky in a case;

-  Tobolowsky filed a grievance with the State Bar to have Kelly Hollingsworth disbarred;

- Sharon Bornstein - the homeless girl who called Tobolowsky 18 times over the weekend;

- Judy Brauman - Tobolowsky and Schoettmer sued her for defamation. She was Toblowsky's former client;

- Alexandra Krot - friend of Aubrey and Vodicka; and

- Marti Doran saw a white male walking a little white dog on at about 5:30 pm on the evening of the fire.

107.  Immediately after the murder, Paddock flew to Dallas and joined forces with Schoettmer and George Tobolowsky to develop a bogus 25-page amicus brief loaded with false accusations. The next morning, on May 17, 2016, she submitted the deceptive brief to Hallie Tichenor with the FBI and she sent a letter of introduction to Judge John Parker, Northern District of Texas. Her letter was a request that Vodicka and I be prosecuted under the Hate Crime Act and that we would be placed on a "no-fly" and  "no-border-crossing" lists. She stated that the attached amicus brief could support our arrest, warrant, and prosecution. She finished her letter by revealing the names of her partners in the witch-hunt (not a surprise), stating, "please do not hesitate to call me…Steve Schoettmer...or George Tobolowsky." The letter and amicus brief were sent to the judge at 8:40 am so in the span of three days, two guys, heavily entrenched in activities at 4305 West Lovers Lane, cooked up a jihad motive with us as the scapegoats and had another Tobolowsky relative, with connections, fly into town to present the falsified brief and knock on doors. (App. at 14-15.)

108.  Ironically, Schoettmer was the co-creator of Tobolowsky's Jihad lawsuit filed against Vodicka and me for purposes of harassment and judicial abuse. (He is also the one who stole my

identity and impersonated me to access my financial accounts.) Schoettmer absolutely knew that the jihad allegations were a scam and had no basis in fact because he helped fabricate them. Paddack's signed the brief so either she just accepted the hearsay as fact for her document or she did read the court document, realized there were not jihad or anti-Semitic content, and lied to the courts and judges saying the opposite as have many involved with this litigation. Her brief begins with her loose comparison of Vodicka and me with Hitler because Hitler set Jews on fire as part of his plan to exterminate Jews and according to Paddock we set Tobolowsky on fire simply because he was a Jew. She states in her brief:

> Additionally, Aubrey's frequent terrorist rhetoric and threats, including both verbal and written statements in court documents, related to waging "jihad" war (Aubrey's term) on Mr. Tobolowsky relate to Mr. Tobolowsky's Jewish religion.

My frequent terroristic rhetoric and threats? There are none and if someone could finally point to just one of these threats, but nobody can. Instead, certain people continue to talk about them as though they exist. And I have verbal and written statements in court documents that involve waging "jihad" on Tobolowsky? Nobody has ever been able to locate the magic "court document" that reflects I was waging "jihad" on Tobolowsky. Just because Tobolowsky and Schoettmer filed a Jihad lawsuit against Vodicka and me, the crazed allegations remained just that.

109.   Paddack proceeds to lie in her brief stating, "Mr. Tobolowsky also received numerous verbal and email threats from Aubrey." We know that is a lie because 1) no email threat has *ever* been produced; 2) nobody has ever alleged that they heard Aubrey make a verbal threat; 3) Tobolowsky himself never alleged any verbal or email threats in his "jihad" lawsuit against us; and 4) Leigh Allen, Tobolowsky's legal assistant for 18 years, told Captain Stephens that she "has not seen any threatening emails or letters." (App. at 3.) Paddack is simply dishonest as she intentionally misrepresented and fabricated facts just like Defendants. George Tobolowsky, Schoettmer and Paddack reached way to far and failed to have us investigated for a hate crime against Jews but they were successful in directing the spotlight on Vodicka and me and the spotlight never went anywhere else, just like Ermatinger and Sayers.

110.   Tobolowsky and I bickered back and forth about religious holidays which does not indicate a hate crime against Jews. One can bet that if the influences of Paddack and the rest of the Tobolowsky clan could not convince the U.S. Justice Department or the FBI that this was a hate crime, then it was not a hate crime. Paddack's wild allegations were made without proof and without basis and the U.S. Justice Department did not take the bait, unlike Ermatinger and Sayers.

111.   Vodicka and I have hired Jewish lawyers, one in particular, Brian Zimmerman.  We lost everything, roughly $3 million, because at trial he failed to present 90% of our evidence and he sold us down the river. Beyond our extreme resentment and disappointment in him, I have never considered threatening him and I never blamed his betrayal against us on his Jewish faith, religion or ethnicity. We never threatened in any form or fashion our Jewish lawyer who destroyed our lives, as we had known them. How can Defendants justify the attention directed at us in this investigation?  No doubt, Tobolowsky was a major nuisance to us, yet he never got his

hands in our pockets.  In the grand scheme of things happening in our lives, Tobolowsky just was not that important to us. People like Schoettmer, George Tobolowsky and Paddack have oddly tried to make our relationship with the victim something that it wasn't. Literally before the fire had been extinguished at the Tobolowsky home, Schoettmer had interviewed with the Dallas Morning News and stated that he and Tobolowsky were involved in a "high-profile" case, speaking about the frivolous jihad defamation suit. Labeling the case "high-profile" is laughable as it was so low profile, Vodicka and I attended less than half of the scheduled hearings for the case.

112.   There were never any "jihad" threats to Tobolowsky; just the one time I used it in an email to my mother before I knew the name Tobolowsky. Vodicka made this fact painfully clear during his May 19, 2016 interview with Ermatinger. Vodicka told him emphatically twice that the term "jihad" was used only one time in an email to my mother. Ermatinger acknowledged that he completely understood. (App. at 78.)

113.   Other than hearsay, no proof was ever adduced to reflect that I had made "jihad" threats but the hearsay was used to support a finding of probable cause and trick Dallas County Criminal district judges. Ermatinger and Sayers egregiously fabricated the demonstrably false statement that threatened Tobolowsky's life. It seems that their nine (9) counts of aggravated perjury would be enough but Defendants double down again and boldly lie to this Court transforming the one false and never proven statement about a Jihad threat into a bigger new lie alleging Aubrey made multiple "jihad" comments, stating: "Aubrey's 'jihad' comments." (Doc. 168 at 3.) As well, in their sworn Declarations, Ermatinger and Sayers both declare: "Aubrey had made multiple references to 'jihad.'" (Doc. 169-1 at 59, 67.) Defendants are completely aware this is false and they are intentionally lying to this Court. I suppose the additional lies to this Court are an attempt to cover for the first one in that if I made multiple references to "jihad" then even though the one is without basis, there are others to make up for the one. But there was never even the first one that Ermatinger and Sayers alleged was against Tobolowsky's life in their SWAs.

114.   Ermatinger absolutely knows his "jihad" representations to this Court and other courts are false. Sayers did not personally verify any facts included in his affidavits for search warrants. It appears that everything Sayers attested to as truthful in his SWAs was hearsay so the best he could do was hope his statements of fact were truthful. However, Sayers was spoon-fed false information from other dishonest investigators, including Ermatinger. He blindly relied on the information and swore to its truth in his SWAs that same as he did here in his Declaration. (Doc. 169-1.)

115. Not only did Sayers rely on Ermatinger's May 18, 2016 affidavit, he copypasted Ermatinger's false statements verbatim into his search warrant affidavits, misspelled words and all, to support a finding of probable cause. To the best of my knowledge and belief, Sayers did not even bother to read the copypasted statements because the same (9) misspelled words in the statements in Ermatinger's SWAs remained the same misspelled words in statements copypasted by Sayers into his SWAs. The copypaste statements Sayers pirated include:

- Any combustible [sic] liquids or empty containers that are similar to the items found at the crime scene;

32

- Any combustible [sic] liquids or empty containers that are similar to the items found at the crime scene; (Ermatinger and Sayers included this exact statement in their affidavits twice.)

- Any egnitable [sic] liquids or evidence of any egnitable [sic] liquids that could have been spilled on the floor that can be sent to a laboratory and compared to evidence found at the scene;

- Detectives discovered that the victim Ira Tobolowky [sic] was involved in a civil defamation lawsuit with Steven Aubrey and his partner Brian Vodicka who was representing him;

- Family members advised detectives that complainant Tobolowsky felt threatened by Steve Aubrey because of a law suit [sic] that complainant Tobolowsky won when he represented the mother of Steven Aubry [sic], Betsy Aubrey;

- It was aledged [sic] in the lawsuit that Steven Aubrey threatened "jihad" the same words used to describe the wars brought by terrorists, and against his life which was filed in court document number 15-08135 in the 14 Judicial district court judge Eric Moye presiding; and

- Ira Tobolowsky is of Jewish descend [sic] and felt Jihad was an anti-semitic statement.

Odds are insurmountable that Ermatinger and Sayers are both challenged with spelling the exact same words in their separate and independent search warrant affidavits.

116.  Ermatinger and Sayers both failed to identify a statement in which I threatened Jihad against Tobolowsky's life. Just like Tobolowsky did in his frivolous defamation suit against Vodicka and me, Ermatinger and Sayers try to get away with just guiding us in the general direction for the answer but never can identify the exact statement because it does not exist. In Sayers's Answers to Vodicka's First Set of Interrogatories signed on May 22, 2020, he admits he just grabbed the information from Ermatinger's affidavits.

> **Interrogatory No. 15:**  For each document you identify in your answer to Interrogatory No. 14, identify the page number, paragraph, and exact statement or statements that form the factual basis of the statement in Affidavits 1-6: "It was aledged in the lawsuit that Steven Aubrey threatened "jihad" the same words used to describe the wars brought by terrorists, **and against his life** which was filed in court document number 15-08135 in the 14 Judicial district court judge Eric Moye presiding."
>
> **Answer:** Defendant Sayers relied upon paragraph 4 of Defendant Ermatinger's May 18, 2016 affidavit submitted as part of a search warrant application for 7777 Glen America #223. Upon information and belief, Defendant Sayers also refers

Plaintiff to Defendant Ermatinger's Response to Interrogatory Nos. 4 and 5 issued by Plaintiff Brian Vodicka.

What? Upon information and belief Sayers refers Plaintiff?  I am unsure how to interpret this answer but it could indicate that Sayers thinks it is possible that he relied on Ermatinger's responses, but he can't be sure. In Ermatinger's Answers to Vodicka's First Set of Interrogatories signed on May 22, 2020, he admits in his answer to No. 4 that the "jihad" threat is not in a court document, stating in his answer:

> **Answer:** As permitted by Rule 33(d) of the Federal. Rules of Civil Procedure, please refer to the Petition filed on Ira Tobolowsky's behalf in *Tobolowsky v. Aubrey, et al.*, Case No. 15-08135, and also COD 000070-71, 74, 78-79, 85, 95. Defendant does not recall whether every concept in the specified sentence was based upon a particular document. Defendant also relied on information provided by members of the victim's family.

> (Ermatinger's Interrogatory No. 5 Answer: "Defendant refers Plaintiff to the Answer to Interrogatory No. 4 above.)

117.   Ermatinger does not recall if the "concept" was based on a document? Ermatinger signed an affidavit that specifically stated the concept (death threat) was based on a *court document* and Sayers signed six search warrant affidavits that said the same. This information that Ermatinger suddenly remembers was provided to him by Tobolowsky family members was not in the notes he took when he interviewed family members. Now we are supposed to believe that he remembered nonspecific family members told him that I threatened Tobolowsky's life and the death threat did not make it into his notes?

118.   The interrogatory did not request an explanation of how Ermatinger fabricated the false statement that he and Sayers used repeatedly to support a finding of probable cause and the statement was material to the finding of probable cause. In Ermatinger's Answer to Interrogatory No. 5, he stated, "Defendant also relied on information provided by members of the victim's family." However, in response to my discovery requests, Ermatinger's investigative reports indicate the only members of the Tobolowsky family that he interviewed were Debbie and Michael and they did not tell Ermatinger that Tobolowsky was threatened by anybody.

119.   Because Sayers states that he relied on Ermatinger's affidavit and on his answer to the Interrogatory No. 4, Sayers is admitting there is no court document that contains a "jihad" death threat as well. Sayers used poor judgment when he plagiarized most of what was included in Ermatinger's SWAs and passed it off as his work in his SWAs without verifying the facts. But exhibiting even worse judgment, Sayers chose to depend on Ermatinger for his source of information.

120.   The investigative reports include meticulous detail and it is inconceivable that Ermatinger failed to take notes when the victim's family mentioned that I made a death threat. Ermatinger was backed into a corner when pressed to identify a statement in the court document regarding a "jihad" threat to Tobolowsky's life because the statement was fabricated and false.

Ermatinger now tries to shift away from the "court document" that supported his statement and he fabricated an new basis, which is "information provided by members of the victim's family."

121.   Ermatinger's own records reflect that no family member alleged that Tobolowsky was threatened by anybody. Ermatinger's May 24, 2016 interview with Debbie and Michael Tobolowsky indicates that they never mentioned Vodicka or me and never said anything at all about the defamation lawsuit, about Jihad, or about threats. Ermatinger did include in his report that both Debbie and Michael told him about a homeless girl that would call Tobolowsky at 3 am and Ermatinger put that information under the heading, "Person of Interest." (App. at 21.)

122.   Ermatinger's answer to the interrogatory does not take into consideration his interview with Vodicka on May 19, 2016. Ermatinger was the student when they discussed "jihad" allegations. (App. at 78.)

123.   Ermatinger's consistent lack of truthfulness would cause the average person to believe he is lying about getting the information from members of the victim's family. He conveniently can't remember which family member told him (and he has no notes) that I threatened Tobolowsky's life with Jihad, a fact that undoubtedly is worthy of being written into the notes.

124.   Finally, the statement: "It was aledged in the lawsuit that Steven Aubrey threatened "jihad" the same words used to describe the wars brought by terrorists, **and against his life** which was filed in court document number 15-08135…" is a false statement. Ermatinger knew it was false because he fabricated it and Sayers was too lazy to verify any of the facts and as he stated in his discovery responses, he just relied on Ermatinger. Sayers is just a copypaste guy who swears under penalty of perjury to the truth of the statements in his affidavits and in his declaration supporting his Brief, irrespective of the truth. Ermatinger and Sayers are dishonest and untrustworthy jaded detectives whose useful years are long gone if they were ever useful at all.  Sayers should join Ermatinger in retirement.

125.   Intentionally lying to judges is a criminal offense.  The lies Ermatinger and Sayers imposed upon various judges caused them to issue illegal search warrants that have caused irreparable injury to Vodicka and me. I believe that Ermatinger has committed aggravated perjury at least three (3) times and Sayers has committed aggravated perjury at least six (6) times.  Without consequences they will continue to do the same and the pattern of police violating the rights of citizens continues.

126.   **<u>Undisputed Fact</u>" No.11**   "Ms. Paddock told Detective Ermatinger that she had discussed the victim's interactions with Aubrey and Vodicka, reviewed documents related to the lawsuits, and found threats and hate mail directed at Jews generally and at Tobolowsky in particular." (Doc. 168 at 4.)

This "undisputed fact" is irrefutably false.  If she "found threats and hate mail directed at Jews generally and at Tobolowsky in particular;" then where is it?  If Paddack "found threats and hate mail" she should have been able to share the proof. But she did not because, in truth, she did not find anything. Paddack failed to show the U.S. Justice Department what she found and it lost interest in her claims as well. Paddack, lied to Ermatinger telling him that she had read the court

App. 000193

documents and "she found threats and hate mail directed at Jews and Ira." (App. at 2.) Ermatinger was too lazy to read the court documents and Sayers was too busy looking through gay websites to read the documents. As a general rule, Sayers would just copy someone else's SWA and sign his name on the document. (*Id.* ¶¶ 96-100.)

127.   **"Undisputed Fact" No.12** "Tobolowsky represented Aubrey's parents in eight lawsuits that Aubrey had filed against them." (Doc. 168 at 5.)

This "undisputed fact" is irrefutably false. My father never hired Tobolowsky and he never knew Tobolowsky existed. My father was too smart to become involved in lawsuits and the only lawyer that I know he hired was Don Malouf, a highly regarded and respected attorney. Mr. Malouf drafted my father's last will and testament and I don't believe my father would have hired Tobolowsky had he known him. I did not file eight lawsuits against my father or even one. I filed three lawsuits in Dallas County, Texas against Betsy Aubrey, Trustee of the Testamentary Trusts created under the Will of Richard Buck Aubrey, Deceased and Tobolowsky did not represent her interests as Trustee; Tobolowsky represented my brother, Buck Aubrey, because he had the funds to pay Tobolowsky's legal fees of $600,000 to ensure he would keep the stolen trust properties.

128.   Ermatinger and Sayers fabricated the new false fact to make it appear that I can't get along with anybody and hated my parents. I admired and loved my father. He never lied and was respected by everyone who knew him; completely unlike Defendants. My mother is weak and she had an affair while my father was alive. I do not respect her but I do feel sorry for her because of the way my brother and Tobolowsky took advantage of her. My father worked hard and had my mother set up to not ever have to worry about finances.  With Tobolowsky's assistance, my brother stripped the assets from the trust that were for her benefit for her lifetime. She would be very comfortable living off of $300,000+ per year but all of that income goes straight into Buck Aubrey's bank account and $600,000 went into Tobolowsky's pocket. My mother has complained that she has to beg my brother for money. I did my best to get things back the way my father intended and per the terms of his last will and testament, but I failed.

129.   **"Undisputed Fact" No. 13** "Ms. Allen said Aubrey and Vodicka were so uncooperative during a deposition that Tobolowsky was forced to stop the deposition." (Doc. 168 at 5.)

This "undisputed fact" is irrefutably false. Ms. Allen was not present at the depositions of Vodicka or me to personally witness how well behaved we were. Like Ermatinger and Sayers, Leigh Allen has absolutely no idea about the events that occurred at my deposition. The proof is in the court reporter's video of the depositions that is in the possession of Tobolowsky's attorney, Schoettmer, who has repeatedly refused to provide us copies of the depositions. During my deposition, I told Schoettmer three (3) times that if he did not lower his voice and stop screaming at me that I was going to end the deposition. That video would clearly reflect which parties to the depositions were poorly behaved.

130.   **"Undisputed Fact" No. 14** "Ms. Allen said that Aubrey hated Tobolowsky and made anti-Semitic comments to Tobolowsky during the deposition" (Doc. 168 at 5.)

App. 000194

This "undisputed fact" is irrefutably false and represents abusive lying and hearsay. Ms. Allen was not at my deposition. At no time during my deposition are at any other time did I suddenly start talking about Jews or the Jewish religion. The ridiculous Jihad and anti-Semite attacks against me are false and the video of the deposition would prove it.

131. "Defendants learned from Earl Jeffers of the United States Marshal's Service that Aubrey and Vodicka had pursued lawsuits in federal court as well, and had exhibited similar behavior in the course of those lawsuits." (Doc. 168 at 5.)   This statement is nonsensical. Behavior similar to what? Aubrey and I always act in a completely civilized and respectful manner in every federal courtroom, state courtroom, county courtroom and justice of the peace courtroom.

132. **<u>Undisputed Fact</u>" No. 15** "Jeffers told Defendants that Judge Ed Kincaid and Judge Barbara Lynn had both expressed safety concerns regarding Aubrey and Vodicka in the wake of Tobolowsky's murder." (Doc. 168 at 5.)

While this "undisputed fact" could potentially be true, it is highly unlikely because we never had a case filed in their courts, we had never been in front of either of these judges and we did not know these judges. If Jeffers spends time contacting random judges and asking if they are scared of us and Judge Kincaid and Judge Lynn said that they were, then the statement is truthful. Ermatinger consistently relies on hearsay based upon hearsay. And because Sayers gets all of his information from Ermatinger, he relies on hearsay based upon hearsay that is based upon hearsay. I will dispute this "fact."

133.  **<u>Undisputed Fact</u>" No. 16** "Detective Ermatinger called Aubrey and Vodicka, and left voicemail messages." (Doc. 168 at 5.)

This "undisputed fact" is irrefutably false. Detective Ermatinger has never left Vodicka a voicemail message.

134.  **<u>Undisputed Fact</u>" No. 17** "Aubrey's credit card had been used [May 18, 2016] at a truck stop in Belton, Texas, a town roughly two hours south of Dallas." (Doc. 168 at 6.)

This "undisputed fact" is irrefutably false. I never left Dallas city limits for the entire month of May in 2016 and at all times I had possession of my credit card. The credit card statement reflects the same. (App. at 61.) In fact, Ermatinger's May 18, 2016 investigation report reflects that my credit card was used at a KFC store in Dallas on the same date as his report. (App. at 6.) And while the fabricated statement was used in the SWAs to give the false impression that Vodicka and I were fleeing from Dallas, Ermatinger's report states: "Detective Ermatinger receives info that Aubrey/Vodicka are traveling from Belton toward Dallas." (App. at 7.) Ermatinger knew that I was not with Vodicka because I was in Dallas. The false statement indicates detectives were tracking our cards, which again proves I was in Dallas, not Belton. The CEFCO convenience store where Vodicka used his credit card (while I was in Dallas) was not a "truck stop," a fabricated homophobic connotation implying a seedy place that attracts gay men. During the 7½ hours that Ermatinger interviewed Vodicka on May 19, 2016, he admitted that he was tracking our credit cards. (App. at 79.)

135.  Ermatinger and Sayers knew the truth that my credit card was not used in Belton and Vodicka was not at a "truck stop." They included the false facts in their affidavits, knowing they would present the fabrications under oath to judges, intending to falsify the basis for probable cause to trick the judges into issuing search warrants.  The quickest and easiest way to get the search warrants sought by Ermatinger and Sayers was to lie in their search warrant affidavits, applying their ends justifies the means theory.

136.  **<u>Undisputed Fact</u>" No. 18** "Vodicka said that Aubrey had also sent one email referring to Jihad to Tobolowsky." (Doc. 168 at 7-8.) (Doc. 169-1 at  61, 69)

This "undisputed fact" is irrefutably false and goes far beyond reckless disregard for the truth.  . Ermatinger and Sayers put the lie in their Brief and then they each attested to the truth of this false statement in their declarations. Defendants just can't stop lying to this Court. I reviewed Ermatinger's interview with Vodicka and he never told Ermatinger that I sent a jihad email to Tobolowsky. Vodicka told him repeatedly that I never sent a jihad email to Tobolowsky and the video reflects that Ermatinger completely understood Vodicka. Ermatinger even repeated what Vodicka said and he seemed to be taking notes about their topic of discussion. Vodicka told Ermatinger that I sent one email to his mother and it was the "only time, only time, only time." (*Id*. ¶ 6.) (App. at 78.)

137.  The Brief states that I told Ermatinger that Aubrey sent a one letter to Tobolowsky referring to jihad and Ermatinger has personal knowledge that this representation to this Court is a bold lie. And such a lie is indisputably material. Because Sayers relies on hearsay only for his "verified" information, the same bold lie belongs to him as well. Falsely stating the I said Aubrey sent a jihad e-mail to Tobolowsky is a game changer that would alarm any judge who would believe it was truthful, but it was not. Defendants are fabricating these lies specifically for this case and this Court.

138.  **<u>Undisputed Fact</u>" No. 19** "Vodicka was photographed, fingerprinted and was released at the conclusion of his interview." (Doc. 168 at 8.)

This "undisputed fact" is irrefutably false. DPD never took my fingerprints.

139. **<u>Undisputed Fact</u>" No. 20** "Ermatinger and Sayers…<u>were</u> notified of the arrest [Aubrey's]." "In situations where a sole or primary caregiver is <u>arrested</u>, both Detective Ermatinger and Detective Sayers had a practice of contacting the <u>arrested</u> caregiver's dependents to let them know that the caregiver <u>had been arrested</u>, spare them the concern and anxiety that would be caused by a caregiver's unexplained absence, check on their welfare, and make sure that the dependents are able to make alternative arrangements. Therefore, Detectives Ermatinger and Sayers decided to stop by Plaintiffs' apartment to let Vodicka know what <u>had happened</u> and make sure that Vodikca would be safe and cared for in Aubrey's absence" (Doc. 168 at 10,11; Doc. 169-1 at 70, 71.) (Underscores added to emphasize that this text is quoted in past tense, indicating that the event being referred to had already occurred.)

These "undisputed facts" are irrefutably false. Ermatinger and Sayers conspired with other DPD officers to develop an elaborate sting and harassment operation in which I was to be arrested,

which would then be used as an excuse for Defendants' warrantless entry into our residence on October 20, 2016. The plan failed because Ermatinger and Sayers had already illegally trespassed into our residence before I was falsely arrested for prostitution. (*Id.* ¶¶ 53-58.)

140.   Ermatinger and Sayers have the audacity represent to this Court that after they learned about my arrest, they went to our apartment "to let Vodicka know what had happened and make sure that Vodicka would be safe and cared for in Aubrey's absence." This is the 20th and final lie in Defendants' Brief. Defendants had no idea that we had records that prove they were already trying to get into our residence and interview Vodicka before I had been arrested.

> On October 20, 2016, DPD officers arrested Aubrey for prostitution. (Doc. 121, Third Am. Compl. ¶¶ 224, 233.) Because Detectives Ermatinger and Sayer were actively investigating Aubrey for the Tobolowsky murder, they were notified of the arrest. (Doc. 168 at 10.)

> Detectives Ermatinger and Sayers decided to stop by Plaintiffs' apartment to let Vodicka know *what had happened* and make sure that Vodicka would be safe and cared for in Aubrey's absence. (Emphasis added.) (Doc. 168 at 11.)

Their representation to the Court sounds very genteel, humane and empathetic, almost painting a visual of Ermatinger and Sayers beginning each day wearing aprons while they bake cookies and prepare a healthy batch of homemade chicken soup to get ready for that days round of welfare checks. But in truth, Defendants' were scheming and planning a conspiracy that was underhanded, cruel, evil and criminal. Defendants did not decide "to stop by," they were positioned at our front door ready to pounce, waiting for the call that I had been arrested. But, the records reflect they were too eager to terrorize Vodicka so they pushed the timeline and knocked on the door well before my arrest, proving their visit was for improper purposes.

141.   The evidence in the records does not support the fabricated storyline that Ermatinger and Sayers are selling in their Brief and Declarations. In fact, the evidence supports my allegations that Defendants engaged in an illegal sting operation to entrap and falsely arrest me so they would be unencumbered to harass Vodicka with their warrantless search and investigative interview. Their Brief asserts that Defendants perform routine welfare checks **after** someone has been arrested. The records support the indisputable timeline that reflects Defendants were banging on front door of our personal residence **before** Aubrey was falsely arrested. Ermatinger and Sayers are trying to sell this Court on the idea that welfare checks are one of their primary responsibilities as homicide detectives. In truth, they lack the skills and instincts to be effective homicide detectives and if Ermatinger were still employed by DPD, he and Sayers would be more successful if they were in charge of a new DPD welfare check division.  (*Id.* Timeline ¶ 64.)

142.   Ermatinger's investigative notes for October 20, 2016, include the title: Steve Aubrey Arrest / Vodicka Interview. His notes reflect that he and Sayers illegally entered our residence and they harassed Vodicka with a 90-minute interview. Instead of investigating murders, the two homicide detectives spent an inordinate amount of time designing the sting for my arrest and simultaneous illegal entry into our residence to mercilessly scare and harass Vodicka.

Defendants' use of extra legal means ultimately failed to entrap Aubrey for prostitution and failed to produce anything beneficial for the Tobolowsky murder investigation.

## FALSE IMPLICATIONS

143.   "Detective Richardson recalled seeing a drill and drill bits at Plaintiffs' apartment when he previously helped search the apartment pursuant to the May 19, 2016 search warrant." (Doc. 168 at 8.) Ermatinger and Sayers act as though they found a smoking gun in our apartment because I had a cordless drill. They failed to mention that the storage closet on our porch was stuffed with every kind of tool I could possibly cram in there, including a chain saw, orbital sander, circular saw, reciprocating saw, hammer drill and more. They also failed to mention that they took and giant container with every kind of drill bit imaginable, including multiple sizes of hole saw bits (each old and very used), many sizes of very long and very short spade bits, and dozens of regular drill bits, long and short and very used.  (App. at 109.) Because Defendants allege someone cut a hole in Tobolowsky's fence, they took many of my tools and attachments likely worth one thousand dollars, the majority, which could not have made the hole they were concerned about. The things they took make no sense and likely were removed just to further their harassment towards me. They took parts of my car and I can't imagine why, but I assume I never will get any of those items back unless they solve the murder and never really tried to investigate it. The Brief implies that having a cordless drill is peculiar but Defendants' own photograph gives more understanding that my drill and my container of bits had a long history with me none of which had been purchased within one year of their unlawful search and seizure. I believe it is more peculiar if someone does not own a cordless drill.

144.   "Detectives also recovered at that location a drill and related tools, a propane tank and torch attachment, and two plastic gas cans." (Doc. 168 at 9.) Defendants did recover a propane tank and torch attachment but the Brief leaves that fact hanging as though a murderer would take a bulky and heavy propane torch to start a fire. A propane torch needs something else to light it so there would be no use for a propane torch in such a situation. Defendants were fully aware that a propane torch would not be needed or used to light a fire. They also knew the torch was part of a large container full of plumbing supplies, which makes perfect sense. Defendants are master and pulling objects away from what makes them relevant the photos they produced do give logic and reason for a propane torch. (App. at 110.) The Brief intentionally omits the relevant information to give the Court a false impression.

145.   The "two plastic gas cans" might be out of place for some people but not for someone who has lawn equipment. Defendants took pictures of the gas cans and the pictures reflect that "two-stroke" was written on the side of the container. That means that the gas in the container was mixed with two-stroke oil, which is required for operation of small gas powered motors. Not only do Defendants know that someone would not take two gas cans to do whatever was done in Tobolowsky's garage, it would not be necessary to add oil to the gas. Moreover, their picture indicates the gas container was very dusty and had not been used for a long period of time. (App. at 111.) I also had a bag of charcoal in the storage closet and am a bit surprised they did not take it because it is also a fire related item.  I would guess that charcoal briquettes are just as unlikely as a propane torch regarding the need to quickly start a fire.

40

App. 000198

146. "….and two cans of primer paint." (Doc. 168 at 9.)  Ermatinger and Sayers failed to include other information relevant to the two cans of primer paint. They were white, one water base and the other oil base. Ermatinger and Sayers produced photos of the fence with the drilled hole and the fence was a typical faded brown/grey color, it was not a white fence. (App. at 24.) They included this information about the two cans of primer paint to imply it was connected to the fence with the hole in which "the interior of the holes had been painted the same color as the exterior of the fence, making the holes far less noticeable." (Doc. 169-1 at 8.) Thinking this implication all the way through, it implies the murderer used two cans of white primer (water-based and oil-based) to first paint one (or two) coats of primer on the hole and then return to paint the final color. I find Sayers theory is beyond extraordinary and crosses the line of preposterous. Of course, Sayers omitted in his affidavits for search warrants that the colors of the paint found in Aubrey's garage did not match up with the color of Tobolowsky's fence, which would lead someone to believe that the multiple cans of primer and multiple cans of paint were intended for something other than Tobolowsky's fence.

147. "When detectives entered Plaintiffs' apartment at 7777 Glen America, they found an Apple MacBook laptop. The laptop's disk utility application was actively deleting and erasing files from its hard drive." That is one of a very few truthful statements in the Brief. The laptop was the computer I used for my massage business. It contained my entire client list and contact information for hundreds of clients. I backed up everything on the computer onto a remote hard drive and then erased the computer as a precaution against Defendants getting additional unlawful search warrants and returning to harass us further, which they did. I foresaw how Ermatinger and Sayers could destroy his business by harassing my clients (they later destroyed my business with my false arrest for prostitution). (Our other computers that were unlawfully seized and searched, did not contain any of my business information. That was all on his laptop.)

148. Defendants never missed an opportunity to prove us right and show how dirty and underhanded they could be.  Because they were tracking our credit cards, they became aware that I booked a room for our friend who was visiting from Detroit, Dr. Alexandra Krot. They harassed her when they stopped and identified her at the DFW airport. Defendants literally gave our friend's personal information to the one person that should not be given anything personal, Michael Tobolowsky.  Additionally, because Defendants were tracking our phones, they were aware that my brother, Tom, had contacted me on the afternoon of the fire/murder and Defendants felt compelled to give that information to Michael Tobolowsky as well. First, Michael Tobolowsky and Schoettmer executed a subpoena duces tecum through the civil "jihad" defamation case on Alexandra Krot's bank, looking for charges that would represent payment for a hit man, according to Michael Tobolowsky. Next, Michael Tobolowsky filed a Rule 202 petition against Alexandra Krot and Thomas Aubrey for purposes of investigating potential wrongful death claims. Information he expected to learn from our friend and from my younger brother included:

     a.  the "plan" to commit the capital murder / wrongful death of Ira E. Tobolowsky;

     b.  the series of events that occurred on May 13, 2016, which resulted in the capital murder/ wrongful death of Ira E. Tobolowsky;

    c.  the identity of the individual(s) who murdered/ caused the wrongful death of Ira
       E. Tobolowsky;

    d.  the identity of the individual(s) who acted or served as accessories, accomplices,
       and/ or who otherwise participated in the capital murder / wrongful death of Ira E.
       Tobolowsky; and

    e.  information pertaining to the destruction or hiding of evidence relevant to the
       capital murder/ wrongful death of Ira E. Tobolowsky.

Michael Tobolowsky literally believed the answer to his father's murder would be found with
our friend or my little brother and that they had the above information. Crazy. Michael
Tobolowsky's brother, Jonathan, went to Thomas Aubrey's workplace where he has worked for
25 years and is a senior marketing manager. According to Thomas Aubrey, Jonathan entered the
workplace, ignored the receptionist and screamed that he had a subpoena for Thomas Aubrey
like it was some kind of a raid. Michael Tobolowsky and his two brothers deposed Thomas
Aubrey.  As well, the three of them flew to Detroit, MI to depose Alexandra Krot for an entire
day. This represents the kind of unruly, erratic and imbalanced behavior Tobolowsky's sons are
capable of.

    149.  Any private information in the hands of Ermatinger and Sayers is destined to be used to
harm others. Upon information and belief, DPD has recently given Michael Tobolowsky the
entire investigative file for the murder of Ira Tobolowsky, something that is never done and is
against the laws of the state. Time will tell how he will abuse the confidential health information,
etc.

## CONCLUSION

    150.  Ermatinger's SWAs, Brief, and declaration all include statements of false facts that
resemble proclamations without any reference to the origin of the false information. Because
Ermatinger fabricated these false "proclamations" the information is his. Examples include:

- Ira Tobolowsky is of Jewish descend [sic] and felt Jihad was an anti-semitic [sic]
  statement; and

- Aubrey had made multiple references to jihad in the course of the litigation;

Sayers just copypasted whatever Ermatinger proclaimed.

    151.  Interspersed among the proclamations with no origin, Ermatinger would include more
statements of false facts, which seemed to have origins of significant importance but they were
cloudy and opaque.  These statements would be attributed to "family members" or "neighbors."
However, upon searching for the source of the information, there never is a record of anybody
contributing to the declarations other than Ermatinger himself. Examples include:

App. 000200

- Family members advised detectives that complainant Tobolowsky felt threatened by Steve Aubrey;

- The Tobolowskys explained that they are Jewish, and that they and the victim believed that Aubrey's references to jihad were anti-Semitic threats to Ira Tobolowsky's safety and life; and

- Neighbors stated that they have not seen either Steven Aubrey or Brian Vodicka since Saturday the 14th of May 2016 and they have not heard any occupants walking around inside.

Sayers just copypasted whatever Ermatinger declared.

152.  Each of Ermatinger's false statements of this nature are material to support a finding of probable cause. Stating that according to "family members" the victim believed that my references to "jihad" were threats to his life is a material and alarming statement. If taken as true, the reader understands that Tobolowsky feared for his life because of me and the family knew it. Of course this is a totally fabricated lie because records prove that I never made a "jihad" allegation towards Tobolowsky and I never threatened Tobolowsky. Moreover, none of this false information regarding "jihad" was discussed or alleged in the interviews with the family but the interviews did establish that there had been no threats from anybody, myself included.

153.  Ermatinger's SWA Nos. 3, 4 and 5 are just buckets of false statements and omissions that create a false narrative so that Ermatinger could trick the judges into finding probable cause that, in truth, did not exist. Sayers's SWA Nos. 6, 7, 8, 9, 10 and 11 are the same.

154. With reckless disregard for the truth, both Ermatinger and Sayers committed aggravated perjury each time they intentionally presented one of their falsified search warrant affidavits to a judge, causing an unlawful search warrant to be issued.

155.  Ermatinger and Sayers decided the best was to avoid liability for their flagrant practice of lying in their affidavits was to double-down on the falsity and fabricate new lies specifically for this Court. Defendants added "family members" to be responsible for the lies, thereby escaping culpability, giving the lies an appearance of legitimacy, and definitely establishing the lies materiality. The Brief attempts to wear down the Court through endless repetition of nonexistent "jihad" fabrications all sworn as truthful in Defendants' declarations.

156.  Sayers is not as skilled as Ermatinger when it comes to lie fabrication. He made an enormous misstep going out on a limb and attributing a lie to a single person, Debbie Tobolowsky. Ermatinger would never be so foolish. Possibly they are aware that between them, Ermatinger is the better liar and for that reason, Sayers nearly always just copypastes whatever Ermatinger fabricates. For the Brief, Sayers stepped outside his comfort zone and included the following demonstrably false statement:

> When Detective Sayers asked her who could possibly have wanted to kill the victim, Mrs. Tobolowsky identified Plaintiffs Steven Aubrey and Brian Vodicka.

App. 000201

It is difficult to believe that a statement so alarming, damaging, and material did not make it into any of the SWAs. It is difficult to believe that this information was not mentioned in either of Debbie Tobolowsky's interviews with detectives. It is difficult to believe that Debbie Tobolowsky's and her family's interviews with the media contradicts this statement. It is very difficult to believe that Sayers decided to just recently fabricate this statement specifically for his this Court to consider after he was personally interviewed by D Magazine and he stated that Debbie Tobolowsky could not think of anybody who would want to harm her husband. Sayers should have said "family members" identified Plaintiffs Steven Aubrey and Brian Vodicka, but he did not. He attributed his lie to a specific person making his lie demonstrably false.

157.   Sayers relied solely on hearsay from Ermatinger and from other self-interested persons (i.e. Schoettmer and George Tobolowsky) who have all failed to produce a single document to support the echo chamber of false allegations regarding threats against Jews, threats against Tobolowsky, and my greed for inheritance. Ermatinger and Sayers rely on repeating the same baseless claims over and again with tireless repetition in an echo chamber, gambling that this Court will accept their fabrications as truth.

158.  Rather than evaluate all of the exculpatory evidence concerning Vodicka and me on October 20, 2016, Ermatinger and Sayers instead thought their resources were best spent devising a sting operation to falsely me for prostitution while they made a warrantless entry into our residence to interview Vodicka, again.  The scheme hinged on Defendants' gamble that I was a prostitute and required at least 10 DPD officers who could have been protecting the citizens of Dallas. However, Defendants bet on the wrong guy, because I am not a prostitute and they added two more criminal offenses to their stack when they illegally entered our residence. Ermatinger and Sayers could have been interviewing the convicted felon and other criminals who shared office space with Tobolowsky and shared businesses with him, instead they wanted to interview Vodicka one more time. Ermatinger and Sayers ignored the exculpatory evidence that was related to Vodicka and me, including:

- Phone location data in Ermatinger's possession on May 17, 2016, which proved where we were on May 13, 2016 and proved that we both were in public site constantly, not hiding;

- Detectives were tracking our credit cards, which proved that we both were in public site constantly, not hiding;

- Identification of our friend Alexandra Krot who stayed in the hotel booked under her name; the room was not a hideout for us;

- Ermatinger's visual proof confirming that Aubrey's arms were not burned;

- Follow up on Aubrey's dermatologist appointment that occurred just hours after the fire and murder;

44

App. 000202

- There was not a single jihad comment made by Aubrey or me directed at Tobolowsky or at anybody in any court document and there were absolutely no threats of any nature directed at Tobolowsky or any judge anywhere; and

- Immediate family members had no idea who would have wanted to hurt Tobolowsky, which is proven in Sayers own interview with D Magazine.

159.  Ermatinger and Sayers took the above exculpatory evidence and/or irrelevant facts and flipped them upside down to use against us. Defendants were either too lazy to find a legitimate suspect, not bright enough to find a true suspect, or maybe they were directed to focus on Vodicka and avoid investigating or interviewing the business associates of Tobolowsky, including his business partner and officemate for several decades, convicted felon Marc Birnbaum.

160.  Moreover, Defendants' false statements of fact used to support a finding of probable cause are all directed at me and should not be in the SWAs used against Vodicka alone. The SWAs and corresponding search warrants executed against Vodicka include:

- SWA No. 4: Brian Vodicka; May 18, 2016 (Doc. 169-1 at 12-13.);

- SWA No. 9: Verizon Wireless - Brian Vodicka; May 26, 2016 (Doc. 169-1 at 37-38.); and

- SWA No. 11: Google, Inc.; October 5, 2016  (Doc. 169-1 at 46-53.).

There are no statements about Vodicka, true or false, that support a finding of probable cause against him. Absent the demonstrably false statements concerning me, Defendants' SWAs (above) do not support a finding of probable cause. Ermatinger and Sayers improperly impugned Vodicka's reputation by impugning my reputation in their affidavits used against Vodicka, including the following statements, which are irrelevant to Vodicka:

- Family members advised detectives that complainant Tobolowsky felt threatened by Steve Aubrey because of a lawsuit that complainant Tobolowsky won when he represented the mother of Steven Aubrey, Betsy Aubrey; (SWA Nos. 4, 9, 11.)

- It was alleged in the lawsuit that Steven Aubrey threatened "Jihad" the same words used to describe the wars brought by terrorists, which was filed in court docket number 15-08135 in the 14th Judicial District Court Judge Eric Moye presiding; and (SWA No. 4.)

- It was alleged in the lawsuit that Steven Aubrey threatened "Jihad" the same words used to describe the wars brought by terrorists, and against his life which was filed in court document number 15-08135 in the 14 Judicial district court judge Eric Moye presiding. (SWA Nos. 9, 11.)

Statements concerning me cannot be used for a finding of probable cause against Vodicka, even if they are fabricated and false.  The lazy detectives should have fabricated false statements of fact on Vodicka's behalf before going after him personally. But the did not and the finding of probable cause against Vodicka was based entirely on allegations against me.

I declare under penalty of perjury that the foregoing statements are true and correct.

Executed in Broward County, State of Florida, on the 19th day of August 2020.

/s/ *Steven B. Aubrey*
Steven B. Aubrey

46

App. 000204