UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| STEVEN B. AUBREY and BRIAN E. VODICKA, | § § § | |
| Plaintiffs, | § § | |
| v. | § § | CIVIL ACTION NO. 3:19-CV-0056-B |
| ROBERT L. ERMATINGER, JR. and SCOTT ROBERT SAYERS, | § § § | |
| Defendants. | § § | |

<u>MEMORANDUM OPINION AND ORDER</u>

Before the Court are Plaintiffs Steven Aubrey and Brian Vodicka's Motion for Partial Summary Judgment (Doc. 163) and Defendants Robert Ermatinger, Jr. and Scott Robert Sayers's Motion for Summary Judgment (Doc. 167). These cross-motions require the Court to determine whether Ermatinger and Sayers are entitled to qualified immunity on Aubrey and Vodicka's 42 U.S.C. § 1983 claims arising from Ermatinger and Sayers's preparation of several search-warrant affidavits and warrantless entry into Aubrey and Vodicka's home.

For the reasons explained below, Ermatinger and Sayers are entitled to qualified immunity on the § 1983 claims premised on the search-warrant affidavits. However, genuine issues of material fact exist regarding whether Ermatinger and Sayers are entitled to qualified immunity on the § 1983 claims premised upon their warrantless entry. Accordingly, the Court **DENIES** Aubrey and Vodicka's motion (Doc. 163) and **GRANTS IN PART** and **DENIES IN PART** Ermatinger and Sayers's motion (Doc. 167). Further, the Court **OVERRULES** all evidentiary objections presented in the briefing as moot.

-1-

# I.

# BACKGROUND

A.    *Factual Background*

This is a dispute between former suspects in a murder investigation and the investigators following their trail. The story begins on May 13, 2016, when firefighters responded to a reported structure fire and found the burned remains of Dallas attorney Ira Tobolowsky in the garage of his home. Doc. 169-1, Defs.' App., 57. A responding arson investigator called Sayers, a homicide detective at the Dallas Police Department, to the scene. *Id.* Sayers claims that upon arrival, he spoke with Tobolowsky's wife, who identified Aubrey and Vodicka as individuals who might have wanted to kill Tobolowsky. *Id.* at 58. Tobolowsky, she explained, was involved in contentious litigation with Aubrey and Vodicka. *Id.*[1] Because the investigation was initially classified as an arson investigation, arson investigators "took primary responsibility" and obtained two search warrants for Aubrey's and Vodicka's cell-phone records from May 10, 2016, to May 16, 2016. *Id.* at 58; *see id.* at 1–3, 5–7.

Subsequently, the investigation into Tobolowksy's death was reclassified as a murder investigation led by Ermatinger, another Dallas Police Department homicide detective, whom Sayers assisted. *Id.* at 66. The arson investigators provided the cell-phone records obtained through the search warrants, as well as the information they had learned thus far, to Ermatinger and Sayers. *See id.* at 58–59, 66–67. Specifically, Ermatinger and Sayers state that they learned about a lawsuit between Aubrey and his mother in which Tobolowsky represented Aubrey's mother, *id.* at 58, 66,

---

[1] Aubrey and Vodicka dispute whether Ms. Tobolowsky told Sayers this, but they have not cited any competent summary-judgment evidence contradicting Sayers on this matter. *See* Doc. 178, Pls.' Resp., 35 (citing to Aubrey's and Vodicka's declarations, which are not based on personal knowledge of Ms. Tobolowsky's conversation with Sayers).

which was later dismissed with prejudice, Doc. 179, Pls.' App., 94, as well as a subsequent defamation lawsuit filed by Tobolowsky against Aubrey and Vodicka. Doc. 169-1, Defs.' App., 58, 66.

Ermatinger and Sayers also state that during the investigation, they spoke with members of Tobolowsky's family, who confirmed the "contentious litigation" between Tobolowsky and Aubrey and Vodicka. *Id.* at 59, 66–67. Tobolowsky's family members, according to Ermatinger and Sayers, explained that "Aubrey had made multiple references to 'jihad'" during the lawsuit, and as a Jewish family, Tobolowksy's family (as well as Tobolowsky) believed these references constituted "antisemitic threats to [Tobolowsky's] safety and life." *Id.* at 59, 67.[2]

On May 18, 2016, Ermatinger and Sayers attended a hearing in the pending defamation lawsuit in order to speak with Aubrey and Vodicka, but they did not appear. Doc. 169-1, Defs.' App., 67. After the hearing, Ermatinger could not locate Aubrey or Vodicka and received information from the U.S. Marshal's Service that "Aubrey's credit card had been used at a truck stop in Belton, Texas, a town roughly two hours south of Dallas." *Id.* at 68. Additionally, Ermatinger found out that Aubrey's credit card was used to book a hotel room in Dallas "under the name of Alexandria Krot." *Id.* His investigative notes suggest that he received this information around 6:30 p.m. on May 18, 2016. Doc. 165, Pls.' App., 30.

Ermatinger and Sayers claim that based on the information they had received throughout the investigation, they concluded that Aubrey and Vodicka "had a motive to harm Tobolowsky," "appeared to be deliberately avoiding the detectives," and "may have information or involvement

---

[2] Aubrey and Vodicka dispute whether the family members made these statements—they point out that there is no evidence of "jihad" threats against Tobolowsky. But they do not point to any competent summary-judgment evidence suggesting that Tobolowsky's family members did *not* relay this to Ermatinger and Sayers. *See* Doc. 178, Pls.' Resp., 39–40 (citing to Aubrey's and Vodicka's declarations, which are not based on personal knowledge of the conversation between Tobolowsky's family members and detectives).

with the murder." Doc. 169-1, Defs.' App., 60, 68. Further, they suspected that Tobolowsky's murderer suffered burns, because the fire "occurred within a small, confined space in Tobolowsky's garage[.]" *Id.* In light of this suspicion, on May 18, 2016, Ermatinger applied for and obtained three search warrants: two permitted detectives to search Aubrey's and Vodicka's bodies for injuries and burns, and the other authorized a search of Aubrey and Vodicka's residential apartment. *Id.*; *see* Doc. 165, Pls.' App., 7–17. Ermatinger's notes suggest he obtained the warrants around 9:00 p.m., and thereafter, around 10:00 p.m., he found out that a woman named Alexandra Krot did indeed check in to the hotel room booked with Aubrey's credit card. Doc. 165, Pls.' App., 30.

The following day, detectives located Aubrey and Vodicka and executed the search warrants. Doc. 169-1, Defs.' App., 68. When the detectives conducted the search of Vodicka's person, Vodicka consented to an interview with Ermatinger, during which he explained that he and Aubrey were a married couple that had been "together for twenty years[.]" *Id.* at 61, 68. Vodicka also stated that he had acquired immunodeficiency syndrome (AIDS) and bipolar disorder, and that he spent two weeks receiving in-patient treatment at a mental health facility. *Id.* Additionally, when Ermatinger asked Vodicka about Aubrey's previous "jihad" references, Vodicka stated that Aubrey sent one email to his mother in 2009 that contained a "jihad" reference. *Id.* at 61, 69. Vodicka also asserts that during the interview, he informed Ermatinger that Aubrey had a dermatologist's appointment "just hours after the fire and Tobolowsky's death . . . ." Doc. 179, Pls.' App., 124.

About one week after the interview, Ermatinger and Sayers received information that there were holes drilled in Tobolowsky's fence "allow[ing] someone in the adjacent alley to watch the Tobolowskys going to and from the garage without being seen[.]" Doc. 169-1, Defs.' App., 61, 69.

-4-

Further, Ermatinger and Sayers claim that another detective "recalled seeing a drill and drill bits at [Aubrey and Vodicka's] apartment" during the May 19 search. *Id.*

After receiving this information, Sayers applied for and executed four more search warrants: another warrant to search Aubrey and Vodicka's residential apartment; a warrant to search the apartment Aubrey used for his massage business; and two warrants to obtain Aubrey's and Vodicka's cell-phone records. Doc. 169-1, Defs.' App., 21–24, 27–30, 33–35, 37–39.

Sayers executed the two apartment searches on May 25, 2016. *Id.* at 61. Between these searches and the first search of Aubrey and Vodicka's residence, detectives seized three laptops. *Id.* at 61–62. Sayers thus obtained another warrant to subject the seized laptops to forensic examination. *Id.* at 41–44. Finally, on October 5, 2016, Sayers obtained a warrant requiring Google, Inc. to produce data-location records associated with Aubrey and Vodicka's Google accounts. *Id.* at 46–52. In all, there are nine search warrants from the murder investigation relevant to this Order, which are listed below:[3]

| Author | Date | Subject of Warrant | Location in Doc. 169-1 |
|---|---|---|---|
| Ermatinger | 5/18/2016 | Aubrey's Person | 8–10 |
| Ermatinger | 5/18/2016 | Vodicka's Person | 12–14 |
| Ermatinger | 5/18/2016 | Aubrey and Vodicka's Residence | 15–17 |
| Sayers | 5/25/2016 | Aubrey and Vodicka's Residence | 21–24 |
| Sayers | 5/25/2016 | Aubrey's Business Apartment | 27–29 |
| Sayers | 5/26/2016 | Aubrey's Cell Phone | 33–35 |
| Sayers | 5/26/2016 | Vodicka's Cell Phone | 37–39 |

---

[3] For the sake of brevity, the Court will discuss the content of the affidavits supporting these search warrants, which Aubrey and Vodicka extensively contest, in its analysis.

| Sayers | 5/31/2016 | Three Laptops | 41–44 |
| Sayers | 10/5/2016 | Google's Records | 46–55 |

During the murder investigation, Dallas Police Department officers were investigating Aubrey for an additional crime—prostitution. *See* Doc. 169-1, Defs.' App., 70. In Ermatinger's investigative notes from October 13, 2016, he states that he received information suggesting that Aubrey was offering prostitution services, rather than massage services, on a website. Doc. 179, Pls.' App., 107–08. According to the notes, Ermatinger relayed this information to another detective and instructed the detective "to again check into the possibility that Aubrey is a male prostitute and[,] if so[,] to make cases." *Id.* at 108. The notes state that one week later, the detective contacted Ermatinger and indicated that he was "working the case on [Aubrey] for Prostitution and expected to arrest him at 2 pm." *Id.* at 22. "Ermatinger requested he be informed that the arrest did occur." *Id.*

Later that day, Aubrey was arrested on prostitution charges by an undercover officer, whom he called "Ryan." Doc. 121, Third Am. Compl., ¶¶ 224, 233 (51–52).[4]  Prior to the arrest, Aubrey sent "Ryan" a text message, which had a 2:15 p.m. time stamp, indicating that he had parked at the hotel where they were to meet. *See* Doc. 179, Pls.' App., 88. Aubrey states in his declaration that after parking, he unloaded his massage table, walked to the hotel room where he planned to meet "Ryan," and began unpacking the table. *Id.* at 175. He states that he set up the table and spoke with "Ryan" about money for four-to-five minutes, at which point "Ryan" excused himself, and officers

---

[4] Because the third amended complaint contains inconsistent paragraph numbering, the Court cites the paragraphs to which it refers, followed by the page number where the paragraphs are found in parentheses.

arrested Aubrey. *Id.* Aubrey states the arrest occurred "at approximately 2:30 p.m." *Id.* Ermatinger's investigative notes, on the other hand, state that Aubrey was arrested by 2:10 p.m. *Id.* at 22.

At some point around the time of the arrest, Ermatinger and Sayers came to Aubrey and Vodicka's apartment. *Id.* at 157; Doc. 169-1, Defs.' App., 71. Ermatinger and Sayers state that they "decided to stop by . . . to let Vodicka know what had happened and make sure that Vodicka would be safe and cared for in Aubrey's absence." Doc. 169-1, Defs.' App., 63, 71. In Ermatinger's and Sayers's declarations, each explains that—before their visit to Vodicka—they knew Vodicka took "powerful medications" for his AIDS diagnosis that "often rendered [him] disoriented, physically weak, and extremely fatigued." *Id.* at 63, 70. Moreover, they state they knew "that Aubrey was Vodicka's (likely sole) caregiver," meaning that due to Aubrey's arrest, "Vodicka would have no caregiver for an indefinite period of time" and "may need to make other health-related arrangements." *Id.* at 63, 70–71. Additionally, due to Vodicka's previous interview, they both knew that he was "diagnosed with bipolar disorder during two weeks of in-patient treatment at a mental health facility." *Id.* at 61, 68.

However, in Ermatinger's declaration, he claims that he and Sayers knew even more about Vodicka's mental health. Ermatinger states that they "had recently learned that in February and March of 2016, Vodicka had suffered a psychotic episode with paranoia and suicidal ideation," which led to "a court order committing Vodicka" to a hospital for "inpatient psychiatric treatment." *Id.* at 70. Additionally, he states that they knew Vodicka had bipolar disorder "with psychotic features" and "had made prior suicide attempts[.]" *Id.* Lastly, he states that they knew that Vodicka's "mental health conditions were both chronic and acute, and were exacerbated by psychosocial stressors," with Aubrey's arrest being one such potential stressor. *Id.*

-7-

Upon arriving at the apartment, Ermatinger and Sayers state, they "knocked loudly on Vodicka's apartment door, identified [themselves,] and called his name for five to six minutes." *Id.* at 63, 71. When Vodicka did not answer the door, their "concern for Vodicka's health and welfare increased," as they "believed [he] was probably inside the apartment[.]" *Id.* Sayers then retrieved a key to the apartment from the apartment complex's management while Ermatinger remained at the door. *Id.* Thereafter, Ermatinger and Sayers entered the apartment "and loudly and repeatedly called Vodicka's name and identified [themselves.]" *Id.* They found Vodicka asleep in his bedroom. *Id.*; Doc. 165, Pls.' App., 192. Vodicka states that he awoke to find Ermatinger next to him "tapping [his] leg," Doc. 165, Pls.' App., 192, while Ermatinger states that after attempting to wake Vodicka "for at least a full minute," he "grasped Vodicka's foot and shook it until Vodicka eventually woke up." Doc. 169-1, Defs.' App., 71.

Ermatinger and Sayers claim that upon Vodicka's awakening, they explained that Aubrey was arrested, and they "asked Vodicka if he was okay" and "about [his] caregiving needs[.]" *Id.* at 63, 71. This interaction, Ermatinger and Sayers state, "lasted only a short time[.]" *Id.*

Aubrey and Vodicka's submitted evidence paints a different picture of the exchange. Specifically, Ermatinger's investigative notes suggest that he and Sayers arrived at the apartment at 2:30 p.m. and left at 4:03 p.m. Doc. 179, Pls.' App., 22–23. Further, the notes indicate that Ermatinger and Sayers came "to interview [Vodicka] regarding the Tobowlosky case," and "also" to "make a welfare check on Vodicka since he had not been seen for about 5 days." *Id.* at 22. Finally, in Vodicka's declaration, he states that "[n]either Ermatinger nor Sayers asked [him] about [his] welfare or if [he] needed any kind of assistance or aid." Doc. 165, Pls.' App., 193.

Over four years have passed since these events, and detectives have not charged Aubrey, Vodicka, or anyone else with the murder of Tobolowsky. Doc. 169-1, Defs.' App., 71.

B.      *Procedural Background*[5]

At this point, there are two sets of § 1983 claims against Ermatinger and Sayers: (1) claims by Aubrey and Vodicka for the falsification of search-warrant affidavits; and (2) claims by Vodicka for the warrantless entry. Doc. 121, Third Am., Compl., ¶¶ 333–45 (74–77), 346–50 (77–78). When the Court denied Ermatinger's and Sayers's motions to dismiss these claims, it ordered limited discovery on the issue of qualified immunity. Doc. 151, Mem. Op. & Order, 25. Upon the close of discovery, Aubrey and Vodicka filed a motion for partial summary judgment (Doc. 163), seeking summary judgment on their claims against Ermatinger. Likewise, Ermatinger and Sayers filed a motion for summary judgment (Doc. 167), asserting they are entitled to qualified immunity on all of the remaining claims. The Court has received all briefing on these motions, so they are now ripe for review.

## II.

## LEGAL STANDARD

Courts must grant summary judgment "if there is no genuine dispute as to any material fact" and the party bearing the burden of proof "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A material fact is one that might affect the outcome of the suit under governing law, and a fact issue is genuine if the evidence is such that a reasonable jury could return a verdict for the

---

[5] The Court summarizes only the procedural background necessary for understanding this Order. For a more detailed summary of this case, see the Court's order on Ermatinger's and Sayers's motions to dismiss. *See* Doc. 151, Mem. Op. & Order, 3–5.

non-moving party[.]" *Renwick v. PNK Lake Charles, L.L.C.*, 901 F.3d 605, 611 (5th Cir. 2018) (cleaned up). Typically, the summary-judgment movant bears the burden of proving that no genuine issue of material fact exists. *Latimer v. Smithkline & French Lab'ys*, 919 F.2d 301, 303 (5th Cir. 1990) (citation omitted).

"However, a good-faith assertion of qualified immunity alters the usual summary[-]judgment burden of proof, shifting it to the plaintiff to show that the defense is not available." *Ratliff v. Aransas Cnty.*, 948 F.3d 281, 287 (5th Cir. 2020) (cleaned up). Thus, where qualified immunity is raised, "[t]he plaintiff bears the burden of negating qualified immunity," but the Court draws all inferences in favor of the plaintiff. *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010) (citation omitted).

"[Q]ualified immunity insulates state officials from liability [under § 1983] to the extent that the officials' actions do not violate clearly established statutory or constitutional rights." *Trent v. Wade* (*Trent I*), 776 F.3d 368, 376–77 (5th Cir. 2015) (alterations incorporated) (citation and quotation marks omitted).[6] To defeat qualified immunity, the plaintiff must demonstrate: "(1) that the official[s] violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." *Id.* at 377 (citation and quotation marks omitted). Courts have discretion to determine which prong of the qualified immunity analysis to address first. *Id.* (citations omitted).

In sum, when the Court is considering the application of qualified immunity on summary judgment, the burden is on the plaintiff to demonstrate a genuine dispute of material fact "as to

---

[6] Under § 1983, a person acting "under color of any statute, ordinance, regulation, custom, or usage, of any State" who violates another person's constitutional rights is liable to the person whose rights he violated.

-10-

whether the official's allegedly wrongful conduct violated clearly established law." *McCoy v. Alamu*, 950 F.3d 226, 230 (5th Cir. 2020) (citation omitted).

### III.

### ANALYSIS

The Court first examines whether Ermatinger and Sayers committed a constitutional violation by authoring the search-warrant affidavits. Because they did not, the Court grants Ermatinger and Sayers qualified immunity on Aubrey and Vodicka's claims premised on the affidavits.

Next, the Court addresses two new claims raised by Aubrey and Vodicka—that the search-warrant affidavits at issue lacked probable cause as to Vodicka, and that Sayers relied upon stale information in his affidavits. Because Aubrey and Vodicka failed to provide notice of these claims in their operative complaint, the Court grants Ermatinger and Sayers summary judgment on the claims.

Thereafter, the Court turns to whether Sayers or Ermatinger violated Vodicka's constitutional rights by entering Aubrey and Vodicka's home without a warrant. With respect to both officers, the Court concludes the entry violated Vodicka's Fourth Amendment rights. Nevertheless, because there are genuine issues of material fact regarding whether each officer violated clearly established law, the Court denies summary judgment on Vodicka's warrantless-entry claim.

Finally, the Court addresses the parties' evidentiary objections and overrules all of the objections as moot.

A. *Aubrey and Vodicka Do Not Raise a Genuine Issue of Material Fact as to Whether Ermatinger Deliberately or Recklessly Made False Statements in or Omitted Information from His Search-Warrant Affidavits.*

An officer violates the Fourth Amendment when: "(1) the [officer], in support of [a] warrant, includes a 'false statement knowingly and intentionally, or with reckless disregard for the truth' and (2) 'the allegedly false statement is necessary to the finding of probable cause.'" *Winfrey v. Rogers*, 901 F.3d 483, 494 (5th Cir. 2018) (quoting *Franks v. Delaware*, 438 U.S. 154, 155–56 (1978)). "Likewise, the intentional or reckless *omission* of material facts from a warrant application may amount to a Fourth Amendment violation." *Kohler v. Englade*, 470 F.3d 1104, 1113 (5th Cir. 2006) (emphasis added) (citation omitted). Courts commonly refer to claims for both types of violations as "*Franks* claim[s.]" *See, e.g.*, *Blake v. Lambert*, 921 F.3d 215, 218 (5th Cir. 2019).

To withstand summary judgment on a § 1983 claim premised on a *Franks* violation, "the plaintiffs must demonstrate that a genuine issue of material fact exists as to whether the false information contained in the affidavit was provided deliberately or with reckless disregard for the truth." *Mason v. Lowndes Cnty. Sheriff's Dep't*, 106 F. App'x 203, 206 (5th Cir. 2004) (citation omitted); *see United States v. Tomblin*, 46 F.3d 1369, 1377 (5th Cir. 1995) (applying the same standard to omissions). "To prove reckless disregard for the truth, [the plaintiff] must present evidence that [the affiant] in fact entertained serious doubts as to the truth of the statement . . . ." *Hart v. O'Brien*, 127 F.3d 424, 449 (5th Cir. 1997) (citations and quotation marks omitted), *abrogated on other grounds by Kalina v. Fletcher*, 522 U.S. 118 (1997)).

The burden is on the plaintiff "to make a substantial showing of deliberate falsity or reckless disregard for the truth." *Mason*, 106 F. App'x at 207 (citing *Franks*, 438 U.S. at 171). "To meet this burden, the plaintiffs must make a 'strong preliminary showing' that the affiant made the

misstatement or omission 'with the intent to mislead the magistrate.'" *Id.* at 206 (quoting *Tomblin*, 46 F.3d at 1377). The officer's negligence is insufficient. *Winfrey*, 901 F.3d at 494 (citation omitted). Only after the plaintiff makes this preliminary showing does a factfinder consider "whether probable cause exists absent the false information . . . ." *Mason*, 106 F. App'x at 207 (citations omitted).

Here, Aubrey and Vodicka do not create a genuine dispute of material fact regarding Ermatinger's deliberate or reckless inclusion of false statements or omission of material information. Below, the Court analyzes each of Ermatinger's alleged false statements and omissions.[7]

### 1.    The "against his life" statement

Aubrey and Vodicka allege that the following statement appearing in Ermatinger's search-warrant affidavit for the search of their residence was false: "It was aledged [sic] in the lawsuit that Steven Aubrey threatened 'Jihad' the same words used to describe the wars brought by terrorists, and *against his life* which was filed in court document number 15-08135 in the 14 Judicial district court judge Eric Moye presiding." Doc. 164, Pls.' Mot., 10 (emphasis added) (quoting Doc. 169-1, Defs.' App., 16). Aubrey and Vodicka contend that this statement is false because the referenced state-court case does not contain any "allegation that Aubrey threatened the life of Tobolowsky." *Id.* They assert that Ermatinger "should have searched for evidence" to substantiate the "jihad" allegations. Doc. 178, Pls.' Resp., 17. Further, to support their contention that Ermatinger

---

[7] Aubrey and Vodicka allege several "false impression statements" that "may remain true," but nonetheless "contribute to a narrative about [them] that was not truthful." *See, e.g.*, Doc. 164, Pls.' Mot., 2, 16. But Aubrey and Vodicka have not provided the Court with any legal authority suggesting that the inclusion of truthful statements in an affidavit can give rise to a *Franks* violation. Rather, the Fifth Circuit recognizes a *Franks* violation for the omission of facts that are "required to prevent technically true statements in the affidavit from being misleading." *Tomblin*, 46 F.3d at 1377 (citation omitted). Accordingly, for each officer, the Court confines its inquiry to Aubrey and Vodicka's allegations of misrepresentations and material omissions.

intentionally included this false statement, Aubrey and Vodicka point out that Ermatinger included the words "against his life" in one affidavit, but not in two others. *Id.* at 9; *compare* Doc. 169-1, Defs.' App., 16, *with id.* at 8, 12.[8]

As explained above, to survive summary judgment, Aubrey and Vodicka must "make a *substantial showing*" that Ermatinger acted with "deliberate falsity or reckless disregard for the truth" by including the words "against his life" in the affidavits. *See Mason*, 106 F. App'x at 207 (emphasis added) (citation omitted). They have not done so.

Though Aubrey and Vodicka rely upon Ermatinger's selective use of the words "against his life" as evidence that he knew the words were false, the Court disagrees with this inference. While this selective inclusion may suggest Ermatinger intentionally included the words "against his life," it does not indicate that he intentionally included these words *knowing they were false*. Indeed, Ermatinger explains in his declaration that when he met with Tobolowsky's family members—who are Jewish—they "confirmed that [Tobolowsky] had been involved in contentious litigation against Aubrey and Vodicka for the past few years," and that "they and [Tobolowsky] believed that Aubrey's references to jihad [during the litigation] were antisemitic threats to [Tobolowsky's] safety and life." Doc. 169-1, Defs.' App., 66–67. Further, the fact that Ermatinger included the words in some of the affidavits but not others—when all of the affidavits were submitted to the same magistrate (and on the same day)—suggests that he did not intend to mislead the magistrate. *See Mason*, 106 F. App'x at 206 (citation omitted).

---

[8] Aubrey and Vodicka also point out that Ermatinger included this statement even after interviewing Vodicka, who stated that "Aubrey never used the term 'jihad' while [he] knew Tobolowksy." Doc. 178, Pls.' Resp., 11. This fact is irrelevant, however, because the falsity of the statement depends on whether Tobolowsky made the allegations, not whether Aubrey actually threatened Tobolowsky's life.

Aside from Ermatinger's selective use of the words "against his life," Aubrey and Vodicka do not offer any other evidence that Ermatinger stated this phrase with deliberate falsity or reckless disregard for the truth. Thus, the Court holds that they have not demonstrated a *Franks* violation premised upon the "against his life" statement.

2.   The "family members" statement

Next, Aubrey and Vodicka attack Ermatinger's statement in one affidavit that "[f]amily members advised detectives that complainant Tobolowsky felt threatened by Steve Aubrey because of a lawsuit that complainant Tobolowsky won when he represented the mother of Steven Aubrey, Betsy Aubrey." Doc. 164, Pls.' Mot., 12; *see* Doc. 169-1, Defs.' App., 16. They contest the accuracy of this statement with several arguments.

First, Aubrey and Vodicka contend that Ermatinger failed to produce all his investigative notes, and the remaining investigative notes, "[u]pon information and belief, . . . told a different story that did not comport with the falsified affidavits." Doc. 164, Pls.' Mot., 12.

As a preliminary matter, Ermatinger did not improperly withhold discovery. The Court ordered Ermatinger and Sayers to explain whether any outstanding discovery remained after the parties briefed their summary-judgment motions. Doc. 184, Order, 1. In response, Ermatinger and Sayers filed a notice explaining that they "submitted all responsive materials within their possession[,] custody[,] or control, subject to" certain objections and exceptions, which Aubrey and Vodicka did not challenge. Doc. 185, Defs.' Notice, 1–2. Accordingly, to the extent Aubrey and Vodicka now seek to raise a discovery objection, the Court overrules it based on Ermatinger and Sayers's response.

-15-

Moreover, Aubrey and Vodicka's argument that other unidentified investigative notes would contradict the affidavits is speculative at best. The possible existence of these contradictory notes is not evidence that Ermatinger authored his affidavit with deliberate falsity or reckless disregard. Thus, the Court rejects Aubrey and Vodicka's first argument.

Aubrey and Vodicka next contend the statement is false because Ermatinger's produced investigative notes do not corroborate it. Doc. 164, Pls.' Mot., 13. But the mere fact that Ermatinger failed to record this statement does not suggest that it is false—much less that Ermatinger included the statement with deliberate falsity or reckless disregard for the truth.

Third, Aubrey and Vodicka point out that Tobolowksy's "family members gave interviews many weeks after Tobolowsky's death reporting that they had no idea who may have wanted to harm Tobolowsky." *Id.* at 14. This evidence—admissibility aside—does not create a fact issue as to whether Tobolowsky's family members told detectives that Tobolowsky felt threatened by Aubrey. Nor is it relevant to Ermatinger's state of mind when authoring the warrant affidavits.

Finally, Aubrey and Vodicka suggest that the statement is false because Tobolowsky, in representing Betsy Aubrey, had not "won" a lawsuit against them. *Id.* at 15. But as Ermatinger points out, Aubrey and Vodicka's own summary-judgment evidence reflects that a state court dismissed Aubrey's case against Betsy Aubrey with prejudice. Doc. 180, Defs.' Reply, 13 (citing Doc. 179, Pls.' App., 94). Accordingly, Aubrey and Vodicka have not provided any evidence that this portion of the statement was false, nor that Ermatinger made the statement with deliberate falsity or reckless disregard for the truth.

In sum, Aubrey and Vodicka offer no evidence to support their contention that Ermatinger made the above statement with deliberate falsity or reckless disregard—indeed, they have not even

created a fact issue as to the statement's falsity. Thus, Ermatinger is entitled to qualified immunity on Aubrey and Vodicka's *Franks* claim premised on the "family members" statement.

### 3. The "whereabouts" omission

Aubrey and Vodicka contend that Ermatinger's affidavits painted a misleading picture that Aubrey and Vodicka were hiding from the public because Ermatinger did not include "ample proof that [they] were not hiding from public site [sic]," Doc. 164, Pls.' Mot., 17, and he knew that they had no burns on their bodies. Doc. 178, Pls.' Resp., 20.

According to Aubrey and Vodicka, Ermatinger was tracking their credit-card spending and cell-phone location data, and in the days leading up to Ermatinger's presentation of the affidavits at issue, they "were out in public using their credit cards . . . ." Doc. 164, Pls.' Mot., 17. As a result, Aubrey and Vodicka assert that Ermatinger "knew [they] were going about their normal routine in public" and created a false impression by stating that whoever "set [Tobolowsky] on fire . . . is hiding from public site [sic] . . . ." *Id.* (quoting Doc. 165, Pls.' App., 8). Additionally, Aubrey and Vodicka assert that Ermatinger knew this statement was false because Vodicka, in an interview on May 19, 2016, told Ermatinger that "Aubrey had been to see his dermatologist . . . for a scheduled appointment . . . just hours after the fire . . . ." Doc. 179, Pls.' App., 124.

Aubrey and Vodicka's claim fails because they provide no evidence that Ermatinger omitted information with deliberate falsity or with reckless disregard for the truth.

As Ermatinger explains, the U.S. Marshal's Service—not Ermatinger—was "periodically receiving information from the credit card company and relaying that information to the detectives." Doc. 176, Def.'s Resp., 15 (citing Doc. 175-1, Def.'s App., 81). Further, in his declaration, Ermatinger states that he "had not reviewed the voluminous records at the time [he] submitted his

[search-warrant] affidavits." *Id.* (citing Doc. 175, Def.'s App., 81). With respect to the cell-phone data, Ermatinger points out that it "provided no information about activity on May 17 or 18"—the two days leading up to Ermatinger's presentation of the affidavits at issue. *Id.* (citing Doc. 164, Pls.' Mot., 17). Aubrey and Vodicka have not identified any evidence to dispute these facts.

Moreover, even assuming Vodicka's interview provided Ermatinger with knowledge that Aubrey and Vodicka were not hiding or suffering from burns, this interview took place on May 19, 2016—the day after Ermatinger submitted his search-warrant affidavits. *See* Doc. 169-1, Defs.' App., 8–16 (showing Ermatinger executed his affidavits on May 18, 2016). Thus, Aubrey and Vodicka have not created a fact issue as to whether Ermatinger omitted their whereabouts with deliberate falsity or reckless disregard for the truth, and their *Franks* claim fails.

4.   The "truck stop" statement

Aubrey and Vodicka also attack Ermatinger's statement in two of his affidavits that "Detectives were notified by Steven Aubrey's credit card company that Aubrey's card was used at a truck stop in Belton, Texas, which is approximately two hours south of Dallas." Doc. 164, Pls.' Mot., 19. They explain that "Aubrey never left Dallas and Ermatinger knew this was Vodicka's credit card." *Id.* at 20. In support, they point out that in an interview following Ermatinger's execution of the affidavits, Ermatinger told Vodicka that he knew Vodicka had "stopped and got[ten] gas in Belton." *Id.* (quoting Video Ex.).

This evidence falls short of Aubrey and Vodicka's burden. Aubrey and Vodicka provide no evidence to suggest that Ermatinger knew Aubrey did not go to Belton. On the contrary, Ermatinger's investigative notes state that "Aubrey/Vodicka are travelling [sic] from Belton toward Dallas," and "their credit card is being used at a truck stop in Belton, Tx." Doc. 165, Pls.' App., 34.

And Ermatinger stated in his declaration that the credit-card information relayed to him did not include *who* used the credit card—it was limited to "where and when a credit card . . . [was] used[.]" Doc. 175-1, Def.'s App., 81.

Under these circumstances, Ermatinger's reference to Vodicka's use of the credit card in the interview does not give rise to a substantial showing that Ermatinger acted with deliberate falsity or reckless disregard for the truth when he stated that Aubrey used the credit card in Belton. Accordingly, Ermatinger is entitled to qualified immunity on Aubrey and Vodicka's *Franks* claim based on the "truck stop" statement.

### 5. The "lawsuit" statement

Aubrey and Vodicka contest Ermatinger's statement in one of his affidavits that "[d]uring the investigation[,] Detectives discovered that [Tobolowsky] was involved in a civil defamation lawsuit with Steven Aubrey and his partner Brian Vodicka who was representing him." Doc. 178, Pls.' Resp., 4 (quoting Doc. 169-1, Defs.' App., 16). Aubrey and Vodicka claim that they both were "party defendants," and "Vodicka never represented Aubrey in [the] case." *Id.* at 16.

Again, Aubrey and Vodicka's argument fails because they have not provided evidence that Ermatinger made this misstatement with the requisite state of mind. Instead, they simply conclude that "[t]his false statement was fabricated with reckless disregard for the truth . . . ." *Id.* Thus, they have not created a fact issue regarding Ermatinger's deliberate falsity or reckless disregard for the truth, and their *Franks* claim fails.

### 6. The "hotel room" omission

Finally, Aubrey and Vodicka claim "Ermatinger omitted significant information" from an affidavit when he explained that Aubrey's credit card was used to book a hotel room. Doc. 164, Pls.'

Mot., 24. Specifically, the affidavit stated that detectives received information that Aubrey's credit card was used to book a hotel room in Dallas under a woman's name, but the affidavit did not include the fact that "[t]he deployment unit knew that a woman, not [Aubrey and Vodicka], checked in under the reservation . . . ." *Id.* (citing Doc. 165, Pls.' App., 12, 21). However, Aubrey and Vodicka have not pointed to any evidence that Ermatinger knew of the deployment unit's discovery before he submitted the affidavit. Indeed, Ermatinger's investigative notes suggest that he received this information *after* obtaining his search warrants. *See* Doc. 165, Pls.' App., 30 (logging the receipt of the search warrants at 9:00 pm and the receipt of the deployment unit's information at 10:00 pm). Thus, Aubrey and Vodicka fail to create a fact issue as to Ermatinger's deliberate falsity or reckless disregard, and their *Franks* claim based on the "hotel room" omission fails.

In sum, Aubrey and Vodicka do not raise a genuine issue of material fact regarding whether Ermatinger included any false information or omitted material information in his affidavits with deliberate falsity or reckless disregard.[9] Accordingly, the Court **GRANTS** summary judgment in favor of Ermatinger on Aubrey and Vodicka's *Franks* claims.

B.  *Aubrey and Vodicka Do Not Create a Genuine Dispute of Material Fact as to Whether Sayers Deliberately or Recklessly Included False Statements in or Omitted Information from His Search-Warrant Affidavits.*

Aubrey and Vodicka do not raise a genuine dispute of material fact regarding Sayers's deliberate or reckless inclusion of false statements or omission of material information. The Court addresses each alleged false statement or omission by Sayers below.

---

[9] As a result, the Court need not consider whether each alleged misstatement and omission was necessary for a finding of probable cause. *See Winfrey*, 901 F.3d at 494 (citation omitted).

    1.    The "against his life" statement

Aubrey and Vodicka allege that Sayers, like Ermatinger, is liable for stating that Tobolowsky's lawsuit involved allegations of threats against Tobolowsky's life. Doc. 178, Pls.' Resp., 3; *see supra* Section III.A.1.

The Court disagrees. Aubrey and Vodicka do not provide any evidence that Sayers included this statement with deliberate falsity or reckless disregard for the truth. Indeed, they appear to concede this by stating "Sayers is just a copypaste guy and uses whatever Ermatinger has used so that his verification stops at Ermatinger . . . ." Doc. 178, Pls.' Resp., 12. This is an allegation of negligence—not deliberate falsity or reckless disregard for the truth. Thus, Aubrey and Vodicka fail to make a "substantial showing" of Sayers's deliberate falsity or reckless disregard for the truth. *See Mason*, 106 F. App'x at 207 (citation omitted). Consequently, their *Franks* claim based on the "against his life" statement fails.

    2.    The "family members" statement

Additionally, Aubrey and Vodicka seek to hold Sayers liable for stating, like Ermatinger, that family members advised investigators that Tobolowsky won a lawsuit against Aubrey and felt threatened by Aubrey. Doc. 178, Pls.' Resp., 13; *see supra* Section III.A.2.

With respect to Sayers's state of mind in authoring this affidavit, Aubrey and Vodicka allege only that "Sayers completely relied on Ermatinger's false statements of fact . . . ." Doc. 178, Pls.' Resp., 16. Aubrey and Vodicka do not point to any evidence that Sayers knew this statement was false or "entertained serious doubts as to" its truth. *See Hart*, 127 F.3d at 449. Thus, they do not create a genuine issue of material fact regarding Sayers's state of mind with respect to the "family

members" statement, and Sayers is entitled to qualified immunity on the *Franks* claim premised on this statement.

>    3.    The "lawsuit" statement

Aubrey and Vodicka also contend Sayers is liable under *Franks* for stating that Vodicka represented Aubrey in Tobolowsky's defamation lawsuit. Doc. 178, Pls.' Resp., 16–17; *see supra* Section III.A.5. Again, Aubrey and Vodicka explain that "Sayers blindly copypasted the statement from Ermatinger's affidavit," but they fail to point to any evidence that Sayers did so with deliberate falsity or reckless disregard for the truth. Doc. 178, Pls.' Resp., 16. Thus, their *Franks* claim against Sayers based upon this statement fails.

>    4.    The "whereabouts" omission

Aubrey and Vodicka's next *Franks* claim against Sayers is premised upon his implication that they were hiding from the public to conceal their burn injuries despite being "completely aware that Aubrey and [Vodicka] were not hiding from public view and that [they] did not have burns on their bodies." Doc. 178, Pls.' Resp., 20; *see supra* Section III.A.3.

To support their claim that Sayers possessed this knowledge, Aubrey and Vodicka explain that Aubrey visited a dermatologist on the day of Tobolowsky's murder and that Aubrey and Vodicka repeatedly asked Ermatinger to look into this alibi. *Id.*; *see* Doc. 179, Pls.' App., 53–57. Additionally, Aubrey and Vodicka extensively describe the state of Aubrey's unburned arms following the fire. Doc. 178, Pls.' Resp., 20–21.

But Aubrey and Vodicka miss the point—to withstand summary judgment, they must present evidence relevant to Sayers's state of mind, and they have not done so. *See Mason*, 106 F. App'x at 207 (citation omitted). Vodicka states in his declaration that he asked Ermatinger about following

up on the dermatologist's appointment when Ermatinger and Sayers entered his home. Doc. 179, Pls.' App., 125. But even assuming this evidence suggests Sayers's knowledge of Aubrey and Vodicka's lack of burns—a generous assumption—this exchange occurred on October 20, 2016, four days after Sayers applied for his warrants. *See* Doc. 169-1, Defs.' App., 52. Accordingly, Aubrey and Vodicka's *Franks* claim pertaining to Sayers's "whereabouts" omission fails.

    <u>5.</u>   <u>The "truck stop" statement</u>

    Lastly, Aubrey and Vodicka claim Sayers is liable for his use of Ermatinger's statement that Aubrey's credit card was used at a truck stop in Belton, Texas. Doc. 178, Pls.' Resp., 42; *see supra* Section III.A.4. In support of this claim, Aubrey and Vodicka rely upon the same evidence they relied upon to demonstrate Ermatinger's *Franks* violation for making this statement. *Compare* Doc. 164, Pls.' Mot., 20, *with* Doc. 178, Pls.' Resp., 42–43. Just as this evidence does not create a genuine fact issue as to Ermatinger's state of mind, *see supra* Section III.A.4, it does not create a fact issue with respect to Sayers's state of mind—indeed, Aubrey and Vodicka do not even mention Sayers in their allegations. *See* Doc. 178, Pls.' Resp., 42–43. Thus, their *Franks* claim premised upon Sayers's reference to the credit-card usage fails.

    Overall, Aubrey and Vodicka do not create a genuine issue of material fact as to whether Sayers included any false information or omitted material information in his affidavits with deliberate falsity or reckless disregard. Accordingly, the Court **GRANTS** summary judgment in favor of Sayers on Aubrey and Vodicka's *Franks* claims.

C.     *Vodicka's § 1983 Claim Premised on a Lack of Probable Cause Fails Because Vodicka Failed to Provide Notice of the Claim.*

In *Aubrey* and Vodicka's response, Vodicka asserts a claim against Ermatinger and Sayers based on *Malley v. Briggs*, 475 U.S. 335 (1986). *See* Doc. 178, Pls.' Resp., 26–27. *Malley* recognizes that an officer is not entitled to qualified immunity where he submits an affidavit for a warrant when "it is obvious that no reasonably competent officer would have concluded that a warrant should issue under the circumstances." *Blake*, 921 F.3d at 220 (citation and quotation marks omitted). In contrast with *Franks*, which recognizes a Fourth Amendment violation for "the presentment of false evidence," *Malley* targets "the obvious failure of accurately presented evidence to support the probable cause required for the issuance of a warrant." *Id.* (citation omitted).

But Vodicka did not raise this claim in the operative complaint. *See generally* Doc. 121, Third Am. Compl. Rather, *Aubrey* and Vodicka's claims pertaining to the search-warrant affidavits are premised upon *Franks* liability. *Compare id.* ¶ 390 (89) (alleging that the City of Dallas is liable under *Malley* for its arrest of Aubrey for prostitution), *with id.* ¶¶ 333–45 (74–77) (alleging that Ermatinger and Sayers are liable under *Franks* for falsifying affidavits).

Consequently, Vodicka's claim under *Malley* fails, and the Court **GRANTS** summary judgment in favor of Ermatinger and Sayers on the claim. *See Cutrera v. Bd. of Superiors of La. State Univ.*, 429 F.3d 108, 113 (5th Cir. 2005) ("A claim which is not raised in the complaint but, rather, is raised only in response to a motion for summary judgment is not properly before the court." (citation omitted)).

D.     *Likewise, the § 1983 Claim Based on Sayers's Use of "Stale" Information Fails for Lack of Notice.*

Aubrey and Vodicka bring an additional new claim in their response—a § 1983 claim against Sayers based on his use of "stale" information in his October 5, 2016, search-warrant affidavit. Doc. 178, Pls.' Resp., 24–26. Again, however, Aubrey and Vodicka did not allege this claim in their complaint. Indeed, their factual allegations pertaining to the October 5, 2016, affidavit state that the facts in this affidavit "were neither truthful nor verified"—not that the facts were stale. *See* Doc. 121, Third Am. Compl., ¶ 156 (36). Because Aubrey and Vodicka did not provide notice of this claim in their complaint, the Court **GRANTS** summary judgment on the claim in favor of Sayers. *See Cutrera*, 429 F.3d at 113.

E.     *A Genuine Issue of Material Fact Exists as to Whether Ermatinger's Warrantless Entry Violated Clearly Established Law.*

Vodicka asserts that Ermatinger is liable under § 1983 for violating Vodicka's Fourth Amendment rights by entering Aubrey and Vodicka's home without a warrant. Doc. 164, Pls.' Mot., 39; Doc. 178, Pls.' Resp., 34. "Although a warrantless search of a home is presumptively unreasonable, 'the warrant requirement is subject to certain exceptions.'" *Carroll v. Ellington*, 800 F.3d 154, 169 (5th Cir. 2015) (quoting *Brigham City  v. Stuart*, 547 U.S. 398, 403 (2006)). Here, Ermatinger and Sayers concede that they lacked a warrant to enter Aubrey and Vodicka's residence, but they contend that their entry fell within two exceptions to the Fourth Amendment's warrant requirement—community caretaking and emergency aid. Doc. 168, Defs.' Mot., 11–12, 20. The Court analyzes Ermatinger's warrantless entry under each exception below. Thereafter, the Court examines whether Ermatinger violated clearly established law.

1.      Community-caretaking exception

Ermatinger's entry does not fall within the community-caretaking exception. To support his contention that this exception applies, Ermatinger explains that one purpose of his entry was "to inform Vodicka that Aubrey, Vodicka's likely sole caretaker, had been arrested on a charge unrelated to the Tobolowsky murder, and to make sure that Vodicka did not need immediate medical care or assistance . . . ." *Id.* at 21 (citing Doc. 169-1, Defs.' App., 70–71). Ermatinger states in his declaration that during the investigation, Ermatinger and Sayers had learned that Vodicka "suffered from AIDS" and took "several powerful medications to control the disease," which "often rendered [him] disoriented, physically weak, and extremely fatigued." Doc. 169-1, Defs.' App., 70. Further, he claims they knew that "Aubrey's arrest meant that Vodicka would have no caregiver for an indefinite period of time" and that "Vodicka may need to make other health-related arrangements." *Id.* at 70–71.

Ermatinger states they had also learned that "Vodicka had suffered a psychotic episode with paranoia and suicidal ideation; was committed "for inpatient psychiatric treatment"; was "diagnosed with severe bipolar disorder with psychotic features"; and "had made prior suicide attempts[.]" *Id.* at 70. Finally, Ermatinger claims that he and Sayers knew that Vodicka's conditions "were exacerbated by psychosocial stressors" and thought that the news of Aubrey's arrest might cause stress that would "trigger another episode of psychosis or suicide attempt." *Id.*

The Supreme Court announced the community-caretaking doctrine in *Cady v. Dombrowski*, 413 U.S. 433 (1973). In *Cady*, the Court held that the officers' warrantless search of a vehicle was reasonable under the Fourth Amendment where they were engaged in "community[-]caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Id.* at 441. "Since *Cady*, some circuits have expanded this

-26-

'community[-]caretaking' exception to searches of residences as well as automobiles, while others have explicitly declined to do so." *Ramirez v. Fonseca*, 331 F. Supp. 3d 667, 678 (W.D. Tex. 2018) (citations omitted).

The Fifth Circuit has not directly addressed the applicability of the community-caretaking exception to searches of homes. Indeed, "it has consistently acknowledged the constitutional distinction between searches of automobiles and residences." *Id.* at 678–79 (citations omitted). Nevertheless, the Fifth Circuit's reasoning in *United States v. York*, 895 F.2d 1026 (5th Cir. 1990), sheds some light on the application of the community-caretaking exception to the entry of homes.

In *York*, the defendant's houseguests called the police to the defendant's residence after he "had come home drunk" and threatened them. *Id.* at 1027. Upon request by the guests, the arriving officers escorted the guests into the residence so that they could safely retrieve their belongings and leave. *Id.* at 1027–28. The Fifth Circuit held that this entry was not a search under the Fourth Amendment, because the officers' entry was "reasonably foreseeable" in light of the third parties' status as occupants of the residence and the defendant's "threatening actions . . . ." *Id.* at 1029. The officers were performing "community[-]caretaking functions," and this "reasonable police action did not violate any privacy interest" given the defendant's invitation to the third parties and his belligerent threats. *Id.* at 1030 (citing *Cady*, 413 U.S. at 441).

This reasoning in *York* suggests that the community-caretaking exception, as applied in the the Fifth Circuit, does not justify Ermatinger's warrantless entry—even if the Court credits Ermatinger's declaration. Unlike the defendant in *York*, Vodicka did not take any action that would reduce his expectation of privacy in his home. Put differently, he did not take any action that would make Ermatinger's entry "reasonably foreseeable," *see id.* at 1029—he was "apparently asleep or

otherwise unconscious" when Ermatinger and Sayers found him. Doc. 169-1, Defs.' App., 71. Under these circumstances, Ermatinger's entry was nothing like that of the officers in *York*.

Further, regardless of whether the community-caretaking exception extends to home entries, the Supreme Court intends the exception to apply to tasks "totally divorced from the detection, investigation, or acquisition of evidence . . . ." *Cady*, 413 U.S. at 441. Here, Ermatinger's investigative notes state that "Detectives Ermatinger and Sayers went to Vodicka's residence to interview him regarding the Tobowlowsky case." Doc. 179, Pls.' App., 22.

Accordingly, based on the guidance provided by the Supreme Court and the Fifth Circuit, the community-caretaking exception does not apply to Ermatinger's warrantless entry.

### 2.   Emergency-aid exception

Nor does the emergency-aid exception justify Ermatinger's entry. To support his argument that the emergency-aid exception applies, Ermatinger relies upon the same evidence that he suggests gives rise to the application of the community-caretaking exception: he was informing Vodicka that Aubrey, his "likely sole caretaker," was arrested; he knew of Vodicka's previous diagnoses, psychiatric hospital commitment, and suicide attempts; and he feared that news of the arrest would lead to "another episode of psychosis or suicide attempt." Doc. 168, Defs.' Mot., 21 (citing Doc. 169-1, Defs.' App., 70–71).

Officers may enter a home without a warrant "where exigent circumstances," such as "the need to assist persons who are seriously injured or threatened with such injury," justify the entry. *United States v. Toussaint*, 838 F.3d 503, 507 (quoting *Brigham City*, 547 U.S. at 403). This justification is known as "the emergency[-]aid exception to the warrant requirement." *Id.* (quotation marks omitted). The emergency-aid exception "does not depend on the officers' subjective

intent"—rather, "[i]t requires only an objectively reasonable basis for believing that a person within the house is in need of immediate aid[.]" *Michigan v. Fisher*, 558 U.S. 45, 47 (2009) (alterations incorporated) (citations and quotation marks omitted).[10]

"Officers do not need ironclad proof of a likely serious, life-threatening injury to invoke the emergency[-]aid exception." *Fisher*, 558 U.S. at 49 (quotation marks omitted). Nevertheless, courts must "ensure that, at the time the officer[s] acted, there was reliable information of an urgent, ongoing emergency." *Rice v. ReliaStar Life Ins. Co.*, 770 F.3d 1122, 1132 (5th Cir. 2014) (citation and quotation marks omitted). Indeed, the Fifth Circuit has "declined to apply the emergency[-]aid exception absent strong evidence of an emergency at the scene or an imminent need for medical attention." *Linicomn v. Hill*, 902 F.3d 529, 536 (5th Cir. 2018).

But the existence of an emergency does not end the inquiry. *See Toussaint*, 838 F.3d at 509. "In addition to determining whether there was an objectively reasonable basis for identifying an emergency, courts must decide whether the officer who engaged in conduct without a warrant acted reasonably." *Toussaint*, 838 F.3d at 509 (citing, *inter alia*, *Rice*, 770 F.3d at 1132).

Here, even if the Court were to credit Ermatinger's declaration as wholly true, the emergency-aid exception does not apply because there is no evidence that Ermatinger was confronting an emergency or urgent need. Though Ermatinger states that he knew that Vodicka could become psychotic or suicidal upon discovering Aubrey's arrest, the totality of this information suggests a speculative risk for self-harm—not an "urgent, ongoing emergency." *Cf. Rice*, 770 F.3d at

---

[10] The Fifth Circuit has noted that "the police serve a community[-]caretaking function" by entering an area to render emergency aid. *Toussaint*, 838 F.3d at 507 (alteration incorporated) (citation and quotation marks omitted). This statement suggests potential overlap between the emergency-aid exception and the community-caretaking exception. The Court nonetheless addresses each exception separately.

1132 (holding that the emergency-aid exception applied where the officer entered the plaintiff's home after receiving information that the plaintiff was suicidal, had a gun to his head, and had been drinking (citation omitted)). Nor does Vodicka's failure to answer the door trigger the emergency-aid exception. *See* Doc. 169-1, Defs.' App., 71 (explaining that Ermatinger's "concern for Vodicka's health and welfare increased" after Vodicka failed to answer his door); *Linicomn*, 902 F.3d at 537 ("Although [the plaintiff] did not answer his cell phone and did not initially respond to the repeated knocks at his front door, his failure to respond did not constitute exigency." (citation omitted)).

Consequently, the Court sees no basis in binding precedent for applying the emergency-aid exception to Ermatinger's entry and concludes that he violated the Fourth Amendment.

### 3. Clearly established law

Moreover, there is a genuine issue of material fact as to whether Ermatinger's entry violated clearly established law. "A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (citation and quotation marks omitted). While a case need not be "directly on point, . . . existing precedent must "place[] the . . . constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (citations omitted). The Supreme Court has "repeatedly" admonished courts "not to define clearly established law at a high level of generality." *Id.* at 742 (citations omitted). Courts must determine, "in light of the specific context of the case," "whether the violative nature of *particular* conduct is clearly established." *Mullenix*, 577 U.S. at 12 (emphasis in original) (citations and quotation marks omitted).

Nonetheless, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). The ultimate inquiry is

whether the officers have "fair warning"—the Court must decide whether "prior decisions gave reasonable warning that the conduct . . . at issue violated constitutional rights." *Trent I*, 776 F.3d at 383 (citations and quotation marks omitted). In the context of a Fourth Amendment violation, if "there is a legitimate question whether an exception to the warrant requirement exists, it cannot be said that a warrantless search violates clearly established law." *Mitchell v. Forsyth*, 472 U.S. 511, 535 n.12 (1985).

Here, there are genuine issues of material fact bearing on whether there is a "legitimate question" that an exception to the warrant requirement applies. *See id.* As noted above, Ermatinger, in his declaration, claims that he and Sayers knew that Vodicka had psychotic and suicidal episodes that could be "exacerbated by psychosocial stressors," and that "news of Aubrey's arrest would be distressing to Vodicka . . . ." Doc. 169-1, Defs.' App., 70. But Sayers, in his declaration, relays his and Ermatinger's knowledge, and he makes no mention of Vodicka's past suicide attempts, "psychotic episode with paranoia and suicidal ideation," or that Vodicka's physicians had found that psychosocial stressors exacerbated his mental health conditions. *Compare* Doc. 169-1, Defs.' App., 70, *with id.* at 63. Given this discrepancy between the declarations, there is a genuine dispute as to whether Ermatinger knew of the suicide attempts, psychotic episode, or the physicians' findings. If he did not, there is certainly not a "legitimate question" as to whether Ermatinger's entry is protected by an exception. *See supra* Section III.E.1–2 (concluding that even if Ermatinger knew these facts, neither of his asserted exceptions applies). Accordingly, this is a material factual dispute precluding Ermatinger's entitlement to qualified immunity.

Additionally, there is a genuine issue of fact regarding whether Ermatinger entered the apartment before Aubrey's arrest. Vodicka points out time discrepancies between Ermatinger's

investigative notes and text messages sent by Aubrey. *See* Doc. 178, Pls.' Resp., 31; Doc. 181, Pls.' Reply, 16. Specifically, Ermatinger's notes indicate that Aubrey was arrested at 2:10 p.m., while Vodicka points out that Aubrey sent a text message to the undercover officer at 2:15 p.m stating Aubrey had "[j]ust parked." *Compare* Doc. 179, Pls.' App., 22, *with id.* at 88. Thus, there is a fact issue as to whether Ermatinger preemptively sought entry into the apartment before Aubrey's arrest occurred. And this issue is material to Vodicka's claim against Ermatinger. If Ermatinger lacked knowledge of the arrest, there would be no "legitimate question" as to whether an exception to the warrant requirement applied, *Mitchell*, 472 U.S. at 535 n.12, and Ermatinger would have violated the presumption that "warrantless entries into a person's home are per se unreasonable[.]" *See United States v. Kelly*, 683 F.2d 871, 876 (5th Cir. 1982) (citations omitted).

Finally, Ermatinger cannot rely upon the unsettled boundaries of the community-caretaking exception to obtain qualified immunity. Ermatinger points out that there is limited binding precedent addressing the exception's application to home entries—the Supreme Court has never addressed the issue, and the Fifth Circuit only touched upon the issue in *York*. *See* Doc. 168, Defs.' Mot., 22–23; *see also supra* Section III.E.1 (discussing *York*). Further, there is "disagreement among other circuits as to whether the community[-]caretaking exception extends to warrantless searches of residences." Doc. 168, Defs.' Mot., 23 (citations omitted). Due to this lack of clarity, Ermatinger asserts that he has not violated clearly established law. *See id.* 23–24.

The Court disagrees. First, the Fifth Circuit has rejected the argument that "if a prior case has not explicitly rejected an officer's proposed justification for his actions, the officer, by default, [is] entitled to qualified immunity" for a Fourth Amendment violation. *See Trent I*, 776 F.3d at 383 n.12; *see also Trent v. Wade* (*Trent II*), 801 F.3d 494, 496 (5th Cir. 2015) (mem. op.) (Elrod, J., concurring)

-32-

("When a party proposes a new exception to a constitutional rule, we do not ask whether the non-existence of that exception has been clearly established."). Instead, courts "ask whether the constitutional rule itself is clearly established." *Trent II*, 801 F.3d at 496. Put differently, courts must "view the [rule] *as the rule* and the justifications *as the justifications*." *See Trent I*, 776 F.3d at 383 n.12 (emphasis in original). "An officer does not act reasonably when he blatantly disregards the rule without an accepted justification." *Id.* (citation omitted). Ermatinger was subject to the rule "that warrantless entries into a person's home are per se unreasonable," *Kelly*, 683 F.2d at 876, and resolving factual disputes in favor of Vodicka, the Court concludes Ermatinger has not offered an accepted justification.

Second, while the law is not "clearly established" when "circuit courts are split on [an] issue," *Morgan v. Swanson*, 659 F.3d 359, 372 (5th Cir. 2011) (citation omitted), there is no circuit split regarding the constitutionality of Ermatinger's entry when the Court views the facts in the light most favorable to Vodicka.

As explained above, the holding in *York*—the Fifth Circuit's only case addressing community caretaking in the context of a home entry—does not suggest that Ermatinger's entry could be constitutional. To reach its holding that no Fourth Amendment search occurred, the *York* court relied upon the reasonable foreseeability of the officers' entry in light of the defendant's actions. *See* 895 F.2d at 1029. Thus, in *York,* the Fifth Circuit did not squarely address whether the community-caretaking exception applied to warrantless home entries; rather, it held only that under the facts, a search did not occur. *See id.* at 1030. Consequently, the Fifth Circuit has not suggested Ermatinger's entry is constitutional.

Likewise, the Second, Fourth, Eleventh, and District of Columbia Circuits have not explicitly decided whether a warrantless home entry can be justified under the community-caretaking exception. *See Harris v. O'Hare*, 770 F.3d 224, 239 n.10 (2d Cir. 2014); *Hunsberger v. Wood*, 570 F.3d 546, 554 (4th Cir. 2009); *United States v. McGough*, 412 F.3d 1232, 1238 (11th Cir. 2005); *Corrigan v. District of Columbia*, 841 F.3d 1022, 1034 (D.C. Cir. 2016).

In contrast, the Third, Seventh, and Tenth Circuits have held that the community-caretaking exception does not justify a warrantless entry into a home. *See Ray v. Twp. of Warren*, 626 F.3d 170, 177 (3d Cir. 2010); *Sutterfield v. City of Milwaukee*, 751 F.3d 542, 557 (7th Cir. 2014); *United States v. Bute*, 43 F.3d 531, 535 (10th Cir. 1994).

Next, although the Sixth, Eighth, and Ninth Circuits have held that the community-caretaking exception may justify a warrantless home entry, Ermatinger's entry does not fall within the boundaries established by these courts. Namely, the Eighth and Ninth Circuits have limited the exception's applicability to situations where an officer confronts an emergency. *See United States v. Smith*, 820 F.3d 356, 360 (8th Cir. 2016) ("A police officer may enter a residence without a warrant as a community caretaker where the officer has a reasonable belief that an emergency exists requiring his or her attention." (citation omitted)); *United States v. Stafford*, 416 F.3d 1068, 1073 (9th Cir. 2005) (explaining how police, when acting as "community caretakers," may be justified in conducting a warrantless search if they have "reasonable grounds to believe there is an emergency at hand" (citation omitted)).

As the Court already explained, Ermatinger was not confronting an urgent need. At best, there is a genuine dispute of material fact as to whether he entered based on the speculative threat Vodicka posed to himself. With factual disputes resolved in favor of Vodicka, just as there is no

"legitimate question" that the emergency-aid exception would apply to Ermatinger's entry, there is no "legitimate question" that the Eighth and Ninth Circuit's community-caretaking precedent would justify the entry. *See Mitchell*, 472 U.S. at 535 n.12. It would not.

Nor would Ermatinger's entry be justified under the Sixth Circuit's community-caretaking precedent if the Court resolves factual disputes in Vodicka's favor. While the Sixth Circuit has recognized the exception can apply to warrantless home entries, it has clarified that "[t]he community[-]caretaking function of the police cannot apply where . . . there is significant suspicion of criminal activity." *United States v. Williams*, 354 F.3d 497, 508 (6th Cir. 2003). Echoing the Supreme Court, the Sixth Circuit emphasized that "the community[-]caretaking function of the police applies only to actions that are 'totally divorced from the detection, investigation, or acquisition of evidence . . . .'" *Id.* (quoting *Cady*, 413 U.S. at 441). Given that the evidence in the record suggests that Ermatinger's entry was not divorced from the murder investigation, *see* Doc. 179, Pls.' App., 22, it would likely be unlawful under Sixth Circuit precedent as well.

Accordingly, Ermatinger's entry is not at all analogous to the entries that the Sixth, Eighth, and Ninth Circuits have justified under the community-caretaking exception. *Cf. Castagna v. Jean*, 955 F.3d 211, 224 (1st Cir. 2020) ("The officers . . . could have looked to other circuits that had . . . applied the community[-]caretaking exception to warrantless entries into homes in circumstances analogous to this case."), *petition for cert. filed*, No. 20-253 (U.S. Aug. 28, 2020).

Only the First Circuit remains. The First Circuit has recently extended the community-caretaking exception to warrantless home entries even where the officers have "mixed motives" for their entry. *See id.* at 222 (citations and quotation marks omitted). Specifically, the First Circuit applied the exception to a case in which officers removed firearms from the home of a suicidal

-35-

man whose wife had called the officers for assistance, *Caniglia v. Strom*, 953 F.3d 112, 119–20 (1st Cir. 2020), *petition for cert. filed*, No. 20-157 (U.S. Aug. 10, 2020), as well as to a case in which officers, responding to a 911 call, entered the open, front door of a home where a loud party was underway. *Castagna*, 955 F.3d at 214, 220.[11]

While the First Circuit's jurisprudence does not explicitly foreclose the application of the community-caretaking exception to Ermatinger's entry, neither of these cases bears any similarity to Ermatinger's entry—especially if he lacked knowledge of Vodicka's previous suicide attempts.

Consequently, Ermatinger has not highlighted any disagreement among circuit courts regarding the constitutionality of his conduct. *Cf. Wilson v. Layne*, 526 U.S. 603, 618 (1999) ("If judges thus disagree on a constitutional question, it is unfair to subject police to money damages for picking the losing side of the controversy.").

Overall, Ermatinger's argument that the law was not clearly established fails when the Court resolves factual disputes in favor of Vodicka. There is a genuine dispute regarding Ermatinger's knowledge, and this dispute is material: if resolved in favor of Vodicka, there is no legitimate basis for applying an exception to the warrant requirement. This remains true despite the unsettled community-caretaking exception, because viewing the facts in the light most favorable to Vodicka, there is no circuit split regarding the constitutionality of Ermatinger's conduct. Accordingly, the Court holds that there are genuine disputes of material fact regarding whether Ermatinger violated

---

[11] The First Circuit did not extend the exception to warrantless home entries until years after Ermatinger's entry. *See Caniglia*, 953 F.3d at 124. Nevertheless, the Court acknowledges the First Circuit's holding, because a circuit split is relevant even if it arises "after the events in question." *Morgan*, 659 F.3d at 372 (emphasis and citation omitted).

clearly established law. As a result, the Court **DENIES** Ermatinger's and Vodicka's motions for summary judgment on Vodicka's Fourth Amendment warrantless search claim.

F.    *There Is a Genuine Issue of Material Fact as to Whether Sayers's Warrantless Entry Violated Clearly Established Law.*

Vodicka contends that Sayers, like Ermatinger, is liable under § 1983 for violating Vodicka's Fourth Amendment rights by entering his home without a warrant. Doc. 178, Pls.' Resp., 34.

As noted above, Sayers asserts that his entry into Vodicka's home was authorized under the community-caretaking exception and emergency-aid exception. Doc. 168, Defs.' Mot., 11–12, 20. The Court addresses each exception below and then turns to whether Sayers violated clearly established law.

1.    Community-caretaking exception

The community-caretaking exception does not apply to Sayers's entry. In urging the Court to apply the exception here, Sayers relies upon all of the same circumstances as Ermatinger—indeed, Sayers cites Ermatinger's declaration to support his arguments. *See id.* at 21.

However, as explained above, even if the Court were to credit all of the information set forth in Ermatinger's declaration as true, there is no basis for applying the community-caretaking exception to Sayers's entry. *See supra* Section III.E.1. The Fifth Circuit has not expressly ruled that this exception applies to searches of residences. Further, Sayers has not provided any facts suggesting that Vodicka had a reduced expectation of privacy in his home when Sayers entered. *Cf. York*, 895 F.2d at 1030. In addition, evidence in the record suggests that Sayers's entry was not "totally divorced from the detection, investigation, or acquisition of evidence . . . ." *Cady*, 413 U.S. at 441. As a result, the community-caretaking exception does not justify Sayers's entry.

2.     Emergency-aid exception

Nor does the emergency-aid exception apply to Sayers's conduct. In Sayers's brief, he relies upon the same evidence that he suggests gives rise to the application of the community-caretaking exception: he was informing Vodicka that Aubrey, Vodicka's "likely sole caretaker" was arrested; he knew of Vodicka's previous diagnoses, psychiatric hospital commitment, and suicide attempts; and he feared that the news of the arrest would lead to "another episode of psychosis or suicide attempt." Doc. 168, Defs.' Mot., 21 (citing Doc. 169-1, Defs.' App., 70–71).

But as the Court explained in its analysis of Ermatinger's conduct, *see supra* Section III.E.2, this knowledge is insufficient to trigger the emergency-aid exception. Thus, even if the Court assumes Sayers knew all of this information, he still lacked any "reliable information of an urgent, ongoing emergency." *Rice*, 770 F.3d at 1132 (citation and quotation marks omitted). And as already noted, Vodicka's failure to answer the door is insufficient to trigger the emergency-aid exception. *See supra* Section III.E.2. Accordingly, the emergency-aid exception does not justify Sayers's entry.

3.     Clearly established law

As discussed above with respect to Ermatinger, there are two genuine disputes of fact that are material to whether Sayers violated clearly established law. First, the discrepancy between Ermatinger's and Sayers's declarations suggests that Sayers might not have known of Vodicka's previous suicide attempts, his "psychotic episode with paranoia and suicidal ideation," or that Vodicka's physicians had found that psychosocial stressors exacerbated his mental health conditions. *Compare* Doc. 169-1, Defs.' App., 70, *with id.* at 63. This dispute is material, because it bears on whether Sayers possessed any knowledge suggesting Vodicka posed a threat to himself. If Sayers

lacked such knowledge, the Court sees no "legitimate question" as to whether the emergency-aid or community-caretaking exception could apply to his entry. *See Mitchell*, 472 U.S. at 535 n.12.

Second, there is a genuine dispute regarding whether Aubrey had been arrested—and therefore whether Sayers even knew of Aubrey's arrest—before Sayers sought to enter the apartment. *See supra* Section III.E.3. Knowledge of the arrest forms the factual basis for Sayers's argument that the emergency-aid and community-caretaking exceptions apply to his entry. *See* Doc. 168, Defs.' Mot., 22 (asserting that the officers entered "for the purpose of informing Vodicka that Aubrey had been arrested"). If Aubrey's arrest had not occurred, there is no "legitimate question" regarding whether either exception applies, and Sayers violated the clearly established rule "that warrantless entries into a person's home are per se unreasonable," *Kelly*, 683 F.2d at 876.

Moreover, as the Court has already explained with respect to Ermatinger, the variance among federal circuit courts regarding the community-caretaking exception does not entitle Sayers to qualified immunity. *See* Doc. 168, Defs.' Mot., 22–23; *see supra* Section III.E.3. The only circuit that has even suggested Sayers's entry could fall within the community-caretaking exception is the First Circuit, and if the Court resolves all factual disputes in favor of Vodicka, Sayers's entry bears no similarity to those examined by the First Circuit. *See supra* Section III.E.3.

In sum, viewing the facts in the light most favorable to Vodicka, Sayers may have violated clearly established law. Put differently, if factual disputes regarding Sayers's knowledge at the time of entry are resolved in favor of Vodicka, there is no "legitimate question" as to whether an exception to the warrant requirement saves Sayers's entry. *See Mitchell*, 472 U.S. at 535 n.12. As a result, the Court **DENIES** Sayers's motion for summary judgment on Vodicka's claim.

G.     *The Court Overrules All Evidentiary Objections as Moot.*

Ermatinger and Sayers raise two evidentiary objections in their briefing. *See* Doc. 180, Defs.' Reply, 6–7. First, they move to strike all statements in Aubrey and Vodicka's response brief (Doc. 178) and motion brief (Doc. 164) that lack citation to an appendix. Doc. 180, Defs.' Reply, 6; Doc. 176, Def.'s Resp., 8. Because the Court has not credited any of Aubrey and Vodicka's unsubstantiated allegations in reaching its decision, the Court **OVERRULES** this objection as moot.

Second, Ermatinger and Sayers move to strike assertions in Aubrey's and Vodicka's declarations that are not based upon personal knowledge. Doc. 180, Defs.' Reply, 6–7; Doc. 176, Def.'s Resp., 8–9. Because the Court has not relied upon any information from these declarations of which Aubrey or Vodicka lacked personal knowledge, the Court **OVERRULES** this objection as moot.

Similarly, Aubrey and Vodicka "move to strike all statements in Ermatinger's Response that are uncited and/or unsupported by competent summary judgment evidence . . . ." Doc. 181, Pls.' Reply, 8. In reaching its decision, the Court did not rely upon any unsubstantiated assertions from Ermatinger's brief; rather, the Court cited to the competent summary-judgment evidence. Consequently, the Court **OVERRULES** Aubrey and Vodicka's objection as moot.

## IV.

## CONCLUSION

In sum, the Court **DENIES** Aubrey and Vodicka's motion for partial summary judgment (Doc. 163), and it **GRANTS IN PART** and **DENIES IN PART** Ermatinger and Sayers's motion for summary judgment (Doc. 167).

Specifically, the Court grants summary judgment in favor of Ermatinger and Sayers on the § 1983 claims premised on *Franks* violations, a lack of probable cause, and the use of stale information. But with respect to Vodicka's § 1983 claim based on Ermatinger and Sayers's warrantless entry, the Court concludes that Ermatinger and Sayers violated the Fourth Amendment through their entry. Further, there are genuine disputes of material fact bearing on whether the entry violated clearly established law. As a result, the Court denies summary judgment on Vodicka's § 1983, warrantless-entry claim. Finally, the Court **OVERRULES** all evidentiary objections raised by the parties as moot.


SO ORDERED.

SIGNED: December 7, 2020.

                                       JANE J. BOYLE
                                       UNITED STATES DISTRICT JUDGE